## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| REMBRANDT 3D HOLDING LTD., a Nevis Corporation,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>WILLIAM A. HOMONY, an individual residing in Pennsylvania and Chapter 11 Trustee for The Estates of Stream TV Networks, Inc. and Technovative Media, Inc.;<br>SSG ADVISORS, LLC, a Pennsylvania Corporation; J. SCOTT VICTOR, an individual working for SSG ADVISORS, LLC, TERESA C. KOHL, an individual working for SSG ADVISORS, LLC, CRAIG D. WARZNAK, an individual working for SSG ADVISORS, LLC, ALEXANDER D. LAMM, an individual working for SSG ADVISORS, LLC, SAMUEL P. CHARLTON, an individual working for SSG ADVISORS, LLC, and DOES 1-10, inclusive,<br><br>　　　　　　Defendants. | Case No. 2:24-cv-6706<br><br>**COMPLAINT FOR PATENT INFRINGEMENT, TRADE SECRET MISAPPROPRIATION, AND BREACH OF CONTRACT**<br><br>**DEMAND FOR JURY TRIAL** |

　　　　Plaintiff Rembrandt 3D Holding Ltd. ("Plaintiff" or "Rembrandt") now complains of Defendants William Homony ("Homony"), SSG Advisors, LLC ("SSG"), J. Scott Victor ("Victor"), Teresa C. Kohl ("Kohl"), Craig D. Warznak ("Warznak"), Alexander D. Lamm ("Lamm"), and Samuel P. Charlton ("Charlton") (collectively, "Defendants") and alleges as follows:

1

**NATURE OF CASE**

1.      Rembrandt brings this Complaint for patent infringement, 35 U.S.C. § 271, et seq., trade secret misappropriation under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, et seq., and breach of contract under Delaware law. Rembrandt seeks damages and injunctive relief for Defendants' (i) unauthorized manufacture, use, offer for sale, importation into the United States, and sale of assets that utilize Rembrandt's patented technology, know-how, and trade secrets and (ii) breach of their fiduciary duties in the jointly administered bankruptcy cases, *In re: Stream TV Networks, Inc., et al.*, Case No. 23-10763 (MDC) and *In re: Technovative Media, Inc., et al.*, Case No. 23-10764 (MDC) pending in this District (the "Bankruptcy Cases"), where Rembrandt is an unsecured creditor by way of its preexisting intellectual property licensing arrangement with Stream TV Networks, Inc. ("Stream") under the parties' Settlement Agreement and Mutual Release dated May 23, 2021 ("Settlement Agreement," a true and correct copy of which is attached hereto as **Exhibit 1**).

**INTRODUCTION**

2.      Rembrandt is the owner by assignment of United States Patent No. 8,558,830 ("the '830 Patent"), United States Patent No. 9,521,390 ("the '390 Patent"), and United States Patent No. 9,681,114 ("the '114 Patent") (collectively, the "Rembrandt Patents" or "Asserted Patents," true and correct copies of which are attached hereto as **Exhibits 2-4**, respectively) and trade secrets for optimizing glasses-free three-dimensional (3D) display technology (the "Rembrandt Trade Secrets"), which are articulated with reasonable specificity in the following paragraphs. The Rembrandt Patents and the Rembrandt Trade Secrets, along with Rembrandt's know-how, are collectively referred to as the "Rembrandt IP."

2

3.     Rembrandt is a holding company and the current owner of all of the assets of 3D Fusion Corp. ("3D Fusion"), a Delaware corporation formed on March 26, 2007 with its principal office formerly at 110 Wall Street in New York City and wholly owned Dutch subsidiaries 3D Fusion Holding B.V. ("3D Fusion Holding") and 3D Fusion EU B.V. ("3D Fusion EU") located in Eindhoven, the Netherlands.

4.     Stephen K. Blumenthal ("Blumenthal") is an individual residing at 128 Bull Hill Road, Newfield, New York. Blumenthal:

    a.  co-founded and owned approximately 45% of 3D Fusion and served as its director and President;

    b.  is an inventor of the inventions claimed in the Rembrandt Patents;

    c.  worked at 3D Fusion to develop the Rembrandt Trade Secrets;

    d.  after a secured creditor foreclosed on the assets of 3D Fusion, purchased the assets of 3D Fusion from the secured creditor;

    e.  formed Rembrandt, owns 100% of the outstanding shares in Rembrandt, and serves as its director and CEO;

    f.  assigned title to all of the assets of 3D Fusion to Rembrandt; and

    g.  formed Rembrandt 3D Corp ("R3D Corp") as an operating Delaware corporation to commercialize no glasses 3D display technology, owns approximately 72% of the outstanding shares in R3D Corp, and serves as its director and CEO.

5.     Stream came to Rembrandt's predecessor, 3DFusion, as an investor in 2010 and the relationship became adversarial when Rembrandt filed suit against Stream in the Southern District of New York Court in 2017. Rembrandt's lawsuit against Stream was resolved in their

signing a May 23, 2021, Settlement Agreement (Exhibit 1) which included a license to the Rembrandt IP.

6.      The trade secrets licensed by Rembrandt to Stream are embedded in the technology Stream included in its products and are known to the engineers that used to work with 3DFusion, then for Stream, and now for SeeCubic, Inc.

7.      Homony, as the appointed Chapter 11 trustee for Stream and Technovative Media, Inc. ("Technovative," and with Stream, the "Debtors") in the Bankruptcy Cases controls Debtors' operations and Debtors' estates including SeeCubic, B.V. ("SCBV"), a foreign subsidiary of Stream. During the bankruptcy administration, Homony permitted SCBV to manufacture and/or import into the United States prototypes that exploit the Rembrandt IP without Rembrandt's authorization (the "SCBV Prototypes") and in violation of the Settlement Agreement. Homony also permitted SeeCubic, Inc. ("SeeCubic")[1], the stalking horse bidder chosen by Homony and now purchaser of Debtors' estate assets, to receive and use the SCBV Prototypes so that it could demonstrate Stream's glasses-free 3D display technology to potential investors as part of a capital raise that includes foreign investors. Homony noted the existence and sale of the SCBV Prototypes in royalty reports provided to Koninklijke Philips N.V. ("Philips"), who, like Rembrandt, licenses patented technology that would otherwise encumber the commercialization of Stream's technology and accordingly, impose liability on any successor that assumes Debtors' estate assets. Homony's actions are outside the ordinary course of the Debtors' business and breached the Settlement Agreement between Rembrandt and Stream.

---

[1] While SeeCubic and SCBV are both controlled by Shadron L. Stastney, SCBV was not owned by SeeCubic until the sale of Debtors' estate assets.

8.     Homony retained SSG as the exclusive investment banker to handle the sale of Debtors' estate assets and solicit competing offers. As part of its "363 Sale Teaser" document, a true and correct copy of which is attached hereto as **Exhibit 5**, SSG indicates that it is offering the Debtors' assets for sale, including but not limited to SCBV and software that implements the Rembrandt Trade Secrets and the claimed subject matter of the Rembrandt Patents. The 363 Sale Teaser lists Victor, Kohl, Warznak, Lamm, and Charlton as the individuals to contact regarding the offer to sell the assets that include the Rembrandt IP.

9.     Despite having notified Homony on numerous occasions regarding Rembrandt's concerns and his statements during the Bankruptcy Court hearing on June 5, 2024, that he had not hired any experts to help him evaluate whether 2D + Depth technology was involved in the assets being sold, the 363 Sale Teaser does not mention the Rembrandt IP or the Settlement Agreement.

10.     On December 10, 2024, Defendants initiated the sale of those assets without Rembrandt's authorization and in breach of the Settlement Agreement. On information and belief, the relevant parties are still working to close the sale, which will result in Rembrandt suffering irreparable harm that includes the loss of Rembrandt's competitive advantage and business opportunities that it will not recover. By allowing the infringement of the Rembrandt Patents to pass in a sale, the Defendants have effectively shortened the Rembrandt Patents' valuable exclusivity period. Accordingly, monetary damages alone are inadequate to address the harm to Rembrandt.

11.     Rembrandt's license to Stream under the Settlement Agreement is not assignable to a buyer of the Debtors' estate assets without Rembrandt's express consent. Rembrandt has repeatedly informed Homony that it does not consent to include the Rembrandt IP in the sale of

Debtors' bankruptcy estate assets.  Accordingly, the Defendants' offer to sell and the sale of the Debtors' bankruptcy estate assets with Rembrandt's IP constitutes a reckless disregard of Rembrandt's intellectual property rights and a deliberate breach of Stream's Settlement Agreement with Rembrandt. Under the Settlement Agreement, Rembrandt is entitled to recover its attorney's fees and costs for the Defendants' breach.

12.     The alleged activities by Defendants occurred after filing the bankruptcy petition in the Bankruptcy Cases, thereby constituting post-petition torts not protected by automatic stay provisions. The assets Defendants have sold include the intellectual property of Rembrandt.

**THE PARTIES**

13.     Plaintiff is a corporation organized and existing under the laws of the Island of Nevis with a registered address at Suites 5&6 Horsfords Business Centre, Long Point Road, Nevis, West Indies and has an office at 128 Bull Hill Road, Newfield, New York.

14.     Defendant Homony is an individual with a place of business located at 1628 John F. Kennedy Blvd., Suite 950, Philadelphia, PA 19103, which is in this District.

15.     Defendant SSG is a limited liability company with a place of business located at 300 Barr Harbor Drive, Conshohocken, PA 19428, which is in this District.

16.     Defendant J. Scott Victor is an individual working for SSG, with a place of business located at 300 Barr Harbor Drive, Conshohocken, PA 19428, which is in this District.

17.     Defendant Teresa C. Kohl is an individual working for SSG, with a place of business located at 300 Barr Harbor Drive, Conshohocken, PA 19428, which is in this District.

18.     Defendant Craig D. Warznak is an individual working for SSG, with a place of business located at 300 Barr Harbor Drive, Conshohocken, PA 19428, which is in this District.

19.     Defendant Alexander D. Lamm is an individual working for SSG, with a place of business located at 300 Barr Harbor Drive, Conshohocken, PA 19428, which is in this District.

20.     Defendant Samuel P. Charlton is an individual working for SSG, with a place of business located at 300 Barr Harbor Drive, Conshohocken, PA 19428, which is in this District.

21.     Rembrandt is ignorant of the true names and capacities of the parties sued herein as DOES 1 through 10, inclusive, whether individual, corporate, or otherwise, and therefore sues these defendants by such fictitious names. Rembrandt will seek leave to amend the Complaint to assert their true names and capacities when they have been ascertained. Rembrandt is informed and believes, and based thereon, alleges that all defendants sued herein as DOES 1 through 10 are in some manner responsible for the acts and omissions alleged herein.

## JURISDICTION AND VENUE

22.     This Court has original and exclusive subject matter jurisdiction over this action according to 28 U.S.C. 1331 and 1338(a) because it arises under federal patent law and the DTSA.

23.     This Court has supplemental jurisdiction over all state law claims under 28 U.S.C. § 1367(a) because they are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

24.     This Court has diversity jurisdiction under 28 U.S.C. §1332 because complete diversity of citizenship exists in the parties and the matter in controversy exceeds the sum or value of $75,000.00.

25.     The acts and transactions complained of herein were conceived, carried out, made effective, and had effect within this District.

26.     Venue is proper under 28 U.S.C. §§ 1391(b) and (c) and 1400(b) because Defendants reside and/or have a regular and established place of business in this District, and that a substantial part of the events giving rise to the claims and the threatened and actual harm to Rembrandt occurred in this district because of Defendants' conduct as alleged herein.

## RELEVANT FACTUAL BACKGROUND

27.     Rembrandt is a holding company that holds intellectual property rights related to glasses free 3D displays and content solutions that include the Rembrandt Trade Secrets and claimed subject matter of the Rembrandt Patents.

28.     In February 2016, Rembrandt acquired all or substantially all the assets of 3DFusion, including all intellectual property and causes of action arising therefrom. Although Homony and SSG did not become involved with the matter hereof until January 2024 and July 2022, respectively, a summarized history of Rembrandt's technology and Stream's Ultra-D technology is necessary to describe the integral relationship between them and the dependence of one on the other.

**A.     Philips and 3DFusion: Origins of the Glasses-Free 3D Technology**

29.     Beginning around 2000, Philips developed inventions for viewing 3-dimensional images and video without needing 3D glasses based on the "2D+Depth" autostereoscopic mathematical encryption technology of the Heinrich Hertz Institute. Philips secured patents for technology related to its glasses-free 3D computer source code, optical designs, and other implementations (collectively, the "Philips IP"). Philips manufactured and marketed glasses-free 3D autostereoscopic display ("3DASD") hardware and software products as part of its "WOWvx Platform" and tried to license the Philips IP to third parties.

30.    3DFusion was co-founded by Blumenthal to create and sell glasses-free 3D content. 3DFusion secured a content creation license from Philips and began using Philips "Blue Box" hardware and software to convert 2D video content into a glasses-free 3D format for the Philips WOWvx Platform.

31.    The WOWvx Platform used mathematical algorithms and a grayscale depth map to transform normal 2D viewing into a glasses-free 3D experience. Although the Philips solution achieved a 3D effect, it suffered from significant image quality issues and numerous artefacts such as double-image "ghosting" that caused viewer dizziness and eye strain. Content generated for the WOWvx Platform required weeks of manual post-processing to correct the anomalies and achieve results acceptable to 3DFusion. The process was prohibitively expensive, slow, complicated, and highly labor intensive.

32.    Through extensive experimentation and research comprising more than 3,000 hours of 2D-to-3D-depth-map rotoscoping, Blumenthal developed a novel and non-obvious methodology to correct the image quality issues of the WOWvx Platform. Blumenthal's discoveries were treated as a proprietary technology of 3DFusion. Although Blumenthal patented some of his inventions, other technology was kept proprietary as confidential trade secrets of 3DFusion.

33.    By July 2009, 3DFusion had developed a sound strategy that included:

a.  Support of current and future patent filings for new 3DFusion technology,

b.  Acquisition of a worldwide Master License for the Philips IP, and

c.  Engagement of appropriate technical, administrative, and technical personnel in the USA and the Netherlands.

34.    Philips notified 3DFusion that it was in the process of winding down its glasses-free 3D operations due to, among other reasons, lackluster sales of WOWvx products. Despite the operational shutdown of its glasses-free 3D division, Philips was committed to licensing its technology to third parties, and 3DFusion continued using the previously licensed hardware and software of the WOWvx Platform.

35.    In or about September 2009, Blumenthal contacted former key technology experts of the then-defunct Philips glasses-free 3D division (the "Eindhoven Team") about 3DFusion's desire to build support for the WOWvx Platform. The Eindhoven Team was solicited to join 3DFusion. Plans commenced to form a Netherlands subsidiary to employ the Eindhoven Team, all of whom were Dutch Citizens.

36.    In December 2009, Blumenthal visited the Netherlands and demonstrated 3DFusion's improved WOWvx Platform results to the Eindhoven Team, all of whom orally agreed to keep 3DFusion's proprietary technology confidential. After the demonstration, one member of the Eindhoven Team stated, "It took two guys from New York to come to Philips to show us how to fix our TV."

37.    Blumenthal pursued a broad technology license from Philips. Endorsed by the former senior technical team of the Philips glasses-free 3D division, Blumenthal convinced Philips to issue a non-exclusive master license for the 800+ patents that comprise the Philips IP.

38.    Through 2010, 3DFusion and the Eindhoven Team commenced bi-weekly R&D and business development teleconferences and exchanged numerous emails regarding the 3DFusion technology.  Meeting minutes were kept and describe the various technical and administrative issues addressed by 3DFusion and Eindhoven Team.

39.    While 3DFusion had included some of the information and improvements in the Rembrandt Patents, many other improvements were held as trade secrets and were disclosed and developed under non-disclosure agreements with the Eindhoven Team. Nonetheless, many of the Rembrandt Trade Secrets were developed prior to Blumenthal engaging the Eindhoven Team.

40.    3DFusion filed its first patent application in 2008 and had filed a dozen patent applications prior to the end of 2009.

41.    While 3DFusion prosecuted some applications to become the Rembrandt Patents, 3DFusion opted to rely on trade secret protection and did not pursue utility patent coverage for at least 10 patent applications that were filed as provisional applications but were not published. Specifically, the following applications were filed in 2009, but never published:

    a.   System For Optically Capturing Live Media Content In Conjunction With Acquisition Of Content-Related Non-Media Information Usable For Generation Of Improved Three Dimensional Content From The Captured Live Media

    b.   System And Method For Generating Improved Three-Dimensional Media Content Utilizing Non-Media Information Acquired During Two- Or Three-Dimensional Content Capture

    c.   System And Method For Multiple View Optical Path Content Integration

    d.   Multiple View Optical Path Array And Digital Light Projection Lens Screen System And Method

    e.   System And Method For Multiple Image Alignment For Digital Light Projection Stereoscopic Image Correction

f.   System And Method For Camera Through-The-Lens Stereo Depth Determination For Zed Measurement Triangulation

g.   System And Method For Removal Of Undesirable Image Components From Three Dimensional Content Displayed Through A Stereoscopic Digital Light Projection System

h.   Media Content Display System And Method For Displaying At Least One Of Two- And Three-Dimensional Media Content Within Corresponding Plural Display Regions Thereof

i.   Dynamically Configurable Adaptive Stereoscopic Display And Viewer-Related Data Acquisition System And Method

j.   Digital Light Projection Auto Stereoscopic Display System And Method

42.   The Eindhoven Team and 3DFusion worked on a number of projects and relied on the 3DFusion license with Philips that allowed them to utilize the Philips IP, which included know-how, trade secrets, software, and patent rights.

43.   In addition to improving the Philips IP, Blumenthal also worked with Corning Glass on 3D lenticular lens optical design aspects which are essential to the superior performance of glasses-free 3D products and are included as part of the Rembrandt Trade Secrets.

**B.    3D Fusion and Stream**

44.   Having accomplished its primary business objectives of developing its own proprietary technology for no glasses 3D displays and content tools, securing a license to the Philips IP, and hiring key technology experts, 3DFusion began seeking capital to support expanded operations and satisfy its new liabilities.

45.   In June 2010, Raja Rajan and Mathu Rajan (the "Rajans"), principals of Stream, came to 3DFusion's New York office for a demonstration of 3DFusion's technology. Upon

information and belief, Stream had previously acquired its own WOWvx display from Philips

and had experienced the same artefacts and ghosting issues that plagued the Philips WOWvx

Platform.

46.    Impressed by the improvements achieved by 3DFusion, the Rajans signed a

Mutual Non-Disclosure and Confidentiality Agreement ("NDA") on June 9, 2010, and an

Addendum to the Agreement dated June 11, 2010, for due diligence investigation for potential

equity funding of 3DFusion.

47.    In reliance on these agreements, 3DFusion provided Stream with information

regarding developments by Blumenthal and the Eindhoven Team, including the pathway to

automation of the 3D content generation process and the 3D playback optimization and

correction process that had, prior to Blumenthal's groundbreaking work, been impossible to

achieve.

48.    On October 8, 2010, Blumenthal visited Stream's office in Philadelphia, PA, to

demonstrate the 3DFusion technology for Stream employees and answer various technical and

business questions. Blumenthal described (a) all proprietary aspects of the content creation

workflow, including conversion from 2D, optimization, and elimination of artefacts; (b) how 3D

lens optical design was critical to matching content; and (c) ideas for a 2D/3D switchable

technology solution, all of which had been developed as computer source code, optical designs,

technical sketches, or similar.

49.    The research and development effort by Blumenthal and the Eindhoven Team

from mid-2007 through December 2010 produced valuable confidential and proprietary

intellectual property including derivative works developed under the Philips technology license,

trade secrets, patents and patent applications, and copyrights, all of which became essential

technology components for an improved and commercially marketable WOWvx Platform. 3DFusion disclosed the intellectual property only on a need-to-know basis and only under the protection of NDAs.

50.     In December 2010, 3DFusion secured a loan to make the required payment to Philips for the technology license.

**C.     Stream Employs the Eindhoven Team and Launches the Ultra-D™ Technology**

51.     Upon information and belief, certain members of the Eindhoven Team accepted contract employment from Stream in May 2011 to continue their work in developing a marketable glasses-free 3D solution. They encouraged Stream to obtain its own license of the Philips IP as a foundation for Stream's new solution, which it would later trademark Ultra-D™ ("Ultra-D"). The Ultra-D technology and related products as they have existed at all times require utilization of the Rembrandt Trade Secrets and the claimed subject matter of the Rembrandt Patents.

52.     In November 2011, Stream formed SCBV as a wholly owned operating subsidiary in Eindhoven. In December 2011, Stream secured a license of the Philips IP, which it holds in another wholly owned subsidiary, Ultra-D Ventures C.V. The Eindhoven Team, which has expanded and evolved in personnel over the years, has continuously worked on the Ultra-D technology since 2011.

53.     Over several years, Stream continued to develop its business based on the Ultra-D technology, showcasing Ultra-D at global trade shows, filing patent applications, engaging in product manufacturing and sales, and securing customers and strategic partnerships.

**D.     3DFusion Dissolves and Rembrandt Acquires the Assets Including IP**

54.     In January 2012, Blumenthal resigned from 3DFusion due to lack of funding.

14

55.     On October 31, 2014, 3DFusion defaulted on its obligation to repay the loan it had secured to pay the December 2010 license payment to Philips. The secured lender seized all of 3DFusion's tangible and intangible assets through foreclosure and sold them to Blumenthal in or about February 2016.

56.     In December 2016, Blumenthal assigned the 3DFusion assets to his newly formed holding company, Rembrandt 3D Holding, Ltd. Blumenthal owns 100% of Rembrandt.

**E.     Rembrandt Commences Litigation Against Stream, Resulting in a Settlement**

57.     Rembrandt filed a complaint against Stream and the Rajans in January 2017, alleging patent infringement, breach of contract, and unjust enrichment.

58.     A first mediation conference in July 2018 commenced many months of failed negotiations, but a second mediation conference in April 2019 led to an agreed settlement term sheet that was initialed by the parties and signed by the presiding magistrate judge (the "Settlement Term Sheet").

59.     Notably, the Settlement Term Sheet was negotiated and signed by Shadron L. Stastney ("Stastney") on behalf of Stream. At the time, Stastney was an officer and director of Stream and a managing member of Stream's senior secured lender. Stastney – as an individual, as managing member of SLS, or as CEO of SeeCubic – would later (a) attempt to foreclose on Stream's assets, including ownership of SCBV and Stream's other subsidiaries as well as the Ultra-D technology which incorporates the Rembrandt IP (the "Stream Assets"), (b) seize the Stream Assets through an improvident injunction, (c) refuse to return the Stream Assets following an order by the Delaware Supreme Court, (d) exercise dominion and control over the Stream Assets during the administration of Debtors' estates, and (e) serve as the stalking horse bidder in a bankruptcy sale of the Stream Assets conducted by the Defendants over Rembrandt's objections.

60.     The Settlement Term Sheet provided that Stream would pay Rembrandt $5.8 million and provide Rembrandt with approximately 3 million Ultra-D televisions at cost as compensation for a license to use the Rembrandt IP. Stastney stated that the "at cost" provision conferred a value of more than $1 billion to Rembrandt. Every Ultra-D television utilizes the Rembrandt Trade Secrets and subject matter claimed in the Rembrandt Patents.

**F.      Stream Loses its Assets Pursuant to an Improvident Injunction, Putting Rembrandt Intellectual Property at Risk**

61.     Stream's secured lender, SLS Holding's VI, LLC ("SLS"), filed a foreclosure action against Stream in Delaware Superior Court in March 2020. Stream's newly appointed board of directors established a debt Resolution Committee, which negotiated and executed a settlement agreement (the "Omnibus Agreement") that purported to transfer the Stream Assets to Stastney's newly formed company, SeeCubic, Inc.

62.     Arguing that the Omnibus Agreement violated the company's charter, Stream filed for injunctive relief in the Delaware Court of Chancery in September 2020. SeeCubic filed a counterclaim, commencing three months of initial litigation. In December 2020, the Chancery Court issued a preliminary injunction order against Stream, enjoining it from attempting to prevent the asset transfer to SeeCubic.

63.     SeeCubic took possession of the Stream Assets immediately afterward, thereby gaining access to the Rembrandt IP without authorization from Rembrandt.

64.     Rembrandt attempted to negotiate a license with SeeCubic, but Stastney, as CEO and Chairman of SeeCubic, refused Rembrandt's overtures despite his previous acknowledgment of the need for a license when negotiating on behalf of Stream.

65.     In November 2021, the Chancery Court issued a partial final judgment, ruling that the Omnibus Agreement was valid and binding upon Stream.

**G.**    **Stream wins its Appeal to the Delaware Supreme Court but Fails to Secure the Return of its Assets**

66.    Stream appealed the Chancery Court ruling to the Delaware Supreme Court in December 2021. Sitting *en banc*, the Delaware Supreme Court heard the case in April 2022. It issued a unanimous 5-0 opinion in June 2022 that (a) found that Stream's board of directors had violated the company's charter, (b) ruled the Omnibus Agreement invalid and thus void *ab initio*, (c) reversed and vacated the lower court decision, and (d) remanded the case to the Chancery Court to unwind the damage done to Stream.

67.    Rather than return the Stream assets as mandated by the Delaware Supreme Court, SeeCubic argued that it should not have to return assets it had improved during the time it held possession as a result of the improvident injunction.

68.    When the Chancery Court disagreed, SeeCubic conspired with Stream's junior secured lender, Hawk Investment Holdings Limited ("Hawk"), to sell the assets rather than return them. In July 2022, Hawk engaged in discussions with SSG to market and sell the Stream Assets in a UCC Article 9 sale for the benefit of SeeCubic.

69.    Stream was able to stop SSG from proceeding by obtaining temporary injunctive relief from the Chancery Court. In October 2022, however, Hawk attempted to exercise proxy rights and seize control of Stream's subsidiary, Technovative. Hawk formally engaged SSG to sell the Stream Assets, and SSG began the marketing process. SSG was stopped only by a status quo order issued by the Chancery Court before the sale could transpire.

70.    Rembrandt moved to intervene in the Chancery Court action on October 18, 2022. *See Stream TV. Networks, Inc. v. SeeCubic, Inc.*, Case No. 2020-0766-JTL, D.I. 331 (Del. Ch., Oct. 18, 2022).  Shortly thereafter, Rembrandt filed a pleading and motion for injunction on October 21, 2022. *Id.* at D.I. 335.  Rembrandt's involvement in the Chancery Court action was

denied without prejudice due to the commencement of the Bankruptcy Cases. *See Stream TV. Networks, Inc. v. SeeCubic, Inc.*, Case No. 2020-0766-JTL, D.I. 351 (Del. Ch. Apr. 26, 2023).

**H.    Stream Files for Bankruptcy Protection and Attempts to Secure the Return of its Assets**

71.    Stream and Technovative filed for Chapter 11 bankruptcy protection in March 2023, nine months after the Delaware Supreme Court ruled that Stream was entitled to the return of its assets. Stream provided copies of approximately $138 million in purchase orders that could be fulfilled with return of the Stream assets.  With more than $20 million in trade debt and no assets to operate its business and generate revenue, Stream expected the bankruptcy court to assist with the turnover of assets, so it could proceed to fulfill the purchase orders and work towards a reorganization plan.

72.    SeeCubic and Hawk filed motions to dismiss the Bankruptcy Cases and challenged every move Stream attempted to make in its potential reorganization. With the Bankruptcy Court's focus on the animosity of Stream's creditors, it failed to act on turnover motions and other requests to mandate the return of Stream's assets.

73.    Stream's counsel worked to keep the bankruptcy estates administratively solvent and negotiated an amendment to the settlement agreement with Rembrandt (the "Settlement Amendment"), a true and correct copy of which is attached hereto as **Exhibit 6.**

74.    This amendment shifted payments to be paid to Rembrandt during the administration of the Bankruptcy Cases to the execution date of a reorganization plan. At a minimum, this amendment reduced the administrative burden to the Stream estate by $40,000/month and avoided the immediate payment of all arrears due if the executory contract was assumed.

75.     Stream filed a disclosure statement that included a plan to utilize and fund the Settlement Agreement and Settlement Amendment with Rembrandt (D.I. 293 of *In re: Stream TV Networks, Inc. et al.,* U.S. Bankruptcy Court for the Eastern District of Pennsylvania, filed 3/15/2023, case no. 23-10763-amc).

**I.      Rembrandt Enters into the Licensing Covenant with VSI**

76.     Recognizing a common interest in rehabilitating Stream in bankruptcy and protecting the Stream and Rembrandt intellectual property from the SeeCubic Parties (as defined below), Rembrandt, Stream, and Visual Semiconductor, Inc. ("VSI") entered a Licensing Covenant on August 14, 2023.

77.     The Licensing Covenant provided that (a) VSI would pay additional compensation to Rembrandt, (b) additional consumer products would be made available at cost to Rembrandt, (c) VSI would be able to transfer the Rembrandt license from Stream if desired by Stream and VSI, and (d) Rembrandt would prohibit the SeeCubic Parties and those working in concert with them from ever obtaining a technology license from Rembrandt.

**J.      The SeeCubic Parties Seize Control of Stream's Intellectual Property in the Netherlands**

78.     Stastney, SeeCubic, SLS, and Hawk (the "SeeCubic Parties") took legal action in the Netherlands during the pendency of the Bankruptcy Cases to gain control of Stream's Dutch subsidiaries.

79.     Despite a warning from the Bankruptcy judge to refrain from taking any action that would affect the estate's assets, the SeeCubic Parties succeeded in having an independent director appointed from the law firm Jones Day.

80.     Rembrandt sent emails to the independent director putting him and Jones Day on notice that Rembrandt's IP was being used by SCBV outside of the license by Stream, a true and correct copy of which is attached hereto as **Exhibit 7.**

81.     In response, the independent director resigned rather than be involved with infringement and misappropriation of Rembrandt IP.

82.     The SeeCubic Parties had Stastney appointed as director of Stream's three Dutch subsidiaries in September 2023.

83.     Since then, the SeeCubic Parties have used Stastney's position as director to exercise dominion and control of SCBV, the Ultra-D technology, Stream's patent portfolio, countless technology demonstrations in the United States including the SCBV Products, and other enhancements derived from and incorporating the Rembrandt IP.

**K.     The Bankruptcy Court Issues a TRO to Enjoin the SeeCubic Parties**

84.     Stream filed for injunctive relief from the Bankruptcy Court in an adversary complaint against the SeeCubic Parties and SCBV in September 2023. *See Stream TV Networks, Inc., et al. v. Shadron L. Stastney et al.*, Adversary Case No. 23-00057-amc. The Complaint cited unauthorized use of the Ultra-D technology, which presented a threat of irreparable harm because such use potentially risked Stream's licenses with Philips and Rembrandt.

85.     In particular, Stream argued that SeeCubic's business model of offering sublicenses to customers directly violated both the Rembrandt and Philips licenses, which prohibit sub-licensing.

86.     Both the CEO of Stream and the CFO of Rembrandt testified that the Rembrandt IP was indeed incorporated in the Ultra-D technology and that neither SeeCubic nor SCBV had a license from Rembrandt.

87.     The Bankruptcy Court issued a Temporary Restraining Order on January 4, 2024 (the "Bankruptcy TRO"), a true and correct copy of which is attached hereto as **Exhibit 8**), enjoining the SeeCubic Parties, SCBV, and those working in concert with them from, among other things, taking any action affecting the Rembrandt license.

**L.     Homony is Appointed Chapter 11 Trustee, Settles with the SeeCubic Parties, and Commences a Plan to Sell Stream's Assets**

88.     The Bankruptcy Court appointed Homony as Chapter 11 Trustee shortly after issuing the Bankruptcy TRO. Homony had certain mandates as Trustee for the bankruptcy estates of Stream and Technovative, including (a) determining the validity of the claims of Stream's secured creditors, and especially that of Hawk, which had filed a claim for $178 million; (b) evaluating the business prospects of the Debtors, including $138 million in purchase orders received from VSI; and (c) marshaling the assets of the Debtors and securing their return.

89.     On February 19, 2024, R3D Corp provided a proposal to Homony's counsel for a Chapter 11 reorganization plan that would have fully repaid or converted the secured creditors of Stream and repaid most of the unsecured creditors, a true and correct copy of which is attached hereto as **Exhibit 9.**

90.     Rembrandt relayed that "[w]e discussed with Stream's prior counsel setting up a call with our team and the customers to assess these contracts." (Exhibit 9)

91.     Rembrandt provided a list of due diligence items to be investigated to proceed with a proposal. (Exhibit 9)

92.     Rembrandt stated that preservation of the intellectual property was paramount: "If the Philips license is terminated due to a change of control or breaches of the license, the value of Stream is pretty much destroyed, so keeping the IP intact during administration and through

21

plan execution is critical. We have listed the assets we want to confirm. The IP assets are critical, the contracts with customers are important to valuation but not deal killers." (Exhibit 9)

93.    Homony arranged one phone call with employees of SCBV, but upon information and belief, he took no other action to investigate the due diligence items or to preserve the IP.

94.    Upon information and belief, Mathu Rajan and other employees of Stream (a) provided Homony with a list of Stream assets that SeeCubic had failed to return as mandated by the Delaware Supreme Court; (b) offered to arrange meetings with VSI's end-user customers so that Homony could validate the purchase orders; and (c) provided hundreds of pages of documentation supporting the extinguishment of most, if not all, of Hawk's debt according to a debt-to-equity conversion agreement executed by Hawk in 2018.

95.    According to VSI's filings in the Bankruptcy Cases, "Upon information and belief, the Trustee was given a presentation of the Debtors' own technology in March 2024 by Stastney, who demonstrated one of the latest samples made by the Debtors' Netherlands R&D engineers. Rather than confiscate the demonstrator sample as estate property since it contained the Debtors' proprietary technology, the Trustee allowed Stastney, a party specifically enjoined by the Bankruptcy TRO, to maintain possession of the unit for use in competition with the Debtors." (See paragraph 49 on page 27 of 534 of D.I. 788 in Stream Bankruptcy, a true and correct copy of page 27 is attached as Exhibit 10)

96.    Homony entered into a settlement agreement with Hawk and SeeCubic in May 2024. The settlement agreement (a) settled all open litigation between the Debtors and the SeeCubic Parties; (b) gave Hawk an allowed claim of $180 million; (c) appointed SeeCubic as the Stalking Horse Bidder in a planned sale of the Debtors' assets to be held pursuant to Section 363 of the U.S. Bankruptcy Code (the "363 Sale"), (d) allowed SeeCubic to use $150 million of

the Hawk claim to credit bid in the 363 Sale, with only a $7.5 million cash requirement for a carve-out; and (e) outlined 363 Sale bidding procedures that would require any other bidder to provide a minimum of $120 million in cash.

97.     Rembrandt filed a motion objecting to Homony's settlement agreement, and on June 6, 2024, the Bankruptcy Court held a hearing. Rembrandt attempted to raise intellectual property issues, arguing that the settlement contained terms for a 363 Sale of assets that the Debtors do not own. The Bankruptcy judge refused to consider Rembrandt's argument, stating that Rembrandt would be entitled to make its argument when Homony submitted the 363 Sale bidding procedures. According to the Court, the time for IP arguments would come later.

**M.      Homony Allows the SeeCubic Parties to Violate the TRO**

98.     On May 6, 2024, Rembrandt notified the counsel for Homony, SeeCubic and Hawk that it had become aware of a planned May 7, 2024, meeting to be held in violation of the Bankruptcy TRO as it affected the Rembrandt IP, a true and correct copy of the email exchange is attached hereto as **Exhibit 11**.

99.     Hawk's counsel eventually responded, but only two days after the meeting. The email response from Hawk was revealing in its overly defensive tone and presumption to speak for Homony and the Debtors:

> **It is up to the Debtors to determine whether they believe a violation occurred or needs to be addressed.** The Debtors have not taken any action or voiced any concerns. The e-mails also suggest Rembrandt believes its technology may have been improperly used. But there is no pending motion or order defining or dealing with the use of Rembrandt's technology.

100.    The position of Hawk is untenable because the Bankruptcy TRO specifically references the Rembrandt technology and prohibits the enjoined parties from:

> Tak[ing] any action to sublicense, transfer, assign, or otherwise dispose of or **affect** any license or technology held or purported to be held by the Debtors'

estates, including but not limited to the Ultra-D technology, and the Philips or **Rembrandt licenses**. (Bankruptcy TRO ¶ 9(a), emphasis added)

101.    Rembrandt responded to Hawk's email on May 12, 2024 (Exhibit 11) asking questions about whether Homony authorized the SeeCubic Parties' meetings and whether Hawk was involved. Rembrandt eventually sought discovery.

102.    VSI and Rembrandt informed Homony multiple times that it believed Stastney, SeeCubic, Hawk, and SCBV were committing violations. VSI notified Homony and Rembrandt about fundraising meetings conducted in April 2024 and May 2024, including a global Zoom teleconference on May 28, 2024, that was recorded by SeeCubic. VSI encouraged Homony to request a copy of the Zoom recording from SeeCubic to confirm the nature of the meeting and whether a violation had occurred. On information and belief, Homony made no effort to investigate the alleged violations.

103.    Rembrandt noted that Stream's monthly operating report filed by Homony for September 2024 included a royalty payment to Philips.

104.    Homony knew that SCBV had produced products incorporating the Philips IP and Stream's Ultra-D technology (and, therefore, the Rembrandt IP). Homony reported the sales to Philips in a quarterly royalty report he prepared for Stream covering the months of April, May, and June 2024.

105.    Homony clearly understood that royalties were due to Philips and paid them, yet he did not pay Rembrandt under its license agreement.

106.    During the hearing before the bankruptcy court on November 17, 2024, Rembrandt raised the issue that it believed SeeCubic had demonstrated a display that is an asset of Stream including Rembrandt technology to Homony. However, Ms. Brumee representing SeeCubic, stood and reported that in actuality *"The demo units were developed and built by*

*SeeCubic B.V. in the Netherlands, which is five entities down in the corporate structure. Any demo unit that has been produced and especially one that Mr. Homony has seen would be from SeeCubic B.V.*", a true and correct copy of page 45 from the transcript from the November 17, 2024, hearing at page 45 is attached as **Exhibit 12**.

107.    SCBV has no license from Rembrandt and making a demo unit for SeeCubic is a clear infringement and misappropriation of the Rembrandt IP and further a violation of the Bankruptcy TRO.

108.    Despite the Bankruptcy TRO, Homony permitted SeeCubic to act as though its acquisition of Stream's assets was assured and that it has the right to all the underlying technology, including Rembrandt's and Philip's intellectual property, neither of which should be included in any 363 Sale as neither agreement is assignable and the Philips license terminates upon change of control (*See* Sections 1.9 and 5.4(d) of the Philips license).

**N.    Homony Fails in his Duty to Determine the Property of the Estate and Stifles Discovery**

109.    Rembrandt asked Homony numerous times to investigate the assets of the Debtors' estates and those held by SCBV regarding the Rembrandt IP. Upon information and belief, Homony failed to do so.

110.    On the simple issue of whether Homony had secured the username and password to Stream's software development system, Rembrandt asked on the following occasions and received no confirmation that Homony had access to the system:

    a.    March 22, 2024:

"[the SCBV engineers] confirmed something very critical – the software development has been managed through a professional tool that maintains versions for the last 13 years of work.  That is the value of SCBV. If the trustee gets access to that server, the value in SCBV is largely preserved. Likewise, if it slips out the back door, there is zero value and lots of liabilities in SCBV."

b. April 3, 2024:

"Is the intellectual property in the form of software, know-how, copyright, patents, and licenses intact?"

c. April 4, 2024:

"We understand you don't have staff that are capable of reviewing the software and IP stored on the servers, but can you please confirm that you have possession and access to the developer system where the source code is stored both from SCBV and the work done by Stream and their vendors?"

d. April 26, 2024:

"It has been over three weeks since we have heard from you. Are you going to send an NDA so we can share investor information with you? Basically, the entire value of the Stream and Technovative estates boil down to the IP related to the UltraD improvement. We believe that practical value of this asset is found in the software development management system. Our belief is that the former officers of the company got in a spat and one went to form SeeCubic, Inc and the other VSI. As best as we understand, both insiders have access to this system and source code, software, and firmware design that forms the UltraD technology. The only asset that the trustee needed to marshal and protect was the username and password for the software development system that was referenced in our call with the software engineers. Basically, the former officers have created a situation where they are the only two entities that can garner any value from Stream unless the trustee acted to secure this essential asset.

I emailed you the following our call with the Eindhoven team on March 22: '… they confirmed something very critical – the software development has been managed through a professional tool that maintains versions for the last 13 years of work. That is the value of SCBV. If the trustee gets access to that server, the value in SCBV is largely preserved. Likewise, if it slips out the back door, there is zero value and lots of liabilities in SCBV.'

While we have many follow-on issues to resolve, did you and/or the trustee obtain access to the server and the software development tools that form the value of this estate? This is a threshold issue before any investor will start funding any costs related to a reorganization plan."

111.    The entire value of the Stream and Technovative estates boiled down to the IP related to the UltraD improvement. The practical value of this asset is found in the software development management system. The only asset that Homony needed to marshal and protect to

prevent transfer of Rembrandt IP and to capture value for the bankruptcy estate was the username and password for the software development system.

112.     Homony allowed Stastney and SCBV to control this critical asset.

113.     Upon information and belief, Homony made no effort to separate estate property from the Rembrandt IP and made no reasonable inquiry or request of anyone at SCBV to separate the Rembrandt IP from the assets held at SCBV prior to the 363 Sale.

114.     Rembrandt sought discovery to investigate potential Bankruptcy TRO violations by sending notices of deposition to Hawk, SeeCubic, Hawk principal Arthur Leonard Robert Morton ("Morton"), and Stastney, but the Bankruptcy Court effectively quashed the discovery at a hearing on June 5, 2024 and in its order following the next day.

115.     Rembrandt is aware that on multiple occasions, commencing from July 26, 2024, VSI sought discovery from Homony on the issue of Bankruptcy TRO violations. Such discovery would have yielded critical information for Rembrandt as well regarding its intellectual property rights. Unwilling to cooperate, Homony filed a Motion to Quash the discovery. Homony failed to exercise the reasonable skill and care required of a statutory fiduciary in his trustee position.

116.     During the June 5, 2024, hearing to determine whether to approve the settlement agreement between the SeeCubic Parties and Stream, as negotiated by Homony, Rembrandt raised its objection on the basis that the settlement also outlined the terms for a proposed 363 Sale of the Debtors' assets. As it was unclear if the 363 Sale would include the Rembrandt IP, which Homony would have no legal right to sell, Rembrandt attempted to communicate the need to separate the financial and legal settlement from the sale of Debtors' assets, which include the Rembrandt IP.

117.    During the June 5, 2024, hearing, when asked if Homony "made any assessment whether the displays that currently are in the possession of SCBV and/or SeeCubic are utilizing 2d-plus-depth technology?" Homony responded "I have not. I know there's a dispute with respect to Rembrandt and its belief that their IP is being utilized by SCBV."

118.    Homony also testified that he had no experience with the design or manufacture of flat panel displays or software related to 3D content.

119.    Homony further testified that he did not retain any experts to advise him on the status of the technology with respect to the Philips technology that had been provided under license to Stream and its subsidiaries or with respect to the Rembrandt technology provided under the license to Stream.

120.    Although the Bankruptcy TRO remained valid and enforceable against the SeeCubic Parties, Homony allowed them to violate the Rembrandt license and willfully chose to breach the Rembrandt license while paying royalties to Philips but not paying for the Rembrandt license.

121.    Rembrandt wrote to Homony's counsel regarding the proposed engagement of a prior investment banker ("Capstone") which withdrew from the Bankruptcy Cases on June 14, 2024, a true and correct copy of which is attached hereto as **Exhibit 13**. Rembrandt asked if Homony was relying on Rembrandt's license to sell assets that included Rembrandt's IP. Rembrandt also stated that if Homony's "intent is to proceed with Capstone committing alleged infringing acts without paying the license fee, then the broker, the trustee, and debtors are all independently liable for the acts of infringement. The trustee already testified under oath that you are not relying on an opinion of counsel, nor has he evaluated the IP issues. Ignorance is not a defense to patent infringement and the debtors and trustee are certainly on notice."

122.    Homony's counsel responded on June 18, 2024, stating in part that "I am certainly going to share your e-mail below threatening the Trustee, the Debtors, the Debtors' secured creditors and Capstone."

123.    Capstone's agreement requested that their indemnification be limited to their fees and the US Trustee and Judge objected.  Homony later withdrew its application to hire Capstone.

124.    Despite being put on notice that proceeding with a sale of estate assets that included the Rembrandt IP would subject himself and those working with him to legal repercussions and liability for IP infringement, Homony pressed forward with the 363 Sale.

125.    The Court eventually approved the Bid Procedures and set a 363 Sale hearing date for December 4, 2024.

## O.    Homony and SSG Market Stream's Assets, Misappropriating Rembrandt's IP, and Violating Federal Statues

126.    On August 14, 2024, Homony filed an application to employ SSG as an investment banker to market and sell Stream's assets. Homony's selection of SSG was a curious choice, as Hawk had previously retained SSG to sell the same set of assets for the benefit of Hawk, which sponsored the Stalking Horse that has been declared the winning bidder of the 363 Sale.

127.    Rembrandt again reached out to Homony and copied SSG's counsel, asking "whether you are planning to assume the Rembrandt license or remove the Rembrandt technology from the assets being offered for sale" in an email dated September 6, 2024, a true and correct copy of which is attached hereto as **Exhibit 14**.

128.    In the same email, Rembrandt called out SSG's counsel asking "Does SSG Advisors have a plan to avoid offering Rembrandt's technology for sale while conducting the sale of Stream assets?" (Exhibit 14)

29

129.    SSG did not respond to Rembrandt, but initiated a marketing campaign and distributed the 363 Sale Teaser to approximately 500 potential buyers of Stream's assets, including industry professionals, competitors, and venture capitalists. The teaser included language stating:

> The Company's extensive intellectual property portfolio covers key technological advancements in optical solutions, display manufacturing, 3D image rendering, and optical stack design, providing robust protection for the Company's innovations. **The technology can be licensed** and embedded into partner hardware, enabling devices to display both native 2D content and immersive 3D content.

The 363 Sale Teaser was incorrect by implying to potential buyers of Stream's assets that the technology available for purchase could be licensed to customers, irrespective of the fact – known by SSG and Homony – that the foundational technology from Rembrandt and Philips was secured by Stream solely through non-transferable and non-assignable licenses.

130.    The 363 Sale Teaser lists Victor, Kohl, Warznak, Lamm, and Charlton as the individuals to contact regarding the offer to sell the assets that include the Rembrandt IP. Each of Victor, Kohl, Warznak, Lamm, and Charlton were offering to sell a patented invention of Rembrandt and transferring the Rembrandt Trade Secrets without Rembrandt's authorization.

131.    At least Homony's, SSG's and Victor's actions were willful and knowing because Rembrandt sent multiple emails to Homony's and SSG's counsel, made numerous court filings received by both Homony and SSG stating its IP assets were inappropriately being included in the 363 Sale, and stated in Bankruptcy Court, with SSG managing director J. Scott Victor in attendance, that the proposed 363 Sale violated Rembrandt's intellectual property rights.

132.    Homony's counsel promised to "share your e-mail below threatening the Trustee, the Debtors, the Debtors' secured creditors and Capstone." Upon information and belief,

Homony's counsel informed all of the Defendants of Rembrandt's IP rights and notice that it would enforce those rights, such that all of the Defendants acted willfully and knowingly.

**P.    Summary of Trade Secrets**

133.    The Rembrandt Trade Secrets include proprietary methodologies for efficiently converting, correcting, and optimizing a 2D+Depth video for playback on a 3D autostereoscopic display, which are referred to as 3D Tooling and Fuser.

134.    These methodologies are utilized as an auto-conversion means for creating a seamless 2D to 3D conversion imaging. They represent key foundational technologies which are included in the design of autotomatic functions of Ultra-D. When coupled with a 2D/3D switchable lens, the diffractive/refractive optics provide an artefact-free 3DASD image.

135.    The methodologies included coding the "adjustments" of the factor and offset into the video were termed "DRT" or "Depth Range Tuning" by 3DFusion.

136.    The DRT advancements are incorporated into Stream's Ultra-D technological platform. The Eindhoven Team started to refer to these adjustments as "Steve's magic" and in one example, Eindhoven Team senior software engineer Bart Barenbrug stated, "he's a wizard at that for sure" in a November 10, 2010, email.

137.    Fuser was 3DFusion's foundation technological approach for the 2D to 3D conversion, and by using Philip's Blue Box as a test platform, Blumenthal was able to conceptualize a pre-automation level of content conversion designed to evolve into a fully automated 2D/3D conversion, in support of Philip's WOWvx, 2D+Depth platform's application. This advancement is key to the Philips 2D+D technological platform as found in Ultra-D.

138.    The Rembrandt Trade Secrets also include proprietary methodologies utilizing lens technology for refractive and diffractive lens switching for the creation of a light field and 3D content artefact correction. These methodologies are utilized in Ultra-D.

139.    The Rembrandt Trade Secrets include proprietary methodologies for facilitating on screen display functions of Borders and Liveliness and innovative adjustment capabilities. Borders neutralizes the window violation artefact issue found in larger 3D autostereoscopic screens. The edge of an object popping out of the screen in 3D cannot be touching the borders of the hardware displaying the image because that gives a perceptual contradiction, commonly known in the 3D community as a "window violation": on the one hand, the depth assigned will tell the viewer that the object is in front of the display, but on the other hand, it disappears behind the border of the display, which suggests a depth which is at least as far from the viewer as that border. Such perceptual contradiction detracts from the depth perception (the amount of pop) and can become discomforting eventually. Rembrandt's "Borders" trade secret, which is implemented as source code in Ultra-D, fixes this problem by creating objects that stick out in the middle but recede in depth near the edges of the image.

140.    As shown below, Borders appears on the Ultra-D On Screen Display Menu. It is both a user manual and automatic intervention based on the factor depth values in the zone identified as the Border, to accentuate the 3D objects center screen pop out effect, as described above.



141.    This multiple featured mechanism is designed to correct window edge violations and to enhance the 3D impact of the forward "pop" off the screen, and by limiting the factor depth range thereby contributing to the creation of an artefact free 3D image. The Borders menu provides for a depth map "factor" adjustment to be contained within a defined zone of the screen edge.

142.    In conventional 3D movie making depending upon the camera angles and the objective of the filming, a "window of borders" was created which framed the 3D image. Its purpose was to break the visual cues which neutralized the 3D impact when objects touched the edge of the screen.

143.    Shown below is a screen shot of the Ultra-D On-Screen Display (OSD) menu, showing the Borders menu with the four sides of the invisible "frame" defined by the positions top, bottom, left, and right. These are active factor adjustment locations of defined factor zones set by the position of the numerical counter as seen on the screen.  They provide an invisible frame as seen in the window diagram above.

144.    When the Ultra-D Borders menu is clicked in the next menu, an adjustable "Factor" window opens permitting the user to set the location of the top, bottom, left or right side of the frame area. This zone is adjustable as needed depending upon the type of 3D content and the desired impact.

145.    The thin line visible in the image below is the location of the invisible factor frame position setting, which is adjustable.  This allows the user to select the factor setting, which position the frame edge zone as defined by the bottom factor as shown by the faint blue visual line running under the man's foot just above the bottom edge.



146.    These manipulations are illustrated here for the User to make manual adjustments, whereas the automated process utilizes algorithms to achieve a seamless effect for correcting window violations.

147.    When looking at a 3D picture, a person looks at objects floating in a space defined by the relative position of the edges of the screen and the eyes. In terms of the depth cues, one is looking at a 3D world through a window which the brain will automatically make the adjustment for minor distortions due to objects disappearing from one eye view of the two views of 3D.

148.    As shown below, poor quality 3D content creates window violations which the brain cannot correct, resulting in eye strain, dizziness, and headaches. Consequently, a frame outline was used in 3D movies to offset the distortion created when objects moved out of view.

 

149.    The Ultra-D Borders adjustment is both a user manual adjustment and an automatic adjustment designed to minimize edge distortions operating in conjunction with other operations stemming from the use of the diffractive/refractive optics of the 2D switchable lens which imposes a 3D pop off the screen limiter function.

150.    These key Ultra-D advancements allow almost any 3D content to played on the screen without the artefacts that plague all other 3D auto stereoscopic platforms and utilize the Rembrandt Trade Secrets.

151.    This Rembrandt enabled technology goes to the heart of the commercial value for the Ultra-D technology and Debtors' estates as it allows and supports a broadcast quality, 3DTV mass market product for the consumer home.

152.    The Stream OSD Menu for the "Liveliness" adjustment is an additional 3D content modification technique based on the manipulation of an additional algorithm which has been remastered to apply to a 3D segment as an ongoing upgraded 3D enabling adjustment.  This is another 3D content modification technique utilizing Rembrandt's proprietary slant motion software, providing an additional 3D image improvement. Liveliness appears on the Ultra-D On-Screen Display and utilizes Rembrandt's slant motion software.

35

## FIRST CLAIM FOR RELIEF

### (Infringement of U.S. Patent No. 8,558,830)

153.    Rembrandt repeats, realleges, and incorporates by reference the allegations contained in the previous paragraphs of this Complaint as though fully set forth herein.

154.    Defendants make, use, import, sell, and/or offer for sale in the United States products including but not limited to the SCBV Products for selectively performing 3D content processing and/or settings/parameter configuration at one or more components of the system from 3D content capture to 3D content media display, including, for example, Stream's Ultra-D technology and Ultra-D Enabled Monitor ("UDEM") (collectively referred herein as the "Ultra-D System"). The Ultra-D technology generates a light-field addressing human depth perception in a way close to seeing the real three-dimensional world. The Ultra-D optical solution addresses two important depth cues, stereopsis and (partial) motion parallax, resulting in a more natural 3D experience.

155.    The Ultra-D System is a data processing system for improving the efficiency, quality, viewing comfort and/or visual impact of a 3D experience capable of being provided to at least one viewer of a 3D content media comprising a plurality of content sections, in conjunction with the use of predetermined 3D content modification techniques as recited in Claim 1 of the '830 Patent.

156.    The Ultra-D technology incorporated in the UDEM embodies at least Claim 1 of the '830 Patent by performing all of the steps of the claimed method. UDEM provides an on-screen-display (OSD) menu that allows an operator to identify a content section comprising a 3D media element and to select one or more 3D content modification techniques such as "3D Factor," "3D Offset" and "Borders" tools for the operator to improve the 3D media element thereby meeting the limitations of step (a) of Claim 1.

157.    The UDEM OSD allows the operator to apply the selected 3D content modification technique to improve the 3D media element thereby meeting the limitations of step (b) of Claim 1.

158.    The UDEM OSD allows the operator to determine a setting for at least one parameter (e.g. 62%) of the selected 3D content modification technique ("Borders") optimal for the 3D media element in future application frames thereby meeting the limitations of step (c) of Claim 1.

159.    The UDEM OSD allows the operator to associate a reference to the selected 3D content modification technique (e.g. "Borders") and the determined setting (e.g. 62%) with the 3D media element in future application frames thereby meeting the limitations of step (d) of Claim 1.

160.    The UDEM OSD allows the operator to selectively repeat the above steps for an additional section of the 3D content media.

161.    The UDEM OSD allows the operator to view in real time results of the above steps and to selectively cancel at least one result of at least one operation of the previously performed steps and/or selectively change at least one operation previously performed at the above steps to an alternate operation.

162.    The UDEM, after the above steps, generates a file configured for playback to a viewer and applies the selected 3D content modification technique to the 3D media element using the optimal parameter, and further configured to store for each 3D media element, the selected 3D content modification technique applied to each 3D media element and the associated reference to the future 3D content modification technique and the optimal parameter. The UDEM

performs this step by, for example, including a separate depth signal next to the regular video signal extended with meta-data.

163.    The UDEM processes "all [media] content (even non-3D)." Accordingly, it also meets all of the limitations of claims 2-5 of the '830 Patent.

164.    The UDEM meets all of the limitations of claim 6 of the '830 Patent by including an OSD that allows manual control of one or more steps of claim 1 by an operator.

165.    Defendants intended to induce patent infringement by SeeCubic and purchasers of Debtors' estate assets by incorporating Ultra-D technology and had knowledge that the inducing acts would cause infringement or were willfully blind to the possibility that their inducing acts would cause infringement of the subject matter claimed in the '830 Patent.

166.    Defendants willfully infringed the '830 Patent because Rembrandt provided actual notice of the Rembrandt patents and informed Defendants of the infringement, which continued unheeded. Defendants' infringement constitutes egregious conduct because Defendants engaged in infringing acts over Rembrandt's objections.

167.    Homony failed to enforce the Bankruptcy TRO against SeeCubic and Stastney. Homony has failed to monitor the infringing actions of the enjoined parties despite specific requests to do so, allowing them to infringe the '830 Patent with impunity and causing harm to Rembrandt.

168.    At any time, Homony could have worked with Rembrandt to remove Rembrandt's patented technology from the Debtors' assets being sold or narrow the scope of the assets so that it was clear that Rembrandt's technology was not included in the sale. Homony has failed to meet his duty to identify the assets of the Debtors' estates and violated his duty to enforce the Bankruptcy TRO despite direct knowledge of the violations.

169.     Upon information and belief, Homony is aware that Stastney, SeeCubic, and SCBV are using the Rembrandt IP in support of an effort to acquire the Debtors' assets as well as to market the assets, including Rembrandt's technology, in an attempt to commercialize the technology. This conduct violates the Bankruptcy TRO issued by the Bankruptcy Court and injures both Rembrandt and the Debtors.

170.     The above examples are based on information that has been made publicly available. They do not set forth all of Rembrandt's infringement theories. Other claims in the Rembrandt Patents read on the products will be disclosed in forthcoming infringement contentions under this District's local patent rules. Rembrandt reserves the right to amend or supplement its infringement theories upon more information available through formal discovery and this Court completing its claim construction proceedings.

171.     As a direct and proximate result of Defendants' infringement of the '830 Patent, Rembrandt has suffered damages in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF

### (Infringement of U.S. Patent No. 9,521,390)

172.     Rembrandt repeats, realleges, and incorporates by reference the allegations contained in the previous paragraphs of this Complaint as though fully set forth herein.

173.     The Ultra-D technology incorporated in the UDEM, or other display devices directly infringes at least claim 1 of the '390 Patent by performing all of the steps of the claimed method.

174.     The UDEM provides an on-screen-display (OSD) menu that allows an operator to identify a content section comprising a 3D media element and to select one or more 3D content

modification techniques such as "3D Factor," "3D Offset" and "Borders" tools for the operator to improve the 3D media element thereby meeting the limitations of step (a) of claim 1.

175.    The UDEM OSD allows the operator to apply the selected 3D content modification technique to improve the 3D media element thereby meeting the limitations of step (b) of claim 1.

176.    The UDEM OSD allows the operator to determine a setting for at least one parameter (e.g. 62%) of the selected 3D content modification technique ("Borders") optimal for the 3D media element in future application frames thereby meeting the limitations of step (c) of claim 1.

177.    The UDEM OSD allows the operator to associate a reference to the selected 3D content modification technique (e.g. "Borders") and the determined setting (e.g. 62%) with the 3D media element in future application frames thereby meeting the limitations of step (d) of claim 1.

178.    The UDEM OSD allows the operator to selectively repeat the above steps for an additional section of the 3D content media.

179.    The UDEM OSD allows the operator to view in real time results of the above steps and to selectively cancel at least one result of at least one operation of the previously performed steps and/or selectively change at least one operation previously performed at the above steps to an alternate operation.

180.    The UDEM, after the above steps, generates a file configured for playback to a viewer and applies the selected 3D content modification technique to the 3D media element using the optimal parameter, and further configured to store for each 3D media element, the selected 3D content modification technique applied to each 3D media element and the associated

reference to the future 3D content modification technique and the optimal parameter. The UDEM performs this step by, for example, including a separate depth signal next to the regular video signal extended with meta-data.

181.    The UDEM processes "all [media] content (even non-3D)." Accordingly, it also meets all of the limitations of claims 2-5 of the '390 Patent.

182.    The UDEM meets all of the limitations of claim 6 of the '390 Patent by including an OSD that allows manual control of one or more steps of claim 1 by an operator.

183.    Defendants intended to induce patent infringement by SeeCubic and purchasers of Debtors' estate assets by incorporating Ultra-D technology and had knowledge that the inducing acts would cause infringement or were willfully blind to the possibility that their inducing acts would cause infringement of the subject matter claimed in the '390 Patent.

184.    Defendants willfully infringed the '390 Patent because Rembrandt provided actual notice of the Rembrandt patents and informed Defendants of the infringement, which continued unheeded. Defendants' infringement constitutes egregious conduct because Defendants engaged in infringing acts over Rembrandt's objections.

185.    Homony failed to enforce the Bankruptcy TRO against SeeCubic and Stastney. Homony has failed to monitor the infringing actions of the enjoined parties despite specific requests to do so, allowing them to infringe the '390 Patent with impunity and causing harm to Rembrandt.

186.    The above examples are based on information that has been made publicly available. They do not set forth all of Rembrandt's infringement theories. Other claims in the Rembrandt Patents read on the products will be disclosed in forthcoming infringement contentions under this District's local patent rules. Rembrandt reserves the right to amend or

supplement its infringement theories upon more information available through formal discovery and this Court completing its claim construction proceedings.

187.    As a direct and proximate result of Defendants' infringement of the '390 Patent, Rembrandt has suffered damages in an amount to be determined at trial.

**THIRD CLAIM FOR RELIEF**

**(Infringement of U.S. Patent No. 9,681,114)**

188.    Rembrandt repeats, realleges, and incorporates by reference the allegations contained in the previous paragraphs of this Complaint as though fully set forth herein.

189.    The Ultra-D technology incorporated in the UDEM, or other display devices directly infringes at least claim 20 of the '114 Patent by performing all of the steps of the claimed method.

190.    The UDEM provides an on-screen-display (OSD) menu that allows an operator to identify a content section comprising a 3D media element and to select one or more 3D content modification techniques such as "3D Factor," "3D Offset" and "Borders" tools for the operator to improve the 3D media element thereby meeting the limitations of step (a) of claim 20.

191.    The UDEM OSD allows the operator to apply the selected 3D content modification technique to improve the 3D media element thereby meeting the limitations of step (b) of claim 20.

192.    The UDEM OSD allows the operator to determine a setting for at least one parameter (e.g. 62%) of the selected 3D content modification technique ("Borders") optimal for the 3D media element in future application frames thereby meeting the limitations of step (c) of claim 20.

193.    The UDEM OSD allows the operator to associate a reference to the selected 3D content modification technique (e.g. "Borders") and the determined setting (e.g. 62%) with the 3D media element in future application frames thereby meeting the limitations of step (d) of claim 20.

194.    The UDEM OSD allows the operator to selectively repeat the above steps for an additional section of the 3D content media.

195.    The UDEM OSD allows the operator to view in real time results of the above steps and to selectively cancel at least one result of at least one operation of the previously performed steps and/or selectively change at least one operation previously performed at the above steps to an alternate operation.

196.    The UDEM, after the above steps, generates a file configured for playback to a viewer and applies the selected 3D content modification technique to the 3D media element using the optimal parameter, and further configured to store for each 3D media element, the selected 3D content modification technique applied to each 3D media element and the associated reference to the future 3D content modification technique and the optimal parameter. The UDEM performs this step by, for example, including a separate depth signal next to the regular video signal extended with meta-data.

197.    Defendants intended to induce patent infringement by SeeCubic and purchasers of Debtors' estate assets by incorporating Ultra-D technology and had knowledge that the inducing acts would cause infringement or were willfully blind to the possibility that their inducing acts would cause infringement of the subject matter claimed in the '114 Patent.

198.    Defendants willfully infringed the '114 Patent because Rembrandt provided actual notice of the Rembrandt patents and informed Defendants of the infringement, which continued

unheeded. Defendants' infringement constitutes egregious conduct because Defendants engaged in infringing acts over Rembrandt's objections.

199.    Homony failed to enforce the Bankruptcy TRO against SeeCubic and Stastney. Homony has failed to monitor the infringing actions of the enjoined parties despite specific requests to do so, allowing them to infringe the '114 Patent with impunity and causing harm to Rembrandt.

200.    The above examples are based on information that has been made publicly available. They do not set forth all of Rembrandt's infringement theories. Other claims in the Rembrandt Patents read on the products will be disclosed in forthcoming infringement contentions under this District's local patent rules. Rembrandt reserves the right to amend or supplement its infringement theories upon more information available through formal discovery and this Court completing its claim construction proceedings.

201.    As a direct and proximate result of Defendants' infringement of the '114 Patent, Rembrandt has suffered damages in an amount to be determined at trial.

**FOURTH CLAIM FOR RELIEF**

**(Misappropriation Under Defend Trade Secrets Act, 18 U.S.C. §§ 1836 et seq.)**

202.    Rembrandt repeats, realleges, and incorporates by reference the allegations contained in the previous paragraphs of this Complaint as though fully set forth herein.

203.    The Rembrandt Trade Secrets constitute trade secrets within the meaning of 18 U.S.C. §1839(3).

204.    The Rembrandt Trade Secrets were trade secrets at the time of the Defendants' misappropriation, and Rembrandt has taken reasonable steps to keep the trade secrets confidential.

205.    The Rembrandt Trade Secrets derive independent economic value from not being known or readily ascertainable by others who could obtain economic value from their disclosure or use.

206.    Homony misappropriated the Rembrandt Trade Secrets by selling or allowing the sale of the SCBV Products to entities competing with Stream, allowing SeeCubic to obtain and use the SCBV Products, offering for sale assets that include the Rembrandt Trade Secrets as part of the 363 Sale of the Debtors' estate assets, and offering for purchase a license to the Rembrandt Trade Secrets.

207.    SSG misappropriated the Rembrandt Trade Secrets by offering for sale assets that include the Rembrandt Trade Secrets as part of the 363 Sale of Debtors' estate assets and offering for purchase a license to the Rembrandt Trade Secrets.

208.    Each of Victor, Kohl, Warznak, Lamm, and Charlton misappropriated the Rembrandt Trade Secrets by offering for sale assets that include the Rembrandt Trade Secrets as part of the 363 Sale of Debtors' estate asssets and offering for purchase a license to the Rembrandt Trade Secrets.

209.    The misappropriation of the Rembrandt Trade Secrets was and continues to be willful and malicious.

210.    Rembrandt has suffered and will continue to suffer damages as a result of the misappropriation in an amount to be determined at trial.

211.    The Defendants' acquisition, use, and/or disclosure of the Rembrandt Trade Secrets have substantially harmed, and are continuing to harm, Rembrandt.

212.    Defendants' misappropriation has diminished and continues to diminish the value of the Rembrandt Trade Secrets.

## FIFTH CLAIM FOR RELIEF

### (Breach of Contract under Delaware Law)

213.    Rembrandt repeats, realleges, and incorporates by reference the allegations contained in the previous paragraphs of this Complaint as though fully set forth herein.

214.    The Settlement Agreement is a valid and binding contract between Rembrandt and Stream, which is now part of the bankruptcy estate administered by Homony and offered for sale by Defendants.

215.    Rembrandt has fully performed all its obligations under the Settlement Agreement.

216.    Homony has materially breached the Settlement Agreement by taking actions during his administration of the Debtors' estates that fall outside the scope of the intellectual property license in the Settlement Agreement. These actions include but are not limited to selling or allowing the sale of the SCBV Products to entities competing with Stream, allowing SeeCubic to obtain and use the SCBV Products upon importation into the United States from SCBV, offering for sale assets that include the Rembrandt IP as part of the 363 Sale of Debtors' estate assets, and offering for purchase a license to the Rembrandt IP.

217.    SSG has materially breached the Settlement Agreement by offering for sale assets that include the Rembrandt IP as part of the 363 Sale of Debtors' estate assets and offering for purchase a license to the Rembrandt IP.

218.    As a direct and proximate result of Defendants' breach, Plaintiff has suffered damages, including but not limited to, lost profits and harm to its business reputation in an amount to be determined at trial.

219.    Rembrandt is entitled to recover its attorney's fees and costs in bringing this claim.

## **PRAYER FOR RELIEF**

WHEREFORE, Rembrandt prays for entry of judgment in its favor and against

Defendants as follows:

     A.     Defendants have infringed one or more claims of the Rembrandt Patents;

     B.     Defendants have misappropriated the Rembrandt Trade Secrets;

     C.     Defendants have breached the Settlement Agreement;

     D.     Temporary, preliminary, and permanent injunctive relief preventing further

infringement, misappropriation, and breach by Defendants;

     E.     An award of damages adequate to compensate Rembrandt for Defendants'

infringement, misappropriation, and breach, including pre-judgment and post-judgment interest;

     F.     An award of treble damages, costs, and attorney fees pursuant to 35 U.S.C. § 285;

     G.     Exemplary damages for willful and malicious misappropriation under the DTSA;

     H.     An award of attorney fees under the Settlement Agreement; and

     I.     Granting such other and further relief as the Court may find just, proper, and

equitable.


Date: December 17, 2024               Respectfully submitted by:


                                     */s/ Andrew DeMarco*
                                     Andrew DeMarco, Esq. (PA Bar No. 326294)
                                     ademarco@devlinlawfirm.com
                                     DEVLIN LAW FIRM LLC
                                     1526 Gilpin Avenue
                                     Wilmington, DE 19806
                                     (302) 449-9010

                                     *Attorneys for Rembrandt 3D Holding Ltd.*