# Exhibit 2

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **In re:** | : **Chapter 11** |
| | : |
| | : **Bankruptcy No. 23-10763 (AMC)** |
| **Stream TV Networks, Inc.,** *et al.* | : **(Jointly Administered)**[1] |
| | : |
| **Debtors.** | : **Hearing Date: June 26, 2024** |
| | : **Hearing Time: 12:30 p.m.** |
| | : **Hearing Place: Courtroom #4** |

**MOTION OF WILLIAM A. HOMONY IN HIS CAPACITY AS CHAPTER 11 TRUSTEE
FOR ENTRY OF AN ORDER APPROVING A SETTLEMENT AGREEMENT AND
MUTUAL RELEASE WITH HAWK INVESTMENT HOLDINGS, LTD., AS
COLLATERAL AGENT FOR THE SECURED NOTEHOLDERS OF SEECUBIC, INC.,
PURSUANT TO FED. R. BANKR. P. 9019(a) AND 11 U.S.C. § 105(a)**

William A. Homony (the "Trustee"), in his capacity as Chapter 11 trustee of the bankruptcy estates of Stream TV Networks, Inc. ("Stream") and Technovative Media Inc. ("Technovative" when referred to with Stream, the "Debtors"), by and through his counsel, Obermayer Rebmann Maxwell & Hippel LLP, files this Motion for Entry of an Order Approving a Settlement Agreement and Mutual Release (the "Agreement") with Hawk Investment Holdings, Ltd. ("Hawk"), as Collateral Agent for the secured noteholders of SeeCubic, Inc. ("SeeCubic" or in conjunction with the Trustee, Hawk and SeeCubic may be generally referred to as "Party" or collectively as the "Parties") and SeeCubic pursuant to Fed. R. Bankr. P. 9019(a) and 11 U.S.C. § 105(a) (the "Motion"), and in support thereof, respectfully avers as follows:

**JURISDICTION AND VENUE**

1.     This Court has jurisdiction over this Motion under 28 U.S.C. § 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.     This matter is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A),

---

[1] On April 11, 2023, the Court entered an order directing joint administration of the above-captioned case and *In re Technovative Media, Inc.*; Case No. 23-10764 (AMC). (D.I. #81).

(B), (K) and (O).

3.      The statutory basis for the relief requested herein is Fed. R. Bankr. P. 9019 and 11 U.S.C. § 105(a).

## **BACKGROUND**

**A.      Bankruptcy Procedural Background.**

4.      On March 15, 2023, (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq.  (the "Bankruptcy Code").

5.      On March 20, 2023, Hawk filed a motion for relief from the automatic stay (the "Hawk Stay Relief Motion") to proceed with an action against the Debtors (D.I. #16) in the Delaware Court of Chancery (the "Delaware Chancery Court") under § 225 of Title 8 of the Delaware Code (the "225 Action").

6.      On April 5, 2023, the Debtors filed an objection to the Hawk Stay Relief Motion (D.I. #78).

7.      On April 6, 2023, Hawk filed a motion pursuant to sections 1112/1104 of the Bankruptcy Code, seeing dismissal or conversion of the Debtors' cases, or alternatively, the appointment of a Chapter 11 trustee pursuant to section 1104(a) of the Bankruptcy Code (the "1112/1104 Motion") (D.I. #94).

8.      In the 1112/1104 Motion, Hawk argued that cause existed to appoint a trustee based upon the Debtors' pre- and post-petition history of fraud, dishonesty, incompetence, and gross mismanagement of their businesses.

9.      The Debtors filed an opposition to the 1112/1104 Motion on May 8, 2023 (D.I. #193).

10.     On January 5, 2024, the Court entered an order, which, among other things, (1)

granted the 1112/1104 Motion with respect to the appointment of a Chapter 11 trustee, and (2) granted the Hawk Stay Relief Motion to allow the Section 225 Action to proceed (the "<u>Trustee Order</u>") (D.I. #549).

11. The Trustee Order instructed the United States Trustee's Office to immediately begin the process of appointing a Chapter 11 trustee and set a status hearing for January 24, 2024 (the "<u>Status Hearing</u>").

12. On January 9, 2024, the Office of the United States Trustee filed a notice of appointment of William A. Homony to serve as the chapter 11 trustee as well as an application for the entry of an Order approving the appointment of the Trustee. (D.I. #554 and 553, respectively).

13. On January 12, 2024, the Bankruptcy Court entered an Order Approving the Appointment of the Trustee (D.I. #558).

14. On January 17, 2024, the Trustee filed an Application to Employ Miller Coffey Tate LLP as his accountants/advisors (D.I. #566) and that Application was approved on February 15, 2024 (D.I. # 586).

15. On January 17, 2024, the Trustee filed an Application to Employ Obermayer Rebmann Maxwell & Hippel LLP as his counsel (D.I. #564) and that Application was approved on January 29, 2024 (D.I. # 577).

16. On January 31, 2024, the Trustee filed an Application to Employ Steven M. Coren and Coren & Ress, P.C. as his litigation counsel (D.I. # 579) and that Application was approved on February 15, 2024 (D.I. # 587).

**B.**     **The 225 Action and Chancery Court Litigation.**

17.     At the time of the Trustee's appointment, the 225 Action was pending in the Delaware Chancery Court.

18.     Prior to the commencement of the 225 Action, a contingent of the Debtors' secured creditors entered into an Omnibus Agreement (the "Omnibus Agreement"), which the Delaware Court of Chancery upheld as validly effectuating a foreclosure.

19.     In June 2022, the Delaware Supreme Court voided the Omnibus Agreement and reversed the the decision of the Delaware Court of Chancery.

20.     Thereafter, Hawk sought to exercise certain of its rights as a secured creditor of the Debtors through the exercise of proxy rights in pursuit of a foreclosure sale under Article 9 of the UCC.

21.     The Debtors contested that Hawk had validly exercised its proxy rights resulting in Hawk's institution of the 225 Action to determine the proper composition of Technovative's board of directors.

22.     Numerous issues were raised in the 225 Action, including, *inter alia*, whether Hawk's secured position had been converted from debt to equity pursuant to certain conversion agreements.  Hawk alleges that collateral estoppel precludes the Trustee from advancing certain positions, a premise which the Trustee disputes.  The Debtors contest Hawk's positions and allege that the Hawk secured debt was converted to equity.

23.     In any event, but for the settlement (the "Settlement") embodied in the Agreement, the ultimate determination of Hawk's status—and its impact on the Debtors—likely would require extensive and extremely expensive continuing litigation in the Delaware Chancery Court, the Delaware Supreme Court, this Court and perhaps other courts—the outcome of which is

unpredictable.

24.    To prevail in the 225 Action, the Debtor must overcome significant factual and legal challenges, and its ability to do so is far from guaranteed.

25.    On March 1, 2024, the Trustee filed an expedited motion to reinstate the automatic stay in connection with the 225 Action.  On April 1, 2024, the Bankruptcy Court entered a consent order granting the Trustee's motion, thereby affording the Trustee and his advisors additional time to prepare for and defend the 225 Action.

26.    If the Agreement is not approved, the trial of the 225 Action likely would commence on July 31, 2024.  Hawk will seek relief that, if awarded, may substantially prejudice the Debtors' estates, and perhaps leave nothing for other creditors.

C.    **The Pending Adversary/Injunction Proceedings Against Hawk.**

27.    After the Petition Date, the Debtors instituted a proceeding in bankruptcy court against Hawk and others (the "Adversary").

28.    In the Adversary, the Debtors alleged, *inter alia*, that certain shareholders and their secured lenders (the "Secured Creditors") conspired to and did exert control wrongfully over Debtor property.  The Adversary further alleges that the defendants, including the Secured Creditors and SeeCubic, and certain board members interfered with employees and investors, while conspiring to cause the Debtors to breach their loan agreements with the Secured Creditors pursuant to which the Debtors were loaned more than $50,000,000.00 (US).[2]

29.    The Debtors also allege that the Omnibus Agreement, which resulted in the transfer of certain assets to SeeCubic and the decision by board members to enter and consummate same, breached fiduciary duties to the Debtors.  The Debtors complain that the Secured Creditors used

---

[2] In addition to the Adversary and the 225 Action, the Settlement resolves all Pending Litigation Matters, as that term is defined in the Agreement.

their power and position to shift ownership away from the principals of the Debtors, and to wrongfully secrete, remove and convert assets of the Debtors.

**D.     The Trustee's Efforts to Bring Value into the Estates.**

30.     In the relatively brief period since his appointment, the Trustee and his professionals have: (i) reviewed and analyzed volumes of documents relating to Debtors and their foreign subsidiaries; (ii) reviewed the extensive filings and hearing transcripts in the bankruptcy cases; (iii) investigated and analyzed Debtors' Adversary, (iv) investigated and analyzed the Delaware Chancery Court cases including the 225 Action and the Delaware Supreme Court case, and (v) interviewed Debtors' bankruptcy counsel, Delaware counsel, Netherlands counsel, and other representatives.

31.     Since appointed, the Trustee has been faced with a "melting ice cream cone."

32.     Debtors have no money, faltering operations, and potentially valuable operations held by a foreign subsidiary—an indirect subsidiary of Technovative in the Netherlands known as SeeCubic BV ("SCBV").

33.     Debtors have been unable to fund SCBV, whose expenses have been funded post-petition by the Secured Creditors.

34.     It is widely recognized that the principal value of Debtors' assets resides in SCBV, its employee knowhow and operations, and Debtors' downstream IP.

35.     Unable to secure a DIP loan or to fund SCBV, SCBV employees in the Netherlands were close to leaving, and SCBV recently was on the verge of shutting down—to the substantial detriment of Debtors and their ability to garner value for the benefit of Debtors' bankruptcy estates.

36.     Because of the substantial and unliquidated secured claims and the disputes connected thereto, the Trustee was unable to obtain third-party debtor in possession financing to

begin operations, fund SCBV and/or fund case administration, including prosecution of the 225 Action and the Adversary.

37.     It quickly became clear to the Trustee that Debtors' capital stack was in disarray, and that continuing litigation over debt-to-equity conversion and other matters would be risky, costly, and perhaps leave the estates without unencumbered assets to market or sell.

38.      As the Trustee investigated the Debtors' cash needs and available resources, it quickly became apparent that Stream was not selling televisions or technology and had no reliable revenue sources to fund operations or the bankruptcy proceedings.  Rather, Debtors' principal had been attempting to finance Stream through bootstrap equity raises in a non-debtor company known as Visual Semiconductor, Inc. or "VSI".  The Trustee made clear that neither the Debtors' estates nor the Trustee would participate in post-petition equity raises.

39.     The Trustee met unsuccessfully with Debtors' principal to explore a viable plan of reorganization.

40.     After a presentation of the Debtors' technology and the principal's envisioned future use of the technology, the Trustee awaited both a proposal for Debtor in Possession Financing (a "DIP") and exit plan financing from the Debtors' principal, with proof of financial wherewithal, which would allow the secured claims (if any) to be satisfied once determined and provide a return to unsecured creditors.  In the Trustee's business judgment, no such viable proposals were presented.

41.     The Trustee also met with Rembrandt 3D Holding Ltd. ("Rembrandt"), who is alleged to be one of the Debtor's largest unsecured creditors and a third party interested in the technology owned by or licensed to the Debtors.  No offer to purchase or to provide a DIP was forthcoming, though Rembrandt continues to express interest in Debtors' property.

4875-7966-5596 v1
318450713.5

42.     After open and robust discussion and negotiation, the Trustee has entered into the Agreement, and seeks Bankruptcy Court approval under Federal Rule of Bankruptcy Procedure 9019.

## E.     The Proposed Settlement With Hawk (as Agent for the Secured Creditors).

43.     The Trustee has interacted and negotiated with interested parties, including Debtors' principal, Rembrandt, and Hawk.  From the outset, the Trustee made clear that he would entertain only realistic proposals, coupled with proof of the financial ability to fund.

44.     In the Trustee's business judgment, only Hawk made a viable proposal.

45.     The Settlement proposal embodied in the Agreement leaves open the possibility that others who have expressed interest, including the Debtors' principal and Rembrandt, will have the opportunity to present a potentially higher or better offer when Debtor property is exposed to sale.

46.     The Settlement with Hawk takes into account possible claims against Hawk, the prospect of litigating with Hawk into the future, the risk inherent in litigating with Hawk about the nature and extent of its liens while trying to administer the Bankruptcy Cases, and the importance of achieving a recovery for unsecured creditors in a reasonable time.

47.     The Settlement reflects the substantial efforts of the Trustee and his advisors and the advisors of Hawk to achieve a commonsense resolution of the bankruptcy and related proceedings as expeditiously as possible, while minimizing further administrative expenses.

48.     In the Trustee's business judgment, the time is right to attempt a full resolution, which results in payments to creditors, rather than continued administration of potentially insolvent bankruptcy estates.

49.     Significantly, the Trustee is faced with millions of dollars in administrative

expenses before money can be made available for unsecured creditors.

50.     Under the circumstances, the Trustee has determined that the Agreement provides the best alternative for the bankruptcy estates.

51.     Accordingly, the Trustee and Hawk seek to settle all claims between Debtors' estates and the Secured Creditors, while the Trustee undertakes a process to market and sell substantially all the Debtors' assets, including the Secured Creditors' collateral[3] under Section 363 of the Bankruptcy Code.

**F.     The Settlement**

52.     A detailed description of the terms of the Settlement and Agreement are set forth below and a copy of the Agreement is attached hereto as Exhibit "A" and incorporated herein.

53.     Treatment of Secured Claims:

    a.  Upon the entry of the order approving the 9019 Motion, the Hawk Claim shall be deemed an allowed Secured Claim, secured by the Collateral as more fully set forth in Claim No. 6 and the supporting documentation, in the amount of $180 million, subject to increase as set forth in the Agreement (such amount, the "Allowed Secured Claim").  The Trustee waives the right to object to any portion of the Allowed Secured Claim or to seek the conversion or subordination of such claim for so long as the applicable provision of the Agreement remains valid and binding on the Parties.

    b.  The Allowed Secured Claim shall increase on a dollar-for-dollar basis for documented and evidenced amounts actually advanced to fund the operations of

---

[3] For the avoidance of doubt, the Secured Creditors' collateral excludes all claims and causes of action against third parties including but not limited to Chapter 5 claims against third parties and causes of action and D&O claims and any resulting proceeds therefrom.

9

SeeCubic, B.V. ("SCBV") between the Trustee's appointment date and the sale

Closing in accordance with Section 6 of the Agreement, which advanced amounts

shall not constitute administrative expenses of the Debtors' estates and shall only

increase the Allowed Secured Claim.

c.   Upon the entry of the order approving the 9019 Motion, the proofs of claim of

SLS Holdings VI, LLC [Claim No. 9 on the official claims docket of Stream and

Claim No. 2 on the official claims docket of TMI] and the proofs of claim of

SeeCubic, Inc. [Claim No. 14 on the official claims docket of Stream and Claim

No. 3 on the official claims docket of TMI] shall be deemed withdrawn of record

with no further order of the Bankruptcy Court necessary to effectuate such

withdrawal.

54.    Sale of the Debtors' Assets.  The Trustee has sought approval of the retention of an

investment banker to market the Collateral.  The Trustee shall seek entry of the Bidding Procedures

Order on an expedited basis to obtain approval thereof concurrently with the entry of the 9019

Order. Subject to documentation satisfactory to Hawk (and drafted in consultation with Hawk),

SCI shall serve as the stalking horse bidder for the Collateral, with such bid (the "Stalking Horse

Bid") and Asset Purchase Agreement (the "Stalking Horse APA") attached to the Bidding

Procedures.  Subject to documentation satisfactory to Hawk and the Trustee, the Stalking Horse

Bid shall consist of a credit bid of the Allowed Secured Claim in the amount of $150 million.  The

Secured Creditors waive the right to seek or obtain a "breakup fee" or a "topping fee" or any other

bid protections as part of the Stalking Horse Bid.

55.    The Bidding Procedures shall specify that in order for any bid other than the

Stalking Horse Bid to constitute a "Qualifying Bid" such bid shall include:

a. A bid deposit in the amount of 10% of the proposed aggregate purchase price (the "Bid Deposit"), and

b. Evidence satisfactory to the Trustee of its financial wherewithal to consummate a Sale in the amount of the proposed purchase price.

56.　The Bidding Procedures shall specify that Qualifying Bids may include both cash and non-cash consideration, subject to the following conditions:

a. The cash component shall be no less than $120 million,

b. The non-cash component of the bid shall be backed by a letter of credit or other security, over which Hawk shall have consultation rights as to the sufficiency and form of such security, and

c. The Bid Deposit shall be 10% of the aggregate purchase price, including both the cash component and the non-cash component of the bid.

57.　To the extent the Trustee receives any other Qualified Bids (exclusive of the Stalking Horse Bid which will be deemed a Qualified Bid), SCI may participate in the Auction. Any overbid submitted by SCI in excess of the Stalking Horse Bid at the Auction shall be in cash only.  For the avoidance of doubt, SCI cannot utilize any of the remaining Allowed Secured Claim as part of any overbid; however, its overbid may include a credit bid up to $150 million.

58.　Trustee/Estate Carve out.  With respect to any sale that closes as contemplated by, and in accordance with, the terms of the Agreement, the Secured Creditors will provide a carve-out ("Carve-Out") in the form of cash from the sale proceeds of their collateral, or SeeCubic shall fund the Carve-Out if the Secured Creditors' Stalking Horse Bid or any subsequent overbid is determined to be the winning bid, as follows:

4875-7966-5596 v1
318450713.5

a. $7,500,000.00 and an additional 10% of each dollar in excess of the Stalking Horse
Bid for the benefit of the Debtors' estates paid as follows:

    i. $1,000,000.00 paid to the Trustee upon entry of an Order approving the
Agreement (ie: the 9019 Motion);

    ii. $1,500,000.00 paid to the Trustee upon approval of the bidding procedures;
and

    iii. The Trustee shall receive the balance of the Carve-Out (*i.e.*, the Carve-Out
minus the Carve-Out Advance) at Closing:

        1. In the event SCI is the successful bidder, by SCI in cash at Closing.

        2. In the event a third party is the successful bidder, from the cash
proceeds of the purchase price.

b. Trustee to retain rights to the $1 million bond posted by the Debtors in the DE
Chancery Court.

c. Trustee to retain all claims and cause of action not released against third-parties
including but not limited to Chapter 5 claims and causes of action and any claims
against the Debtors' directors and officer (collectively "Litigation Claims") and any
resulting proceeds from said Litigation Claims.

c. The bankruptcy estates and/or any trustee or disbursing agent retain the right to
object to claims against the bankruptcy estates.

d. The Secured Creditors will provide the Trustee with documentation regarding
SeeCubic's financial ability to fund the Carve-Out.

e. The Secured Creditors will be allowed a subordinate unsecured deficiency claim
subordinated to all other general unsecured creditors (the "Deficiency Claim") to

the extent that the Secured Creditor Distribution is not sufficient to satisfy the

Allowed Secured Claim in full.  The Secured Creditors' Deficiency Claim will be

recognized as an impaired unsecured claim which the Secured Creditor shall be

entitled to vote on confirmation of any Trustee Plan.

54.    Releases.

a.    Included in the Agreement and the 9019 Motion (as defined below), the Trustee,

Debtors and the Debtors' estates and the Secured Creditors (released parties to be

further defined in the 9019 Motion and agreement, but will include the foregoing

as well as any named defendants in any action currently pending initiated by the

Debtors who participate by granting releases to the Debtors and Trustee) will

exchange customary mutual general releases, effective upon the closing of any sale

of the Debtors' assets as contemplated by, and in accordance with, the  Agreement

(whether such sale is to the Secured Creditors or a third party), including, for the

avoidance of doubt, dismissal with prejudice all causes of action and claims

currently pending in any other federal or state court (or analogous foreign

jurisdiction) currently pending in the United States or abroad, and excluding any

obligations created under the Agreement or ultimate asset purchase agreement.  The

Secured Creditors agree to not file any further pleadings in the Debtors' pending

bankruptcy cases subsequent to a sale closing and receipt of any sale proceeds from

the Trustee, except to enforce or otherwise seek an interpretation of the Agreement

and the sale documents.

## RELIEF REQUESTED

55.    The Trustee respectfully requests entry of an Order approving the Settlement and

4875-7966-5596 v1
318450713.5

the Agreement pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 9019.

56.     The discussion of the terms contained in the Agreement is intended as a summary

only and all parties in interest are encouraged to read the Agreement in its entirety.

57.     To the extent that there are discrepancies between the summary contained in the

Motion and the terms contained in the Agreement, the terms of the Agreement shall control.

58.     Federal Rule of Bankruptcy Procedure 9019(a) provides "on motion by the trustee

and after notice and a hearing, the Court may approve a compromise or settlement.  The decision

to approve or disapprove a settlement is within the sound discretion of the bankruptcy judge." *See*,

*In re Martin*, 91 F.3d 389, 393 (3rd Cir. 1996).

59.     The Debtors seek approval, pursuant to Bankruptcy Code § 105 and Fed. R. Bankr.

P. 9019, of the Settlement of the claims among the Parties as set forth in the Agreement.

60.     In *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc.*

*v. Anderson*, 390 U.S. 414, *reh'g denied*, 391 U.S. 909 (1968), the Supreme Court instructed as to

those factors to be considered in determining whether to approve a settlement.  The factors outlined

by the Supreme Court in *Anderson* have been uniformly summarized as follows:

      a.     the probability of success in the litigation;

      b.     the complexity of the litigation involved and the expense, inconvenience
          and delay necessarily attending it;

      c.     the difficulties, if any, to be encountered in the matter of collection; and

      d.     the paramount interest of the creditors.

*See*, *Martin*, 91 F.3d at 393; *In re Marvel Entertainment Group, Inc.*, 222 B.R. 243, 249 (D. Del.

1998); *In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997); *In re Pennsylvania Truck Lines,*

*Inc.*, 150 B.R. 595, 598 (E.D. Pa. 1992), aff'd, 8 F.3d 812 (3d Cir. 1993); *In re Grant Broadcasting*

*of Philadelphia, Inc.*, 71 B.R. 390, 395 (Bankr. E.D. Pa. 1987).

14

61.     Bankruptcy Rule 9019 authorizes this Court to approve the settlement entered into

by the Debtor.  The decision whether to accept or reject a compromise is committed to the sound

discretion of the Bankruptcy Court, "which must determine if the compromise is fair, reasonable,

and in the interest of the estate."  *See*, *Louis's*, 211 B.R. at 801.  *See also*, *In re Neshaminy Office*

*Building Assocs.*, 62 B.R. 798, 803 (E.D. Pa. 1986).

62.     The settlement need not be the best that the debtor could have achieved but must

only fall "within the reasonable range of litigation possibilities."  *See*, *In re Penn Central Transp.*

*Co.*, 596 F.2d 1102, 1114 (3d Cir. 1979).  In making its determination, a court is not to substitute

its own judgment for that of the debtor.  *See*, *Neshaminy Office Bldg.*, 63 B.R. at 803.  Moreover,

it is not necessary for the court to conduct a truncated trial of the facts of the merits underlying the

dispute.  *See Grant Broadcasting*, 71 B.R. at 396.  *See also*, *In re A&C Properties*, 784 F.2d 1377,

1384 (9th Cir.), cert. denied, 479 U.S. 854 (1986).  Rather, the court need only "canvass the issues

to see whether the settlement fall[s] below the lowest point in the range of reasonableness."  *See*,

*Neshaminy Office Bldg.*, 62 B.R. at 803 (*quoting*, *In re W.T. Grant Co.*, 4 B.R. 53, 69 (S.D.N.Y.

1977)).

63.     Here, the Agreement clearly falls within the range of reasonableness for purposes

of satisfying Bankruptcy Rule 9019 criteria.

64.     The dispute between the Parties involves numerous, complex issues.   The

Agreement resolves these matters in a manner which, in the exercise of the Trustee's business

judgment, is appropriate and beneficial to the Bankruptcy Estates.

65.     Faced with insolvent estates and understanding fully the complex and wasting

collateral picture and the challenged capital structure of the Debtors, the Trustee has reasonably

elected a path that minimizes additional administrative expenses and avoids the substantial

additional expenses to be incurred with continuing a litigation-based path to recovery—a path that is speculative and fraught with peril.

66.     If the Agreement is not approved, Debtors' property likely will devalue and waste, rendering it even more likely that creditors will receive nothing.

67.     The looming hearing on the 225 Action may further limit the Trustee's options should the proceedings not end in Debtors' favor.

68.     Moreover, a further delay in these Bankruptcy Cases will exponentially increase administrative expenses, to the prejudice of creditors.

69.     Simply stated, litigation is time-consuming, costly, and uncertain.  The Trustee cannot, in his exercise of business judgment, expose creditors to that risk when there is a potential for an assured recovery through settlement, and a chance for others who have shown interest to bid on the assets being put up for sale.  The potential for an overbid recovery further enhances creditor's potential opportunities.

70.     Without the Agreement, the Trustee will be unable to conduct a realistic sale process, as it would be forced to fight with Hawk over the nature and extent of Hawk's secured claims.

71.     If the Agreement is not approved, Debtors' estates will face stiff headwinds, without money to continue operations or fund case administration, and a future of hotly contested litigation whose outcomes are unpredictable.

72.     Accordingly, the Trustee believes that the Agreement is in the best interests of the Debtors' estates and requests that it be approved by this Court.

## **NOTICE**

73.     The Trustee's counsel has served this Motion and Notice of Motion, Response

4875-7966-5596 v1
318450713.5

Deadline and Hearing Date upon: (a) the Office of the United States Trustee, (b) counsel to the former debtor in possession, (c) counsel to the signatories to the Agreement, and (d) all parties who have requested notice pursuant to Fed. R. Bankr. P. 2002.  The Trustee's counsel has also served the Notice of Motion, Response Deadline and Hearing Date upon all of the Debtor's creditors.

**WHEREFORE**, the Trustee respectfully requests that this Honorable Court enter an Order (i) granting the relief sought in the Motion; (ii) approving the Agreement and the Settlement contained therein; (iii) authorizing the Trustee to move forward with the Agreement and Settlement, and (iv) granting such other and further relief it deems just and proper.

Respectfully submitted,

*/s/ Michael D. Vagnoni*
Edmond M. George, Esquire
Michael D. Vagnoni, Esquire
Obermayer Rebmann Maxwell & Hippel LLP
Centre Square West
1500 Market Street, Suite 3400
Philadelphia, PA  19102
Telephone: (215) 665-3066
Facsimile: (215) 665-3165
E-mail addresses:
edmond.george@obertmayer.com
michael.vagnoni@obermayer.com
*Counsel to William Homony, Chapter 11 Trustee*

Dated: May 6, 2024

17

# Exhibit A

# SHARING AND CARVE-OUT AGREEMENT

This Sharing and Carve-out Agreement (this "Agreement") is entered into as of May 6, 2024 by and between (a) William A. Homony, solely in his capacity as the Chapter 11 Trustee ("Trustee") of the bankruptcy estates of Stream TV Networks, Inc. ("Stream") and Technovative Media Inc. ("TMI" and, together with Stream, the "Debtors") and (b) (i) Hawk Investment Holdings, Ltd. ("Hawk"), in its capacity as Collateral Agent for the secured noteholders of SeeCubic, Inc. ("SCI") and (ii) all other individuals and entities individually who execute a Release Supplement annexed hereto (collectively, the "Interested Parties"). The Trustee and Hawk are referred to herein together as the "Parties" and each individually as a "Party" (unless the context indicates otherwise).

# RECITALS

**WHEREAS,** from 2011 through 2020, SLS Holdings VI, LLC ("SLS" and, together with Hawk, the "Secured Creditors") and Hawk lent Stream funds pursuant to a series of promissory notes, with respect to which Hawk has filed proof of Claim No. 6-1 on the Official Proof of Claim Docket in the Stream's case (the "Hawk Claim") asserting a claim secured by substantially all of the Debtors' property (the "Collateral");

**WHEREAS,** on March 15, 2023, the Debtors initiated the bankruptcy cases captioned as *In re Stream TV Networks, Inc.*, Case No. 23-10763 (Bankr. E.D. Pa.) (the "Chapter 11 Cases"), before the United States Bankruptcy Court for the Eastern District of Pennsylvania (the "Bankruptcy Court"), under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code");

**WHEREAS,** prior to the Petition Date, the Secured Creditors, the Debtors, and certain other entities were party to several pending litigation matters, including, but not limited to: (a) *Stream TV Networks, Inc. v. Stastney*, Case No. 22-00851-CJB (D. Del.) (the "District Court Action"), (b) *Hawk Investment Holdings Ltd. v. Stream TV Networks, Inc.*, C.A. 2022-0930-JTL (Del. Ch.) (the "225 Action"),

**WHEREAS,** after the Petition Date, the Debtors initiated the adversary proceeding against the Secured Creditors and other Interested Parties captioned as *Stream TV Networks, Inc. v. Stastney*, AP No. 23-00027-mdc (Bankr. E.D. Pa.) (the "Adversary Proceeding" and, together with the District Court Action, the 225 Action, and all other pending litigation matters to which the Parties are party to, the "Pending Litigation Matters");

**WHEREAS,** Hawk filed a motion with the Bankruptcy Court seeking relief from the automatic stay to conclude the 225 Action on March 20, 2023 [ECF No. 16] (the "Stay Relief Motion") and a motion to appoint a chapter 11 trustee on April 6, 2023 [EF No. 83] (the "Trustee Motion");

**WHEREAS,** on January 5, 2024, the Bankruptcy Court granted Hawk limited relief under the Stay Relief Motion and the Trustee Motion, appointing the Trustee in these Chapter 11 Cases and granting relief from the automatic stay to conclude the 225 Action;

**WHEREAS,** upon the Trustee's appointment, the Trustee engaged in extensive investigation, review, and analysis of the various Pending Litigation Matters, the Hawk Claim, the Debtors' need for funding, and other disputes and aspects of the relationship between the Secured Creditors and the Debtors;

**WHEREAS**, during the Trustee's investigation, on March 1, 2024, the Trustee filed an expedited motion to reinstate the automatic stay in connection with the 225 Action and on April 1, 2024, the Bankruptcy Court entered a consent order granting the Trustee's motion;

**WHEREAS,** the Trustee and Hawk have engaged in good faith negotiations in an attempt to resolve the several disputes between the Debtors, Hawk, SLS, SCI, and several other parties that have arisen over the course of the dealings of the several parties;

**WHEREAS,** the Trustee, Hawk, and the Interested Parties have reached an agreement to ensure the orderly disposition of the Collateral, funding of the Chapter 11 Cases, a recovery mechanism for unsecured creditors and the release of any and all claims, whether monetary or otherwise, between Hawk, SLS, SCI, the Debtors, and the Interested Parties;

**WHEREAS**, Parties now wish to fully and finally resolve these matters by mutual agreement;

**NOW, THEREFORE,** for and in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.     Settlement Generally; Cooperation.

    a)  The Trustee shall use his best efforts to consummate a sale of the Collateral under section 363 of the Bankruptcy Code as contemplated under this Agreement (any such sale, a "Sale"), which he shall endeavor to close (the "Closing") no later than August 2, 2024 (subject to further extension by written agreement of Hawk and the Trustee, the "Outside Closing Date"), in accordance with the provisions of the Agreement.

    b)  The Parties and their attorneys, advisors and other agents and professionals, shall cooperate in good faith to support the Sale with the goal of maximizing the proceeds of the same. The Parties acknowledge the Sale will be only of the Debtors' interests in the Collateral, on an "as is where is" basis, without any warranty express or implied. The Parties hereby acknowledge and agree that such support shall include cooperating in providing requested diligence materials, if available, and reasonably responding to diligence inquiries in a timely manner consistent with this goal, as well as supporting (and not objecting to) the entry of an order approving this Agreement (the "9019 Order") and an

2

order (the "Bidding Procedures Order") establishing bidding procedures (the "Bidding Procedures") so long as such Bidding Procedures' terms are in accordance with this Agreement. The Parties acknowledge that the Trustee has limited access to records to provide all requested due diligence, but will use his best efforts to assist.

2.   Treatment of Secured Creditors' Claims.

a)   Upon the entry of the 9019 Order, the Hawk Claim shall be deemed an allowed Secured Claim, secured by the Collateral[1] as more fully set forth in Claim No. 6-1 and the supporting documentation, in the amount of $180 million, subject to increase as set forth below (such amount, the "Allowed Secured Claim"). The Trustee waives the right to object to any portion of the Allowed Secured Claim or to seek the conversion or subordination of such claim for so long as this provision remains valid and binding on the Parties.

b)   The Allowed Secured Claim shall increase on a dollar-for-dollar basis for documented and evidenced amounts actually advanced to fund the operations of SeeCubic, B.V. ("SCBV") between the Trustee's appointment date and the sale Closing in accordance with Section 6 hereof, which advanced amounts shall not constitute administrative expenses of the Debtors' estates and shall only increase the Allowed Secured Claim as set forth herein.

c)   Upon the entry of the 9019 Order, the proofs of claim of SLS Holdings VI, LLC [Claim No. 9 on the official claims docket of Stream and Claim No. 2 on the official claims docket of TMI] and the proofs of claim of SeeCubic, Inc. [Claim No. 14 on the official claims docket of Stream and Claim No. 3 on the official claims docket of TMI] shall be deemed withdrawn of record with no further order of the Bankruptcy Court necessary to effectuate such withdrawal.

3.   Sale of Debtor's Assets.   The Trustee shall pursue a Sale, subject to the following parameters:

a)   The Trustee shall seek approval of the retention of an investment banker to market the Collateral.

b)   The Trustee shall seek entry of the Bidding Procedures Order on an expedited basis to obtain approval thereof concurrently with the entry of the 9019 Order.

c)   Subject to documentation satisfactory to Hawk (and drafted in consultation with Hawk), SCI shall serve as the stalking horse bidder for the Collateral, with such bid (the "Stalking Horse Bid") and Asset Purchase Agreement (the "Stalking Horse APA") attached to the Bidding Procedures.

---

[1] For the avoidance of doubt, Collateral excludes any and all claims and cause of action against third-parties including but not limited to Chapter 5 claims and causes of action and any claims against the Debtors' directors and officer (collectively "Litigation Claims") and any resulting proceeds from said Litigation Claims.

d) Subject to documentation satisfactory to Hawk and the Trustee, the Stalking Horse Bid shall consist of a credit bid of the Allowed Secured Claim in the amount of $150 million. The Secured Creditors waive the right to seek or obtain a "breakup fee" or a "topping fee" or any other bid protections as part of the Stalking Horse Bid.

e) The Bidding Procedures shall specify that in order for a bid to constitute a "Qualifying Bid" such bid shall include:

   i. A bid deposit in the amount of 10% of the proposed aggregate purchase price (the "Bid Deposit"), and

   ii. Evidence satisfactory to the Trustee of its financial wherewithal to consummate a Sale in the amount of the proposed purchase price.

f) The Bidding Procedures shall specify that Qualifying Bids may include both cash and non-cash consideration, subject to the following conditions:

   i. The cash component shall be no less than $120 million,

   ii. The non-cash component of the bid shall be backed by a letter of credit or other security, over which Hawk shall have consultation rights as to the sufficiency and form of such security, and

   iii. The Bid Deposit shall be 10% of the aggregate purchase price, including both the cash component and the non-cash component of the bid.

g) To the extent the Trustee receives any other Qualified Bids (exclusive of the Stalking Horse Bid which will be deemed a Qualified Bid), SCI may participate in the Auction. Any overbid submitted by SCI in excess of the Stalking Horse Bid at the Auction shall be in cash only. For the avoidance of doubt, SCI cannot utilize any of the remaining Allowed Secured Claim as part of any overbid; *however*, its overbid may include a credit bid up to $150 million.

4. <u>Trustee Carve-Out</u>.

a) With respect to any Sale that closes in accordance with the Section 3, the Secured Creditors shall carve out of the proceeds of the Collateral $7,500,000 plus 10% of every additional dollar by which the ultimate purchase price at the conclusion of the Auction, exceeds the Stalking Horse Bid up to the amount of the Allowed Secured Claim (the "Carve-Out").

b) SCI shall pay a portion of the Carve-Out (such portion, the "Carve-Out Advance") to the Trustee according to the following schedule:

   i. $1,000,000.00 within two business days of the entry of the 9019 Order; and

4

ii.   $1,500,000.00 within two business days of the entry of the Bidding Procedures Order.

c)   The Trustee shall receive the balance of the Carve-Out (*i.e.*, the Carve-Out minus the Carve-Out Advance) at Closing:

i.   In the event SCI is the successful bidder, by SCI in cash at Closing.

ii.   In the event a third party is the successful bidder, from the cash proceeds of the purchase price.

d)   The Bidding Procedures and Sale Order shall provide that in the event a third party is the successful bidder, the Secured Creditors shall receive the "Secured Creditor Distribution" within five (5) business days of the Closing of a Sale, which "Secured Creditor Distribution" shall equal the purchase price minus the Carve-Out.  The Secured Creditor Distribution shall not exceed the amount of the Allowed Secured Claim.

e)   Any sale proceeds in excess of the amount necessary to satisfy the Allowed Secured Claim in full (after giving effect to the Carve-Out) shall be retained by the Trustee.

5.   <u>Support of the Carve-Out</u>.  In support of the Carve-Out, the Parties further agree:

a)   The Secured Creditors shall provide the Trustee with documentation regarding SCI's financial ability to fund the Carve-Out in the event the Stalking Horse Bid is the prevailing bid and sufficient to support any overbid.

b)   The bankruptcy estates and/or any trustee or disbursing agent retain the right to object to claims against the bankruptcy estates other than the Allowed Secured Claim.

c)   The Secured Creditors will be allowed a subordinate unsecured deficiency claim subordinated to all other general unsecured creditors (the "<u>Deficiency Claim</u>") to the extent that the Secured Creditor Distribution is not sufficient to satisfy the Allowed Secured Claim in full.  The Secured Creditors' Deficiency Claim will be recognized as an impaired unsecured claim which the Secured Creditor shall be entitled to vote on confirmation of any Trustee Plan.

d)   The Secured Creditors agree to support and not oppose any Plan filed by the Trustee and that on or before the deadline to do so, each shall submit a written acceptance of any Plan containing terms consistent with this Agreement, in the full value of the Allowed Secured Claim and/or Deficiency Claim.

e)   Notwithstanding any provision herein to the contrary, the Trustee shall retain rights to the $1 million bond posted by or on behalf of the Debtors in the 225 Action.

6.    <u>Funding of SCBV</u>.  Until and through the Outside Closing Date (as such may be extended with the consent of the Secured Creditors in their sole discretion), SCI shall continue to fund all costs and expenses of SCBV incurred in the ordinary course of business and consistent with SCBV's operations during the pendency of these Chapter 11 Cases (and including any employee claims arising therefrom); *provided, however,* immediately upon a breach of this Agreement by the Trustee, SCI shall no longer have any obligations to continue funding SCBV.

7.    <u>Releases</u>.  Effective as of the Closing of any Sale:

a)    Each of (i) Hawk and (ii) SCI, on behalf of themselves and their respective partners, general partners, limited partners, affiliates, parents, subsidiaries, predecessors, successors, and all of the foregoing entities' current and former officers, directors, managers, managing directors, equity holders, investors, beneficiaries, employees, agents, attorneys, advisors, insurers and reinsurers, and (iii) separately and individually, any Interested Party signatory to the Release Supplement annexed hereto (collectively, the "<u>Creditor Releasing Parties</u>"), hereby release and discharge (i) the Trustee, (ii) the Debtors, and (iii) the Debtors' estates, and (iv) any attorneys, agents, and advisors retained by the Trustee in connection with these Chapter 11 Cases (all of the foregoing, the "<u>Trustee Released Parties</u>") from any and all claims, liabilities, demands, accounts, reckonings, or causes of action, whether known or unknown, matured or unmatured, domestic or foreign, arising from, relating to, or in connection with these Chapter 11 Cases, the various actions listed in Section 8 of this Agreement and the subject matter thereof, and the Secured Creditors' extension of credit to and/or investment in the Debtors' businesses, including efforts to enforce rights with respect to same, including but not limited to the Omnibus Agreement, dated as of May 6, 2020, and the ensuing litigation and related subject matter; *provided, however,* the Creditor Releasing Parties do not release or discharge the Trustee Released Parties from any claims, liabilities, demands, accounts, reckonings, or causes of action arising from, relating to, the Trustee Released Parties' obligations arising under this Agreement or the Stalking Horse APA and the other documents to be executed in connection therewith.

b)    The Trustee, on behalf of (i) himself, (ii) the Debtors, (iii) the Debtors' estates and (iv) any attorneys, agents, and advisors retained by the Trustee in connection with these Chapter 11 Cases (collectively, the "<u>Trustee Releasing Parties</u>"), hereby release and discharge (i) Hawk and (ii) SCI, individually and their respective partners, general partners, limited partners, affiliates, parents, subsidiaries, predecessors, successors, and all of the foregoing entities' current and former officers, directors, managers, managing directors, equity-holders, investors, beneficiaries, employees, agents, attorneys, advisors, insurers and reinsurers, and (iii) separately and individually, any Interested Party signatory to the Release Supplement annexed hereto (all of the foregoing, the "<u>Creditor Released Parties</u>") from any and all claims, liabilities, demands, accounts, reckonings, or causes of action, whether known or unknown, matured or unmatured, domestic or foreign, arising from, relating to, or in connection with these Chapter 11 Cases, the various actions listed in Section 8 of this Agreement

6

and the subject matter thereof, and the Secured Creditors' extension of credit to and/or investment in the Debtors' businesses, including efforts to enforce rights with respect to same, including but not limited to the Omnibus Agreement, dated as of May 6, 2020, and the ensuing litigation and related subject matter; *provided, however,* the Trustee Releasing Parties do not release or discharge the Creditor Released Parties from any claims, liabilities, demands, accounts, reckonings, or causes of action arising from, relating to, the Creditor Released Parties' obligations arising under this Agreement or the Stalking Horse APA and the other documents to be executed in connection therewith.

c) Entry of the 9019 Order shall constitute the Bankruptcy Court's approval of the releases included in this provision, which shall only become effective upon the Closing of any sale of the Collateral and receipt by the Trustee of the entire Carve-Out. The Bankruptcy Court's entry of the 9019 Order shall constitute the Bankruptcy Court's finding that the foregoing release is: (a) in exchange for the good and valuable consideration provided by the Creditor Released Parties; (b) a good faith settlement and compromise of the claims and causes of action released by the Trustee and Debtors' estates; (c) in the best interests of the Trustee, the Debtors, the Estates, and all holders of claims and interests against the estates in these Chapter 11 Cases; (d) fair, equitable, and reasonable; (e) given and made after reasonable investigation by the Trustee and after due notice and opportunity for hearing; and (f) a bar to any of the Trustee, the Debtors, the post-effective date Debtors under any plan of reorganization (if any), or the Debtors' estates asserting any claim or cause of action hereby released.

d) Only those individuals and entities listed as named defendants in any of the Pending Litigation Matters may execute a Release Supplement to become an "Interested Party" if they so choose; *provided however*, contemporaneously with the execution of this Agreement, each of Shadron L. Stastney, Arthur Leonard Robert "Bob" Morton, Alastair Crawford, Patric Theune, SCBV, and SLS shall execute Release Supplements and without the fully executed Release Supplement from each of the individuals and entities set forth above, this Agreement shall be null and void and of no legal effect. To become effective, such individuals or entities must execute the Release Supplement and deliver it to the Trustee and Hawk on or before ten (10) days prior to the entry of the 9019 Order.

8. <u>Dismissal of Pending Litigation Matters</u>.

a) As of the date hereof, the Debtors are party to the Pending Litigation Matters, including but not limited to:

    i.    The 225 Action;

    ii.    The Adversary Proceeding;

iii.   The District Court Action; and

iv.   Any other pending litigation matters currently pending in any federal or state court (or analogous foreign jurisdiction), including, but not limited to, any actions pending in the Netherlands with respect to control of SCBV.

b)  Upon the entry of the 9019 Order, the Pending Litigation Matters will be or will remain stayed indefinitely while the Parties pursue the consummation of the Sale.

c)  On or within 14 calendar days of the Closing, the Trustee and/or Hawk as appropriate, shall obtain dismissal with prejudice of each of the Pending Litigation Matters.

9.     <u>Agreement Subject to Bankruptcy Court Approval</u>.  The Parties hereby agree and acknowledge that this Agreement remains subject to Bankruptcy Court approval under Federal Rule of Bankruptcy Procedure 9019, and this Agreement shall have no binding effect on any of the Parties until entry of an order approving it pursuant thereto (such an order, the "9019 Order").

10.     <u>Consent to Exclusive Jurisdiction of Bankruptcy Court</u>.  The Parties hereby agree that the Bankruptcy Court shall have exclusive jurisdiction to interpret and implement the terms of this Agreement.

11.     <u>Governing Law</u>.  This Agreement is to be governed by and construed in accordance with the laws of the State of Delaware without giving effect to the conflict of laws principles thereof.

12.     <u>Survival of Representations and Warranties</u>.  All representations and warranties made hereunder shall survive the Closing.

13.     <u>No Admissions</u>.  It is understood by the Parties that this Agreement constitutes a compromise of potential, unresolved, and disputed claims. This Agreement, and the negotiation thereof, shall in no way constitute, be construed as, or be evidence of an admission or concession of any violation of any statute or law; of any fault, liability, or wrongdoing; or of any infirmity in the claims or defenses of the Parties with regard to any of the complaints, claims, allegations, or defenses asserted or that could have been asserted in the Action or in connection with the subject matter of this Agreement or the Action. This Agreement shall not be used, directly or indirectly, in any way, in litigation or other proceedings between the Parties, and this Agreement shall not be admissible as evidence in any legal proceeding between the Parties, other than in litigation or a proceeding to enforce the terms of this Agreement.

14.     <u>Remedies Cumulative</u>. All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

15.   <u>Complete Agreement</u>.  The Parties hereby represent and warrant that no promise or inducement not contained herein has been offered to them, that this Agreement constitutes the entire agreement between them related to the subject matter hereof, and supersedes all prior agreements, oral, or written, among the Parties with respect thereto. The Parties further represent that this Agreement is executed without any reliance upon any statement or representation by the other, their respective agents, representatives, or attorneys not set forth herein.

16.   <u>Effect of Breach</u>.

a)   In the event a breach of this Agreement by either Party, the non-breaching Party shall be entitled to terminate this Agreement in its entirety in its sole discretion and this Agreement shall be null and void; *provided, however,* that any documented and evidenced amounts actually advanced to fund SCBV in accordance with Section 6 hereof shall survive such termination remain an Allowed Secured Claim that is not subject to conversion under the Hawk Conversion Agreement or SLS Conversion Agreement.

b)   In the event this Agreement is terminated for any reason other than a breach by the Secured Creditors, (a) Section 2 of this Agreement shall remain in full force and effect, and the Secured Creditors shall have an Allowed Secured Claim as defined herein, and (b) the Carve-Out Advance shall be deemed an allowed administrative claim against the estate as of the date the Secured Creditors made the advance, subordinate to the allowed fees and expenses of the Chapter 11 Trustee and his retained professionals.  .

c)   In the event the Secured Creditors breach this Agreement, the Trustee shall be entitled to retain any portion of the Carve-Out previously received for the benefit of the Debtors' estates.

17.   <u>Amendment; Non-Waiver</u>.  This Agreement shall not be amended or modified except by a written amendment signed by each of the Parties, approved by the Bankruptcy Court, which writing expressly states that it is intended to be an amendment to or modification of this Agreement. No other writing, irrespective of its content, and no course of conduct will act as an amendment or modification of this Agreement. Any waiver by a Party of its rights hereunder shall be effective only if in writing, and no waiver shall be implied by a party's action(s) or inaction(s). No failure or delay on the part of any Party in the exercise of any right or privilege hereunder shall operate as a waiver thereof or of the exercise of any other right or privilege hereunder, nor shall any single or partial exercise of any such right or privilege preclude other or further exercise thereof or of any other right or privilege.

18.   <u>Successors and Assigns</u>.  The obligations and duties of the Parties under this Agreement may not be assigned or transferred absent written consent of each Party, unless specifically stated otherwise. This Agreement shall be binding upon the Parties and their respective affiliates, successors and assigns.

19.   <u>Severability</u>.  In the event that any provision of this Agreement should be held to be void, voidable, or unenforceable in a particular instance and such provision does not affect the

basis of the bargain of the Parties hereunder, such provision shall be severed in such instance, and the remaining portions hereof shall remain in full force and effect.  Furthermore, in lieu of such severed provision, there shall be added automatically in any such instance as a part of this Agreement, a provision as similar to the severed provision as may be possible and be legal, binding, and enforceable.

       20.    <u>Cooperation/Further Assurances</u>.  Subject to the other terms of this Agreement, the Parties and their attorneys, advisors, and other agents and professionals agree to cooperate in good faith to execute and deliver all other instruments and perform any acts, in addition to the matters herein specified, as may be appropriate or necessary from time to time, to effectuate and implement the terms of this Agreement. The Parties and their attorneys, advisors and other agents and professionals agree not to take any actions, either directly or indirectly through any other agent or party, reasonably calculated to frustrate implementation of this Agreement or otherwise impair the rights of any Party thereunder.

       21.    <u>Multiple Counterparts</u>.  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which constitute one and the same agreement. The signature pages from any counterpart may be appended to any other counterpart to assemble fully executed counterparts.  Counterparts of this Settlement Agreement also may be exchanged via electronic mail or facsimile, and an electronic, photocopied, or .pdf version of any Party's authorized signature shall be deemed to be an original signature for all purposes.

       22.    <u>Headings</u>.  The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

       23.    <u>Interpretation and Rules of Construction</u>.  This Agreement is the product of negotiations among the Parties, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof. The Parties were each represented by counsel during the negotiations, drafting, and execution of this Agreement.

*[Signature Pages to Follow]*

10

IN WITNESS WHEREOF, the parties hereto have caused this Sharing Agreement to be duly executed as of the date first written above.

WILLIAM A. HOMONY,
solely in his capacity as Chapter 11 Trustee
of the estates of Stream TV Networks, Inc. and
Technovative Media Inc.

By: _____

Printed Name: _William A. Homony_

Title: _Chapter 11 Trustee_

HAWK INVESTMENT HOLDINGS LIMITED,
a Guernsey holding company, as Collateral Agent

By: _____

Printed Name: _____

Title: _____

SEECUBIC, INC.,
a Delaware corporation, as Stalking Horse Bidder

By: _____

Printed Name: _____

Title: _____

*[Signature Page to Sharing Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Sharing Agreement to be duly executed as of the date first written above.

WILLIAM A. HOMONY,
solely in his capacity as Chapter 11 Trustee
of the estates of Stream TV Networks, Inc. and
Technovative Media Inc.

By: _____

Printed Name: _____

Title: _____


HAWK INVESTMENT HOLDINGS LIMITED,
a Guernsey holding company, as Collateral Agent

By: _____
     *AUTHORISED SIGNATORIES*

Printed Name: *FOR : ALBANY DIRECTORS LIMITED*

Title: *DIRECTOR.*


SEECUBIC, INC.,
a Delaware corporation, as Stalking Horse Bidder

By: _____

Printed Name: _____

Title: _____


*[Signature Page to Sharing Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Sharing Agreement to be duly executed as of the date first written above.

WILLIAM A. HOMONY,
solely in his capacity as Chapter 11 Trustee
of the estates of Stream TV Networks, Inc. and
Technovative Media Inc.

By: _____

Printed Name: _____

Title: _____


HAWK INVESTMENT HOLDINGS LIMITED,
a Guernsey holding company, as Collateral Agent

By: _____

Printed Name: _____

Title: _____


SEECUBIC, INC.,
a Delaware corporation, as Stalking Horse Bidder

By: _____

Printed Name: ___Shad L. Stastney___

Title: ___Chairman and CEO___

*[Signature Page to Sharing Agreement]*

**Annex**

**Release Supplement**

This RELEASE SUPPLEMENT (the "Release Supplement") to the Sharing and Carve-Out Agreement, dated as of _____, 2024 (as may be amended, supplemented, restated, or otherwise modified from time to time, the "Sharing Agreement"), by and among (a) William A. Homony, solely in his capacity as the Chapter 11 Trustee of the bankruptcy estates of Stream TV Networks, Inc. and Technovative Media Inc., and (b) Hawk Investment Holdings, Ltd. and SeeCubic Inc., is executed and delivered by the party executing the signature page hereto (the "Interested Party") and shall be effective only upon the satisfaction of the conditions precedent as set forth in the Sharing Agreement.  Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Sharing Agreement.

1. <u>Agreement to Release</u>.  The Interested Party hereby affirmatively opts into the Sharing Agreement solely with respect to granting and obtaining the Releases, in its/his/her individual capacity and including the Interested Party's respective partners, general partners, limited partners, affiliates, parents, subsidiaries, predecessors, successors, and all of the foregoing entities' current and former officers, directors, managers, managing directors, equity holders, investors, beneficiaries, employees, agents, attorneys, advisors, insurers and reinsurers, as set forth in Section **[7]** of the Sharing Agreement, which is incorporated herein by reference in its entirety.

2. <u>Representations and Warranties</u>.  The Interested Party hereby represents and warrants that it has full authority to enter into this Release Supplement and no material consent or approval of, or any registration or filing with, any other person or entity is required for it to do so.

3. <u>Representation by Counsel</u>.  The Interested Party hereby acknowledges that it has been represented by counsel (or had the opportunity to and waived its right to do so) in connection with execution this Release Supplement and the releases contemplated hereby, and it is no relying on the statement or representation of any of the Parties to the Sharing Agreement (or their counsel) in exercising its/his/her right to execute this Release Supplement.

4. <u>Reservation of Rights; Non-Consent to Jurisdiction</u>.  Nothing herein shall be deemed or construed as (a) a waiver or release of any claim or right by the Interested Party other than as expressly set forth herein and in Section **[7]** of the Sharing Agreement, (b) a consent by the Interested Party to the jurisdiction of any court within the United States or abroad, or (c) an election of remedies or choice of law.

IN WITNESS WHEREOF, the party signing below has caused this Release Supplement to the Sharing Agreement to be duly executed as of the date herein indicated.

**_Signature Block for Individuals:_**

Signature: _____

Printed Name: ARTHUR LEONARD ROBERT MORTON

Date: _____2nd May 2024_____

**_Signature Block for Entities:_**

Entity Name: _____

Jurisdiction: _____

Signature: _____

Name: _____

Title: _____

Date: _____

_[Signature Page to Release Supplement to Sharing Agreement]_

318513638.2

IN WITNESS WHEREOF, the party signing below has caused this Release Supplement to the Sharing Agreement to be duly executed as of the date herein indicated.

***Signature Block for Individuals:***

Signature: _____

Printed Name: Alsstair Crawford

Date: May 2 2024

***Signature Block for Entities:***

Entity Name: _____

Jurisdiction: _____

Signature: _____

Name: _____

Title: _____

Date: _____

*[Signature Page to Release Supplement to Sharing Agreement]*

318513638.2

IN WITNESS WHEREOF, the party signing below has caused this Release Supplement to the Sharing Agreement to be duly executed as of the date herein indicated.

***Signature Block for Individuals:***

Signature: _____

Printed Name: _____Asef Gola_____

Date: _____5/02/24_____

***Signature Block for Entities:***

Entity Name: _____

Jurisdiction: _____

Signature: _____

Name: _____

Title: _____

Date: _____

*[Signature Page to Release Supplement to Sharing Agreement]*

IN WITNESS WHEREOF, the party signing below has caused this Release Supplement to the Sharing Agreement to be duly executed as of the date herein indicated.

*Signature Block for Individuals:*

Signature: _____

Printed Name: KEVIN JOHN GOLLOP

Date: 05 - 02 - 2024 .

*Signature Block for Entities:*

Entity Name: _____

Jurisdiction: _____

Signature: _____

Name: _____

Title: _____

Date: _____

*[Signature Page to Release Supplement to Sharing Agreement]*

IN WITNESS WHEREOF, the party signing below has caused this Release Supplement to the Sharing Agreement to be duly executed as of the date herein indicated.

***Signature Block for Individuals:***

Signature: _____

Printed Name: _Patrick Miles_____

Date: _2nd May 2024_____

***Signature Block for Entities:***

Entity Name: _____

Jurisdiction: _____

Signature: _____

Name: _____

Title: _____

Date: _____

*[Signature Page to Release Supplement to Sharing Agreement]*

318513638.2

IN WITNESS WHEREOF, the party signing below has caused this Release Supplement to the Sharing Agreement to be duly executed as of the date herein indicated.

*Signature Block for Individuals:*

Signature: _____

Printed Name: _____

Date: _____

*Signature Block for Entities:*

Entity Name: SeeCubic BV _____

Jurisdiction: Netherlands _____

Signature: _____

Name: Shad L. Stastney _____

Title: Director A _____

Date: 30 April 2024 _____

*[Signature Page to Release Supplement to Sharing Agreement]*

318513638.2

IN WITNESS WHEREOF, the party signing below has caused this Release Supplement to the Sharing Agreement to be duly executed as of the date herein indicated.

***Signature Block for Individuals:***

Signature: _____

Printed Name: Shad L. Stastney

Date: April 30, 2024

***Signature Block for Entities:***

Entity Name: _____

Jurisdiction: _____

Signature: _____

Name: _____

Title: _____

Date: _____

*[Signature Page to Release Supplement to Sharing Agreement]*

318513638.2

IN WITNESS WHEREOF, the party signing below has caused this Release Supplement to the Sharing Agreement to be duly executed as of the date herein indicated.

***Signature Block for Individuals:***

Signature: _____

Printed Name: _____

Date: _____

***Signature Block for Entities:***

Entity Name: SLS Holdings VI, LLC

Jurisdiction: Delaware

Signature: *[signature]*

Name: Shad L. Stastney

Title: Managing Member

Date: April 30, 2024

*[Signature Page to Release Supplement to Sharing Agreement]*

IN WITNESS WHEREOF, the party signing below has caused this Release Supplement to the Sharing Agreement to be duly executed as of the date herein indicated.

### *Signature Block for Individuals:*

Signature: _____

Printed Name: Patric Theune

Date: 1 May 2024

### *Signature Block for Entities:*

Entity Name: _____

Jurisdiction: _____

Signature: _____

Name: _____

Title: _____

Date: _____

*[Signature Page to Release Supplement to Sharing Agreement]*

318513638.2

IN WITNESS WHEREOF, the party signing below has caused this Release Supplement to the Sharing Agreement to be duly executed as of the date herein indicated.

**Signature Block for Individuals:**

Signature: _(signature)_

Printed Name: KRZYSZTOF KABACINSKI

Date: MAY 02, 2024

**Signature Block for Entities:**

Entity Name: _____

Jurisdiction: _____

Signature: _____

Name: _____

Title: _____

Date: _____

*[Signature Page to Release Supplement to Sharing Agreement]*

318513638.2

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **In re:** | : | **Chapter 11** |
|  | : |  |
| **Stream TV Networks, Inc.,** *et al*. | : | **Bankruptcy No. 23-10763 (AMC)** |
|  | : |  |
| **Debtors.** | : | **(Jointly Administered)**[1] |
|  | : |  |

## <u>ORDER</u>

**AND NOW,** upon consideration of the Motion of William A. Homony (the "Trustee"), in his capacity as Chapter 11 trustee of the bankruptcy estates of Stream TV Networks, Inc. ("Stream") and Technovative Media Inc. ("Technovative" or in conjunction with Stream, the "Debtors"), for Entry of an Order Approving a Settlement Agreement and Mutual Release with Hawk Investment Holdings, Ltd. ("Hawk"), as Collateral Agent for the secured noteholders of SeeCubic, Inc. ("SeeCubic"), Pursuant to Fed. R. Bankr. P. 9019(a) and 11 U.S.C. § 105(a) (the "<u>Motion</u>");[2] and the Court having jurisdiction to consider the matters raised in the Motion pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided to the required and necessary parties; and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and the Court having reviewed the Motion; and the Court having held a hearing to consider the relief requested in the Motion (the "Hearing"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and the

---

[1] On April 11, 2023, the Court entered an order directing joint administration of the above-captioned case and *In re Technovative Media, Inc.*; Case No. 23-10764 (AMC). (D.I. #81).
[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

Court having determined that the relief requested is in the best interests of the Debtors, their estates, creditors and all parties in interest; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor; it is hereby **ORDERED** that:

1.　　　The Motion is **GRANTED**.

2.　　　The Agreement is **APPROVED**, subject to the conditions and requirements for effectiveness set forth therein.

3.　　　All objections to the Motion have been considered and are hereby overruled.

4.　　　The Settlement represents a valid exercise of the Trustee's business judgment, having been informed by extensive research, investigation, and negotiation by the Trustee and other parties in interests.

5.　　　Upon the entry of this Order, the proof of claim of Hawk Investment Holdings Ltd. [Claim No. 6 on the official claims docket of Stream] shall be deemed allowed in the amount of $180 million (subject to increase as set forth in the Agreement) with no further order of the Bankruptcy Court necessary to effectuate the same.

6.　　　Upon the entry of this Order, the proofs of claim of SLS Holdings VI, LLC [Claim No. 9 on the official claims docket of Stream and Claim No. 2 on the official claims docket of TMI] and the proofs of claim of SeeCubic, Inc. [Claim No. 14 on the official claims docket of Stream and Claim No. 3 on the official claims docket of TMI] shall be deemed withdrawn of record with no further order of the Bankruptcy Court necessary to effectuate such withdrawal and SLS Holdings VI, LLC and SeeCubic, Inc. shall not have an allowed claim against the bankruptcy estates of the Debtors.

7.　　　The Settlement and Agreement are in the best interest of the Debtors' estates and all of the Debtors' stakeholders.

8.    The Parties are authorized to take all actions necessary to effectuate and consummate the Agreement including, without limitation, the execution and delivery of any documents, agreements, or other instruments.

9.    This Order and the Agreement shall be binding on the Parties, the Debtors' estates, all creditors and parties-in-interest, and any trustee or plan administrator appointed in this case.

10.    Notice of the Motion as provided therein shall be deemed good and sufficient notice, service was proper and parties in interest were afforded adequate opportunity to file opposition to the Motion and appear at the Hearing, and the requirements of the Federal Rules of Bankruptcy Procedure and Local Rules of Bankruptcy Procedure are satisfied by such notice.

11.    This Court shall retain exclusive jurisdiction to hear and determine all matters arising from the implementation of this Order and consummation of the Agreement.

**BY THE COURT:**

Date: _____          _____
                              HONORABLE ASHELY M. CHAN,
                              UNITED STATES BANKRUPTCY JUDGE

3

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **Stream TV Networks, Inc.,** *et al.* | : | **Bankruptcy No. 23-10763 (AMC)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | |

## CERTIFICATE OF SERVICE

I, Michael D. Vagnoni, Esquire, do hereby certify that on the 6th day of May, 2024 a copy of the Motion for Entry of an Order Approving a Settlement Agreement and Mutual Release with Hawk Investment Holdings, Ltd. ("Hawk"), as Collateral Agent for the secured noteholders of SeeCubic, Inc. ("SeeCubic") Pursuant to Fed. R. Bankr. P. 9019(a) and 11 U.S.C. § 105(a) (the "Motion") Pursuant to Fed. R. Bankr. P. 9019(a) and 11 U.S.C. § 105(a) and Notice of Motion, Response Deadline and Hearing Date were served upon the parties on the attached list in the manner indicated thereon.

> */s/ Michael D. Vagnoni*
> Edmond M. George, Esquire
> Michael D. Vagnoni, Esquire
> Obermayer Rebmann Maxwell & Hippel LLP
> Centre Square West
> 1500 Market Street, Suite 3400
> Philadelphia, PA 19102
> Telephone: (215) 665-3066
> Facsimile: (215) 665-3165
> E-mail addresses:
> edmond.george@obertmayer.com
> michael.vagnoni@obermayer.com
> *Counsel to William Homony, Chapter 11 Trustee*

Dated: May 6, 2024

4875-7966-5596 v1
318450713.5