# Exhibit 5

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| | : |
| IN RE: | : Case No.  23-10763-amc |
| | : |
| STREAM TV NETWORKS, INC.  CH: 11 | : |
| AND NETWORKS, INC. AND | : Philadelphia, Pennsylvania |
| TECHNOVATIVE MEDIA, INC. | : June 5, 2024 |
| | : 11:17 a.m. |
| . . . . . . . . . . . . . . . . . . : | |

BEFORE THE HONORABLE ASHELY M. CHAN
UNITED STATES BANKRUPTCY JUDGE

<u>APPEARANCES</u>:

| | |
|---|---|
| For the  Debtor: | Rafael X. Zahralddin<br>Lewis Brisbois Bisgaard & Smith<br>500 Delaware Avenue, Suite 700<br>Wilmington, DE 19801<br>302-985-6004 |
| For SeeCubic, Inc.: | Eben P. Colby, Esq.<br>Skadden Arps Slate Meagher &<br>Flom, LLP<br>500 Boylston Street, 23rd Floor<br>Boston, MA 021116<br>617-573-4800 |
| For the Chapter 11 Trustee: | Michael D. Vagnoni, Esq.<br>Edmond M. George, Esq.<br>Obermayer Rebmann Maxwell &<br>Hippel LLP<br>Centre Square West<br>1500 Market Street, Suite 3400<br>Philadelphia, PA 19102<br>215-665-3066 |
| | Steven M. Coren, Esq.<br>Kaufman Coren & Ress, P.C.<br>Two Commerce Square<br>Suite 3900<br>2001 Market Street<br>Philadelphia, PA 19103-2713<br>215-735-8700 |

```
For Shadron Stasney:          Terence M. Grugan, Esq.
                              1735 Market Street
                              51st Floor
                              Ballard Spahr
                              Philadelphia, PA 19103
                              215-864-8320


For Rembrandt:                Andrew Peter Demarco
                              Devlin Law Firm, LLC
                              1526 Gilpin Avenue
                              Wilmington, DE 19806
                              302-449-9010


For Hawk Investment Holdings  Steven Caponi, Esq.
Ltd.:                         K&L Gates
                              600 N King Street
                              Suite 901
                              Wilmington, DE 19801
                              302-416-7080


For SLS Holdings:             Davis Wright, Esq.
                              Robinson Cole
                              1201 North Market Street
                              Suite 1406
                              Wilmington, DE 19801
                              302-516-1701


For the Trustee:              Kevin M. Callahan
                              DOJ-UST
                              Robert N.C. Nix Federal
                              Building
                              900 Market Street
                              Suite 320
                              Philadelphia, PA 19107
                              215-597-4411


For Visual Semiconductor,     Leslie Beth Baskin
Inc.:                         Spector Gadon Rosen Vinci P.C.
                              1635 Market Street
                              Seven Penn Center - 7th Floor
                              Philadelphia, PA 19103
                              (215) 241-8888




Proceedings recorded by electronic sound recording;
transcript produced by TheRecordXchange.
```

```
                             INDEX

                    Direct   Cross  Redirect  Recross

WITNESSES:

William Homony
   (By Mr. George)            47
   (By Mr. Michaels)                  70
   (By Ms. Baskin)                    79
```

```
 1    JUNE 5, 2024                                    11:17 A.M.

 2              THE BAILIFF:  Back to the matters involving Stream

 3    TV.  Okay.  Numbers 27 through 31 on the list.  I know I have

 4    several parties on the line.  Do you want to start with the

 5    people in the courtroom?

 6              THE COURT:  All right.  We're going to start with

 7    people in the courtroom first.

 8              THE BAILIFF:  Okay.  Okay.  Everyone in the courtroom

 9    who is assembling could enter their appearances on the record,

10    please.  And please speak directly into the microphone so

11    everyone on the telephone can hear you.

12              MS. BASKIN:  Good morning, Your Honor.  Leslie Beth

13    Baskin, Spector Gadson Rosen Vinci on behalf of VSI.

14              THE COURT:  Good morning.

15              MR. GEORGE:  Good morning, Your Honor.  Edmond George

16    from the Obermayer firm.  With me, Mr. Vagnoni.  Mr. Vagnoni

17    may take a piece of this hearing.

18              THE COURT:  Good morning.  Steven Coren, special

19    counsel for the Trustee.

20              MR. CAPONI:  Morning, Your Honor.  Steven Caponi for

21    K&L Gates on behalf of Hawk Investments Limited in its capacity

22    as collateral agent. And that would be Margaret Westbrook and

23    Jonathan Edel.

24              THE COURT:  Welcome.  Mr. Callaghan has entered the

25    courtroom.
```

```
 1              MR. CALLAGHAN:  Morning, Your Honor.  Kevin Callaghan
 2   on behalf of the United States Trustee.  Thank you, Your Honor.
 3              THE COURT:  Good to see you.
 4              MR. COLBY:  Morning, Your Honor.  Eben Colby of
 5   Skadden Arps on behalf of SeeCubic, Inc.
 6              THE COURT:  Okay.
 7              MR. WRIGHT:  Morning, Your Honor.  Davis Wright with
 8   Robinson & Cole on behalf of SLS Holdings VI, LLC.
 9              THE COURT:  Welcome.
10              MR. GRUGAN:  Good morning, Your Honor.  Terence
11   Grugan from Ballard Spahr on behalf of Shadron Stasney. My
12   collogue --
13              THE COURT:  Okay.
14              MS. LASALLE:  Nekavia LaSalle (phonetic), Your Honor.
15   Nice to see you again.
16              THE COURT:  Welcome.
17              MR. DEMARCO:  Morning, Your Honor.  Andrew DeMarco
18   for Rembrandt.  With me as well is Rembrandt's co-counsel,
19   Christopher Michaels.
20              THE COURT:  Welcome.  Okay.  Do you want to take the
21   people on the phone, Pam?
22              THE BAILIFF:  Okay.  The parties on the line who are
23   here on Stream TV, if you could enter your appearances, please.
24   Try it one at a time, please.  Good luck.
25              MR. ZAHRALDDIN:  Good morning, Your Honor.  Rafael
```

 1  Zahralddin from Lewis Brisbois.

 2          THE COURT:  Okay.

 3          MR. WALLACE:  morning, Judge.  Neil Wallace.  I'm

 4  counsel for Rembrandt.

 5          THE COURT:  Okay.  Is that everyone?

 6          MR. RAJAN:  Good morning, Your Honor.  This is Mathu

 7  Rajan.

 8          THE COURT:  Okay.  Anyone else on the line?  Is there

 9  anyone else on the line on the Stream TV case?

10          MR. BLUMENTHAL:  Morning, Your Honor.  Stephen

11  Blumenthal, CEO of Rembrandt 3D.

12          THE COURT:  Okay.  All right.  So I think we have

13  everyone here.  I know that we have a number of matters today.

14  But I'd like to first start with the application to retain

15  Capstone.  So I saw that there was -- unless you guys have like

16  a settlement or anything to report?

17          MR. GEORGE:  No, Judge.  No.  I don't think so.

18          THE COURT:  No settlement?  No?  Okay.

19          MR. GEORGE:  But I think we requested an adjournment

20  of the Capstone application.  I don't know whether we

21  communicate that to your courtroom deputy or not.

22          THE COURT:  I guess I saw so many different positions

23  on the Capstone application.  I just wanted to make sure that I

24  understood some basics.  Like there was conflicting things like

25  whether or not Capstone had signed a nondisclosure agreement.

 1   Ms. Baskin said that they had.  And I understand that

 2   Capstone's position was that it didn't.  So I thought the one

 3   issue I'd like to hear from both of you on today is did they or

 4   not sign a nondisclosure agreement?

 5           MR. GEORGE:  Well, Your Honor, Capstone has

 6   represented to us that they did not sign an NDA.  And I think

 7   we asked for a copy of it --

 8           THE COURT:  Yeah.

 9           MR. GEORGE:  -- when it was reported, and I don't

10   believe we've been delivered one, so.

11           THE COURT:  Ms. Baskin?

12           MS. BASKIN:  Your Honor, I did make that

13   representation in the pleading.  I did advise at least Mr.

14   Callaghan that I was withdrawing that portion of the objection

15   and the portion of the objection as to conflict because I've

16   yet to be able to get a copy of the NDA from my client.

17           THE COURT:  Right.  So I guess, I guess I just have

18   concerns, right?  You're -- you have a stellar reputation.  And

19   I just want to make sure that as today's hearing unfolds that

20   we all know that, you know, we can't make statements that

21   aren't true.  There's a line between zealously advocating for

22   our client and the truth.

23           So when I saw that statement, that just gave my

24   pause.  Right because you're an attorney of the court, if you

25   tell me that they sign a nondisclosure agreement, I'm going to

```
 1   take you at your word.  So when I saw the affidavit from

 2   Capstone that they in fact hadn't done that, that just raised a

 3   red flag to me.

 4           So I see all of these statements in the affidavit by

 5   Capstone about how Capstone hadn't actually reached out to VSI.

 6   That instead, individuals from VSI were reaching out to them.

 7   So I thought in an effort to bypass the need for an evidentiary

 8   hearing, I would like to hear a proffer from you as to a

 9   response to the affidavit that was filed by Capstone so we

10   could at least make sure what actually happened.  Like if you

11   told me that you read the affidavit and it's patently untrue,

12   then I will hold an evidentiary hearing on this, and we will

13   get to the bottom of who is lying to me.

14           And obviously, you know, when people say things to me

15   that are untrue that is very concerning to me.  So I was

16   wondering if after you read the affidavit, if you had an

17   opportunity to talk to your client and see whether or not those

18   statements are statements you agree with, then perhaps you

19   should withdraw the entire objection to the Capstone

20   application.

21           MS. BASKIN:  A couple of points, Your Honor.

22           THE COURT:  Yeah?

23           MS. BASKIN:  Number one.  Yes, I did read the

24   affidavit.

25           THE COURT:  Yeah.
```

```
 1            MS. BASKIN:  The original one, which I still have

 2   problems with besides the NDA.  And also, the supplemental one.

 3            THE COURT:  Yeah.

 4            MS. BASKIN:  I sent the supplemental affidavit to my

 5   client, and I asked them to mark up where they thought the

 6   representations were accurate and where they were not accurate.

 7            THE COURT:  Yeah.

 8            MS. BASKIN:  I had a conversation via email or a

 9   couple of them with Mr. Callaghan on this issue.  And I sent

10   him the marked-up version or my client's explanation --

11            THE COURT:  For the amended one?

12            MS. BASKIN:  Yes.

13            THE COURT:  Okay.

14            MS. BASKIN:  I asked them to keep it confidential.

15   At this point it doesn't really matter or not.  I'm looking for

16   the markups.  If you want me to mention them, they were like

17   three or four --

18            THE COURT:  I guess I just -- yeah, I just want to

19   see like, you know, are they totally wrong?  Do you totally

20   disagree?  Are they misrepresenting?  Do they either -- are

21   their statements patently false or did they omit things, right,

22   that you've got concerns about?  I just wanted to get that

23   proffer.

24            MS. BASKIN:  I think they misstated comments.  I know

25   that there were a series of conversations in May of 2022 about
```

1    Capstone working with VSI.

2            THE COURT:  Is it true that VSI was the one that

3    initiated that conversation?

4            MS. BASKIN:  There's conflict over that. You may need

5    testimony about that.

6            THE COURT:  Well, I guess I -- again, I am trying to

7    see if there's a way for me to bypass an evidentiary hearing by

8    asking basic questions like who initiated the conversation,

9    right?  That seems like something that shouldn't be

10   controversial.  So and I was kind of hoping that you would have

11   had like some kind of conversations with your client to say,

12   you know, did you -- because the way that it looks like in the

13   affidavit to me is that VSI is the one who approached Capstone.

14   And then in fact it says on May 8th, 2024, Rajan, is that how

15   we pronounce Rajan's name or?

16           MS. BASKIN:  Rajan.

17           THE COURT:  Rajan spoke to Bailey and provided a

18   general business update on VSI.  At that time, Bailey was

19   vaguely aware that Capstone may have had some involvement,

20   reached out to Justin O'Malley (phonetic), and then after that,

21   shut down all the communication.  So is it true that Rajan

22   reached out on May 8th after the application was filed to speak

23   to Mr. Bailey?

24           MS. BASKIN:  Yes, Your Honor.  But it was based on

25   prior conversations that they had.  Prior conversations

```
1   regarding the relationship between VSI and Capstone.  There was
2   an issue, I believe, with a gentlemen.  I have it.  If you
3   could just give me one second, I'll pull up the email that I
4   sent to Mr. Callaghan.
5            THE COURT:  Yeah.  And while you're doing that.  Mr.
6   Callaghan, so I know she asked you to keep it confidential.
7   But I guess I wanted to ask the US Trustee's office if they had
8   any similar concerns with the Capstone application.
9            MR. CALLAGHAN:  Well, Kevin Callaghan for the US
10  Trustee, Your Honor.  We have pending issue with the Capstone
11  engagement having nothing to do with this.
12           THE COURT:  What was your concern?
13           MR. CALLAGHAN:  It's an issue with respect to certain
14  provisions in the transaction agreement purporting to limit
15  Capstone's liability in the event.  And presently, we are
16  discussing that with Mr. Vagnoni, and I think Mr. George
17  suggested that they're going to request a short adjournment,
18  and we're hopeful we can work that out.
19           THE COURT:  All right.
20           MR. CALLAGHAN:  I too read the declaration.  The
21  amended declaration filed just a couple days ago.  And I too
22  was aware of the objection by VSI, which purported to -- well,
23  which stated as a fact that there was an NDA signed.  And I
24  appreciate that the Court reviewed that before today's hearing.
25           I reached out to Ms. Baskin yesterday requesting a
```

 1    copy of the NDA and she did not produce it.  She -- and without

 2    getting detail right now, she indicated that she doesn't have

 3    it, but somebody purports to have something.

 4            THE COURT:  Well, I thought she just said she

 5    withdrew that statement and that suggests that there is no NDA.

 6    Is that what you said, Ms. Baskin?

 7            MR. CALLAGHAN:  Well, that's not the request.  That's

 8    not the response I got.

 9            THE COURT:  Okay.

10            MR. CALLAGHAN:  Well, that wasn't the response.  But

11    there was also a statement that -- well, I have the email.  The

12    person who purportedly has this document is in Paris and is

13    unreachable at the moment.  So I asked Ms. Baskin for a series

14    of questions.  Have you seen it?  What have you done to

15    determine whether there is one?  Who is this person?  Who made

16    this statement?  And Ms. Baskin responded last night, but

17    without that information.  This morning I asked her to provide

18    that information.

19            And Your Honor is asking whether there should be an

20    evidentiary hearing.  I'm not prepared to state if there should

21    or not should or there should be one until we get that

22    information.  But I assure the Court that the US Trustee is

23    extremely concerned about representations made by one of the

24    parties that are clearly not accurate.  We have one declaration

25    under oath and another statement by counsel in a pleading, not

 1    upon information or belief if there was an NDA.

 2           Ms. Baskin has assured me that she's going to

 3    cooperate and find out who the parties were who made these

 4    representations and who -- the other questions that the Court

 5    has just asked whether who had who actually and initially

 6    approached Capstone with respect to doing that.  So I see this

 7    as a still floating issue.  And until we receive that

 8    information, and everything is fine, we can move on, but yes.

 9           THE COURT:  Thank you for your thoughts, Mr.

10    Callaghan.

11           MS. BASKIN:  Well, I'd like to respond to a couple

12    comments that Mr. Callaghan made. Okay.  Number one, when he

13    said that I responded last night, he sent me an email

14    questioning this at 5:05.  I responded to him that I had a

15    cardiologist appointment at 5:30, but I was cancelling it so I

16    could get back to him.  So his blanket statement that I

17    responded last night should be taken in context.  I responded

18    to him immediately.

19           I had advised him that I was withdrawing that part of

20    the application and that he was correct.  I probably phrased it

21    incorrectly.  I should have listed, or I should have stated in

22    the objection that upon information and belief.  I admit I did

23    not do that.  That is my mistake.  I had -- he had asked me

24    what due diligence I did. I mean, it seems like this is more

25    about me than about the objection.  But that's okay.  I accept

1   that.

2          THE COURT:  Well, the reason why it's about you is

3   because when you stated without any kind of conditions that

4   there was NDA and then I have an affidavit saying that there

5   wasn't an NDA, at that point I know that someone is not telling

6   me the truth.  So at that point, I take it very seriously and I

7   just want to make sure that I know exactly what's going on.

8          So the fact that you stood here today, I think what I

9   heard you say was that you don't have the NDA in your hands and

10  you're withdrawing that part of your application.  I assume

11  that means that you haven't seen the NDA; is that correct?

12         MS. BASKIN:  Correct, because my understanding in

13  speaking to the client five times over the past couple of weeks

14  and prior to my filing the objection was that they were

15  forwarding it to me.  The never forwarded it to me.

16         THE COURT:  I know.  They're making you look bad

17  here, Ms. Baskin.

18         MS. BASKIN:  They are making me look bad but --

19         THE COURT:  This is not good.

20         MS. BASKIN:  This is not the first client whose done

21  that, so I accept it.  That's part of my job.

22         But I must say that I had gotten more details and I'm

23  putting on the record as I told --

24         THE COURT:  So there's someone one the phone who just

25  spoke.  You may have accidentally taken yourself off of mute.

```
 1  But I'd ask that you put yourself back on mute or we'll do it

 2  too.  Go ahead.

 3          MS. BASKIN:  My understanding in speaking with the

 4  client and the client's right-hand person, Nicole Medine

 5  (phonetic), that there's a gentlemen, Dan Rink (phonetic) who's

 6  the inhouse counsel at VSI.  I was advised that he had the

 7  document.  I was advised that way all along.  When I kept on

 8  saying please provide it to me, they said he is in Paris.  He

 9  is not taking work calls.  And when he returns, he will send it

10  to you.

11          THE COURT:  When's he getting back from vacation?

12          MS. BASKIN:  In about a week.

13          THE COURT:  Okay.  So we are going to continue the

14  hearing, but I am concerned.  You know, at this point, I'm

15  wondering whether or not your client made a representation to

16  you that's simply not true.  So obviously, you're on notice now

17  that we're all concerned about the statements that they're

18  making to you.  And, you know, you relied upon a statement,

19  right?  That's probably why you didn't put upon information.  I

20  mean, you probably should  have seen it.  But you didn't

21  realize it was an issue because the moment you saw the amended

22  affidavit, that's when I'm sure you realized there was a

23  disconnect.

24          So I would like you to make sure that before the next

25  hearing, you get to the bottom of it and you explain to them
```

1    that when they say things to you and you make that

2    representation, right, that they're -- that they need to be

3    true because --

4            MS. BASKIN:  I have had that conversation, Your

5    Honor.

6            THE COURT:  Right.  And so, if they're not true, then

7    that will affect my assessment of your client's credibility,

8    the gentleman or the people who are talking to you, okay.

9            MS. BASKIN:  And just to assure the Court --

10           THE COURT:  Yeah.

11           MS. BASKIN:  -- and other counsel here, I don't

12   knowingly do that.

13           THE COURT:  Yes.  I have -- I don't ever see you

14   making representations that aren't true.  But I am starting to

15   have concerns about the veracity of statements made to you by

16   your client.  So I'm positive that the next time we have a

17   hearing on Capstone's application, you will get to the bottom

18   of it.  And you will either tell me that they cannot produce

19   one, in which case I will make whatever inferences I need to

20   make.  But that going forward, you're not going to be making

21   statements that, you know, unless you've actually seen it, you

22   know, you're not going to tell me that a document exists.

23           MS. BASKIN:  I accept that, Your Honor.  And just one

24   other comment.

25           THE COURT:  Yeah?

1        MS. BASKIN:  Of course, other people could talk.

2   That was one of the objections.  I still believe that there are

3   other very valid objections that both I raised on behalf of VSI

4   and Rembrandt raised concerning what our major reason for being

5   here at the status conference is.

6        THE COURT:  Yeah.  I guess, I -- you know, it sounds

7   like -- okay.  I wanted to make sure I understood.  It didn't

8   appear to me that VSI is a creditor of this debtor.  Is that --

9        MS. BASKIN:  They are.

10       THE COURT:  I thought that they were just an equity

11  holder.  See, that's like another fact that we should all like

12  be on this --

13       MR. GEORGE:  Your Honor, they're not scheduled, and

14  they haven't filed a proof of claim.  They are listed as an

15  equity security holder as I understand from --

16       THE COURT:  It sounds like they're an equity security

17  holder, but that was another statement that you had made.  You

18  know, that -- sir, I just want to make sure that that guy --

19  we're here on case called Stream.  And just tell me, are you

20  here on a different matter?  What is the name of your case?

21       THE BAILIFF:  It's on at 12:30.

22       THE COURT:  It's on at 12:30.  So about an hour.

23  You're welcome to sit and listen to this, but you've got an

24  hour to kill.  No, no, no.  I just wanted to make sure you

25  weren't in the wrong courtroom.

1          So do you know with certainty that VSI is a creditor

2    of the Debtor?

3          MS. BASKIN:  Based upon representations that they

4    have made and notices that they have sent to me.

5          THE COURT:  And so, could you describe the basis of

6    their position as a creditor?  Did they loan money?  Did they

7    have a contract?

8          MS. BASKIN:  No.  Over the course of the bankruptcy

9    and prior to it they had made loans.

10          THE COURT:  Loans?

11          MS. BASKIN:  Loans to the company --

12          THE COURT:  Okay.

13          MS. BASKIN:  -- that were not equity infusions that

14    they are claiming were loans to the company.

15          THE COURT:  So why didn't they file a proof of claim?

16          MS. BASKIN:  I don't know that answer.  That was

17    before I was involved.

18          THE COURT:  Yeah.  So I guess another concern that I

19    guess I'd like you to raise with your client before we have the

20    continued hearing on the Capstone is, you know, when they tell

21    you that they're a creditor but they're not on the schedules

22    and they didn't file a proof of claim, then it starts to make

23    me think that they're not a creditor, right?  Again, maybe

24    they've got evidence of this, and at the next hearing we'll see

25    it.  But I guess I just want to, I just want to note to you and

```
 1   make sure that you pass along to them that it appears now that

 2   there's a couple of statements that they've made to you that

 3   I'm not sure are true, right?  And, you know, they're just

 4   telling you this.  And until you actually see the evidence, you

 5   won't know either.  But I trust that before the next hearing

 6   you will drill down and make sure that they provide evidence to

 7   you of the statements that they have made.  And hopefully

 8   you're starting to feel a little worried about, you know, some

 9   of the statements that they made to you too.

10           MS. BASKIN:  Yes, Your Honor.

11           THE COURT:  Okay.

12           MS. BASKIN:  I did think they have standing equity

13   holders also to raise certain issues.

14           THE COURT:  I mean, I wasn't questioning their right

15   as equity holders.  But I guess the concern I have is that if

16   it turns out at the end of the day that VSI is merely an equity

17   holder and Capstone forgot to run a conflict check on an equity

18   holder as opposed to forgetting to do a conflict check on a

19   creditor, those are two different things in my book, right?  If

20   Capstone is an unsecured creditor and they had a relationship

21   with Capstone beforehand, that's something that should have

22   been caught.  However, if they were merely an equity holder,

23   you know, I don't feel as concerned about that.

24           And I guess while we're on that topic, I'm also not

25   as concerned if the topic of discussion between VSI and
```

```
 1    Capstone was merely marketing VSI.  Like do you, have you seen

 2    any evidence that there was information given to Capstone about

 3    this debtor?

 4              MS. BASKIN:  Yes.

 5              THE COURT:  Okay.  Do you want to describe for that

 6    to me what you see?

 7              MS. BASKIN:  I can provide it to the Court.

 8              THE COURT:  Okay.  Do you want to just describe it

 9    just so I understand what information they gave just so I have

10    a ballpark understanding?

11              MS. BASKIN:  Information as to what VSI was doing on

12    behalf of Stream in order to market the proper or the assets of

13    Stream.  Not VSI, but of Stream.

14              THE COURT:  Okay.  Well, I think it looks like we are

15    going to have to have this continued hearing.  So I guess it --

16    yeah?

17              MS. BASKIN:  I'd like to make one other point.

18              THE COURT:  Yeah.

19              MS. BASKIN:  I apologize again.  I find it very

20    interesting that they did not put VSI on their conflict list,

21    but they did put --

22              THE COURT:  As an equity holder?  Their position is

23    that it's an equity holder.  So are you saying it's curious

24    that as an equity holder they didn't put that on the conflict

25    check?
```

```
 1              MS. BASKIN:  No.  But if I finish my statement, maybe
 2    you'll understand where I'm coming from.
 3              THE COURT:  Yeah.
 4              MS. BASKIN:  But they did put Nicole Medine who spoke
 5    on behalf of VSI and others and also Mr. Rajan.  So they're not
 6    creditors.   I think that's the same argument that I can make
 7    that why would they list these two people on their list of
 8    review for the conflict, but doesn't list VSI? That to me is --
 9    raises some issues.
10              THE COURT:  Okay.  So for our next hearing then,
11    we'll get to the bottom of the veracity of some of the
12    statements that were made about whether they're a creditor.
13    And we'll get into exactly what information was given to
14    Capstone about the Debtor.
15              So I don't know if we -- maybe at the conclusion of
16    this hearing before we end someone just remind me that we need
17    to pick a continued hearing date on that application.  And
18    obviously, you know, we need to incorporate any comments by the
19    US Trustee's office if that does move forward.  So let's just
20    pick a date before we conclude today, okay?
21              MS. BASKIN:  And -- but I would  like to restate that
22    VSI is withdrawing the portion of their objection concerning a
23    conflict.  I know you've raised issues and --
24              THE COURT:  You mean with regard to the NDA?
25              MS. BASKIN:  Yeah.  Yes, I'm sorry.  About the NDA.
```

1              THE COURT:  Right.

2              MS. BASKIN:  And I totally understand that.  But I'm

3    also withdrawing the portion of the objection concerning, you

4    know, they are not raising or listing VSI as a potential

5    conflict based upon their prior discussions.  So the NDA is

6    tied into that.  But it's not solely an NDA issue from my

7    perspective.  But we are withdrawing that part of the

8    objection.  We are --

9              THE COURT:  So you're withdrawing the part of the

10   objection that alleged that there was an NDA.  So what else are

11   you withdrawing?

12             MS. BASKIN:  But also that we being VSI supplied

13   information to them, notwithstanding the fact that there may

14   not have been an NDA.  That they knew based on conversations

15   were confidential.

16             THE COURT:  Okay.  But obviously, if it was truly

17   confidential and they were really concerned about it, they

18   would have had an NDA signed.

19             MS. BASKIN:  I agree with you, Your Honor.

20             THE COURT:  Yeah.

21             MS. BASKIN:  But we are withdrawing that part of the

22   objection.

23             THE COURT:  Okay.  Thank you for that clarification.

24             All right.  So, Mr. George, I didn't know if you

25   wanted to add anything?

 1          MR. GEORGE:  I did want to add something, Judge.  And

 2   again, I don't want to beat a dead horse here.  But the point

 3   of the matter I would make is I've known Ms. Baskin a long

 4   time.  I've never known her to make misrepresentations.  But I

 5   think this is a common thread that you're going to see weave

 6   through this entire proceeding.  And that is that Mr. Rajan is

 7   a provocateur.  He will say whatever he needs to say.  It's

 8   been judicially determined.

 9          Judge Coleman in her findings and in appointment of

10   the Trustee said, "Unfortunately, in the context of so many

11   other instances where the Court has concerns regarding Mr.

12   Rajan's truthfulness, this is just another example."

13          Another place she says, "I have very serious

14   questions about whether Mr. Rajan is acting in his own instance

15   or his own interest.  The Court would have expressed the

16   Debtors to put on the testimony of Mr. Corso (phonetic) and Mr.

17   Savarese (phonetic), each who purport to have bound VSI.  The

18   Debtor instead relied on Mr. Rajan who's credibility with this

19   Court has been greatly diminished."

20          So he is a person who is, in the words of Judge

21   Laster, a chaos litigator.  He comes in for the purpose of

22   delay.  He came in at the last minute here.  He contacted our

23   potential broker after he knew that they were retained for the

24   purpose of trying to create it.  There's absolutely little

25   question in that.  I don't blame Ms. Baskin for that.

1          But what I want Your Honor to understand, this is a

2   common thread with Mr. Rajan's behavior.  And it's been going

3   on for months and months and months.  And the reason why we're

4   here today --

5          THE COURT:  Okay.  Thank you, George.  Okay.  Well,

6   moving on now to the other matters.  Let me just pull up --

7          MS. BASKIN:  Your Honor, I understood from your

8   order, I understand that you're the Judge and you're the one

9   who decides the order of things, that you were going to hear

10  the status, the request for the status conference and the

11  arguments that I made in there.  And then perhaps go on from

12  that and see whether you are going to hold other --

13         THE COURT:  Yeah.  You know, I've now had a chance to

14  look at everyone's pleadings.  And I guess I just wanted -- I

15  had some questions of my own and I thought it might be more

16  efficient if we just go through some of the questions that I

17  have.

18         MS. BASKIN:  Do you want me --

19         THE COURT:  No.  You can have a seat.  No.  You can

20  have a seat.  Okay.  So let me just pull out the right document

21  here.

22         So it's my understanding that some of the issues that

23  I'll need to be resolving is first the 99T motion filed by the

24  Trustee.  The Trustee was -- the Chapter 11 Trustee was

25  appointed upon motion.  And I presume that the Trustee has

1  reviewed all of the litigation involved in this case before

2  coming up with the 99T motion. The adversary proceeding, the

3  Delaware matters, all of the litigation.  And I'm also

4  presuming that the Trustee has seen the objections raised by

5  VSI and by Rembrandt.

6          So I first wanted to confirm that the Trustee has

7  taken all of these things into consideration.

8          MR. GEORGE:  Well, Your Honor, first I would say that

9  the Trustee hired very competent financial and legal advisors,

10  Mr. Coren from Coren & Ress as I think you know is a very

11  seasoned lender liability attorney.  He was hired not on a

12  contingency basis, but he was hired to review all of these

13  matters.  And he has spent -- he and his associate, Mr. Belli

14  have spent extensive time reviewing, strategizing, discussing

15  those cases in Delaware.

16          In addition, Your Honor, the Trustee spent

17  substantial time with the Debtor in possessions lawyer who was

18  conducting the hearings in Delaware.  Mr. Dupre, who I believe

19  is with McCarter & English.  We spent extensive time with him

20  trying to understand the positions, asking Mr. Dupre what he

21  thought about the potential outcome.  I won't breach

22  privileges.

23          THE COURT:  Yeah.

24          MR. GEORGE:  But all of those things were tested and

25  delved into and analyzed by the Trustee and it's advisors.  And

1    so, I believe there's been a fulsome review of everything

2    that's gone on in this case.

3          It's substantial, Judge, and the records are

4    voluminous.  And there was a lot of work put in over the last

5    four months by the Trustee himself, his financial advisors, and

6    his legal advisors to come to this settlement.

7          THE COURT:  Okay.  Thank them for that.  Because it

8    -- the first issue I want to address is the fact that there's

9    this outstanding objection, this claim objection filed by I

10   guess it was Rembrandt; is that correct?  And so, sometimes

11   I've made statements made by VSI.  But you guys are two

12   completely separate entities; is that correct?

13         MR. DEMARCO:  That is correct, Your Honor.  Rembrandt

14   represents Rembrandt's interests alone.

15         THE COURT:  Okay.

16         MS. BASKIN:  Yes, Your Honor.

17         THE COURT:  All right.  So with regard to Rembrandt's

18   claim objection, it seems to me that there's some overlap here,

19   right, because the essence -- at least one piece of the 99T

20   motion is to resolve the claim of Hawk, which you filed an

21   objection to, which you're allowed to do.  But I don't really

22   see any reason why I'm prohibited from ruling on the 99T motion

23   prior to resolving your claim objection.  I just want to make

24   sure that in one form or another that this issue has been

25   considered and that I make a determination.

1          So although I note that there is an outstanding claim

2     objection, I don't -- I'm planning on ruling on the 99t motion

3     today, which by rule and, you know, if I grant the 99t motion,

4     it will make your claim objection moot.  So I just wanted to

5     throw that out there so that you would understand that.

6          MR. DEMARCO:  Yes, Your Honor.

7          THE COURT:  And I guess next I just wanted to note

8     for the record that with the Trustee at the helm of this 99T

9     motion, unlike -- I sense the emotions of this case, I

10    understand that there are secured creditors in one corner who

11    are -- who have strong interests.  And I see that there's, you

12    know, there's VSI and Rembrandt on the other side.  And then I

13    see the Trustee who's been appointed to be kind of an objective

14    party who really has no skin in the game other than to maximize

15    value for creditors.

16         So when I see the 99t motion, I note that we just

17    need to make sure, I need to make sure that it's fair and

18    reasonable and it's in the best interest of the estate and that

19    the Trustee has some business judgment that I am going to give

20    some deference to.

21         So I just lay that out there because, you know, the

22    whole context in which I review the 99t motion is one where it

23    looks like I've heard that the Trustee has looked at all of

24    this extensive litigation.  And a lot of the objections that

25    I've seen to the 99t motion are issues that are being raised,

1    substantive issues that you have concerns about in connection

2    with the adversary proceeding and with the Delaware litigation

3    and all these other concerns.

4            But these are specifically issues that were

5    considered by the Trustee when he was considering whether or

6    not to enter into the 99T motion.

7            I guess I also wanted to understand a little bit

8    better, it sounds like VSI, you made a counter offer or an

9    offer to the Trustee to try and do what Hawk is trying to do.

10   And I thought I understood you to say that Hawk believes that

11   it's got a claim of somewhere in excess of 168-180.  And I

12   thought I saw that your offer to the Trustee, which you were

13   not happy that the Trustee did not accept that offer, you were

14   offering something like $11 million dollars.  And I was

15   confused as to how VSI could make the statement that under your

16   proposal that if the Trustee had gone with you, that you guys

17   were going to pay 50 percent of unsecured claims.

18           And it thought maybe -- well, I'll let you answer

19   that.  But what was -- how were you going to -- was it $11

20   million dollars that you proposed to pain to try to --

21           MS. BASKIN:  Brought it up.  That was a portion of

22   it.  There was $11 million dollars in total.  And it was broken

23   down in a certain way where it would categorically cover the

24   administrative claims in this case.

25           THE COURT:  So then let's just get to the heart of

 1   the matter.  How did you or how were you going to pay the

 2   secured creditors?

 3          MS. BASKIN:  Well, as part of proposal, we said that

 4   we were going to issue notes.  And if the Court found that they

 5   had a secured claim, which we do not believe they have at all,

 6   that they would be paid pursuant to certain notes over time.

 7          If the Court found that they didn't have a secured

 8   claim, which we believe that they don't based upon conversion

 9   agreements, then their claim irrelevant and that the $11

10   million dollars would be acceptable under a Chapter 11 plan.

11   It pays administrative claims.  It would buy the litigation

12   from the Trustee. The Trustee raises the point that they're

13   concerned that there is a lot of time and expense associated

14   with the outstanding litigation.  That would be taken away.

15          It would actually make Stream TV a viable entity

16   because there are these two outstanding purchase orders, which

17   upon demand by the Trustee, we have produced proof of these in

18   two, from two entities.  From So Tel (phonetic) and Cistar

19   (phonetic)in excess of $165,000.  So that would generate not

20   just business, but substantial business for the company.

21          So we believe that the $11 million -- so the way VSI

22   looks at it --

23          THE COURT:  I didn't need to see the specific

24   breakdown. I guess my primary concern with your offer was how

25   you were going to be able to satisfy the secured claims.  And

1    you're telling me now that you were going to give them notes to

2    -- you know, over time.

3            MS. BASKIN:  It's in the proposal that we --

4            THE COURT:  Right.

5            MS. BASKIN:  The Trustee had asked us, Your Honor --

6    they refused really to talk to us.  There's be no -- very

7    little -- you can laugh all you want.  There has been very

8    little communication.  And that's one reason why we requested

9    this status conference.  I would say 95 percent of my

10   communications with the Trustee have gone unanswered.

11           But the one thing that they did answer is they said,

12   well, if you want to make a proposal, attach it to your

13   objection.  I attached it to the objection, which was basically

14   what I sort of just outlined to you.  They never responded.  I

15   followed up.  Can we talk about the proposal?  No response

16   whatsoever.

17           Silly me, I followed up for a third time.  Still no

18   response.  So this is what is going on here.  Not just as is

19   their divisive behavior, which I accept between the clients.

20   But there is very little, if any, real communication between

21   the parties.  And that's what I think so critical for Your

22   Honor to understand.  And to understand that, there are really

23   certain issues, which they won't even discuss with us why they

24   believe, for example, the conversion agreements don't apply.

25   That is the linchpin of every single motion that is before,

1   Your Honor.

2            Now, I heard you say that, you know, you don't feel

3   -- you're the Judge.  I respect and accept whatever your

4   decision is obviously.  But I just find it confusing to me that

5   if in fact there is a dispute as to the secured creditor's

6   status and if in fact it's proven that this conversion

7   agreement either was fulfilled or it has the potential to be

8   fulfilled based upon order, based upon proposals that are out

9   there or evidence that is out there, then there's certain

10  choices.  They either have no secured claim, they have a

11  greatly reduced secured claim, or they have a secured claim

12  which is vitiated based upon cases like *Philadelphia Newspaper*

13  and *Fisker* which says that even a secured creditor where it's

14  found to be a secured creditor can be found to have -- not have

15  one based upon their malfeasance.  You know, there still is an

16  issue which has never been answered by the Trustee of trustee's

17  counsel as to what is going on, what assets are intended to be

18  sold, and what is going on with the major assets, why no one

19  has honored the Supreme Court of Delaware's order whereby Hawk

20  is required to return the assets to the estate.

21            These are very important issues.  So I assume, Your

22  Honor, if you are going to approve the 9019 that I assume there

23  is going to be some offer of proof or some testimony as to what

24  the research they did, what investigation they did.  I find it

25  bizarre that they have refused to answer any of these questions

1    that we have posed to them.  But that's okay.  They just have

2    to really respond to you, I guess, and prove that they have

3    exercised their due diligence, et cetera, et cetera.  I just

4    think that, as I said before, the lynchpin of this whole matter

5    is whether they in fact have a secured claim.

6         THE COURT:  So I guess I take a different view of

7    this case than you do, Ms. Baskin.  I guess the view that I

8    take is that I don't know if, you know, Counsel has always been

9    responding to you in the manner and, you know, if he's been as

10   responsive to you as you would like him to be.  I don't know

11   about that.  But what I do know is that I trust that the

12   Trustee took a look at your offer, you know, and perhaps the

13   Trustee just wasn't jazzed up about $11 million and a note to

14   pay the secured creditor when clearly the Trustee believes that

15   Hawk is a secured creditor.

16        You know, if that's the position that the Trustee

17   takes I think that we can all agree the Trustee has no skin in

18   this game.  The Trustee is not on the side of the secured

19   creditors.  The Trustee is just trying to generate as much

20   money as the Trustee can to pay off creditors in this case.

21   And when I look at it, it looks like based upon, you know, the

22   Delaware Supreme Court opinion, you know, it sounded like, you

23   know, they believe that Hawk is a secured creditor.  They did

24   lots of findings of fact, far more than I did and certainly

25   more than Judge Coleman did, right?  Which is why she let them

1     go forward with that litigation.

2              So it does seem like another judge has taken a look

3     at this and has found that Hawk is a secured creditor.  So I

4     don't fault the Trustee necessarily then in, you know, taking

5     that fact and then trying to figure out some kind of

6     resolution.  So that was just the question I had for you with

7     regard to the amount that VSI had offered.  So I appreciate

8     your --

9              MS. BASKIN:  I just feel that if you don't really

10    analyze the validity of these secured claims.

11             THE COURT:  I know.  So let's talk about that.  Let's

12    talk about that.  You've got all these objections, right, that

13    they're doing all these things and some of them may have some

14    merit, right?  But the purpose of appointing a Chapter 11

15    trustee is not so that we can all sit here and make our own

16    independent determination and, you know, see out the

17    litigation.

18             The point of a Chapter 11 trustee is to see whether

19    or not that person who is tasked with talking to all of the

20    litigants and getting all of the pleadings in those underlying

21    proceedings, whether they have considered -- you know, what

22    they think about all of these objections that you have raised.

23    And I just want to make sure that the Trustee has seen every

24    single objection.  And it sounds like a lot of the objections

25    that you have raised were the objections that were raised in

1   these proceedings like in the adversary proceeding.

2            These were the exact same arguments and statements.

3   There's no like new thing and I need to make sure the Trustee

4   has taken into account a new arguments.  These were all the

5   arguments that are part of all of this litigation that the

6   Trustee has looked at and has deemed to be -- you know, has

7   caused the Trustee to tee up the 9019 motion, right?  I mean,

8   all of these objections are the issues that were raised in

9   those proceedings.  So for whatever reason, the Trustee does

10  not share your concerns about those issues, right, and has

11  taken that into consideration when coming up with the 9019

12  motion.

13           MS. BASKIN:  I would love to hear if you have an

14  offer of proof or testimony --

15           THE COURT:  Okay.

16           MS. BASKIN:  -- as to what they actually did in

17  investigating.

18           THE COURT:  I'm going to take Rembrandt and then I'll

19  take you, Mr. George.  Yes.

20           MR. DEMARCO:  Yes, Your Honor.  I didn't want to

21  derail Your Honor.

22           THE COURT:  Yeah.  Go ahead.

23           MR. DEMARCO:  Since you said you've got your own

24  questions.

25           THE COURT:  Yeah.

1          MR. DEMARCO:  Rembrandt has thoughts as well.

2    Rembrandt has some thoughts as well on this issue with VSI.  I

3    didn't know if Your Honor wanted to hear us now or if you were

4    going to come to us in your own time.

5          THE COURT:  Well, I guess, you know, I just -- I

6    think that my comments apply to both Rembrandt and VSI which is

7    that the objections that you've raised for me to consider are

8    all based upon the meritorious -- the merits of the litigation

9    that's already been -- you know, everyone knows what those --

10   like in the adversary proceeding, right?  He knows what the

11   complaint says.  He knows what the issues are in the adversary

12   proceeding.

13         So for you to raise them now as an objection, you

14   know, in support of me denying the 9019 motion, to me, it's

15   just not going to get very far because everything that you're

16   raising is something that he's considered.  And I'm sure that

17   there will be a proffer where they assure me that they've

18   considered all of the allegations and arguments that you guys

19   have raised in your objections.

20         MR. DEMARCO:  Well, Your Honor, I understand that

21   might be the case regarding the issue of the convertibility,

22   for example, of Hawk's.

23         THE COURT:  Uh-huh.

24         MR. DEMARCO:  So for that I might be able to

25   understand, but as to matters of sufficiency, you know, as Ms.

1  Baskin noted and we've tried to discuss with the Trustee as

2  well, a lot of issues and some of our concerns.  As far as

3  we're aware, there's been no even --

4          UNIDENTIFIED SPEAKER:  Close the door.

5          THE COURT:  John, could you mute whoever that may be?

6          MR. DEMARCO:  Thank you, Your Honor.

7          As far as we're aware, you know, we at Rembrandt have

8  requested any kind of representation that even these companies

9  have the money in the accounts to go forward with this and

10  we've heard nothing kind of in that response, for example.

11  We've been trying to get some very basic information.  In fact,

12  we sent out discovery requests, noticed depositions.

13          THE COURT:  Yeah.  Those discovery requests, let's

14  talk about that.

15          MR. DEMARCO:  We can, Your Honor.

16          THE COURT:  So who -- you wanted to make discovery

17  requests or VSI was going to make discovery requests?  Who

18  wanted to make these discovery requests?

19          MR. DEMARCO:  So Rembrandt issued discovery requests.

20          THE COURT:  When did you issue these discovery

21  requests?

22          MR. DEMARCO:  So we noticed the depositions a week

23  from this previous Tuesday.

24          THE COURT:  When did you send out the discovery?

25          MR. DEMARCO:  Send out the --

1          THE COURT:  Discovery requests.

2          MR. DEMARCO:  The deposition requests were a week

3   from this past Tuesday, so as far as a date, I believe that was

4   May 29th.  I don't have that --

5          THE COURT:  And is the discovery discovery that is

6   relevant to the adversary proceeding?

7          MR. DEMARCO:  In part, Your Honor.  The portions

8   regarding, for example, the kind of questions we asked which

9   were tangentially related to that part of the proceeding that

10  we could not get answers on from the Trustee or from the other

11  parts of whom we requested.  So part of it was related to that.

12  Yes, Your Honor.  But other parts regarded, for example,

13  representations that there was even money on behalf of these

14  parties that was offered.

15         THE COURT:  I was just curious about it.  I mean, it

16  sounds like this discovery was something that you needed really

17  urgently, but had only, you know, as far as I could tell,

18  hadn't even been issued until, you know, I guess a week ago now

19  it seems.

20         MR. DEMARCO:  Well, yeah.

21         THE COURT:  I just wondered about the delay if there

22  was such an urgent need for the discovery.

23         MR. DEMARCO:  Well, in part -- Your Honor, part of

24  that was we were trying to seek these answers directly from the

25  parties themselves.  A lot of the things that we requested

1    discovery on, we wouldn't have been satisfied with

2    representations from counsel.  So we sent out emails to

3    opposing counsel.  My colleague and co-counsel, Christopher

4    Michaels, for example.  We've tried to reach out through phone,

5    through email.

6              THE COURT:  But you're saying that you're trying to

7    get information to help the Trustee make a decision. Is that --

8              MR. DEMARCO:  We're trying to -- we wanted to get

9    information to understand that the Trustee's decision was on

10   firm footing and that we did not have to challenge it.  And

11   we're sitting from a position here where we don't know what the

12   basis of these decisions are.

13             THE COURT:  Okay.

14             MR. DEMARCO:  And we have serious concerns and

15   questions.

16             THE COURT:  Yep.  Okay.

17             Mr. George, I don't know if you were jumping up here.

18             MR. GEORGE:  Your Honor, I just wanted to respond to

19   a couple of things.  One, the absolute misstatement that we

20   never dealt with Mr. Rajan and his group.  Ms. Baskin got

21   involved very, very late in the case.  She was coming up to

22   speed.  And we did have communications with her, but I won't

23   characterize them.  But every communication was an accusation.

24             And so, you know, when you're -- someone just gets in

25   the case and they don't have the complexion of everything that

1   you've been dealing with for four months and every email is a

2   threat, you know, we don't respond to those kind of things.

3          I'll say this.  The proposal that's in that plan is

4   the same proposal that was made to the Trustee back when we met

5   with Mr. Rajan and his group long before Ms. Baskin was

6   involved.  It wasn't acceptable then.  It's not acceptable now.

7   When he made the proposal, the request was show us that you

8   have the financial ability to fund this.  Judge, there are

9   almost $3 million of administrative expenses in this case all

10  to the Lewis Brisbois firm.

11         Now, Mr. Zahralddin is here today.  There's no

12  debtor-in-possession.  I think that Mr. Zahralddin is here on

13  behalf of VSI because he appears every time Mr. Rajan does with

14  him.  So there is no debtor-in-possession.  So for him to say

15  he represents the Debtor, untrue.  He's not been retained by

16  the Debtor.  He was retained by the Debtors-in-possession and

17  they don't even exist anymore.

18         But any notion, Judge, that we didn't sit and fairly

19  have a discussion with Mr. Rajan in his group.  He brought the

20  TV into my conference room.  We sat it up.  We watched it for

21  three hours.

22         THE COURT:  Let me just make a -- let me just ask you

23  to pause.  I am going to ask for a proffer and at that point,

24  you know, if someone can tell me about --

25         MR. GEORGE:  Well, we have --

1          THE COURT:  Yeah.  Okay.  That's fine.

2          MR. GEORGE:  We have --

3          THE COURT:  We can go through --

4          MR. GEORGE:  -- the Trustee or judge.

5          THE COURT:  We can go through all of that.

6          MR. GEORGE:  And I'll put them on the stand.  But I

7   didn't want that to go without being said.

8          THE COURT:  Yeah.

9          MR. GEORGE:  The other thing wanted to mention,

10  Judge, was the thing that was mentioned in the beginning about

11  the objection to the proof of claim.  On page 73 of Judge

12  Coleman's order, she directs the Trustee to investigate,

13  evaluate, resolve, and/or litigate the claims of Hawk,

14  SeeCubic, and Rembrandt and others.  So this wasn't just --

15  this was a direct charge by the -- by Judge Coleman.

16         THE COURT:  Yep.

17         MR. GEORGE:  And the law is generally, Judge, that

18  when a trustee is appointed, he is the representative of the

19  estate and the one who brings those objections.  And if you

20  write to the Trustee and you ask him to do it and you have a

21  legitimate reason and he does it, then you can come to the

22  Court and ask.

23         But what happened here, Judge was these parties

24  learned about the settlement in advance because we were honest

25  with them.  We told them we had a resolution with Hawk.  We

1    were working through the document.  It took a few weeks to get

2    done.  They filed that objection in order to try to leapfrog

3    their position in front of our position settlement.  So now --

4           THE COURT:  I understand.  Everyone is zealously

5    advocating on behalf of their client.  That's absolutely --

6           MR. GEORGE:  I'm not --

7           THE COURT:  -- clear to me.

8           MR. GEORGE:  I'm not sure whether that's zealous or

9    gamesmanship, but the fact of the matter --

10          THE COURT:  I'm trying to put a nice spin on things.

11          MR. GEORGE:  I appreciate it, Your Honor.  But the

12    fact of the matter is that the Trustee has the exclusive

13    province under the order to make an effort to settle it and

14    resolve it and he has.  And to your point, this is -- these are

15    all litigation claims.  It's not like this is a million dollar

16    preference and, you know, Bristol Myer is on the other side.

17    And we were deciding to pay --

18          THE COURT:  Yeah,  Mr. George, no need -- I think --

19          MR. GEORGE:  -- $10,000.

20          THE COURT:  I think we're on the same -- we see

21    things in the same way.  I understand what you're saying.

22          MR. GEORGE:  Fair enough, Judge.

23          MS. BASKIN:  Your Honor, if I may just respond to one

24    or two things.

25          MR. ZAHRALDDIN:  Your Honor.

```
1              THE COURT:  Yes.

2              MR. ZAHRALDDIN:  Your Honor.

3              THE COURT:  Yes.

4              MR. ZAHRALDDIN:  I'm sorry, Your Honor.  This is Mr.

5   Zahralddin.  I apologize because I know I'm not there.  I'm a

6   little bit sick and I told Ms. Blalock I didn't want to get the

7   rest of the room sick, so --

8              THE COURT:  Thank you.

9              MR. ZAHRALDDIN:  -- I had to appear by phone.

10             THE COURT:  Okay.

11             MR. ZAHRALDDIN:  You're welcome.

12             Your Honor, I just -- I was sitting here quietly

13  listening because I'm really just an observer.  And in a way

14  Mr. George is correct.  There is not a client, though obviously

15  you and I both know that even with a Chapter 11 Trustee or when

16  a Chapter 7 Trustee if brought in, there is still a debtor's

17  counsel that's there.  I'm not billing the estate.  I'm here

18  monitoring this for my firm as we're an administrative

19  claimant.

20             I will say this.  I am very concerned after having a

21  very professional relationship with Mr. George that he wants to

22  drag me into whatever dispute he's having with the other

23  professionals here by alleging that I represent VSI.  That has

24  been an allegation Mr. Caponi and others have made at different

25  times and which have been completely refuted.
```

 1          Right now, since Stream doesn't have funding in place

 2   to pay my admin claim, it would be great if someone would pay

 3   my claim and if it were VSI, but that's not the case.  If that

 4   were the case, I would have reported that to Mr. Callahan as

 5   I've told him before when he's questioned me about that issue.

 6   And that is a trope that's been out there over and over again

 7   in pleadings from the Hawk parties, et cetera, which has been

 8   refuted.

 9          I take serious umbrage being accused of what I

10   believe would be a major ethical issue without any support and

11   in an attempt to drag me into whatever this is, which has not

12   become a civil discourse in the last 30 minutes.  I apologize

13   for being a little bit strident, Your Honor, but there are

14   times when you have to basically put your foot down in this.  I

15   have acted professionally with the Trustee and their counsel.

16   I cooperated in getting things over to them.  I have spent

17   countless hours trying to figure out a way to help them in

18   their diligence, et cetera.  And I take it as a personal

19   attack, what Mr. George said, and I'm not happy about it.

20          THE COURT:  Okay.  All right.  Well, thank you for

21   sharing your thoughts with me.

22          MS. BASKIN:  And, Your Honor, on that point.

23          THE COURT:  Yeah.

24          MS. BASKIN:  And I know the Judge has not and the

25   Court does not usually like entertaining this stuff, but I will

1    say for the record that there is not one modicum of truth as to

2    what Mr. George said as to any threatening emails which I have

3    sent on behalf of VSI.  I will just state on the record that

4    Mr. Michaels and I tried to have a very fair and open

5    discussion, which we tried to do by Zoom with Mr. Vagnoni and

6    Mr. George.

7          Mr. George got to such a point in taking with me or

8    screaming at me on the phone that I told him -- and I will be

9    honest -- that since I turned 67, I do daily affirmations.  And

10    one of my affirmations is I cannot control the behavior of

11    other people.  I can only control my response.  And my response

12    to him talking to me like he was literally a rabid dog was that

13    I choose not to deal with you anymore whereby he immediately

14    hung up.  And then we had a civil conversation with Mr.

15    Vagnoni.  It didn't really move the ball along at all when it

16    came to the merits of the case.  But for him to say that I have

17    sent threatening emails to him is bizarre and totally untrue

18    and I will not let that stand on the record.

19          THE COURT:  Okay.  So I think that I would like at

20    this point to substance of the 9019 motion.  One thing I guess

21    I would like to hear about in whatever proffer is made about

22    that is this allegation that VSI made that Mr. Stastney and

23    SeeCubic are in possession of technology belonging to the

24    Debtors and they have been using that technology to do

25    demonstrations of the glasses 3 3D technology to potential

 1  clients.  I just want to hear that whether or not the Trustee

 2  has heard that allegation and what concerns, if any, that they

 3  have about that.  So I would like to hear that.  And I guess I

 4  just wanted to point out a couple of other things before I hear

 5  that proffer.

 6          MR. GEORGE:  So, Your Honor.

 7          THE COURT:  Yeah.

 8          MR. GEORGE:  We received an email from Ms. Baskin --

 9          THE COURT:  Yeah.

10          MR. GEORGE:  -- making allegations.  We asked her for

11  proof of those allegations.

12          THE COURT:  That they were doing that, yeah.

13          MR. GEORGE:  And we never got anything from them.

14          THE COURT:  Okay.

15          MR. GEORGE:  And the fact of the matter, Judge, is

16  that SeeCubic BV is an affiliate of the Debtor.  And the

17  Phillips license allows the affiliates of the Debtor to use

18  those license for demonstrations.  VSI, on the other hand, is

19  not an affiliate of the Debtor, and they've been using that

20  technology and been out demonstrating on it.

21          THE COURT:  That's the subject of the motion to

22  enforce that we'll need to find a hearing date.  That's also

23  another date that we're going to come back to.  Hold on one

24  second.

25          So I didn't see the settlement agreement making a

1 statement about how the claim filed by Hawk is going to be

2 treated in the Technovative bankruptcy.  So if someone could

3 just talk to me about that.  And then other things I wanted to

4 note is that I just saw this discrepancy where it sounds like

5 the settlement agreement is trying to say that only Hawk will

6 remain standing at the end of the day with a secured claim, but

7 I noticed that the stalking horse bidder might be SeeCubic.

8 And I would just ask that whoever ends up holding a claim at

9 the end of the day probably ought to be the same name of the

10 stalking horse bidder.

11          MR. GEORGE:  Understood.

12          THE COURT:  So you want to maybe --

13          MR. GEORGE:  Your Honor, I think, in fact, that Hawk

14 is the collateral agent for a number of secured creditors.

15          THE COURT:  I know.  So whatever name you want to

16 call the ultimate holder of the allowed secured claim, just

17 make sure it's the name of the stalking horse bidder.

18          MR. GEORGE:  Fair enough, Judge.

19          THE COURT:  Right.  Okay.  So, I guess at this point,

20 I'd like to hear a proffer or if you wanted to put on testimony

21 --

22          MR. GEORGE:  I'm going to put Mr. Homony on the

23 stand, Your Honor.

24          THE COURT:  Alrighty.  So, sir, come right over here.

25 Mr. Barbado will swear you in.  Yeah.

```
 1              MR. DEMARCO:  Your Honor, just as a quick procedural

 2   matter.  I'd like to -- My co-counsel, Christopher Michaels,

 3   would like to do a temporary pro hac for the purposes of this

 4   proceeding that we're going to be having evidence to --

 5              THE COURT:  All right.  Any objection to that?

 6              MR. GEORGE:  No, Judge.

 7              THE COURT:  Okay.  That's fine.  Welcome, sir.

 8              MR. HOMONY:  Good morning, Your Honor, or good

 9   afternoon.

10              THE CLERK:  State and spell your name for the record.

11              MR. HOMONY:  William Homony, H-O-M-O-N-Y.

12              THE CLERK:  Can --

13              MR. HOMONY:  Yes.  1730 Maple Avenue, Hatfield,

14   Pennsylvania 19440.

15              MR. GEORGE:  And, Your Honor, we have an exhibit book

16   that we want to hand Your Honor if we can approach.

17              THE COURT:  Alrighty.

18              MR. GEORGE:  Thank you.

19              THE COURT:  Alrighty.  Thank you.

20              MR. GEORGE:  You ready, Your Honor?

21              THE COURT:  Of course.  Proceed.

22                         DIRECT EXAMINATION

23   BY MR. GEORGE:

24   Q    Mr. Homony, good morning.  And can you tell the Court a

25   little bit about your background in restructuring and
```

1  insolvency proceedings?

2  A    Sure.  Since graduating with a bachelor's degree in

3  accounting from the University of Pittsburgh, in 2000, I joined

4  Miller Coffey Tate and have been with them since.  I'm now a

5  partner and primarily spent most of my career focused on

6  bankruptcy and restructuring matters assisting trustees, both

7  Chapter 11 and Chapter 7 trustees in fulfilling their duties as

8  well as assisting debtors committees and acting as both a plan

9  administrator and liquidating trustee in post-confirmation

10  matters in this Court and in the District of Delaware.  And I

11  am currently also a Subchapter 5 Trustee in the District of

12  Delaware since 2022.

13  Q    And do you have any certifications, any insolvency or

14  restructuring certifications?

15  A    Yes.  I'm a certified insolvency and restructuring

16  advisor.

17  Q    Okay.  And upon your appointment, did you review the

18  Trustee opinion and order?

19  A    Yes.

20  Q    And did you have an understanding of what the Court was

21  asking you to do by the appointment?

22  A    Yes.

23  Q    Would it be fair to say that the Court was asking you to

24  try to bring some sensibility to this matter that's been going

25  on for over ten years with acrimony on both sides?

1  A     I think that's one of the tasks, yes.

2  Q     And di the -- your appointment cause you any immediate

3  concerns with respect to the operations or condition of the

4  Debtor?

5  A     Well, it would certainly seem as if the parties on both

6  sides, clearly the relationship was irreconcilable early on.

7  The question of operations was certain raised in the Court's

8  opinion appointing myself with respect to the MORs, the lack of

9  transparency, the inaccuracies, et cetera.  And so early on,

10 again, trying to, as in any trustee appointment case, trying to

11 evaluate the Debtor's operations, its assets, the parties'

12 positions, you know, interview them, sit down, communicate, and

13 try to figure out a path forward for these cases that had been

14 pending since March of 2023.

15 Q     And did the Court's findings with respect to the character

16 for truthfulness and the findings that the Court made with

17 respect to Mr. Rajan, did that give you any concern?

18 A     Of course.  Having said that and being an independent

19 fiduciary tasked with trying to recover and maximize the value

20 of assets for creditors, I was certainly open-minded in meeting

21 with Mr. Rajan, listening to his side of the story, negotiating

22 a potential resolution with himself, et cetera.  So I certainly

23 came in with an open mind and tried to assess for myself his

24 credibility, his ability to manage and operate a business based

25 on his helm prior to my appointment as the CEO of Stream.  I

1    gave him, in my estimation, every chance to make a case for why

2    his position was the correct one and to propose a path that I

3    felt was viable and feasible to have these cases exit and have

4    a successful go forward business for Stream.

5    Q    And you heard my comments that I made to the Court about

6    the meetings with Mr. Rajan.  Did he meet with you and

7    demonstrate the technology?

8    A    Yes.  We met Mr. Rajan I believe more than once and

9    certainly had many communications via email, telephone, with

10   him and his representatives.  But we certainly met with Mr.

11   Rajan, gave him the opportunity to present his -- the

12   technology that was in his possession and an opportunity to

13   discuss the background of the case, their position, and how

14   they'd like to see the case proceed forward.

15   Q    And you made these efforts with Mr. Rajan before you made

16   the settlement agreement with Hawk?

17   A    Yes.  Several times.  I mean we -- I mean, we met with

18   both sides, or Rembrandt, VSI, Stream representatives multiple

19   times before any terms of any settlement were reached with

20   Hawk.

21   Q    Okay.  That book in front of you or the exhibits, can you

22   turn to T-1 and tell me if you recognize that as the memorandum

23   opinion that resulted in your appointment?

24   A    Yes.

25   Q    And can you now go to T-7, if you could?

1    A    Okay.

2    Q    And is this a document that was provided to you by the

3    Debtors?

4    A    It was provided by -- yes.

5    Q    And did -- have you see this document before?

6    A    I have.

7    Q    And can you tell the Court where the patents and licenses

8    are located, in which entities?

9    A    Yes.  So the intellectual property is held by a indirect

10   subsidiary of one of the Debtors, Technovative, in Ultra D

11   Cooperative.  And the -- I believe the Phillips license is held

12   in also a non-debtor foreign subsidiary of Technovative, Ultra

13   D Ventures.

14   Q    Okay.  And what's the purpose of the entity known as

15   SeeCubic BV?

16   A    That is an operating entity, also a non-debtor affiliate

17   in the Netherlands, primarily a research and development entity

18   that has supported the technology for a number of years for

19   prior and post-petition.

20   Q    And do --

21        THE COURT:  Mr. George, could you just hold on for

22   one second?

23        MR. GEORGE:  Yes, Judge.

24     (Court and Clerk confer)

25        THE COURT:  So, Mr. George, I have a 12:30 list and

1    I've reviewed all of this stuff.  I mean, basically for this

2    examination --

3           MR. GEORGE:  Get to the punch, I think you're saying,

4    Judge.

5           THE COURT:  Yeah.  That's right.  Okay.  Sorry.

6    That's good.  I hear you flipping pages.

7           MR. GEORGE:  Moving ahead.

8    BY MR. GEORGE:

9    Q    Do the Debtors have any factories?

10   A    They do not manufacture product.

11   Q    Are there any warehouses with any finished goods or

12   inventory in them?

13   A    Nothing of any consequence.  There may be some facilities

14   that have some de minimis units utilized to demonstrate for

15   third parties.

16   Q    Is there any manufacturing capabilities today --

17   A    No.

18   Q    -- for these debtors?

19   A    No.

20   Q    Are there any customers currently purchasing from these

21   debtors?

22   A    No.

23   Q    Is there any revenue coming in to these debtors?

24   A    No.

25   Q    Is there any money in the bank?

1  A    Less than $50,000 currently.

2  Q    Do you know when the last time was that the Debtors built

3  a tv?

4  A    I believe it's sometime prior to 2018.

5  Q    And what were the outstanding administrative fees when you

6  took over?

7  A    Approximately $3 million.

8  Q    And under your proposed settlement agreement, do those

9  fees get paid?

10 A    There will be funds sufficient to pay administrative

11 creditors, yes.

12 Q    Now, have you ever seen these purchase orders to which Ms.

13 Baskin has referred?

14 A    Several versions of them, yes.

15 Q    And have you ever been able to get any independent

16 verification of what's in those purchase orders?

17 A    In terms of their validity?

18 Q    Yes.

19 A    No.  No.

20 Q    And have you ever been provided any additional information

21 that satisfied you with respect to the bonafides of those POs?

22 A    No.

23 Q    Have you ever seen anything to indicate that the Debtors

24 would be able to immediately begin manufacturing televisions?

25 A    No.  They don't currently possess that capability.

1   Q    When you took over was payroll being paid in BV?

2   A    When I was appointed, I believe that SeeCubic had a

3   promissory note in place with BV to pay the ongoing costs, as

4   that is an R&D entity only and does not have any independent

5   revenue.

6   Q    Were there a number of employees at BV?

7   A    Yes.

8   Q    And those employees have access to the Debtor's IP and

9   software information?

10  A    Yes.

11  Q    And was there a concern about those employees not being

12  paid?

13  A    Absolutely.

14  Q    And so how was an arrangement made for them to be paid?

15  A    So at a certain point the funding in place with SeeCubic

16  had run out, was exhausted, Your Honor, so I was concerned that

17  they were panicking in the Netherlands in terms of having

18  funding available to pay not just salaries, but the other costs

19  to keep the lights on, house the technology, et cetera.  And so

20  we made several attempts to obtain debtor-in-possession

21  financing from both Rembrandt and VSI throughout the case, not

22  just at that point.  But at that point it had become an

23  emergency -- an urgent situation that needed to be addressed.

24  And so one of the factors considered in entering into an

25  agreement with Hawk was their agreement to fund immediately the

1  costs associated with the Netherlands group, SeeCubic BV.

2  Q   And if I were to tell you that there was about $980,000

3  spent by BV to make sure payroll and other obligations at BV

4  were paid, would that sound --

5  A   Yes.  That's been the amount advanced since we entered

6  into the agreement with Hawk.  Excuse me.  Yeah.  Into the

7  agreement with Hawk, but certainly they had funded millions of

8  dollars before that and have agreed to fund through a sale

9  closing.

10  Q   And as part of your settlement, is that a claim that

11  remains in the bankruptcy case or does that get released, that

12  SeeCubic BV claim?

13  A   With respect to the ongoing funding?

14  Q   Yes.

15  A   It's an increase to their allowed secured claim.

16  Q   Now, with respect to the bonding equipment, do you know

17  what the bonding equipment is for?

18  A   I believe it is to essentially glue the lenses to the

19  actual screens to allow the 3D technology to work.  It is not

20  currently being utilized.  I believe it's in -- it's sitting in

21  a China warehouse somewhere.  It's not anything that SeeCubic

22  BV needs in order to produce the demonstrating units that

23  they're using currently, but that's where it currently resides.

24  Q   Did the Debtor's estates have sufficient money for you to

25  either clear the warehouseman's liens, remove that equipment to

1  the United States?

2  A    No.  The Debtor had and has zero funds since my

3  appointment.

4  Q    But you did in fact make demand for return of the bonding

5  equipment, didn't you?

6  A    We asked that it be shipped to the place that Mr. Rajan

7  had requested.

8  Q    And the settlement agreement that you've reached with Hawk

9  resolves the issue with timing or non-turnover of that

10  particular asset, right?

11  A    It resolves essentially the entire case.

12  Q    Now, you heard the talk about the discussions with Mr.

13  Rajan.  One of the primary discussions I think you had with all

14  the parties was the need for a DIP, right?

15  A    Yes.

16  Q    And did you request that Mr. Rajan or his investor group

17  provide a DIP?

18  A    Yes.

19  Q    Was there any ever any communication to indicate that he

20  was in a position to do that or willing to do that?

21  A    None.

22  Q    And why was getting in a DIP important?

23  A    Well, a couple of reasons.  When I was appointed, the case

24  was administratively insolvent already in the amount of $3

25  million.  I needed to hire professionals in order to fulfill my

1   duties required by both the Code and the appointment order.

2   And so I knew the administrative insolvency was only going to

3   get worse.  And with no operations from Stream to generate

4   revenue, the only other source would have been to go find

5   external funding.

6   Q    And do you know who controls VTI or VSI?

7   A    Matthew Rajan.

8   Q    And do you know anything about those entities generally

9   other than they're controlled by Mr. Rajan and appear to be

10  using the same technology that the Debtor has?

11  A    Yeah.  I think they were formed all around the same time

12  as the omnibus agreement which really started the conflict

13  between the parties.  And my understanding is that they were

14  created to raise capital essentially for the Stream technology.

15  And to my knowledge, they continue to exist today.  They are --

16  well, as you know, I filed a motion to enforce the automatic

17  stay and turnover against VSI recently.

18  Q    And that's T-11 in the book, right?  If you'll just take a

19  look.  Sorry.  I know we're moving rapidly.

20        MS. BASKIN:  Your Honor, I would object to this line

21  of questioning --

22        THE WITNESS:  Yes, it is.

23        MS. BASKIN:  -- as to what the relevance is to a

24  motion that is before the Court that is -- an answer has not

25  yet been filed yet and there has been no hearing.

```
 1                MR. GEORGE:  I'm just --

 2                THE COURT:  If the purpose is to continue to impute

 3    Mr. Rajan, I think that's --

 4                MR. GEORGE:  That's not the purpose, Judge.  We're

 5    just mentioning that it's filed and then I'm moving on to the

 6    next subject, so --

 7                THE COURT:  Thank you.  Okay.  So let's --

 8                MR. GEORGE:  He'll evidence the motion --

 9                THE COURT:  -- do this.  So it's 12:27.  I've got a

10    12:30 list.  It's not going to take that long.  I'm going to

11    blow through it.  But what I think I'd like to do if you guys

12    are okay with it is if you could just take all of your papers

13    at the table; just move back a seat.  Let me blow through the

14    12:30 list and then as soon as I --

15                MR. GEORGE:  I'm sorry, Judge.  I tried.

16                THE COURT:  I know.  Well, and they've got to cross,

17    so I was just trying to see if we could get as far as we could.

18                So you're still under oath, sir.  I'm going to excuse

19    you from the witness seat here and hopefully in the next 15

20    minutes or so I'll get you back up here.

21                THE WITNESS:  Okay.  Thank you, Your Honor.

22                THE COURT:  Okay.  Thank you so much.

23          (Recess taken)

24                THE COURT:  Okay.  Let's pick up where we left off

25    then, everybody.  Thank you so much.
```

BY MR. GEORGE:

Q    So Mr. Homony, I want to try to focus you on the steps

that it took to get to the settlement agreement.  You

retrained, on behalf of the -- on behalf of yourself, Coren &

Ress, did they advise you with respect to the litigation?

A    Yes.

Q    And Coren & Ress were retained on an hourly basis, right?

A    That's correct.

Q    And so did you have discussions with Coren & Ress about

the expense and delay would be occasioned by taking on the

fight with Stream over the extent of their collateral?

A    Yeah.  All -- all aspects of the existing litigation.

Q    And were you satisfied that the litigation approach to

this matter wouldn't result in a meaningful distribution to the

creditors and possibly put at risk the existing assets of the

Debtor?

A    Absolutely.  That was a major concern and one of the main

reasons that led to the settlement.

Q    And one of the actions that we're referring to is the 225

action, correct?

A    Yes.  And when Judge Coleman was on the bench and

immediately after you got appointed, you filed a motion to

reimpose the stay on that case, right?

A    Correct.

Q    And Judge Coleman was unwilling to give you a blanket

1  extension of the deadlines for trial on that matter, correct?

2  A    Correct.  We had requested an indefinite stay, and she was

3  only willing to give us a period of time.  And currently the

4  trial is set for July 31st, I believe.

5  Q    And in the judge's order reimposing or staying that matter

6  temporarily, did the court make clear that the pre litigation

7  matters that are related to the Delaware action have to go

8  forward?  In other words, if there's discovery or documentation

9  that has to be delivered?

10  A    I'm not sure -- I'm not sure I understand.

11  Q    Well, the court didn't just say go have the hearing on the

12  31st.  They said that if there are certain preliminary matters

13  that relate to that case, those are to proceed, right?

14  A    Yes, I apologize.  My understanding was the record, the

15  evidentiary record, is closed to that matter, and I don't have

16  the opportunity to introduce evidence, et cetera.  But yes,

17  preliminary matters in advance of the 7/31 trial start date,

18  yes.

19           THE COURT:  We decided to start without you, John.

20           UNIDENTIFIED SPEAKER:  I've heard it all before.

21  BY MR. GEORGE:

22  Q    So Mr. Homony, would it be fair to say that after your

23  consultation with your consultation with your financial and

24  legal advisors that you made a determination that a settlement

25  of the matters with the secured creditors favored any effort to

1  try to litigate with them?

2  A    Yes.

3  Q    And can you go to T-2, which is a copy of the 9019 motion?

4  A    Okay.

5  Q    Explain to the Court, if you will, walk through the terms

6  of the settlement.  It's on page 9 of the motion.

7  A    Sure.

8  Q    Let's start with how it treats the secured creditors.

9  A    Sure.  So the secured creditors as a whole will now have

10  an allowed claim of -- an allowed secured claim, non-

11  convertible -- of $180 million plus any amounts advanced by

12  them to fund -- to continue funding the Netherlands subsidiary

13  through the closing date -- a sale closing date.

14  Q    Okay.  And how about with respect to the proofs of claim

15  that are on page 10 for SLS Holdings VI, LLC, claim number 9,

16  and the claim with SeeCubic Inc., number 14.  What happens with

17  respect to those?

18  A    Yes.  Those claims are all deemed to be withdrawal.

19  Q    And there is a provision to allow for the marketing and

20  sale of the assets?

21  A    Yes.  So I have already filed an application to retain an

22  investment banker to -- to run a sales process to hopefully

23  generate or create a competitive bidding environment to drive

24  up the -- maximize the value of the assets for the benefit of

25  the unsecured creditors.  And so in connection with that, we're

1    negotiating a stalking horse asset purchase agreement with the

2    secured lenders that will provide a minimum starting point for

3    any -- any auction of $150 million.

4    Q    And there are no bid protections, stocking fees or break-

5    up fees to the secured creditors in the event that they get

6    outbid?

7    A    No.

8    Q    And the $150 million, is that -- I think we can all do the

9    math -- about a $30 million reduction from the face amount of

10   the secured claim as asserted by the secured creditors?

11   A    Correct.

12   Q    And what happens with respect to any efforts to sell the

13   assets?  Is there a reduction in the amount the secured

14   creditors will take if another party comes in and bids with a

15   portion of it payable over time?  I'm talking specifically

16   about paragraph 56 of the motion.

17   A    So any -- so yes.  We have, from certain parties I've

18   talked to, there's been some expressions that -- would they be

19   willing -- is there a willingness to entertain value in some

20   other form in addition to cash.  And so we've -- we negotiated

21   where any -- any bid would, at minimum, would have to include a

22   component of $100 million in cash, but could include some other

23   non-cash components, such as deferred notes, earnouts, you

24   know, other kinds of securities, in order to compete with the

25   stalking horse bid.

1    Q    And what are the provisions with respect to SCI's

2    participation in the auction -- 57?

3    A    So SCI has been identified as the -- as the buyer.  That

4    may change based upon Your Honor's comments earlier.  But

5    they're identified as the -- as the -- as the stalking horse

6    purchaser.

7    Q    Okay.  And I think you mentioned the cash component of the

8    bid in the event another qualifying bidder comes in is 120

9    million?

10   A    Yes.  That's the minimum cash component of any qualified

11   bid.

12   Q    And can you explain to the court what the carveouts are

13   that are provided to the estate?

14   A    Sure.  Generally, the carveouts will provide a minimum of

15   $8.5 million, with the potential upside.  In the event that

16   third parties come in and create value in excess of the

17   stalking horse bid, anything over $150 million, the estate

18   carveout will be increased 10 percent.  So if -- if it sold for

19   $150 million, the estate would get an additional million

20   dollars on top of the minimum $8.5 million, as well as the fact

21   that we are not -- we are excluding certain assets from the

22   collateral that's being sold or secured, such as any cause of

23   action, Chapter 5 cause of action, causes of action against

24   former directors and officers or other third parties, which may

25   hold value and that would benefit directly the unsecured

1   creditors as well.

2   Q    And does the Trustee and the estates retain the right to

3   seek the recovery of the million dollar bond that's in the

4   Chancery Court?

5   A    Yes.

6   Q    And with respect to any deficiency that would exist in the

7   event that either the secured creditors are outbid, what

8   happens to any deficiency claim of the secured creditors?

9   A    I believe it's it will be deemed an impaired claim for

10  purposes of any plan of liquidation that might be proposed by

11  post-sale closing.

12  Q    Are they subordinate to the other unsecured creditors?

13  A    Yes, yes.

14  Q    And there are four releases for both sides in this case?

15  A    Yes.  Outside of the obligations of the agreement, yes.

16  Q    And with respect to the litigation, had K&L Gates taken

17  any positions with respect to the conversion issue about

18  whether that issue had been collaterally estopped or decided by

19  Res judicata in State Court?

20  A    I think they believe it was collateral estopped, yes.

21  Additionally, I think -- I don't think this has been mentioned

22  yet, but the -- the components, there's an SLS component to the

23  debt as well as a Hawk component of the debt, Your Honor.  And

24  my understanding is that the SLS portion of the debt, which is

25  about $18 million, is not subject to conversion at this point.

1   It was triggered.  It hasn't been subject to conversion since

2   2019 is my understanding.  So there's a -- there's a portion

3   that really isn't subject to either past conversion or future

4   conversion at this point.

5   Q    And there are -- there are releases provided to the secure

6   creditors for the violation of the Debtor's rights that

7   occurred in the Delaware State Court proceedings?

8   A    There are, yeah, releases with respect to -- to

9   everything.

10  Q    So, Mr. Homony, can you tell us and the Court, what are

11  the benefits of the settlement in your mind?

12  A    Well, I think it provides a resolution to long-standing

13  litigation between the parties in multiple forms and multiple

14  courts over years and years.  It -- it will provide a recovery

15  for unsecured creditors, and it provides upside for additional

16  recoveries as well.  I think without a settlement, the cases

17  would prolong -- ultimately convert, and I think there might

18  not be value for anybody.  And so my -- my -- my goal here is

19  to achieve a recovery for unsecured creditors.  It's clear to

20  me that the Debtor cannot exist on any kind of go-forward

21  reorganization basis.  And so I think this is the best path

22  forward.  It also provides for a sale process which will

23  establish, in fact, what is the actual value of these assets,

24  which is the subject of interesting positions over time.

25  Anywhere from an excess of a billion dollars, Your Honor, to as

 1  we sit here with an insolvent estate without the ability to pay

 2  anybody.  So there's -- there's a great range, and we hope that

 3  -- obviously the goal here is to again, create a competitive

 4  bidding environment, drive the price up, and hopefully pay off

 5  the secured creditors and provide a -- a larger recovery for

 6  unsecured creditors at the end of the day.

 7  Q    And just concluding one question about the litigation.

 8  Did you consult with Mr. Coren and his firm about the damage

 9  issues that could be related to the actions that were taken in

10  State Court?

11  A    Again, all matters.  I've -- I've -- I've had a

12  relationship with Mr. Coren for 20 years in many matters,

13  including in Chapter 11 trustee cases, and I trust his judgment

14  and experience and -- which is why I hired him in this case.

15  And he went -- he went through all the outstanding matters as

16  did I personally, and he advised me, and, I -- I took that

17  advice and tried to achieve the best outcome as we possibly

18  could.

19  Q    So then, in making a decision about moving forward with

20  the settlement agreement, did you compare the potential for

21  success in the litigation to the benefits that were being

22  provided under the proposed settlement?

23  A    Yes.

24  Q    And did you have any conclusions about proceeding with the

25  litigation based approach to this case?

```
1   A    Well, I think, quite frankly, the -- the 225 action again

2   is scheduled for trial on July 31st, Your Honor, and I think

3   the chances of -- of winning that are remote.  And if we were

4   to lose that case, the chances of any recovery for anybody in

5   this case would likely be zero.  I think the creditors would be

6   free to exercise their rights in terms of ultimately

7   foreclosure, and there would be nothing left for unsecured

8   creditors.

9   Q    And again, in addition to consulting with Coren & Ress,

10  you actually consulted with the Debtor and possessions lawyer

11  that was handling that matter, Mr. Dupree (phonetic), correct?

12  A    Yes.  I spoke to Mr. Dupree personally, along with

13  counsel, and got his viewpoint in connection with all the

14  Chancery Court matters, including the 225 action and certainly

15  took that into consideration in reaching the settlement with

16  the secured creditors.

17  Q    And nothing he said changed your mind about your business

18  judgment and reaching a settlement as opposed to litigating?

19  A    No, just reaffirmed it.

20  Q    Did you consider the benefits that would be provided to

21  the creditors from the resolution of the ongoing disputes

22  between the parties and reaching into the settlement agreement?

23  A    Yeah.  Again, I think the chances, if we took the

24  litigation route, would be -- at the end of the day, there

25  would be nothing left for unsecured creditors.
```

1  Q    And I think you also mentioned to the Judge the benefits

2  and allowing the assets to be sold.  What what are the benefits

3  in allowing the assets to be exposed to the market?

4  A    Well, it will set -- it will set the finally the -- the

5  true value of these assets, which again has been the subject of

6  a great dispute and a range of values over the course of years,

7  and so it provides an opportunity again for to -- to pay off

8  the secured creditors in full and provide a greater benefit to

9  the unsecured creditors over and above what the minimum

10  carveout provides for in the settlement.

11  Q    And I think you mentioned that you did consider the

12  expense and delay that would be occasioned by proceeding in a

13  litigation posture with this case?

14  A    Yes.

15  Q    And administratively, did you have any fears that the

16  Debtor wouldn't be able to sustain any kind of administrative

17  -- additional administrative expenses with $2 million already

18  outstanding?

19  A    Sure.  The estate can't sustain what it has right now.

20  Q    And if the Court were to approve this settlement, what

21  would be the next steps for the Trustee to take in connection

22  with these bankruptcy estates?

23  A    So we will move to file bid procedures and get those

24  approved along with the stalking horse APA, go through that

25  diligence process, have the sale closed and have the sale

```
1    hearing, and then proceed likely -- most likely -- with a plan

2    of liquidation.

3    Q    Okay.  Mr. Homony, do you feel that your advisors,

4    financial and legal, provided you good advice and acted

5    competently --

6    A    Yes, of course.  Yes.

7    Q    And did you reach this resolution in an arm's length

8    discussion with the secured creditor?

9    A    Absolutely.

10   Q    And it was pretty hard fought?

11   A    Yes.

12   Q    The K&L Gates folks are pretty aggressive?

13   A    Yes.  We had some interesting conversations directly and

14   indirectly through counsel, yes.

15   Q    And do you feel that the settlement is the best that you

16   can be attained under the circumstances?

17   A    Yes.

18   Q    And do you feel that it's fair to the creditors?

19   A    Yes.

20   Q    And are there tangible benefits to the estates if Hawk is

21   not the successful bidder?

22   A    Meaning?

23   Q    Well --

24   A    If somebody comes in and out bids Hawk?  Absolutely.  The

25   carveout, as I mentioned before, increases, you know, the
```

 1  estate gets to retain 10 percent of every dollar in excess of

 2  $150 million.

 3  Q    Very good.

 4          MR. GEORGE:  Just a moment, Judge.  Nothing further,

 5  Your Honor.

 6          THE COURT:  Thank you so much.

 7          All right.  Who wants to go first?

 8          MR. DEMARCO:  Yes, Your Honor.  Rembrandt will move

 9  to cross.  Mr. Michaels will be handling that examination.

10          THE COURT:  Do you want to stay at the table or?

11                      CROSS-EXAMINATION

12  BY MR. MICHAELS:

13  Q    So I'm going to try to be brief.  The first question I

14  have for you is in -- you've testified that you have considered

15  the Hawk conversion position.  In your consideration, did you

16  evaluate the testimony and the trial transcript from June 26th

17  when Mr. Caponi represented that the Hawk debt was convertible,

18  to Judge Coleman?

19  A    Yes.

20  Q    And do you believe that that representation by Mr. Capone

21  provides a position where the Hawk debt is currently

22  convertible for 39 million?

23          MR. GEORGE:  Objection to the form, Your Honor.  He

24  added 39 million at the end there and that was not the question

25  he asked before.

1          MR. MICHAELS: I'll revise.

2    BY MR. MICHAELS:

3    Q    Is it your opinion that the Hawk debt is convertible?

4    A    I don't -- it may be convertible.  It's certainly subject

5    to dispute on both sides.  I think Hawk would tell you today

6    that there are arguments against conversion.  I personally

7    would tell you that the conversion agreements are vague and

8    ambiguous, and subject to interpretation.  And so whether or

9    not it's convertible would be subject to certainly litigation

10   going forward.

11   Q    Mr. Homony, do you have any experience in the design

12   manufacture of a flat-panel displays?

13   A    No.

14   Q    Do you have any experience in software related to 3D

15   content?

16   A    Not prior to this case, no.

17   Q    Did you retain any experts to advise you on the status of

18   the technology with respect to the Philips technology that had

19   been provided under license to Stream and its subsidiaries or

20   the Rembrandt technology they have provided under license?

21   A    No.

22   Q    So have you made any assessment whether the displays that

23   currently are in the possession of SCBV and/or SeeCubic are

24   utilizing 2d-plus-depth technology?

25   A    I have not.  I know there's a dispute with respect to --

1   to Rembrandt and its belief that their IP is being utilized by

2   SCBV.  I also know SCBV disputes that to the assertion by

3   Rembrandt.  And so --

4   Q   So there was prior litigation with Rembrandt that was

5   settled that resulted in a settlement agreement and a license

6   agreement also with Philips.  Do you have any information to

7   dispute that all of the technology related to Ultra-D is

8   reliant on a license from Philips and a license from Rembrandt?

9           MR. GEORGE:  Objection to form, Your Honor.  There's

10  no foundation that he would have any basis or ability to even

11  testify about this.  This is like a patent lawyer examining a

12  lay witness.  And so how can he really answer?

13          THE COURT:  I think that a fair question to ask him

14  is if he's seen that settlement agreement and taken that into

15  consideration in coming to this agreement.  You could ask him

16  that.

17          MR. MICHAELS:  I appreciate the guidance, Your Honor,

18  and I will certainly take it.  I think Mr. George is actually

19  making our point, and the questions that I'm trying to elicit

20  is not to enter this with the expectation that Mr. Homony has

21  this expertise, but that he did not retain any form of patent

22  attorney or expert to advise him --

23          THE COURT:  I understand that.  I take the point.

24          MR. GEORGE:  Your Honor, I would object because this

25  is really relevant because the motion's very clear.  The

 1  Trustee's only selling what the Trustee owns.  And so this

 2  seems like a little bit --

 3         THE COURT:  He's trying to make the point that -- I'm

 4  fine with that.  That doesn't --

 5  BY MR. MICHAELS:

 6  Q    Mr. Homony, are you familiar with the provisions in the

 7  Philips license that specifically state that the software

 8  provided to Ultra-D Cooperative Ventures -- excuse me, Ultra-D

 9  Ventures retains ownership of that software by Philips?

10         MR. GEORGE:  Objection, Your Honor.  That's not what

11  the document says.  He knows that's not what it says.  I'm

12  happy to read to you what it says.

13         THE COURT:  I think that all I need to hear is that

14  he's looked at the document or his counsel has looked at the

15  document and taken that into consideration.

16  BY MR. MICHAELS:

17  Q    Have you looked at the portion of the Philips license that

18  states it is expressly acknowledged and agreed that the license

19  software is licensed to Ultra-D and not sold?

20  A    I understand it's not a sale; it's a license.  Yes.

21  Q    Okay.  What provision have you made to remove the Philips

22  technology and the Rembrandt technology prior to any sale of

23  assets?

24  A    So I'm not sure the Rembrandt technology is in

25  incorporated or not.  That was always a subject of dispute and

1    quite frankly, the timing of the settlement agreement you

2    referenced.  And the actions Rembrandt has taken subsequent to

3    that certainly call into question for me the validity of that

4    settlement.  With respect to the Philips license, I'm not sure

5    it's a valid license why any of the technology would have to be

6    removed from the current process.

7    Q    So are you familiar with the fact that the Philips license

8    includes a prohibition of transfer and that it upon change of

9    control, it can be terminated?

10   A    I don't think it says that.  I'm familiar with that

11   provision, and it actually provides that it's -- that there --

12   the request for a change is not to be unreasonably withheld by

13   Philips.  So I think if we notice Phillips that there's a sale,

14   that they will provide the appropriate authority and -- and

15   allow for that to be transferred.

16   Q    So are you aware that Philips has sold the underlying

17   patents and technology to Leah, Inc.? (phonetic)

18           MR. GEORGE:  Objection, Your Honor.  It assumes facts

19   not in evidence.

20           THE COURT:  I'm not sure how that's relevant either.

21           MR. MICHAELS:  But Philips can't grant the

22   authorization that he is --

23           THE COURT:  There's now some other party.  I mean,

24   listen, I get what you're saying -- your objection.  The

25   objections that have been raised is that you believe that the

1   licenses are not assignable; is that correct?

2           MR. GEORGE:  Yes.

3           THE COURT:  Okay.  So those are going to be issues

4   that we can take up at a sale hearing if we have that at some

5   point.  Thank you.

6   BY MR. MICHAELS:

7   Q    What, if any, information has been provided to you by

8   SeeCubic to show that they have the seven million-plus in cash

9   to honor their obligations under the proposed settlement

10  agreement?

11  A    I've been provided with SeeCubic investor information that

12  I'm satisfied that they'll be able to fund the carveout.

13  Q    How much cash does SeeCubic Inc. have to pay on the seven

14  million?

15  A    I don't know how much cash SeeCubic Inc. has.

16  Q    So who is the investor who is going to support the $7

17  million obligation?

18  A    Number one, I think that's confidential.  I don't know if

19  I can disclose that, to be honest with you.  I mean, I have --

20  I have information from an investor, a statement, that provides

21  that they have enough funds to -- to -- to pay the carveout.

22          MR. MICHAELS:  Did somebody object?

23          MR. GEORGE:  No, I didn't object.

24  BY MR. MICHAELS:

25  Q    To your knowledge, has anyone from Stream or its

1    subsidiaries been utilizing hardware or software that includes

2    Ultra-D technology and since you've been trustee?

3    A    I know that the research and development team certainly

4    has access to it and is utilizing it.  On the Stream side, I'm

5    not sure -- as I mentioned, Stream isn't really operating.  And

6    again, this goes back to the motion to compel turnover from

7    VSI.  I think VSI is in possession of a lot of the Stream

8    technology.  But again, this is all relevant to -- to a sale

9    hearing if -- I mean, these are -- these seem to be sale

10   objections and not settlement objections, but --

11   Q    What is -- let's take it specifically with respect to the

12   sale process that you're proposing.

13   A    Uh-huh.

14   Q    How would you propose to demonstrate the technology to

15   potential purchasers?

16   A    We're going to set up either in -- in Live or some kind of

17   a Zoom room in order to allow for live demonstrations of the

18   technology.

19   Q    So in that case, have you made any assessment as to

20   whether or not that technology that will be demonstrated is

21   utilizing Rembrandt technology?

22   A    I have not.  Again, I think the Rembrandt technology is

23   subject to an ongoing dispute.  And again, Rembrandt will have

24   whatever rights Rembrandt has after it's sold as well.  So the

25   sale will be as is, whereas, which is what the stalking horse

1  agreement will provide for.  Meaning, Hawk is taking on

2  whatever responsibilities and obligations that result from a

3  potential IP infringement, and they're well aware of that.

4  Q    So if a license is being utilized by the licensee inside

5  of a bankruptcy during dependency of that bankruptcy, the

6  license fees and royalties would typically be paid.  Are you

7  planning to pay Rembrandt for its license while you're

8  utilizing its technology on displays to demonstrate the

9  technology to potential investors, potential buyers?

10 A    Well, I understand that the license is -- it was

11 incorporated into a settlement, which is a prepetition

12 agreement.  I'm not aware that there are outstanding license

13 fees.  I don't think that's what the agreement provided for.

14 It provided for a lump settlement amounts and then an ongoing

15 delivery of goods.  And again, my view is that the Rembrandt

16 claim is potentially subject to challenge, and we're certainly

17 going to look at that once we get through this sale process.

18 Q    So to understand, you are planning to demonstrate the

19 Ultra-D technology that was the subject of years of litigation

20 and before Magistrate Parker, Shadron Stastney (phonetic), and

21 our team sat down and negotiated the term sheet that eventually

22 the Rajans themselves have signed.  So --

23        MR. GEORGE:  Your Honor, I object.  That's compound

24 and confusing.  I'm not even sure what he's asking whether he's

25 testifying.

1          THE COURT:  It all seems like you're trying to raise

2    potential arguments that are going to be raised at the sale

3    where you think that -- objections to the sale that it

4    shouldn't go forward, right?  Isn't that the basis of all this?

5          MR. MICHAELS:  In part, I think that's a fair

6    assessment of what I'm going.  I'm also looking at the 9019

7    specifically as a settlement agreement in the process

8    contemplated on that?

9          THE COURT:  We're not going to get into the weeds

10   here.  I don't want to hear every single argument, right?

11   You can ask the man if he's considered the litigation and all

12   the arguments raised therein.  And if he has, then I suggest

13   that you move on.

14         MR. MICHAELS:  So just give me a minute, Your Honor.

15   I may be done.

16   BY MR. MICHAELS:

17   Q    Have you, at any point, provided SeeCubic permission to

18   use Stream assets to demonstrate to potential investors in

19   SeeCubic?

20   A    Have I given them authority or permission?  No.

21         MR. MICHAELS:  That's my last question.

22         THE COURT:  Okay.  Thank you.

23         Ms. Baskin, did you --

24         MS. BASKIN:  A couple questions, Your Honor.

25         THE COURT:  Okay.

```
 1                      CROSS-EXAMINATION
 2   BY MS. BASKIN:
 3   Q    When you testified about these purchase orders --
 4              THE COURT:  Why don't you speak into the microphone?
 5              MS. BASKIN:  I'm so sorry.
 6              THE COURT:  That's okay.  You don't have to stand.
 7   You can just sit there, but just draw it closer so we can all
 8   hear your question.
 9   BY MS. BASKIN:
10   Q    When you referred to the purchase orders,  I assume you
11   were talking about the purchase orders from Cistar (phonetic)
12   and from Cistar and from Zotel (phonetic), which were provided
13   to you from VSI?
14   A    Yes.
15   Q    And I assume that you are aware that in about a year ago,
16   March of 2023, there were purchase orders by these two
17   entities, Cistar and Zotel, and those were provided --
18              MR. GEORGE:  Objection, Your Honor.  Oh, I'm sorry.
19   BY MS. BASKIN:
20   Q    And those were provided to your counsel, correct?
21              THE COURT:  Objection, Your Honor.  I don't think
22   that she's identifying who the counterparty to the contract is.
23   He's the Trustee for Stream.  And I think those purchase orders
24   are not Stream purchase orders.
25              MS. BASKIN:  Well, if I could get to that --
```

```
 1            MR. GEORGE:  He can't really testify about --

 2            MS. BASKIN:  -- in my questioning, that would be

 3   helpful.

 4            MR. GEORGE:  He can't testify about what they are or

 5   the contents of them because they're not Stream.

 6            THE COURT:  Let's just try and identify so we all

 7   understand which purchase orders you're talking about.  So who

 8   are the parties to his purchase order?

 9            MS. BASKIN:  The purchase orders are -- there's one

10   -- that is Zotel, and that is for $140 million, and the parties

11   are Zotel and VSI.  VSI had agreed with the Debtor that those

12   purchase orders would be processed through Stream to give

13   Stream a future business going forward and make money.

14            MR. GEORGE:  That's testimony.  That's testimony.

15   That's not an examination of a witness.

16            THE COURT:  So I mean what I think we should do is,

17   you know, you're characterizing that purchase order as

18   something that the Debtor is obligated to pay.  I think that

19   you could ask him if he's seen this purchase order.

20            MS. BASKIN:  That's what I was getting to, Your

21   Honor.

22            THE COURT:  Have you seen this purchase order for the

23   140 million or something?

24            THE WITNESS:  I've seen both the purchase orders that

25   Ms. Baskin's referencing.
```

1          MS. BASKIN:  Okay.  He's seen them.

2          THE COURT:  And you're aware that your lawyer

3   requested VSI's lawyer for updated purchase orders from Zotel

4   and from Cistar, correct?

5          THE WITNESS:  Yes.  And I think they're included in

6   your objection.

7          THE COURT:  Then, I'm not really sure I understand

8   your comment when you just testified that you didn't see

9   evidence of the purchase orders.

10         MS. BASKIN:  Correct.

11         THE COURT:  So you testified earlier that you didn't

12  see sufficient -- you didn't see evidence of purchase orders

13  what would put Stream on the hook.  And so she's saying, well,

14  I'm giving you this purchase order here.  It doesn't have

15  Stream's name on it, but she clearly has some argument that

16  Stream is responsible.  So --

17         THE WITNESS:  So I can -- Your Honor.  So the VSI

18  purchase orders, they're the same purchase orders that were --

19  that Stream put forth as evidence and has spoken at great

20  length about in Judge Coleman's appointment opinion, Your

21  Honor.  They're the same.  They -- we just asked them to update

22  them to try to -- to get a sense of whether or not they were

23  valid.  But they're -- they're VSI purchase orders.  There is

24  no agreement between VSI and Stream to do anything, nothing.

25  And so I don't think they're even capable of being fulfilled,

```
 1    if they are in fact valid in the sense that somebody's actually

 2    going to pay $140 million for the TVs.

 3    BY MS. BASKIN:

 4    Q    Okay.  Well, then can you explain to the Court why your

 5    attorney asked VSI's counsel to provide updated purchase orders

 6    so that you could consider them and that they were actually

 7    provided to you -- to your counsel on April 18th at 1:46 p.m.?

 8    A    Listen, I want to consider everything.  Again, I came into

 9    this with an open mind.  Mathu had it fair and equal

10    opportunity, Rembrandt had a fair and equal opportunity, and

11    Hawk had a fair and equal opportunity to present me with

12    whatever they thought was a proposal -- the best proposal that

13    they thought would resolve everything and provide some

14    recovery, because that was one of my demands from everybody.  I

15    have to get money to unsecured creditors.  And so up until the

16    point where I agreed with Hawk that these were going to be the

17    terms, I was negotiating with everybody.  So of course, VSI has

18    just never come forward with anything that's credible.

19    Q    That's not my question, sir.

20    A    So the proposed --

21              MR. GEORGE:  What is the question, Judge?

22              MS. BASKIN:  That is not my question.

23              THE COURT:  So I think that the testimony that I

24    understand today is that he has seen the purchase orders that

25    you asked him about.  He doesn't believe that those purchase
```

1    orders are credible and sounds like there's a legal argument

2    here which goes beyond testimony today.  VSI believes that the

3    Debtor may be on the hook for those purchase orders and the

4    Trustee, I'm assuming based upon, you know, advice he may be

5    getting from counsel, he disagrees.  So whether he asked for

6    updated purchase orders, he just testified that before coming

7    to an agreement to go with Hawk, he looked at all the evidence.

8            So you're asking me, I think, to infer that because

9    he asked for the updated purchase orders that he believes that

10   Stream was on the hook for it.  But he's just explained that he

11   asked for the updated orders because that was something that

12   you guys clearly thought gave you some -- right, right, that

13   the Debtor's going to pay for it, and he doesn't agree.

14           MS. BASKIN:  Thank you, Your Honor.

15           THE COURT:  You're welcome.

16   BY MS. BASKIN:

17   Q    I have another question.  Actually, what assets are part

18   of the sale?

19   A    Every potential asset that the Debtor has an interest in

20   except for those specifically excluded in the settlement

21   agreement?

22   Q    Well, what are they?  Can you list them?

23   A    All their -- the intellectual property.  It's -- honestly,

24   it's -- the large majority of it is in the non-debtor foreign

25   subsidiaries.

1    Q    I'm sorry, is in the what?

2    A    The non-debtor foreign subsidiaries are being sold.  The

3    equity -- Debtor's equity interest in those entities.

4    Q    Well, you filed a motion saying that you wanted the Court

5    to approve a settlement for the sale of assets and then there

6    was a footnote saying something to the effect, I believe, that

7    it didn't really involve litigation.  So you must somewhere

8    have a list of assets that you believe are subject to the sale

9    and that at some point should be made available to potential

10   bidders.

11   A    Yep --

12        MR. GEORGE:  Again, Judge, isn't that a sale

13   objection?

14        THE COURT:  Yeah, so --

15        MR. GEORGE:  I mean, he's selling everything -- he's

16   already testified he's selling everything that the Debtor owns.

17        THE COURT:  The 9019 motion refers to a sale of

18   substantially all of the Debtor's assets.  I feel no need to

19   get a list of substantially all of the Debtor's assets.  If at

20   the time that a sale is teed up and you want to make sure you

21   nail down everything and you see the exclusions, obviously,

22   you'll relay that to them and I'm sure that they will give that

23   to you.

24        MS. BASKIN:  Understood, Your Honor.  I have no

25   further questions.

```
 1                THE COURT:  Okay.  All right.  Well, thank you very
 2   much.
 3                You guys didn't have any redirect, did you?
 4                MR. GEORGE:  I don't have anything else, Judge.
 5                THE COURT:  Thank you.  You may take a seat.  Thank
 6   you.
 7                THE WITNESS:  Thank you.
 8                THE COURT:  All right.  Well, thank you all for
 9   coming today.  I found this witness's testimony to be very
10   credible.  I do believe that -- oh, I just want to ask.
11                Mr. Callahan, did you have any objection to the 9019
12   motion?  I didn't see anything, but.
13                MR. CALLAHAN:  Your Honor, the US Trustee takes no
14   position on it.
15                THE COURT:  Okay.  Thank you very much.
16                I believe that this proposed settlement is fair and
17   reasonable and is in the best interest of the estate and I am
18   willing to differ and acknowledge the Trustee's business
19   judgment.  So I am prepared to enter an order approving the
20   9019 motion.
21                With regard to the TRO motion that's scheduled for
22   June 26th which Ms. Baskin cannot attend, I wanted to ask
23   counsel whether you thought that this was an urgent enough
24   matter that we should schedule a hearing before her vacation or
25   if this is something we can hear after her vacation.
```

```
 1              MR. GEORGE:  Your Honor, we can push that.  I don't

 2    know if you want to just put it out for 30 days for control

 3    purposes until we see where we are in the -- in the sale

 4    process.

 5              THE COURT:  Yeah.  All right.  I mean, we have that

 6    July -- don't we have the July --

 7              THE CLERK:  24th and the 31st.

 8              THE COURT:  All right.  We have July 24th and 31st

 9    available so at some point can you guys confer amongst

10    yourselves and that's, what --

11              THE CLERK:  It's just the 31st.

12              THE COURT:  All right.  It's just July 31st.  Oh, you

13    know, obviously, we're not going to do that over her vacation.

14    So just if the 31st is okay with you, just confirm that with

15    Pam and then we'll have that hearing then.

16              MR. GEORGE:  Your Honor, I want to interrupt you for

17    a second.  I didn't move in those two exhibits.

18              THE COURT:  Yeah.  Sure.

19              MR. GEORGE:  Just before we do that.

20              THE COURT:  Any objection?

21              MS. BASKIN:  No, Your Honor.

22              THE COURT:  Okay.  Fine.  So admitted.

23              MS. BASKIN:  Your Honor, there's another hearing

24    that's scheduled for the 26th.

25              THE COURT:  Yeah.
```

1          MS. BASKIN:  I was wondering if that could be

2    continued also.

3          THE COURT:  Yeah, what's that -- so I know that there

4    was the Trustee's motion to enforce, which we'll now schedule

5    for July.  We should continue the TRO until some extra dates,

6    so you should give me some kind of order that I can sign about

7    that.  I do want to pick a date for Capstone.

8          What's the other matter scheduled for June 26th?

9          MS. BASKIN:  Well, I thought it was two.  It was

10   the --

11         THE COURT:  I thought there was only the motion to

12   enforce filed by the Trustee.  Was there some other motion that

13   hasn't been mooted today?

14         MS. BASKIN:  The objection to the claims, Your Honor.

15         THE COURT:  Yes.  The objection to the claim is now

16   moot because I'm -- I am going to approve the 9019 motion.

17         Okay.  So I think that leaves --

18         MR. VAGNONI:  Your Honor?

19         THE COURT:  Yeah.

20         MR. VAGNONI:  I'm sorry to interrupt.  The motion to

21   enforce the automatic stay isn't something that we agreed to

22   adjourn.  We agreed with Ms. Baskin that based on her vacation

23   we could have it sooner than the 24th or the 26th, but we

24   hadn't agreed to adjourn it beyond that.

25         THE COURT:  Well, that's what I was just asking you

1   guys.  I was asking you whether or not --

2          MR. GEORGE:  I was confused, Judge.  I thought we

3   were talking about the TRO.

4          THE COURT:  No.  So the TRO, you're just going to

5   give me an order --

6          MR. VAGNONI:  Yes.

7          THE COURT:  -- that continues that date for some

8   further future time.  But the Trustee motion to enforce against

9   VSI, that one we're obviously not going to have over her

10  vacation.

11         MR. GEORGE:  No, we're not.

12         MR. VAGNONI:  No, no.  No, Your Honor.

13         THE COURT:  So I wanted to know -- right.  So I

14  wanted to know if this was an urgent enough issue that you

15  needed me to have a hearing before she goes on vacation?

16         MR. VAGNONI:  And again, we've -- I apologize.  We

17  thought you were talking about the TRO.  Yes, we do believe

18  that it is an urgent enough, especially considering that the

19  assets are going to be marketed.

20         THE COURT:  Right.

21         MR. VAGNONI:  If there's any question about who's

22  utilizing them --

23         THE COURT:  Ms. Baskin, when are you going to -- when

24  are you leaving for vacation?

25         MS. BASKIN:  I am leaving June 24th.

 1               THE COURT:  Okay.  So --

 2               MS. BASKIN:  I do believe we just got served with the

 3      motion.

 4               THE COURT:  You what?

 5               MS. BASKIN:  We just got served with the motion.  The

 6      Trustee was nice enough to give us five extra days to file our

 7      response.  We did not -- we did not consent, although obviously

 8      the Judge can overrule this, that we would have the hearing

 9      before my planned vacation because we believe that there's

10      discovery that needs to be taken.

11               THE COURT:  Well, I mean, it just seems to me that,

12      you know, if they think that you're using their technology and

13      it's, you know, it's somehow hurting them, then I think we

14      should probably have a hearing sooner rather than later on,

15      then.

16               So when did you file that motion to enforce?

17               MR. VAGNONI:  We filed that last week.  Was it the

18      beginning of last week or the end of --

19               THE COURT:  All right.  So when is her objection

20      deadline?

21               MR. VAGNONI:  The 30th, Your Honor.  We filed it on

22      May 30th.

23               THE COURT:  Okay.  So they filed it last Thursday, so

24      I assume you got a copy of that electronically.

25               MS. BASKIN:  Yes.

  1            THE COURT:  And originally it had a date of the 26th,
  2    which you're away from, right?
  3            MS. BASKIN:  Correct.
  4            THE COURT:  Okay.  So didn't you guys know at that
  5    time that she had that vacation scheduled on the 26th?
  6            MS. BASKIN:  Yes, they did.
  7            THE COURT:  I think she'd be saying that multiple
  8    times.  That's why we had the hearings all today.
  9            MR. GEORGE:  Again, Judge, I --
 10            THE COURT:  Let's do this.  Let's not go crazy here.
 11    Let's just schedule it for right after she gets back.
 12            So you said you're leaving on the 24th and you're
 13    coming -- the 24th and you're coming back when?
 14            MS. BASKIN:  On Saturday, July 6th.
 15            THE COURT:  Saturday, July 6th.  Okay.
 16            Pam, do I have any hearing dates on the week of July
 17    8th?
 18            THE CLERK:  You do.  You have --
 19            THE COURT:  You what?
 20            MR. COREN:  Unfortunately, I am starting a trial in
 21    the district court in Delaware that starts on the 8th, will
 22    take the entire week.
 23            THE COURT:  Okay.  What about the 15th?  What about
 24    July 15th?  Monday?
 25            MS. BASKIN:  That works, Your Honor.

```
 1              MR. COREN:  I can do it.

 2              THE COURT:  Okay.  And did you guys feel strongly

 3   about having an in-person hearing or might I persuade you to

 4   have a Zoom hearing where the electronic recorder can put up on

 5   the screen which we all see all of the exhibits?  It's very

 6   efficient.  But if someone feels very strongly about having an

 7   in-person hearing, I will do so.

 8              MS. BASKIN:  I feel the electronic hearing works for

 9   us.

10              THE COURT:  No?  Are you guys -- Mr. Coren, have you

11   ever had a Zoom hearing?

12              MR. COREN:  Yeah, I don't know --

13              THE COURT:  It's lots of fun.

14              MR. COREN:  I don't know about when I'm cross-

15   examining witnesses.

16              MR. GEORGE:  And the jury's out.

17              THE COURT:  All right, fine.

18              MR. COREN:  But if Your Honor feels strongly about

19   it, I'll adapt.

20              THE COURT:  I think that we should try with a 10:00

21   o'clock Zoom hearing on the 15th.  And we'll -- I'll see if I

22   can get you to see my way, Mr. Coren.

23              MR. COREN:  All right.

24              THE COURT:  All right.  So Ms. Baskin, have a good

25   vacation.
```

 1          MS. BASKIN:  Thank you very much.

 2          THE COURT:  Now, when should we have that hearing --

 3     should we also put Capstone on at some point?  How about this,

 4     why don't you guys confer amongst yourselves because you need

 5     to have time to incorporate Mr. Callahan's objection.  It

 6     sounds like Ms. Baskin needs to have a coming to Jesus talk

 7     with her clients about exactly how they feel about the

 8     affidavit.  And then you want to come back to Pam once all of

 9     you have conferred about a good date and we can have that

10     scheduled too?

11          I would suggest not having it, though, on that July

12     15th date.  Just pick another date like on a regular listed

13     hearing or something like that.  Okay?

14          MR. GEORGE:  Very good, Judge.

15          THE COURT:  All right.  I think we have all of the

16     dates and details.

17          MR. GEORGE:  Your Honor, you said you were going to

18     set the Capstone hearing.

19          THE COURT:  That's what I just said.  Wasn't that

20     just the Capstone?

21          MR. GEORGE:  Oh.

22          MR. COREN:  She said whenever we want.

23          MR. VAGNONI:  Your Honor, is there any way we could

24     have it next week, possibly?  We do need to confer --

25          THE COURT:  The Capstone?  Oh, you think you could

1    get that resolved by next week?

2              MR. VAGNONI:  I -- we have to.  We have to get them

3    onboard and moving towards the sale.

4              THE COURT:  Oh, okay, fine.  Do we have -- okay.

5              MS. BASKIN:  Your Honor, I'm not available next week.

6    I'm preparing for another trial.

7              THE COURT:  Yeah, okay.

8              MR. GEORGE:  But we should talk about it this week

9    then.

10             THE COURT:  Oh, okay.

11             MS. BASKIN:  Maybe we could work something out when

12   we --

13             THE COURT:  Okay.  Well, you know, my thoughts about

14   Capstone, clearly, Mr. Callahan, you'll get them your comments.

15             My concern about Capstone, the objections to

16   Capstone, are that I fear that maybe your clients have

17   overextended themselves with regard to the facts.  And I would

18   hate to see -- I don't want to have a hearing where they're

19   going to tell me things that aren't true because, you know,

20   that's going to be bad for everybody.

21             So I don't presently see any concerns with the

22   Capstone objection.  And I'd like to see all of your objections

23   worked out.  If I have to have an evidentiary hearing, your

24   clients will be here.

25             MS. BASKIN:  Yes.

1          THE COURT:  And if they're going to take a position

2    that is opposite to what was put into that amended verified

3    statement, I'm going to have to get to the bottom of the day.

4    And I guess I just want to make sure that your relay to your

5    clients right now that my concern is that if I have to have an

6    evidentiary hearing and they oppose statements made on there

7    and I ultimately find them to be not credible and that they

8    lied to me about that, that I will invite any party here to

9    sanction them for doing so.

10          And I have a lot of confidence in you, Ms. Baskin, to

11   know that you would not do anything untoward.  So I'm hopeful

12   that we're not going to have to have an evidentiary hearing.

13   But if we do, I'd like to make sure that that warning goes

14   straight to them.

15          So having said that if we --

16          MS. BASKIN:  Your Honor, and I will relate that.

17          THE COURT:  Thank you.  If we do need to have a

18   hearing, why don't you guys talk amongst yourselves, come up

19   with a proposed date.  Let Pam know.  If there's an issue and

20   we can't pick a hearing date, let her know that too and I will

21   resolve that.

22          MR. COREN:  Thank you, Your Honor.

23          MR. GEORGE:  Thank you, Your Honor.

24          THE COURT:  All right.  Thank you, everybody.  Have a

25   good day.



```
 1              MR. GEORGE:  Thank you, Judge.

 2              MR. CALLAHAN:  Thank you.

 3              MS. BASKIN:  Thank you.

 4         (Proceedings adjourned)

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

C E R T I F I C A T E


      I hereby certify that the foregoing is a true and

correct transcript from the electronic sound recording of the

proceedings in the above-entitled matter.



*John Buckley*
_____
John Buckley, CET-623
Digital Court Proofreader

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

In re:                                                   : Chapter 11

Stream TV Networks, Inc. and Technovative Media,
Inc.                                                     : Bankruptcy 23−10763−amc

        Debtor(s)

*NOTICE OF FILING OF TRANSCRIPT*
*AND OF DEADLINES RELATED TO RESTRICTION AND REDACTION*

A transcript of the proceeding held on June 5, 2024 was filed on June 17, 2024.

The following deadlines apply:

The parties have until 6/24/24 (seven (7) calendar days from the date of filing of the transcript) to file with the court a Notice of Intent to request Redaction of this transcript. The deadline for filing a request for redaction is 7/8/24 (21 days from the date of filing of the transcript).

If a Request for redaction is filed, the redacted transcript is due 7/18/24 (31 days from the date of filing of the transcript).

If no such notice is filed, the transcript may be made available for remote electronic access upon expiration of the restriction period, which is 9/16/24 (90 calendar days from the date of filing of the transcript) unless extended by court order.

To review the transcript for redaction purposes, you may purchase a copy from the transcriber (contact the court for contact information) or you may view the document at the clerk's office public terminal.

For the Court

Date: 6/17/24

Timothy B. McGrath
Clerk of Court

By:John B.
        Deputy Clerk