# Exhibit 9

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **In re:** | : | **Chapter 11** |
|  | : |  |
| **Stream TV Networks, Inc., *et al.*** | : | **Bankruptcy No. 23-10763 (AMC)** |
|  | : |  |
| **Debtors.** | : | **(Jointly Administered)[1]** |
|  | : |  |

**PRAECIPE TO SUBSTITUTE EXHIBIT "B" TO MOTION OF WILLIAM A. HOMONY IN HIS CAPACITY AS CHAPTER 11 TRUSTEE FOR (I) AN ORDER (A) APPROVING THE BIDDING PROCEDURES AND FORM OF ASSET PURCHASE AGREEMENT FOR THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (B) ESTABLISHING THE NOTICE PROCEDURES AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF AND SCHEDULING A SALE BY AUCTION, (C) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (D) SCHEDULING A SALE HEARING, (E) GRANTING EXPEDITED CONSIDERATION PURSUANT TO LOCAL RULE OF BANKRUPTCY PROCEDURE 5070-1(g), AND (F) GRANTING RELATED RELIEF, AND (II) AN ORDER (A) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO, AND (C) GRANTING RELATED RELIEF**

TO THE CLERK OF BANKRUPTCY COURT:

Kindly substitute the attached for Exhibit "B" – The Placeholder for the Asset Purchase Agreement to the Motion of William A. Homony in His Capacity as Chapter 11 Trustee for (I) an Order (A) Approving the Bidding Procedures and Form of Asset Purchase Agreement for the Sale of Substantially all of the Debtors' Assets, (B) Establishing the Notice Procedures and Approving the Form and Manner of Notice Thereof and Scheduling a Sale by Auction, (C) Approving Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Scheduling a Sale Hearing, (E) Granting Expedited Consideration Pursuant to Local

---

[1] On April 11, 2023, the Court entered an order directing joint administration of the above-captioned case and *In re Technovative Media, Inc.* Case No. 23-10764 (AMC) (D.I. #81).

4864-4811-3144 v1

Rule of Bankruptcy Procedure 5070-1(g), and (F) Granting Related Relief, and (II) an Order (A) Approving the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief, which was filed with the Court on September 30, 2024, at Docket No. 750, in the above-captioned matter.


Dated:  November 11, 2024        By: */s/ Michael D. Vagnoni*
                                        Edmond M. George, Esquire
                                        Michael D. Vagnoni, Esquire (*pro hac vice*)
                                        OBERMAYER REBMANN MAXWELL & HIPPEL, LLP
                                        Centre Square West
                                        1500 Market Street, Suite 3400
                                        Philadelphia., PA 19102
                                        Telephone: (215) 665-3066
                                        Facsimile: (215) 665-3165
                                        E-mail:  edmond.george@obermayer.com
                                                     michael.vagnoni@obermayer.com

                                        *Counsel to William A. Homony Chapter 11 Trustee*

# EXHIBIT "B"

**ASSET PURCHASE AGREEMENT**

by and among

**STREAM TV NETWORKS, INC.,**

and

**TECHNOVATIVE MEDIA INC.,**

as Sellers,

and

**SEECUBIC, INC.,**

as Buyer

Dated as of November [  ], 2024

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ...................................................................................3

    Section 1.1    Certain Defined Terms.....................................................................3
    Section 1.2    Other Definitions ...........................................................................11

ARTICLE II PURCHASE AND SALE ...............................................................12

    Section 2.1    Purchase and Sale of Transferred Assets ....................................12
    Section 2.2    Excluded Assets ............................................................................15
    Section 2.3    Assumed Liabilities ......................................................................16
    Section 2.4    Excluded Liabilities ......................................................................17
    Section 2.5    Seller Maintained Transferred Assets ..........................................18
    Section 2.6    Consideration ................................................................................19
    Section 2.7    Closing .........................................................................................19
    Section 2.8    Tax Allocation ..............................................................................20
    Section 2.9    Withholding ..................................................................................20

ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE SELLER ......21

    Section 3.1    Organization .................................................................................21
    Section 3.2    Authority ......................................................................................21
    Section 3.3    No Conflict; Filings and Consents ...............................................21
    Section 3.4    Transferred Assets ........................................................................23
    Section 3.5    Brokers .........................................................................................23
    Section 3.6    Exclusivity of Representations and Warranties ...........................23

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF BUYER...............24

    Section 4.1    Organization .................................................................................24
    Section 4.2    Authority ......................................................................................24
    Section 4.3    No Conflict; Filings and Consents ...............................................24
    Section 4.4    No Third Party Intellectual Property Rights ................................25
    Section 4.5    Brokers .........................................................................................26
    Section 4.5    Exclusivity of Representations and Warranties ...........................26

ARTICLE V COVENANTS.................................................................................26

    Section 5.1    Conduct of Business Prior to the Closing ....................................26
    Section 5.2    Access to Information ...................................................................27
    Section 5.3    Notification of Certain Matters ....................................................28
    Section 5.4    Consents and Filings; Further Assurances ...................................28
    Section 5.5    Refunds and Remittances..............................................................29
    Section 5.6    No Successor Liability ..................................................................29
    Section 5.7    Sale Free and Clear ......................................................................29

Section 5.8    Bankruptcy Court Milestones; Alternative Transactions..........................30
Section 5.9    Intellectual Property Registrations..............................................31
Section 5.10   Name Change ....................................................................31

ARTICLE VI TAX MATTERS......................................................................32

Section 6.1    Transfer Taxes .................................................................32
Section 6.2    Tax Cooperation................................................................32
Section 6.3    Straddle Periods ...............................................................32
Section 6.4    Tax Treatment ..................................................................34
Section 6.5    Tax Elections ...................................................................34
Section 6.6    Bulk Sales .......................................................................34

ARTICLE VII CONDITIONS TO THE CLOSING ...........................................35

Section 7.1    Mutual Conditions ............................................................35
Section 7.2    Conditions to Obligations of Sellers ....................................35
Section 7.3    Conditions to Obligations of Buyer .....................................35

ARTICLE VIII TERMINATION ..................................................................36

Section 8.1    Termination Rights ...........................................................36
Section 8.2    Effect and Manner of Termination ......................................37

ARTICLE IX GENERAL PROVISIONS .......................................................38

Section 9.1    Nonsurvival of Representations, Warranties and Covenants....................38
Section 9.2    Indemnification ................................................................38
Section 9.2    Fees and Expenses ............................................................38
Section 9.3    Transition of Permits.........................................................38
Section 9.4    Amendment and Modification .............................................38
Section 9.5    Waiver ............................................................................38
Section 9.6    Notices ...........................................................................39
Section 9.7    Interpretation ...................................................................40
Section 9.8    Entire Agreement .............................................................41
Section 9.9    Parties in Interest..............................................................41
Section 9.10   Governing Law .................................................................41
Section 9.11   Submission to Jurisdiction; Waiver of Jury Trial ...................................42
Section 9.12   No Recourse ....................................................................42
Section 9.13   Assignment; Successors.....................................................42
Section 9.14   Enforcement ....................................................................43
Section 9.15   Severability .....................................................................43
Section 9.16   Counterparts ....................................................................43
Section 9.17   Publicity .........................................................................43

**Exhibits**

Exhibit A     Form of Sale Order

Exhibit B      Form of Bid Procedures Order
Exhibit C      Form of Assignment Agreement
Exhibit D      Form of IP Assignment Agreement
Exhibit E      Form of Domain Transfer Agreement

**Schedules**

Schedule A    Disclosure Schedules

# ASSET PURCHASE AGREEMENT

This **ASSET PURCHASE AGREEMENT**, dated as of November [●], 2024 (this "Agreement"), is by and among Stream TV Networks, Inc., a Delaware corporation ("Stream"), Technovative Media Inc., a Delaware corporation ("Technovative" and, together with Stream, the "Debtors" or "Sellers"), by and through William A. Homony, solely in his capacity as Chapter 11 trustee of the bankruptcy estates of Stream and Technovative (the "Trustee") and not individually, and SeeCubic, Inc., a Delaware corporation, or its designee ("SeeCubic" or "Buyer" and, together with Sellers, the "Parties").

## RECITALS

WHEREAS, on March 15, 2023 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code commencing cases that are being jointly administered under Case No. 23-10763 (the "Bankruptcy Cases") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, on March 20, 2023, Hawk Investment Holdings, Ltd. ("Hawk") filed a motion for relief from the automatic stay (the "Hawk Stay Relief Motion") to proceed with an action against the Debtors in the Delaware Court of Chancery (the "Delaware Chancery Court") under § 225 of Title 8 of the Delaware Code (the "225 Action");

WHEREAS, on April 6, 2023, Hawk, as Collateral Agent for the secured noteholders of SeeCubic, filed a motion pursuant to sections 1112/1104 of the Bankruptcy Code, seeking dismissal or conversion of the Bankruptcy Cases, or, alternatively, the appointment of a Chapter 11 trustee pursuant to section 1104(a) of the Bankruptcy Code (the "1112/1104 Motion");

WHEREAS, on May 19, 2023, Hawk filed proof of claim No. 6-1 on the Official Proof of Claim Docket (the "Hawk Claim") asserting a claim secured by substantially all of the Debtor's property (the "Collateral") and asserting the Debtors were indebted to SeeCubic in at least the amount of $178,432,069.68, subject to additional accruing interest, fees, and expenses;

WHEREAS, in the 1112/1104 Motion, Hawk argued that cause existed to appoint a trustee based upon the Debtors' pre- and post-petition history of fraud, dishonesty, incompetence, and gross mismanagement of their businesses;

WHEREAS, on January 5, 2024 (the "Appointment Date"), the Bankruptcy Court entered an order, which, among other things, (i) granted the 1112/1104 Motion solely with respect to the appointment of a Chapter 11 trustee, and (ii) granted the Hawk Stay Relief Motion to allow the Section 225 Action to proceed [Docket No. 549] (the "Trustee Order");

WHEREAS, the Trustee Order instructed the United States Trustee's Office to immediately begin the process of appointing a Chapter 11 trustee;

WHEREAS, on January 9, 2024, the Office of the United States Trustee filed a notice of appointment of William A. Homony to serve as the Chapter 11 trustee as well as an application for the entry of an Order approving the appointment of the Trustee;

WHEREAS the Trustee has, since the Appointment Date, been performing the duties of a trustee for the Debtors in accordance with Section 1106 and the applicable provisions of Section 704 of the Bankruptcy Code;

WHEREAS, on January 12, 2024, the Bankruptcy Court entered an Order Approving the Appointment of the Trustee and the Trustee accepted such appointment;

WHEREAS, pursuant to Sections 105, 1106, and 1108 of the Bankruptcy Code and Bankruptcy Rule 9019, the Trustee may operate the Debtors' businesses and file a motion seeking approval of a compromise or settlement;

WHEREAS, on May 6, 2024, the Trustee filed a motion under Bankruptcy Rule 9019 and section 105 of the Bankruptcy Code (the "Settlement Motion") seeking entry of an order approving that certain Sharing and Carve-Out Agreement, dated May 6, 2024, by and between Trustee, Buyer, Hawk, in its capacity as collateral agent for the secured noteholders of Buyer and certain other parties thereto, Case 23-10763, Doc 630-1 (the "Settlement Agreement"), pursuant to which, Trustee shall, among other things, use his best efforts to consummate a "as-is-where-is" sale of the Collateral by auction, if needed under the Bid Procedures, under Section 363 of the Bankruptcy Code and the Trustee shall endeavor to close by August 2, 2024;

WHEREAS, on June 5, 2024, the Bankruptcy Court entered an order granting the Settlement Motion, approving the Settlement Agreement, and authorizing the Trustee's entry into the Settlement Agreement and certain Carve-Out Advance payments have been made thereunder;

WHEREAS, the Settlement Agreement provides, among other things, that, the Buyer shall act as the Stalking Horse Bidder (as defined in the Settlement Agreement), and the Hawk Claim shall be deemed an allowed, secured claim, secured by the Collateral in the amount of $180,000,000, subject to increase as provided herein (the "Allowed Secured Claim");

WHEREAS, the Settlement Agreement further provides, among other things, that, the stalking horse bid ("Stalking Horse Bid") shall consist of a credit bid by SeeCubic of the Allowed Secured Claim in the amount of $150,000,000 (the "Credit Bid Amount");

WHEREAS, Trustee believes, after consultation with his professionals and consideration of available alternatives, that, in light of the current circumstances, that entering into an agreement for the Stalking Horse Bid for the sale of the Debtors' right, title, and interest, if any, in substantially all of the Debtors' assets, on an "as is, where is" basis as provided herein, is necessary to preserve and maximize value and is in the best interest of the Debtors, and their respective estates;

WHEREAS, Sellers desire to sell to Buyer (or any Designated Buyers) all of the Transferred Assets, and Buyer (or any such Designated Buyers) desires to purchase from Sellers the Transferred Assets, other than the Excluded Assets, free and clear of any and all Encumbrances, on the terms and subject to the conditions hereof, on an "as is, where is" basis, without any warranty of any kind, express or implied, including as to merchantability or fitness for a particular purpose, as further set forth in Section 3.6;

WHEREAS, the execution and delivery hereof and Sellers' ability to consummate the transactions contemplated hereby are subject to, among other things, the Bankruptcy Court's entry of the Sale Order under, among others, Sections 105, 363, and 365 of the Bankruptcy Code, as further set forth herein;

WHEREAS, the Parties desire to consummate the transactions contemplated hereby as promptly as practicable after the Bankruptcy Court enters the Sale Order; and

NOW, THEREFORE, in consideration of the foregoing and the representations, warranties, covenants and agreements hereunder, and intending to be legally bound hereby, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1     Certain Defined Terms. As used herein, each of the following underlined terms has the meaning specified in this Section 1.1:

"Action" means any action, arbitration, audit, charge, claim, complaint, demand, dispute, investigation, notice of violation, legal proceeding, litigation or similar proceeding (whether civil, criminal, administrative, arbitral or investigative), petition, subpoena or suit, by or before any Governmental Authority relating to the Transferred Assets.

"Affiliate" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such first Person, where "control," "controlled by" and "under common control with," means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, as trustee or executor, as general partner or managing member, by contract or otherwise.

"Affiliate Claim" means any General Claim held, owned, or assertible by or on behalf of any the Debtors or either or both of the Debtor's estates against Buyer or any other Affiliate of any Seller.

"Alternative Sale Action" means (i) accepting or entering into any contract, agreement, arrangement or understanding (whether or not legally binding) with any Person relating to, or that would be reasonably expected to lead to, an Alternative Transaction or (ii) committing to (conditionally or otherwise) enter into or consummate any Alternative Transaction.

"Alternative Transaction" means the sale, transfer or other disposition, directly or indirectly, including through an asset sale, share sale, merger, amalgamation, consolidation or other similar transaction, including a plan of reorganization approved by the Bankruptcy Court, or resulting from the Auction, of a material portion of Sellers' assets, in a transaction or series of transactions with one (1) or more Persons other than Buyer (or any Designated Buyer), in each case, except as set forth in the Bid Procedures.

"Ancillary Agreements" means, collectively, the Contracts to be executed in connection with the transactions contemplated hereby, including the Assignment Agreement, the IP Assignment Agreement, the Domain Transfer Agreement, and the Settlement Agreement.

"Antitrust Law" means the HSR Act and any competition, merger control and antitrust Law of any other applicable supranational, national, federal, state, provincial or local Law designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolizing or restraining trade or lessening competition of any other country or jurisdiction, to the extent applicable to the transactions contemplated hereby.

"Auction" has the meaning set forth in the Bid Procedures.

"Bankruptcy Code" means Title 11 of the United States Code, Sections 101 et seq., as in effect or as may be amended from time to time.

"Bid Procedures" means the bidding procedures set forth and approved in the Bid Procedures Order, as entered by the Bankruptcy Court.

"Bid Procedures Hearing" means the hearing conducted by the Bankruptcy Court to approve the Bid Procedures Order.

"Bid Procedures Order" means an Order of the Bankruptcy Court approving the Bid Procedures, substantially in the form of Exhibit B, with such changes as may be required by the Bankruptcy Court that are in form and substance acceptable to Buyer.

"Books and Records" means all documents of, or otherwise in the possession, custody or control of, or used by, any Seller and turned over to the Trustee, including all files, instruments, papers, books, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, lists of past, present and/or prospective customers, supplier lists, regulatory filings, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), data, reports (including environmental reports and assessments), plans, mailing lists, price lists, marketing information and procedures, advertising and promotional materials, books and records and papers relating to Taxes (including Tax Returns), equipment records, warranty information, architects agreements, construction contracts, drawings, plans and specifications, records of operations, standard forms of documents, manuals of operations or business procedures and other similar procedures (including all discs, tapes and other media-storage data containing such information), in each case, whether or not in electronic form.

"Business" means any business conducted by the Debtors or any of their Subsidiaries.

"Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by applicable Law to be closed in the city of New York, New York.

"Buyer Material Adverse Effect" means with respect to the Transferred Assets, any event, change, circumstance, development, effect, occurrence that would prevent, or materially impede Buyer's consummation of the transactions contemplated hereby or by the Ancillary Agreements.

"Claim" shall have the meaning ascribed to such term under Section 101(5) of the Bankruptcy Code.

"Code" means the Internal Revenue Code of 1986.

"Contract" means any written or oral contract, agreement, insurance policy, lease, license, sublicense, sales order, purchase order, instrument, indenture, note, bond or other evidence of indebtedness, or other commitment, that is binding on any Person or any part of its assets or properties under applicable Law.

"Controlled Group Liability" means any and all Liabilities of Sellers and their ERISA Affiliates, if any (i) under Title IV of ERISA, (ii) under Section 302 of ERISA, (iii) under Sections 412 or 4971 of the Code, (iv) as a result of a failure to comply with the continuation coverage requirements of Section 601 et seq. of ERISA and Section 4980B of the Code, (v) under any a "multiemployer plan," as defined in Section 3(37) or 40001(a)(3) of ERISA, or (vi) under corresponding or similar provisions of non-U.S. Laws.

"Designated Buyer" means any Affiliate of Buyer designated by Buyer to Sellers at least seven (7) Business Days prior to the Closing Date.

"Employee Benefit Plans" if any such plan or plans exist, means each (i) "employee benefit plan" within the meaning of Section 3(3) of ERISA, whether or not subject to ERISA, (ii) other benefit and compensation plan, contract, policy, program, practice, arrangement or agreement, including pension, profit-sharing, savings, termination, executive compensation, phantom stock, change-in-control, retention, salary continuation, vacation, sick leave, disability, death benefit, insurance, hospitalization, medical, dental, life (including all individual life insurance policies as to which Stream is an owner, a beneficiary or both), employee loan, educational assistance, fringe benefit, deferred compensation, retirement or post-retirement, severance, equity or equity-based, incentive and bonus plan, contract, policy, program, practice, arrangement or agreement and (iii) other employment, consulting or other individual agreement, plan, practice, policy, contract, program and arrangement, in each case, (1) which is sponsored or maintained by Stream or any of its ERISA Affiliates, if any in respect of any current or former employees, directors, independent contractors, consultants or leased employees of Stream or (2) with respect to which Stream has any actual or contingent Liability.

"Encumbrance" means any lien, pledge, Claim, interest, encumbrance, right, Liability, security interest, mortgage, deed of trust, hypothecation, preference, debt, suit, license, option, right of first refusal, right of way, encroachment, occupancy right, preemptive right, community property interest, easement, and judgment, order, and decree of any court, tax (including foreign, state, and local tax), covenant, and restriction of any nature, against any Person or its assets, including, without limitation, any debt arising under or out of, in connection with, or in any way relating to, any act or omissions, obligation, demand, guarantee, de facto

merger claim, cause of action (whether in law or in equity, under any law), whether arising prior to or subsequent to the commencement of the Chapter 11 Cases or the facts and legal theories giving rise thereto or asserted therein, whether known or unknown, contingent, or matured, perfected or unperfected, liquidated, or unliquidated, statutory or non-statutory, legal, or equitable, or otherwise arising under or out of, in connection with, or in any way related to any of the Debtors, any of the Debtors' interests in the Transferred Assets, the operation of any of the Debtors' businesses before the effective time of the Closing.

"Environmental Law" means any Law related to pollution, the protection of, restoration or remediation of or prevention of harm to the environment or natural resources, or the protection of human health and safety, ecological planning or zoning including Laws related to: (i) the exposure to Hazardous Materials, (ii) the generation, manufacture, processing, distribution, use, transport, treatment, containment, storage, disposal, or handling of Hazardous Materials or (iii) recordkeeping, notification, disclosure and reporting requirements respecting Hazardous Materials.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means all employers, trades or businesses (whether or not incorporated) that would be treated together with Sellers as a single employer for purposes of Section 4001 of ERISA or Section 414 of the Code.

"Excluded Assets" means those Assets reasonably identified in Section 2.2 hereof and listed in Section 2.2(k) of the Disclosure Schedules.

"Final Order" means an order of the Bankruptcy Court or any other court of competent jurisdiction (i) as to which the time to appeal shall have expired and as to which no appeal shall then be pending or (ii) if a timely appeal shall have been filed or sought, either (1) no stay of the Order shall be in effect, (2) no motion or application for a stay of the Order shall be filed and pending or such motion or application shall have been denied or (3) if such a stay shall have been granted, then (A) the stay shall have been dissolved or (B) a final order of the district court or circuit court having jurisdiction to hear such appeal shall have affirmed the Order and the time allowed to appeal from such affirmance or to seek review or rehearing (other than a motion pursuant to Rule 60(b) of the Federal Rules of Civil Procedure) thereof shall have expired and the taking or granting of any further hearing, appeal or petition for certiorari shall not be permissible, and if a timely appeal of such district court or circuit court Order or timely motion to seek review or rehearing of such Order shall have been made, any appellate court having jurisdiction to hear such appeal or motion (or any subsequent appeal or motion to seek review or rehearing) shall have affirmed the district court's (or lower appellate court's) order upholding the Order of the Bankruptcy Court and the time allowed to appeal from such affirmance or to seek review or rehearing thereof shall have expired and the taking or granting of any further hearing, appeal or petition for certiorari shall not be permissible; provided, however, that Buyer in its sole discretion may treat any Order for which a motion or application for a stay is filed or pending as a Final Order by affirmatively agreeing to such treatment in a writing signed by Buyer.

"GAAP" means United States generally accepted accounting principles as in effect on the date hereof.

"Governmental Authority" means any government, court (including the Bankruptcy Court), regulatory or administrative agency, commission or authority or other governmental instrumentality, whether federal, state or local, domestic, non-U.S. or multinational, or any contractor acting on behalf of such agency, commission, authority or governmental instrumentality.

"Hazardous Materials" means any material, substance, chemical or waste (or combination thereof) that (i) is listed, defined, designated, regulated or classified as hazardous, toxic, radioactive, dangerous, a pollutant, a contaminant, petroleum, oil, or words of similar meaning or effect under any Law related to pollution, waste, or the environment or (ii) can form the basis of any Liability under any Law related to pollution, waste or the environment.

"Intellectual Property" means all intellectual property and intellectual property rights and rights in confidential information of every kind and description throughout the world, including all U.S. and non-U.S (i) trade names, trademarks and service marks, business names, corporate names, domain names, trade dress, logos, slogans, design rights, and other similar designations of source or origin, together with the goodwill symbolized by any of the foregoing ("Trademarks"), (ii) patents, patent applications, invention disclosures, and all related continuations, continuations-in-part, divisionals, reissues, re-examinations, substitutions and extensions thereof ("Patents"), (iii) copyrights and copyrightable subject matter (whether registered or unregistered) ("Copyrights"), (iv) rights in computer programs (whether in source code, object code or other form) and software systems, algorithms, databases, compilations and data, technology supporting the foregoing, and all documentation, including user manuals and training materials, related to any of the foregoing ("Software"), (v) confidential or proprietary information, trade secrets and know-how, and all other inventions, proprietary processes, formulae, models, and methodologies, (vi) rights of publicity, privacy rights, and rights to personal information, (vii) all rights in the foregoing and in other similar intangible assets, (viii) all applications and registrations for any of the foregoing and (ix) all rights and remedies (including the right to sue for and recover damages) against past, present, and future infringement, misappropriation, or other violation related to any of the foregoing.

"IRS" means the Internal Revenue Service of the United States.

"Law" means any laws (statutory, common or otherwise), constitutions, treaties, conventions, ordinances, codes, rules, regulations, Orders or other similar requirements enacted, adopted, promulgated or applied by a Governmental Authority.

"Lease" means with respect to the Transferred Assets, a lease, sublease, sub-sublease, license, or purchase option with respect to any Asset to which a Seller is a party as lessee, sublessee, sub-sublessee, option holder or other similar capacity.

"Leased Real Property" means each parcel of real property subject to a Lease.

"Liability" means any assessment, Claim of any kind or nature, commitment, damage, deficiency, demand, fine, interest, liability (including any indebtedness), obligation,

penalty, loss, charges, damages, Orders, cost or expenses, in each case, whether accrued, absolute, contingent or otherwise, known or unknown, or due or to become due, and whether or not required to be recorded or reflected on a balance sheet under GAAP.

"Material Adverse Effect" means with respect to the Transferred Assets, any event, change, or occurrence or state of facts that, individually or in the aggregate, (i) has had, or would reasonably be expected to have, a material adverse effect on the Transferred Assets, each taken as a whole, or (ii) prevents, or materially impedes Sellers' consummation of the transactions contemplated hereby or by the Ancillary Agreements; provided that, in the case of the foregoing clause (i), any event, change, circumstance, development, effect, occurrence or state of facts arising from any of the following shall not be a Material Adverse Effect and shall not be considered in determining whether a Material Adverse Effect has occurred or would reasonably be expected to occur:

(1)     general changes or developments in the industry in which the Business operates;

(2)     changes in general economic, financial market or geopolitical conditions;

(3)     natural disasters, acts of terrorism, sabotages, military actions or wars;

(4)     changes in any applicable Laws or GAAP or interpretations thereof;

(5)     the announcement, pendency or consummation of the transactions contemplated hereby;

(6)     the filing of the Bankruptcy Cases and any actions approved by the Bankruptcy Court;

(7)     any action taken by Sellers which is required hereby (except for compliance with Section 5.1); or

(8)     changes with respect to the identification of the Transferred Assets.

"Order" means any judgment, decree, injunction, rule, order, decision, decree, ruling, settlement, mediation agreement, arbitration decision, corporate integrity agreement or assessment of any arbitrator or Governmental Authority.

"Permit" means any franchise, grant, authorization, business license, permit, easement, variance, exception, consent, certificate, approval, registration, clearance, order or provider number issued or granted by any Governmental Authority or pursuant to any applicable Law.

"Person" means an individual, corporation, partnership, limited liability company, limited liability partnership, syndicate, person, trust, association, organization or other entity, including any Governmental Authority, and including any successor, by merger or otherwise, of any of the foregoing.

"Representatives" means, with respect to any Person, the officers, managers, directors, principals, employees, agents, auditors, advisors, bankers and other representatives of such Person.

"Retained Causes of Action" means Actions that are Excluded Assets that arise under the Bankruptcy Code, as provided in Section 2.2(e), or applicable state law, including but not limited to the Chapter 5 Causes of Action and any Action(s) against third parties, including but not limited to, the Debtors' principals (including but not limited to Mathu Rajan), officers, directors, stockholders, agents, employees, or affiliates and any Action(s) against any entity owned or controlled by the Debtors' principals, officers, directors, stockholders, agents, employees, or affiliates. For the avoidance of doubt, Retained Causes of Action shall not include any Actions, Claims or Causes of Actions that have been released or waived under the Settlement Agreement.

"Required Approvals" means any Consent, whether from any Governmental Authority or Contract counterparty, that Buyer determines (and communicates in writing to Sellers) is required in connection with the transactions contemplated hereby following the Closing.

"Sale Hearing" means the hearing conducted by the Bankruptcy Court to approve the Sale Order and the transactions contemplated hereby.

"Sale Motion" means a motion filed with the Bankruptcy Court seeking, among other things, approval of the Bidding Procedures Order and the Sale Order, which shall be in form and substance acceptable to Buyer in its sole discretion.

"Sale Order" means an Order of the Bankruptcy Court substantially in the form of Exhibit A, with such changes as may be required by the Bankruptcy Court that are in form and substance acceptable to Buyer in its sole and absolute discretion.

"Seller Benefit Plan" means each Employee Benefit Plan that is solely sponsored or maintained by Stream.

"Subsidiary" of any Person means any entity (a) of which 50% or more of the outstanding share capital, voting securities or other voting equity interests are owned, directly or indirectly, by such Person, (b) of which such Person is entitled to elect, directly or indirectly, at least 50% of the board of directors or similar governing body of such entity or (c) if such entity is a limited partnership or limited liability company, of which such Person or one of its Subsidiaries is a general partner or managing member or has the power to direct the policies, management or affairs.

"Successful Bidder" shall have the meaning set forth in the Bid Procedures Order.

"Tax Return" means any return, document, declaration, report, claim for refund, statement, information statement or other information or filing related to Taxes, including any schedule or attachment thereto or amendment thereof, that is filed with or supplied to, or required to be filed with or supplied to, any Governmental Authority.

"Tax" or "Taxes" means (i) any and all U.S. federal, state and local, non-U.S. and other taxes, charges, fees, duties, levies, tariffs, imposts, tolls, customs or other assessments, including all net income, gross income, gross receipts, sales, use, ad valorem, transfer, franchise, profits, branch profits, profit share, license, lease, service, service use, value added, withholding, payroll, employment, pension plan, social security, fringe, fringe benefits, health, disability, excise, estimated, severance, stamp, occupation, premium, property, capital stock, unclaimed property, escheat, inventory, windfall profits, wealth, net wealth, net worth, export and import fees and charges, registration fees, tonnage, vessel, deposits, alternative or add-on minimum or estimated taxes, fees, assessments, customs, duties, levies, tariffs, imposts, tolls or charges imposed by any Governmental Authority, together with any interest, penalties, inflationary adjustments, additions to tax, fines or other additional amounts imposed with respect thereto, or related thereto, wherever and whenever imposed, (ii) any and all liability for the payment of any items described in clause (i) above arising from, through, with respect to or attributable to, a place of business, permanent establishment or a branch, or as a result of being (or ceasing to be) a member of a fiscal unity, affiliated, consolidated, combined, unitary or other similar group (or being included) in any Tax Return related to such group, (iii) any and all liability for the payment of any amounts as a result of any successor or transferee liability, in respect of any items described in clause (i) or (ii) above and (iv) any and all liability for the payment of any items described in clause (i) or (ii) above as a result of, or with respect to, any express or implied obligation to indemnify any other Person pursuant to any tax sharing, tax indemnity or tax allocation agreement or similar agreement or arrangement with respect to taxes.

"Third Party" means any Person who is not a Party or an Affiliate thereof.

Section 1.2    Other Definitions. As used herein, each capitalized term listed below has the meaning identified in the Section set forth opposite such term below.

| | |
|---|---|
| 1112/1104 Motion | Recitals |
| 225 Action | Recitals |
| 245A Election | Section 6.5(a)(ii) |
| 245A Election Agreement | Section 6.5(a)(ii) |
| 245A Subsidiary | Section 6.5(a)(i) |
| Acquired Subsidiaries | Section 2.1(c) |
| Agreement | Preamble |
| Allocation | Section 2.8 |
| Allocation Statement | Section 2.8 |
| Allowed Secured Claim | Recitals |
| Assignment Agreement | Section 2.7(b)(i) |
| Bankruptcy and Equitable Exceptions | Section 3.2 |
| Bankruptcy Cases | Recitals |
| Bankruptcy Court | Recitals |
| Buyer | Preamble |
| Carve-Out | Recitals |
| Closing | Section 2.7(a) |
| Closing Date | Section 2.7(a) |
| Collateral | Recitals |
| Consent | Section 3.3(b) |

10

Credit Bid Amount...................................................................Recitals
Debtors...................................................................................Preamble
Delaware Chancery Court.......................................................Recitals
Disclosure Schedules .............................................................Article III
Domain Transfer Agreement ..................................................Section 2.7(b)(ii)
End Date..................................................................................Section 8.1(c)(i)
Excluded Assets......................................................................Section 2.2
Excluded Liabilities ...............................................................Section 2.4
Filing ......................................................................................Section 3.3(b)
General Claims........................................................................Section 2.1(b)(i)
Governed Claims ....................................................................Section 9.10
Hawk.......................................................................................Recitals
Hawk Claim ............................................................................Recitals
Hawk Stay Relief Motion .......................................................Recitals
Inventory.................................................................................Section 2.1(a)(xiv)
IP Assignment Agreement ......................................................Section 2.7(b)(ii)
Legal Restraint .......................................................................Section 7.1(a)
Milestones ..............................................................................Section 5.8(b)
Non-Periodic Taxes ................................................................Section 6.3
Parties.....................................................................................Preamble
Periodic Taxes ........................................................................Section 6.3
Petition Date...........................................................................Recitals
Purchase Price ........................................................................Section 2.6
Rembrandt...............................................................................Section 2.2(k)
SeeCubic .................................................................................Preamble
Seller Maintained Transferred Asset ......................................Section 2.5(a)
Sellers.....................................................................................Preamble
Settlement Agreement.............................................................Recitals
Settlement Motion...................................................................Recitals
Specified Consents..................................................................Section 3.3(b)(ii)
Specified Filings ....................................................................Section 3.3(b)(ii)
Straddle Period .......................................................................Section 6.3
Stream ....................................................................................Preamble
Technovative...........................................................................Preamble
Transfer Taxes ........................................................................Section 6.1
Transferred Assets ..................................................................Section 2.1
Transferred Interests ...............................................................Section 2.1(c)
Trustee....................................................................................Preamble
Trustee Order ..........................................................................Recitals
U.S. Tax Resident ...................................................................Section 6.5(a)(i)

Case 23-10763-dpc Doc 795-1 Filed 11/11/24 Entered 04/01/25 Page 27 of 52
Case 23-10763-amc Doc 670 Doc 795-1 Filed 11/15/24 Entered 04/01/25 Page 27 of 52 Desc
Exhibit Asset Purchase Agreement    Page 17 of 49

## ARTICLE II
## PURCHASE AND SALE

Section 2.1    Purchase and Sale of Transferred Assets. On the terms and subject to the conditions hereof and, subject to approval of the Bankruptcy Court, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, at the Closing, each Seller, as applicable, shall sell, assign, transfer, convey and deliver to Buyer (or any Designated Buyers), and Buyer (or any such Designated Buyers) shall purchase and accept, all of such Sellers' right, title and interest in, to or under the Transferred Assets, other than the Excluded Assets, free and clear of any Encumbrances, on an "as is, where is" basis, without any warranties of any kind, express or implied, including as to merchantability or fitness for a particular purpose, as further set forth in Section 3.6. Buyer acknowledges and accepts that neither the Sellers nor the Trustee have the ability to deliver to Buyer, the bonding equipment presently located in a warehouse in China or other Transferred Assets not in the Sellers' or the Trustee's possession or control. As used herein, "Transferred Assets" means:

(a)    all rights, properties and assets of Stream of every kind and description, wherever located, real, personal, or mixed, tangible or intangible, to the extent owned, leased, licensed, used, held for use or claimed by Stream, as the same shall exist on the Closing Date, including the following (in each case, to the extent owned, leased, licensed, used or held for use by Stream):

(i)    all accounts receivables (whether current or noncurrent), notes receivables or other receivables, including any security, Action (exclusive of Retained Causes of Action), General Claim, remedy or other right related thereto, including all accounts receivables as to which any Subsidiary of Stream is an obligor or is otherwise responsible or liable and which are owed or payable to Stream;

(ii)    all promissory notes, chattel paper, letter-of-credit rights and related instruments;

(iii)    all investment property;

(iv)    all credits, prepaid expenses, security deposits, other deposits, refunds, claims for refunds, prepaid assets or charges, rebates, setoffs and recoupments;

(v)    all Intellectual Property, with the exception of any Intellectual Property included as an Excluded Asset identified in Section 2.2 hereof and listed in Section 2.2(k) of the Disclosure Schedules hereof, including Intellectual Property listed in Section 2.1(a)(vi) of the Disclosure Schedules, and all rights of Stream including all rights to sue for and recover and retain damages for present and past infringement thereof, and in the case of any trademarks, all goodwill appurtenant thereto, and all other intangible property;

(vi)    all tangible assets and personal property, including all machinery, equipment, apparatus, appliances, implements, computers and computer-related hardware, files, documents, network and internet and information technology systems-related equipment, including all servers and computers used to develop and maintain code in various operating environments and all development environments and software currently residing on such

computers, wherever located, including the items listed in Section 2.1(a)(i) of the Disclosure Schedules;

(vii)    all rights and interests of Stream under nondisclosure or confidentiality invention and Intellectual Property assignment covenants executed for the benefit of Stream with current or former employees, consultants or contractors of Stream, noncompete or nonsolicitation agreements with employees and agents of Stream or with third parties;

(viii)    all Books and Records of Stream or related to the other Transferred Assets;

(ix)    all insurance benefits, including any right, claim or proceeds, of Stream or related to any other Transferred Asset, including all insurance proceeds, condemnation awards or other compensation in respect of loss or damage to any of the Transferred Assets and all rights and claims of Stream to any such insurance proceeds, condemnation awards or other compensation related thereto;

(x)    all general intangibles, goodwill and other intangible assets associated with the Business or the Transferred Assets;

(xi)    all Permits to the extent the transfer thereof to Buyer (or any Designated Buyer) is not prohibited by applicable Law;

(xii)    all inventory, raw materials, work-in-process, finished goods, supplies, samples (including samples held by any sales representatives or agents), components, packaging materials and other inventories ("Inventory");

(xiii)    all telephone, telex and telephonic facsimile numbers, email address, post-office box number and other directory listings used by Stream; and

(xiv)    all rights, assets and properties listed in Section 2.1(a)(xvi) of the Disclosure Schedules; and

(b)    all rights, properties and assets of Stream in the following (in each case, to the extent owned, leased, licensed, used or held for use by Stream):

(i)    all direct, indirect, or derivative Actions (other than the Retained Causes of Action), rights, claims, rebates, refunds, causes of action, hearings, rights of recovery, rights of setoff, rights of recoupment, rights of reimbursement, rights of indemnity or contribution, defenses and other similar rights against any Person, including Buyer or any of its Affiliates (whether known and unknown, matured and unmatured, accrued or contingent, regardless of whether any of the foregoing are currently exercisable or arise from or relate to events, changes, circumstances, developments, effects, occurrences or states of facts occurring or existing as of or prior to the Petition Date), including all warranties, representations, guarantees, indemnities and other contractual claims (express, implied or otherwise) (collectively, "General Claims"), which shall include (1) any General Claims for past infringement or misappropriation of Intellectual Property, (2) any General Claims arising under or related to the other Transferred

13

Assets or the Business and (3) all accounts receivables, notes receivables or other receivables owed to a Seller by Buyer or any of its Affiliates; and

(ii)    prior to the Appointment Date, any and all legal privileges owned by Stream, any communications privileged under the attorney–client privilege, the attorney work-product doctrine or any self-auditing privilege or policy of a Governmental Authority, however, to the extent that any pre Appointment Date privileged communications or other documents are required by the Trustee to defend the Trustee or the Sellers' bankruptcy estates, the Trustee shall be permitted to use such privileged communications for that purpose;

(c)    all shares of capital stock, equity interests, or other ownership interests (including any securities convertible into, exchangeable or exercisable for any such interests) in any Person directly owned or otherwise held by Technovative, including all of the outstanding equity, membership, partnership or other ownership interests in Technology Holdings Delaware LLC, a Delaware limited liability company, Media Holdings Co, LLC, a Delaware limited liability company and Ultra-D Ventures C.V., a Commandítaire Vennootschap under the laws of Curacao (the "Acquired Subsidiaries" and such interests, the "Transferred Interests");

provided, however, that (x) notwithstanding the foregoing, Transferred Assets shall not include any Excluded Assets and (y) a single right, asset or property may be within more than one (1) of Sections 2.1(a) - 2.1(d) and such fact does not imply that such right, asset or property shall be transferred more than once or that any duplication of such right, asset or property is required.

Section 2.2    Excluded Assets. As used herein, "Excluded Assets" means the following:

(a)    All cash and cash equivalents including but not limited to the Carve-Out;

(b)    any right, property or asset set forth as an Excluded Asset in a written notice delivered by Buyer to Sellers prior to the Closing Date;

(c)    any shares of capital stock, equity interests or other ownership interests in Technovative beneficially owned or otherwise held by Stream;

(d)    the $1 million bond posted by or on behalf of the Debtors in the 225 Action;

(e)    all avoidance claims or causes of action available to Sellers under Chapter 5 of the Bankruptcy Code (including Sections 510, 544, 545, 547, 548, 549, 550 and 553) or any similar actions under any other applicable Law and any claims against third parties including but not limited to Debtors' directors, officers, owners, members or shareholders, and any causes of action against any entity owned or controlled by the Debtors' directors, officers, owners, members or shareholders relating to conduct prior to the Closing and any resulting proceeds from such claims or causes of action;

(f)    copies of any Books and Records that any Seller is required by applicable Law to retain;

14

(g)     except as set forth in Section 2.1(d)(ii) all Tax assets (including Tax refunds, Tax rebates, Tax credits, prepaid Taxes, Tax attributes or other Tax benefits) of Sellers related to the other Excluded Assets or the Excluded Liabilities;

(h)     all Third Party General Claims to the extent related to any Excluded Asset or any Excluded Liability;

(i)     all Contracts (including all Seller Benefit Plans and Leases) of Stream and all assets, trusts and funding arrangements related thereto;

(j)     any grant of rights or license by Rembrandt 3D Holding Ltd. ("Rembrandt") or affiliates to Stream, including but not limited to the Rembrandt Grant of Rights in the Settlement Agreement and Mutual Release between Rembrandt and Stream dated May 23, 2021, any amendment thereto, and the Licensing Covenant between Rembrandt, Stream, and Visual Semiconductor, Inc. dated August 14, 2023, each to the extent valid, existing and enforceable as determined by a final, non-appealable order from a court of competent jurisdiction;

(k)     any physical assets that contain or include Rembrandt Intellectual Property, to the extent valid, existing and enforceable as determined by a final, non-appealable order from a court of competent jurisdiction; and

(l)     [the rights, assets and properties listed in Section 2.2(m) of the Disclosure Schedules.]

Section 2.3     Assumed Liabilities. Except as otherwise set forth herein, in accordance with 363(f) of the Bankruptcy Code, at the Closing, notwithstanding any provision in this Agreement, the Ancillary Agreements or any other writing to the contrary, Buyer (or any Designated Buyer) shall not assume any Liability of Sellers (or any predecessor of Sellers, or any prior owner of all or part of the Business or Transferred Assets) of whatever nature, whether absolute, accrued, contingent or otherwise, and whether presently in existence or arising hereafter, whether or not relating to the Transferred Assets. For the avoidance of doubt, Buyer (or any Designated Buyer) shall not assume or agree to pay, perform or discharge the Excluded Liabilities, however, the Buyer (or any Designated Buyer) assumes any liability to the extent that there is any claim or cause of action alleging that any Intellectual Property of any third party, including but not limited to the Rembrandt Intellectual Property, has been improperly transferred or sold to the Buyer (or any Designated Buyer) as part of the Transferred Assets at Closing through the sale pursuant to this Agreement.

Section 2.4     Excluded Liabilities. As used herein, "Excluded Liabilities" means all Liabilities of each Seller, whether arising on, prior to or after the Closing Date, including the following:

(a)     All Liabilities for Taxes solely related to or arising from or with respect to (i) the Transferred Assets or the operation of the Business, in each case, that are incurred in, or attributable to, any taxable period, or portion thereof (in accordance with Section 6.3), ending on or prior to the Closing Date, including any such Taxes which are not due or assessed until after the Closing Date but which relate to a pre-Closing Date taxable period, (ii) the transactions

contemplated hereby, including any Transfer Taxes for which any Seller is responsible pursuant to <u>Section 6.1</u> or (iii) the Excluded Assets or Excluded Liabilities;

(b)      all Liabilities of any Seller resulting from the failure to comply with any applicable "bulk sales," "bulk transfer" or similar Law;

(c)      unless otherwise assumed under this Agreement, all Liabilities under any Contract or Permit of Sellers, whether accruing prior to, at, or after the Closing Date, in each case;

(d)      except as otherwise set forth herein, all Liabilities under or relating to any grant of rights or license by Rembrandt or Affiliates of Stream, including but not limited to the Rembrandt Grant of Rights in the Settlement Agreement and Mutual Release between Rembrandt and Stream dated May 23, 2021, and the Licensing Covenant between Rembrandt, Stream, and Visual Semiconductor, Inc. dated August 14, 2023, each to the extent valid, existing and enforceable;

(e)      all Liabilities arising from, resulting from or related to (i) the employment or service or termination of employment or service of any current or former employees, officers, directors or service providers of Sellers by Sellers or their respective Affiliates, whenever arising, (ii) any Seller Benefit Plans, whenever arising (including pension or retirement Liability of Sellers to their current or former employees) and (iii) any Controlled Group Liability, whenever arising;

(f)      all Liabilities of Sellers arising in the Bankruptcy Cases;

(g)      all indebtedness of Sellers for borrowed money, or guarantees thereof, including Liabilities with respect to notes, bonds, indentures, letters of credit or similar Contracts or instruments of Sellers;

(h)      all Liabilities to distribute to any Seller's equity holders or otherwise apply all or any part of the consideration received hereunder;

(i)      all Liabilities in respect of obligations for indemnification or advancement of expenses, of any current or former officer or director of any Seller;

(j)      all Liabilities arising under any Environmental Law or any other Liability in connection with any environmental, health, or safety matters, including any such Liability arising from or related to (i) the ownership or operation of the Business or the Transferred Assets on or before the Closing Date, (ii) any action or inaction of Sellers or any other Person related to the Business or Transferred Assets, (iii) any formerly owned, leased or operated properties of Sellers or (iv) any condition first occurring or arising on or before the Closing Date with respect to the Business or the Transferred Assets;

(k)      except as specifically provided in the Settlement Agreement, all Liabilities for (i) costs and expenses incurred by Sellers or owed in connection with the administration of the Bankruptcy Cases (including the U.S. Trustee fees, the fees and expenses of attorneys, accountants, financial advisors, consultants and other professionals retained by Sellers, and any

16

official or unofficial creditors' or equity holders' committee and the fees and expenses of the post-petition lenders or the pre-petition lenders incurred or owed in connection with the administration of the Bankruptcy Cases), (ii) costs and expenses of Sellers incurred in connection with the negotiation, execution and consummation of the transactions contemplated hereby or by the Ancillary Agreements and (iii) except as otherwise set forth in this Agreement, including in Section 2.3, all costs and expenses arising from or related to any third-party claims against Sellers, pending or threatened, including any warranty or product claims;

(l)      any Liabilities hereunder or under the Ancillary Agreements;

(m)     all drafts or checks outstanding at the Closing under which Sellers are obligated; and

(n)     except as otherwise set forth herein, and unless related to or caused by Buyer, all Liabilities arising from or related to any Action, claim, investigation, cause of action or dispute brought, commended, arising or threatened against any Seller or arising from or related to the ownership or operation of the Transferred Assets or the Business prior to the Closing.

Section 2.5      Seller Maintained Transferred Assets.

(a)      To the maximum extent permitted by the Bankruptcy Code and subject to the other provisions of this Section 2.5, Sellers shall sell, assign, transfer, convey and to the extent possible, deliver to Buyer (or any Designated Buyers) all of the Transferred Assets and Buyer (or any such Designated Buyers) shall assume and accept all of the Transferred Assets from Sellers on and "as is, where is" basis, pursuant to Section 3.6, as of the Closing Date, pursuant to Sections 363 and 365 of the Bankruptcy Code, free and clear of any Encumbrance. Notwithstanding any other provision hereof or of any Ancillary Agreement to the contrary, this Agreement shall not constitute an agreement to sell, assign, transfer, convey or deliver any right, asset or property if such sale, assignment, transfer, conveyance or delivery would, after giving effect to the Sale Order and the Bankruptcy Code, (i) without the Consent of a Third Party, which Consent has not been obtained prior to the Closing, constitute a breach of any Contract to which Seller is a party or to which such right, asset or property is bound or would in any way adversely affect the rights of Buyer or Sellers with respect thereto or (ii) would violate any applicable Law (any such right, asset or property, a "Seller Maintained Transferred Asset").

(b)      If the Closing is consummated and there are any Seller Maintained Transferred Assets, (i) Sellers shall use their commercially reasonable efforts, and Buyer shall use commercially reasonable efforts to cooperate with Sellers, to obtain any applicable Consent or to remove any restriction under applicable Law, as applicable, to the sale, assignment, transfer, conveyance or delivery to Buyer (or any Designated Buyers) of each such Seller Maintained Transferred Asset, and (ii) subject to the approval of the Bankruptcy Court, Sellers and Buyer (or any Designated Buyer) shall enter into a Contract under which (1) Buyer (or any Designated Buyer) would obtain, through a subcontracting, sublicensing or subleasing arrangement or otherwise, the claims, rights and benefits of Sellers under such Seller Maintained Transferred Asset, (2) Sellers would enforce for the benefit of Buyer (or any Designated Buyer), any and all claims, causes of action, rights and benefits of Sellers against any Person with respect

17

to such Seller Maintained Transferred Asset and (3) Sellers shall promptly pay to Buyer (or any Designated Buyer) when received all monies received by Sellers with respect to such Seller Maintained Transferred Asset. If and when such Consent is obtained or such restriction under applicable Law is removed, such Seller Maintained Transferred Asset shall be deemed sold, assigned, transferred, conveyed and delivered to Buyer (or any Designated Buyer) in accordance herewith. The Parties shall treat any Seller Maintained Transferred Asset as having been sold to Buyer (or any Designated Buyer) as of the Closing for all applicable Tax purposes to the extent permitted by applicable Law. Each of Sellers and Buyer agrees to notify the other parties promptly in writing if it determines that such treatment (to the extent consistent with the relevant arrangement agreed to by such Seller and Buyer pursuant to this Section 2.5(b)) is not permitted for any Tax purposes under applicable Law. Where such treatment is not so permitted, and subject to the terms of any relevant arrangement agreed to by Sellers and Buyer pursuant to this Section 2.5(b) (and without duplication of any such Taxes economically borne by Buyer or any of its Affiliates pursuant thereto), (i) Buyer (or any Designated Buyer) shall indemnify and hold harmless the applicable Seller for any Taxes imposed on such Seller or any of its Affiliates with respect to any such Seller Maintained Transferred Asset for any taxable period or portion thereof (in accordance with Section 6.3) beginning after the Closing Date (determined on a "with and without" basis) and (ii) Seller and its Affiliates shall promptly pay to Buyer (or any Designated Buyer) any Tax refund or credit received with respect to any such Seller Maintained Transferred Asset for any taxable period beginning after the Closing Date or portion thereof (in accordance with Section 6.3) (determined on a "with and without" basis).

Section 2.6    Consideration. The consideration for the sale and transfer of the Transferred Assets from Sellers to Buyer (or any Designated Buyers), shall be the sum of (i) the Credit Bid Amount, plus (ii) any Cure Costs (the "Purchase Price").

Section 2.7    Closing.

(a)    Buyer and Sellers shall consummate the transactions contemplated hereunder (the "Closing") electronically (including by email) by the exchange of required closing deliveries at 9:00 a.m. on the third (3rd) Business Day after the entry of the Sale Order or on such other date, and time and at such other place as Buyer and Sellers may mutually agree in writing. As used herein, the "Closing Date" means the date on which the Closing occurs.

(b)    At or prior to the Closing, Sellers shall deliver or cause to be delivered to Buyer (and any Designated Buyers):[1]

(i)    a bill of sale, assignment and assumption agreement, substantially in the form of Exhibit C (the "Assignment Agreement"), duly executed by Sellers or the Trustee on behalf of the Debtors;

(ii)    (1) an Intellectual Property assignment agreement, substantially in the form of Exhibit D (the "IP Assignment Agreement"), and (B) a domain transfer agreement

---

[1] **Note to Draft**: Subject to further discussions.

18

substantially in the form of <u>Exhibit E</u> (the "<u>Domain Transfer Agreement</u>"), in each case duly executed by the applicable Sellers;

    (iii) a certified copy of the Sale Order;

    (iv) a valid IRS Form W-9 duly executed by each Debtor;

    (v) a duly executed certificate of the Trustee certifying the satisfaction of the conditions set forth in <u>Section 7.3(a)</u>, <u>Section 7.3(b)</u> and <u>Section 7.3(d)</u>;

    (vi) the Transferred Assets by making the Transferred Assets available to Buyer (or any Designated Buyers) at their present location, except for any demonstration units which shall be delivered as directed in writing by Buyer;

    (vii) assignments of the Transferred Interests; and

    (viii) all other documents, instruments or writings of conveyance as Buyer may reasonably request to consummate the transactions contemplated hereby and by the Ancillary Agreements.

   (c) At or prior to the Closing, Buyer shall deliver or cause to be delivered to Sellers:

    (i) payment of the remaining balance of the Carve-Out to Trustee pursuant to and in accordance with Section 4I(i) of the Settlement Agreement;

    (ii) the Assignment Agreement, duly executed by Buyer (or any Designated Buyers);

    (iii) the IP Assignment Agreement and the Domain Transfer Agreement, in each case duly executed by Buyer (or any Designated Buyers); and

    (iv) a duly executed certificate of an executive officer of Buyer certifying the satisfaction of the conditions set forth in <u>Section 7.2(a)</u>.

   Section 2.8 <u>Tax Allocation</u>. The Purchase Price (plus any other amounts to the extent properly taken into account as consideration under the Code) shall be allocated among the [applicable Transferred Assets][2] in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder (any such allocation, an "<u>Allocation</u>"). Buyer shall prepare and deliver to the Debtors a statement (the "<u>Allocation Statement</u>") setting forth the Allocation as promptly as reasonably practicable following the Closing Date. The Trustee shall have thirty (30) days following their receipt of the Allocation Statement to review and provide comments to Buyer and Buyer agrees to consider in good faith any reasonable comments provided by the Trustee. Buyer shall not be obligated to incorporate the Trustee's comments and revise the Allocation Statement unless Buyer, in its reasonable discretion, determines that such

---

[2] <u>**Note to Draft**</u>: Subject to ongoing review.

19

incorporation is necessary or appropriate. If the Trustee does not provide any comments within such period, Sellers shall be deemed to have accepted the Allocation Statement as prepared by Buyer. The Allocation shall be adjusted, as necessary, by Buyer to reflect any subsequent adjustments to the portion of the Purchase Price and any other consideration payable to any Seller pursuant to this Agreement, to the extent properly taken into account under the Code. Buyer and each Seller agrees to (a) timely file in a manner consistent with the Allocation with each relevant Governmental Authority all forms and Tax Returns required to be filed in connection with the applicable Allocation (including the filing of IRS Form 8594 with a U.S. federal income Tax Return for the taxable year that includes the date of the Closing), (b) be bound by the applicable Allocation for the purpose of determining Taxes, (c) prepare and file all Tax Returns on a basis consistent with the applicable Allocation, and (d) not take any position inconsistent with the applicable Allocation in any Tax Return, in any audit or proceeding related to Taxes before any Governmental Authority or in any report made for Tax purposes; provided, however, that notwithstanding anything in this Section 2.8 to the contrary, (a) the Sellers and the Buyer (and any Designated Buyers) shall be permitted to take a position inconsistent with the applicable Allocation if required to do so by a "determination" within the meaning of Section 1313 of the Code and (b) the Buyer (and any Designated Buyers) or the Sellers shall be permitted to settle, solely on its own behalf, any proposed Tax deficiency or adjustment by any Governmental Authority based upon or arising out of the Allocation.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES
## OF THE SELLERS

[Except as disclosed in Schedule A (collectively, the "Disclosure Schedules"), in each case, subject to Section 9.7(k),] Sellers represent and warrant to Buyer as follows:

Section 3.1    Organization. Each Seller is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization or formation.

Section 3.2    Authority. Trustee on behalf of itself and each Seller has all necessary entity power and authority (a) to execute and deliver this Agreement and each Ancillary Agreement to which it is or shall be a party and (b) subject to the Bankruptcy Court's entry of the Bid Procedures Order and the Sale Order, to perform and comply with its covenants and agreements hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. Each Seller's execution and delivery hereof and of each Ancillary Agreement to which it is or shall be a party, such Seller's performance and compliance with its covenants and agreements hereunder and thereunder and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all necessary action on such Seller's part, and no other proceedings on such Seller's part are necessary to authorize this Agreement or any Ancillary Agreement to which it is or shall be a party, such Seller's performance of or compliance with its covenants and agreements hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby. Subject to the Bankruptcy Court's entry of the Bid Procedures Order and the Sale Order, each Seller has duly executed and delivered this Agreement and each Ancillary Agreement to which it is or shall be a party and, assuming Buyer's due authorization, execution and delivery hereof and thereof, as applicable, this Agreement and each Ancillary Agreement to which it is or shall be a party is such Seller's

legal, valid and binding obligation, enforceable against it in accordance with the terms hereof or thereof, except as limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting the enforcement of creditors' rights generally, by general equitable principles (regardless of whether enforcement is sought in a proceeding of law or in equity) or by the discretion of any Governmental Authority before which any Action seeking enforcement may be brought (the "Bankruptcy and Equitable Exceptions").

Section 3.3    No Conflict; Filings and Consents.

(a)    Each Seller's execution and delivery hereof and of each Ancillary Agreement to which it is or shall be a party does not, such Seller's performance of and compliance with its covenants and agreements hereunder and thereunder shall not, and the consummation of the transactions contemplated hereby and thereby shall not, require such Seller to make any registration, declaration, notice, report, submission or other filing (each, a "Filing") with or to, or to obtain any consent, approval, waiver, license, permit, franchise, authorization or Order ("Consent") of, any Governmental Authority, except for the following:

(i)    any Filings with or to or Consents of the Bankruptcy Court;

(ii)    [the Filings and Consents listed in Section 3.3(b)(ii) of the Disclosure Schedules (respectively, the "Specified Filings" and the "Specified Consents"); and][3]

(iii)    any Filings or Consents the failure of which to make or obtain would not, individually or in the aggregate, result in a Material Adverse Effect.

Section 3.4    Transferred Assets.

(a)    Each Debtor, as applicable, unless stated otherwise, has good, valid, marketable and indefeasible title to the Transferred Assets and owns and possesses all interests in, including the right to use, each of the Transferred Assets (or, with respect to licensed Transferred Assets a valid license to use), in each case, the transfer shall be free and clear of any and all Encumbrances, on an "as is, where is" basis, without any warranty of any kind, express or implied, including as to merchantability or fitness for a particular purpose, as further set forth in Section 3.6. Buyers acknowledge that certain Intellectual Property may be subject to superior rights of Rembrandt as Licensor, and that Sellers cannot transfer any interest in the Transferred Assets that is not owned by the Sellers.

(b)    Subject to the Sale Order, at the Closing, (i) Sellers, as applicable, shall transfer to Buyer (or any Designated Buyers) all of their respective right, title and interest in, to and under the Transferred Assets and (ii) and Buyer (or any such Designated Buyers) shall acquire good, valid, marketable and indefeasible title to the Transferred Assets, in each case, free and clear of any Encumbrance.

---

[3]    **Note to Draft**: Subject to ongoing discussion.

Section 3.5     Brokers. Except as set forth in Section 3.5 of the Disclosure Schedules, no other broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Sellers. SSG Capital Advisors, LLC, as the Trustee's Investment Banker, is entitled to a commission for the conduct of the Sale as provided in its engagement with the Trustee.

Section 3.6     Exclusivity of Representations and Warranties. SELLERS ARE CONVEYING THE TRANSFERRED ASSETS AS IS, WHERE IS, AND WITH ALL FAULTS, AND, EXCEPT AS EXPRESSLY SET FORTH IN THIS ARTICLE III, NONE OF SELLERS OR ANY OF THEIR AFFILIATES OR REPRESENTATIVES IS MAKING ANY REPRESENTATION OR WARRANTY OF ANY KIND OR NATURE WHATSOEVER, ORAL OR WRITTEN, EXPRESS OR IMPLIED (ALL OF WHICH SELLER HEREBY DISCLAIMS) AS TO FITNESS FOR ANY PARTICULAR PURPOSE, MERCHANTABILITY, DESIGN, QUALITY, LAYOUT, PHYSICAL CONDITION, OPERATION, COMPLIANCE WITH SPECIFICATIONS, ABSENCE OF LATENT DEFECTS, OR COMPLIANCE WITH LAWS AND REGULATIONS (INCLUDING, WITHOUT LIMITATION, THOSE RELATING TO HEALTH, SAFETY AND THE ENVIRONMENT), OR ANY OTHER MATTER AFFECTING OR RELATING TO THE CONDITION OF THE ASSETS.  BUYER HEREBY FURTHER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS SPECIFICALLY SET FORTH HEREIN, BUYER IS RELYING SOLELY UPON THE INSPECTION, EXAMINATION, AND EVALUATION OF THE TRANSFERRED ASSETS BY BUYER AND BUYER WILL HAVE NO RIGHT TO BE INDEMNIFIED BY OR OTHERWISE BRING ANY ACTION AGAINST SELLERS WITH RESPECT TO ANY MATTER AFFECTING OR RELATING TO THE CONDITION OF THE TRANSFERRED ASSETS, OR ANY PORTION THEREOF.  THE PROVISIONS OF THIS SECTION 3.6 SHALL SURVIVE CLOSING AND THE TERMINATION OF THIS AGREEMENT.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Sellers as follows:

Section 4.1     Organization. Buyer is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization or formation and has all necessary entity power and authority to own, lease and operate its properties and assets and to carry on its businesses as currently conducted.

Section 4.2     Authority. Buyer has all necessary entity power and authority and financial ability (a) to execute and deliver this Agreement and each Ancillary Agreement to which it is or shall be a party and (b) subject to the Bankruptcy Court's entry of the Bid Procedures Order and the Sale Order, to perform and comply with its covenants and agreements hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. Buyer's execution and delivery hereof and of each Ancillary Agreement to which it is or shall be a party, Buyer's performance and compliance with its covenants and agreements hereunder and thereunder and the consummation of the transactions contemplated hereby and thereby have been

22

duly authorized by all necessary action on Buyer's part, and no other proceedings on Buyer's part are necessary to authorize this Agreement or any Ancillary Agreement to which it is or shall be a party, Buyer's performance of or compliance with its covenants and agreements hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby. Subject to the Bankruptcy Court's entry of the Bid Procedures Order and the Sale Order, Buyer has duly executed and delivered this Agreement and each Ancillary Agreement to which it is or shall be a party and, assuming Buyer's due authorization, execution and delivery hereof and thereof, as applicable, this Agreement and each Ancillary Agreement to which it is or shall be a party is Buyer's legal, valid and binding obligation, enforceable against it in accordance with the terms hereof or thereof, except as limited by the Bankruptcy and Equitable Exceptions.

Section 4.3    No Conflict; Filings and Consents.

(a)    Buyer's execution and delivery hereof and of each Ancillary Agreement to which it is or shall be a party does not, Buyer's performance of and compliance with its covenants and agreements hereunder and thereunder shall not, and the consummation of the transactions contemplated hereby and thereby shall not, (i) violate the constituent documents of Buyer, (ii) subject to making the Filings and obtaining the Consents contemplated by Section 4.3(b), violate any Law or (iii) breach, result in the loss of any benefit under, be a default (or an event that, with or without notice or lapse of time, or both, would be a default) under, result in the termination, cancelation or amendment of or a right of termination, cancelation or amendment under, accelerate the performance required by, or result in the creation of any Encumbrance on any of the respective properties or assets of Buyer under, any Contract to which Buyer is a party or by which any asset of Buyer is bound or affected, except, in the case of the foregoing clauses (ii) and (iii), as would not, individually or in the aggregate, result in a Buyer Material Adverse Effect.

(b)    Buyer's execution and delivery hereof and of each Ancillary Agreement to which it is or shall be a party does not, Buyer's performance of and compliance with its covenants and agreements hereunder and thereunder shall not, and the consummation of the transactions contemplated hereby and thereby shall not, require Buyer make any Filing with or to, or to obtain any Consent of, any Governmental Authority, except for the following:

(i)    any Filings with or to or Consents of the Bankruptcy Court;

(ii)    [the Specified Filings and the Required Approvals (including the Specified Consents); and]

(iii)    any Filings or Consents the failure of which to make or obtain would not, individually or in the aggregate, result in a Buyer Material Adverse Effect.

Section 4.4    Third Party Intellectual Property Rights.

(a)    Buyer has reviewed all of the Sellers' Intellectual Property and has confirmed, and hereby represents, that neither the Intellectual Property nor any of the Transferred Assets contain any Intellectual Property rights or other rights of a third party.

(b)　　Pursuant to Section 3.6 hereof, Buyer is relying solely upon Buyer's own inspection, examination, and evaluation of the Transferred Assets, including but not limited to the Intellectual Property. Buyer acknowledges and agrees that Buyer will have no right to be indemnified by or otherwise bring any action against Sellers with respect to any matter affecting or relating to third party Intellectual Property rights or other third party rights in the Transferred Assets.

(c)　　The provisions of this Section 4.4 shall survive closing and the termination of this agreement.

Section 4.5　　<u>Brokers</u>. SSG Capital Advisors, LLC as investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Buyer. No other broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Buyer.

Section 4.6　　<u>Exclusivity of Representations and Warranties</u>. Neither Buyer nor any of its Affiliates or Representatives is making any representation or warranty of any kind or nature whatsoever, oral or written, express or implied, except as expressly set forth in this <u>Article IV</u>, and Buyer hereby disclaims any such other representations or warranties.

## ARTICLE V
## COVENANTS

Section 5.1　　<u>Conduct of Business Prior to the Closing</u>.

(a)　　Except (x) as otherwise expressly required hereby, (y) as required by applicable Law (including an Order of the Bankruptcy Court) or (z) with the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned or delayed), prior to the Closing, Sellers shall not:

(i)　　fail to maintain, or allow to lapse, or abandon any Intellectual Property owned by or registered to, licensed to or held for use by a Seller or enter into or become bound by, terminate or materially amend or modify any Contract relating to the acquisition or disposition or granting of any license with respect to any such Intellectual Property, or otherwise subject to an Encumbrance any such Intellectual Property (including by the granting of any covenant-not-to-sue or covenant-not-to-assert);

(ii)　　(1) enter into any Contract or (2) modify, amend, extend or terminate any Contract which is identified as a Transferred Asset in Section 2.2 of the Disclosure Schedules, or waive, release or assign any rights or claims thereunder;

(iii)　　(1) enter into agreements or arrangements providing for capital expenditure or expenditures or otherwise commit to do so, or (2) fail to make any capital expenditure or expenditures in accordance with such capital budget;

(iv)    commence, waive, release, assign, compromise or settle any Action (other than the Retained Causes of Action) (for the avoidance of doubt, including with respect to matters in which a Seller is a plaintiff, or in which any of their officers or directors in their capacities as such are parties) affecting the Business or the Transferred Assets that is not a Retained Cause of Action;

(v)    cancel or fail to use commercially reasonable efforts to maintain any of insurance policy covering the Transferred Assets, if any, any right, asset or property that would be a Transferred Asset if existing on the Closing Date;

(vi)    pursue or seek, or fail to use commercially reasonable efforts to oppose any Person in pursuing or seeking, a conversion of the Bankruptcy Cases to cases under Chapter 7 of the Bankruptcy Code, the appointment of a trustee under Chapter 11 (other than the Trustee) or Chapter 7 of the Bankruptcy Code or the appointment of an examiner with enlarged powers;

(vii)    take or cause to be taken any action that would reasonably be expected to materially delay, materially impede or prevent the consummation of the transactions contemplated hereunder;

(viii)    (1) reject or terminate any Contract or seek Bankruptcy Court approval to do so or (2) fail to use commercially reasonable efforts to oppose any action by a third party to terminate (including any action by a third party to obtain Bankruptcy Court approval to terminate) any such Contract;

(ix)    with respect to any Transferred Asset, (1) agree to allow any form of relief from the automatic stay in the Bankruptcy Cases or (2) fail to use reasonable best efforts to oppose any action by a third party to obtain relief from the automatic stay in the Bankruptcy Cases;

(x)    settle, pursue, monetize, relinquish, or otherwise dispose of or seek to dispose of the Affiliate Claims other than in accordance with the terms hereof; or

(xi)    agree or authorize, in writing or otherwise, to take any of the foregoing actions.

Section 5.2    Access to Information.  Upon reasonable notice, each Seller shall provide Buyer and its Representatives reasonable access, during normal business hours throughout the period prior to the Closing, to such Seller's properties, books, records, Tax Returns (and all Tax Books and Records, including note papers and work papers, related thereto), personnel and Representatives, and during such period, such Seller shall cause to be furnished promptly to Buyer and its Representatives all readily available information concerning the Business as Buyer may reasonably request; provided, however, that such access and disclosure shall not be required to the extent it would violate any applicable Law or would jeopardize any attorney client privilege or the attorney work product doctrine; provided, further, that, if any such access or disclosure is limited for the reasons described in the foregoing proviso, such Seller shall use commercially reasonable efforts to find a way to allow such access and disclosure to the extent doing so would not be (in the good faith belief of Sellers after

25

consultation with outside counsel) reasonably be likely to cause a violation of applicable Law or such privilege to be jeopardized with respect to such information.

Section 5.3    Notification of Certain Matters. Each Party shall promptly notify the other Parties in writing of any event, change, circumstance, development, effect, occurrence or state of facts of which it becomes aware that would or is reasonably likely to result in any of the conditions set forth in Article VII becoming incapable of being satisfied prior to the End Date.

Section 5.4    Consents and Filings; Further Assurances.[4]

(a)    Each Party shall use commercially reasonable efforts to take, or cause to be taken, all appropriate action to do, or cause to be done, all things necessary, proper or advisable under applicable Law to consummate and make effective the transactions contemplated hereby and by the Ancillary Agreements and to confirm Buyer's (or any Designated Buyer's) ownership of the Transferred Assets as promptly as reasonably practicable, including using commercially reasonable efforts to obtain all Consents of Governmental Authorities or other Third Parties necessary, proper or advisable in connection therewith. Without limiting the generality of the foregoing, the Parties shall use commercially reasonable efforts to (i) obtain from Governmental Authorities all Consents that are necessary for the consummation of the transactions contemplated hereby and by the Ancillary Agreements and Buyer's (or any Designated Buyer's) operation of the Business and the Transferred Assets, (ii) promptly make all necessary Filings with or to Governmental Authorities that are related hereto or to the Ancillary Agreements or the transactions contemplated hereby or thereby, (iii) comply at the earliest reasonably practicable date with any request by a Governmental Authority for additional information, documents or other materials received by each of them or any of their Affiliates, (iv) reasonably cooperate with each other in connection with any such Filing or request (including, to the extent permitted by applicable Law, providing copies of all such documents to the non-filing parties prior to filing and considering all reasonable additions, deletions or changes suggested in connection therewith). This Section 5.4(a) does not apply with respect to Taxes.

(b)    Each Party shall promptly notify the other Parties of any communication it or any of its Affiliates receives from any Governmental Authority related to the matters that are the subject hereof and permit the other Parties to review in advance any proposed communication by such Party to any Governmental Authority. No Party shall agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry unless it consults with the other Parties in advance and, to the extent permitted by such Governmental Authority, gives the other Parties the opportunity to attend and participate at such meeting. Subject to applicable Law, the Parties shall provide each other with copies of all correspondence, filings or communications between them or any of their Representatives, on the one hand, and any Governmental Authority or members of its staff, on the other hand, with respect to this Agreement and the transactions contemplated hereby. This Section 5.4(b) does not apply with respect to Taxes, however, notwithstanding the foregoing, to the extent the Buyer

---

[4] **Note to Draft**: Subject to update.

receives communication from any Governmental Authority related to Taxes attributable to or associated with a pre-Closing Date taxable period, or to the extent the Sellers receive communication from any Governmental Authority related to Taxes attributable to or associated with a post-Closing Date taxable period, either Party shall timely share such correspondence with the other Party.

(c)     From time to time after the Closing, Sellers and Buyer shall execute, acknowledge and deliver all such further conveyances, notices, assumptions and releases and such other instruments, and shall take such further actions, as may be necessary or appropriate to vest in Buyer (or any Designated Buyers) all the right, title and interest in, to or under the Transferred Assets, to provide Buyer (or any Designated Buyers) and Sellers all rights and obligations to which they are entitled.

Section 5.5      Refunds and Remittances.

(a)     After the Closing, if Sellers or any of their Affiliates receive any refund or other amount that is a Transferred Asset or is otherwise properly due and owing to Buyer (or any Designated Buyers) in accordance with the terms hereof, Sellers promptly shall remit, or shall cause to be remitted, such amount to Buyer (or any Designated Buyers).

(b)     In the event that, after the Closing Date, either Party reasonably believes Sellers or any of their Affiliates have retained ownership of an asset intended to be conveyed to Buyer (or any Designated Buyers) as a Transferred Asset as contemplated hereby, for no additional consideration to Sellers or any of their Affiliates, Sellers shall convey, assign or transfer promptly such Transferred Asset to Buyer (or any Designated Buyers), and the Parties hereto shall execute all other documents and instruments, and take all other lawful actions reasonably requested, in order to assign and transfer such Transferred Asset to Buyer (or any Designated Buyers).

Section 5.6      No Successor Liability. The Parties intend that, to the fullest extent permitted by Law (including under Section 363 of the Bankruptcy Code), upon the Closing, Buyer (or any Designated Buyers) shall not be deemed to: (i) be the successor of any Seller, (ii) have, *de facto*, or otherwise, merged with or into any Seller, (iii) be a mere continuation or substantial continuation of any Seller or its enterprise(s) or (iv) be liable for any acts or omissions of any Seller in the conduct of the Business or arising under or related to the Transferred Assets other than as set forth in this Agreement. Without limiting the generality of the foregoing, and except as otherwise provided in this Agreement, the Parties intend that Buyer (or any Designated Buyers) shall not be liable for any Encumbrance against any Seller or any of any Seller's predecessors or Affiliates, and Buyer (or any Designated Buyers) shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business, the Transferred Assets or any Liabilities of Sellers arising prior to the Closing Date. The Parties agree that the provisions substantially in the form of this Section 5.6 shall be reflected in the Sale Order.

Section 5.7      Sale Free and Clear. Sellers acknowledge and agree, and the Sale Order shall be drafted to provide, without limitation, that, (a) on the Closing Date and

27

concurrently with the Closing, all then existing or thereafter arising Encumbrances against or created by Sellers,, or the bankruptcy estates, to the fullest extent permitted by Section 363 of the Bankruptcy Code, shall be fully released from and with respect to the Transferred Assets, and (b) Buyer (or any Designated Buyer) is not successor to any Seller or the bankruptcy estates by reason of any theory of law or equity, and Buyer (or any Designated Buyer) shall not assume or in any way be responsible for any Liability or Claim of Sellers, any of their Affiliates and/or the bankruptcy estates, except as expressly provided in this Agreement. On the Closing Date, the Transferred Assets shall be transferred to Buyer (or any Designated Buyers) free and clear of all Encumbrances to the fullest extent permitted by Section 363 of the Bankruptcy Code.

Section 5.8    Bankruptcy Court Milestones; Alternative Transactions.

(a)    Sellers shall consult with Buyer and Hawk regarding the Bankruptcy Cases, including regarding the Sale Motion, the Bid Procedures Hearing, the Bid Procedures Order, the Sale Hearing, the Sale Order, and any other Filings with or to the Bankruptcy Court, any hearing before the Bankruptcy Court and any Order of the Bankruptcy Court related to the transactions contemplated hereby or by the Ancillary Agreements and the Bankruptcy Cases in connection therewith, and Sellers shall provide Buyer and Hawk with copies of any material Filings to be filed by Sellers in the Bankruptcy Cases that are related to in any way to this Agreement, the Ancillary Agreements or any transaction contemplated hereby or thereby at least three (3) Business Days prior to the making of any such Filing. Sellers shall provide Buyer and Hawk with prompt notice of (i) the filing of any objection to (or any threat or notice of intention of any Person to file any objection to) this Agreement, the Ancillary Agreements, any transaction contemplated hereby or thereby, the Bid Procedures or Buyer or (ii) the commencement of (or any threat or notice of intention of any Person to commence), any Action that relates in any way to this Agreement, the Ancillary Agreements, any transaction contemplated hereby or thereby, the Bid Procedures or Buyer.

(b)    The Parties agree that the following are the milestones (the "Milestones") to be satisfied in connection with the Bankruptcy Cases, and Sellers shall use reasonable efforts to cause the Milestones to be satisfied:

(i)    not later than November 13, 2024, the Bankruptcy Court shall have held the Bid Procedures Hearing and entered the Bid Procedures Order;

(ii)    the deadline for submission of Qualified Bids (as defined in the Bid Procedures) shall be no later than November 15, 2024;

(iii)    if any other Qualified Bid (as defined in the Bid Procedures) is submitted prior to the bid deadline set forth in the Bid Procedures, Sellers shall have commenced the Auction on or before November 18, 2024; and

(iv)    not later than December 7, 2024, the Bankruptcy Court shall have entered the Sale Order.

(c)    Sellers shall promptly (and in no event later than twenty-four (24) hours after receipt) advise Buyer in writing if either Seller or any of such Seller's Affiliates or Representatives receives any inquiry, request for nonpublic information, discussion or

negotiation that is reasonably expected to lead to or that contemplates or relates to, or any proposal that is for, an Alternative Transaction, in each case, together with a written summary of the material terms and conditions thereof, the identity of the Person making any such inquiry, request for nonpublic information, discussion, negotiation or proposal and any draft agreement provided by such Person. Buyer as Secured Creditor shall have only consultation rights, and shall have no ability to object to or impede any Alternate Transaction, but retains the right to assert its Allowed Secured Claim and negotiate with the sponsor of the Alternate Transaction for the treatment of its Allowed Secured Claim.

(d)      In the event an appeal is taken or a stay pending appeal is requested, from the Sale Order, Sellers shall immediately notify Buyer of such appeal or stay request and shall provide to Buyer promptly a copy of the related notice of appeal or order of stay. Sellers shall also provide Buyer with written notice of any motion or application filed in connection with any appeal from such orders. Sellers agree to take all action as may be reasonable and appropriate to defend against such appeal or stay request and Sellers and Buyer agree to use their commercially reasonable efforts to obtain an expedited resolution of such appeal or stay request; provided that nothing herein shall preclude the Parties from consummating the transactions contemplated hereby if the Sale Order shall have been entered and has not been stayed and Buyer, in its sole and absolute discretion, waives in writing the condition that the Sale Order be a Final Order.

(e)      After the Bankruptcy Court's entry of the Sale Order, neither Buyer nor Sellers shall take any action which is intended to or fail to take any action the intent of which failure to act is to, result in the reversal, voiding, modification or staying of the Sale Order.

(f)      None of Sellers or Buyer shall file any pleading or take any other action in the Bankruptcy Court with respect hereto or the Ancillary Agreements or the consummation of the transactions contemplated hereby or thereby that is inconsistent with performing and carrying out the provisions hereof or thereof in accordance with the terms and subject to the conditions herein and therein; provided, however, that the foregoing shall not limit Buyer's rights and remedies hereunder or Buyer's right to advocate for the approval hereof and against any Alternative Transaction.

Section 5.9      Intellectual Property Registrations. After the Closing Date, Sellers shall use commercially reasonable efforts to effect the necessary change of ownership and recordals with all patent, trademark, and copyright offices and domain name registrars and other similar authorities (a) where Intellectual Property of Stream is still recorded in the name of legal predecessors of Stream or any Person other than Stream or (b) where the relevant recordals of the patent, copyright, and trademark offices, and domain name registrars, and other similar authorities, with respect to Stream Intellectual Property, are materially incorrect for any other reason.

Section 5.10      Name Change. Sellers shall, as promptly as practicable (but in no event later than twenty (20) Business Days) after the Closing, cease using and displaying their existing corporate names or any trademarks that are included in the Transferred Assets (including, for the avoidance of doubt, any trademarks held by Subsidiaries of Sellers), and in furtherance of such requirement, Debtors shall use commercially reasonable efforts to, no later than twenty (20) Business Days after the Closing, legally change their corporate and business

names to names that are not confusingly similar to such trademarks or existing names of the Debtors, and file notices of such name changes with the Bankruptcy Court. Subject to the approval of the Bankruptcy Court to change such Debtor's name for purposes of the Bankruptcy Cases (which approval the Sellers shall seek and use commercially reasonable efforts to obtain promptly following the Closing), under no circumstance shall Sellers, after the Closing, use or otherwise exploit the trademarks included in the Transferred Asset or any other indicia confusingly similar to the trademarks included in the Transferred Assets, copyrights included in the Transferred Assets, or any work substantially similar to the copyrights included in the Transferred Assets, as a source identifier in connection with any Seller product, service or corporate, business or domain name.

## ARTICLE VI
## TAX MATTERS

Section 6.1    Transfer Taxes. Any and all sales, harmonized sales, use, property transfer or gains, real estate or land transfer or gains, documentary, stamp, registration, recording, filing, goods and services or other similar Taxes payable in connection with the sale or transfer of the Transferred Assets pursuant to this Agreement (such Taxes, "Transfer Taxes") shall (to the extent not subject to an exemption under the Bankruptcy Code, including Section 1146(a) of the Bankruptcy Code) be borne and split equally between Buyer and Sellers. Sellers and Buyer shall use commercially reasonable efforts and cooperate in good faith to mitigate, reduce or eliminate any such Transfer Taxes, and shall each sign and file (or cause its respective Affiliates to sign and file) all documentation with the relevant Governmental Authority related to such Transfer Taxes as it may be required to sign or file under applicable Law. The Party responsible under applicable Law for filing the Tax Returns with respect to such Transfer Taxes shall prepare and file all necessary Tax Returns or other documents with respect thereto and shall promptly provide a copy of any such Tax Returns or other documents to the other Parties.

Section 6.2    Tax Cooperation. Buyer (or any Designated Buyers) and Sellers agree to furnish or cause to be furnished to each other, upon reasonable request, as promptly as reasonably practicable, such information (including access to Books and Records related to Taxes) and assistance related to the Business, the Transferred Assets as is reasonably necessary for determining any Liability for Taxes, the filing of all Tax Returns, the making of any election related to Taxes, the preparation for any audit by any Governmental Authority and the prosecution or defense of any claim, suit or proceeding related to any Tax; provided, however, that Buyer and its Affiliates (or Designated Buyers and their Affiliates) shall not be required to disclose the contents of their Tax Returns to any Person. Any reasonable expenses incurred in furnishing such information or assistance pursuant to this Section 6.2 shall be borne by the Party requesting it.

Section 6.3    Straddle Periods. For purposes hereof, with respect to any Transferred Asset or the Business, Sellers and Buyer shall apportion the liability for property Taxes, ad valorem Taxes and similar Taxes imposed on a periodic basis ("Periodic Taxes") and for Taxes that are either (i) based upon or related to income or receipts, (ii) imposed in connection with any sale, transfer or assignment or any deemed sale, transfer or assignment of property (real or personal, tangible or intangible), or (iii) payroll or similar Taxes with respect to any employee, or independent contractor associated with any Transferred Asset or the Business

("Non-Periodic Taxes") for any taxable period which begins on or before, and ends after, the Closing Date (a "Straddle Period") applicable to any Transferred Asset or the Business in accordance with this Section 6.3. Periodic Taxes shall be apportioned between Sellers and Buyer (or any Designated Buyers) as of the Closing Date, with Buyer (or any Designated Buyer) liable for that portion of the Periodic Taxes for a Straddle Period (which portion of such Taxes shall for purposes hereof be deemed attributable to the portion of the Straddle Period beginning after the Closing Date) equal to the Periodic Taxes for such Straddle Period multiplied by a fraction, the numerator of which is the number of days remaining in such Straddle Period after the Closing Date, and the denominator of which is the total number of calendar days in such entire Straddle Period. The Non-Periodic Taxes shall be apportioned between Sellers and Buyer (or any Designated Buyers) as of the Closing Date, with Buyer (or any Designated Buyer) liable for that portion of the Non-Periodic Taxes for a Straddle Period (which portion of such Taxes shall for purposes hereof be deemed attributable to the portion of the Straddle Period beginning after the Closing Date) equal to the amount that would be payable in the portion of the Straddle Period beginning after the Closing Date if the taxable year or period ended at the end of the day on the Closing Date; provided, however, that exemptions, allowances or deductions that are calculated on an annual basis, such as the deduction for amortization or depreciation, shall be allocated to the portion of the Straddle Period beginning after the Closing Date (notwithstanding that such exemptions, allowances or deductions may under applicable Law be determined solely at the end of the Straddle Period) by multiplying the total amount of such exemption, allowance, or deduction for such Straddle Period by a fraction, the numerator of which is the number of days remaining in such Straddle Period after the Closing Date, and the denominator of which is the total number of calendar days in such entire Straddle Period. Sellers shall be liable for that portion of the Periodic Taxes and Non-Periodic Taxes for a Straddle Period for which Buyer (or any Designated Buyer) is not liable under the preceding sentences (which portion of such Taxes shall for purposes hereof be deemed attributable to the portion of the Straddle Period ending on the Closing Date). The party hereto responsible under applicable Law for paying a Tax described in this Section 6.3 shall be responsible for administering the payment of such Tax. With respect to any Periodic Taxes or Non-Periodic Taxes imposed with respect to any Transferred Asset or the Business that are allocable to Buyer (or any Designated Buyer) under this Agreement, to the extent such Periodic Taxes or Non-Periodic Taxes were paid by any Seller or any Affiliate thereof, Buyer (or any Designated Buyer) shall pay to Sellers such Periodic Taxes or Non-Periodic Taxes no later than ten (10) Business Days following receipt of written notice from Sellers; and with respect to any Periodic Taxes or Non-Periodic Taxes imposed with respect to any Transferred Asset, or the Business that are allocable to Sellers under this Agreement, to the extent such Periodic Taxes or Non-Periodic Taxes were paid by Buyer or any Affiliate thereof, Sellers shall pay to Buyer (or any Designated Buyer) such Periodic Taxes or Non-Periodic Taxes no later than ten (10) Business Days following receipt of written notice from Buyer (or any Designated Buyers).

Section 6.4    Tax Treatment. Buyer and Sellers shall, consistently treat the transactions hereunder for all Tax purposes as a fully taxable disposition of the Transferred Assets.

Section 6.5    Tax Elections.

(a)    At Buyer's sole option, but only as would not be reasonably anticipated to generate a material Tax liability for which Debtors would be liable under the terms of this Agreement:

(i)    for any Subsidiary of Technovative that is treated as a foreign corporation for U.S. federal income Tax purposes (each, a "245A Subsidiary"), Buyer, Debtor and their respective Affiliates shall cooperate in good faith to determine each "U.S. tax resident" within the meaning of Treasury Regulations Section 1.245A-5(i)(29) that will be a "United States shareholder" within the meaning of Section 951(b) of the Code at the end of the Closing Date that owns directly or indirectly stock of such 245A Subsidiary and is described in Treasury Regulations Section 1.245A-5(e)(3)(i)(C)(1) (each, a "U.S. Tax Resident");

(ii)    Buyer shall enter into and shall use reasonable best efforts to cause all U.S. Tax Residents to enter into (and take all steps necessary to enter into), a written, binding agreement as described in Treasury Regulations Section 1.245A-5(e)(3)(i)(C)(2) (a "245A Election Agreement") with applicable Debtors and their relevant Affiliates to make an election pursuant to Treasury Regulations Section 1.245A-5(e)(3) to close the taxable year of such 245A Subsidiary, effective as of the Closing Date (such an election, a "245A Election"). Buyer shall prepare a form of a 245A Election Agreement and shall consider in good faith any reasonable comments or proposed changes by Debtors. To the extent able to do so under applicable Law, Buyer shall represent that the information provided is complete and that the U.S. Tax Residents identified are the only direct or indirect shareholders of the 245A Subsidiary that are required for purposes of making a valid 245A Election; and

(iii)    Debtors and their Affiliates shall timely file, or cause to be timely filed, valid 245A Elections.

(b)    In the event that Debtors and their Affiliates file the 245 Election, Debtors, Buyer and their respective Affiliates shall not take any position inconsistent with the taxable year of the applicable 245A Subsidiary as closing for all purposes of the Code and Treasury Regulations thereunder on the date of the "extraordinary reduction amount" or "tiered extraordinary reduction amount" (as each are defined in Treasury Regulations Section 1.245A-5) on any Tax Return or in any in any audit or proceeding related to Taxes before any Governmental Authority or otherwise.

Section 6.6    Bulk Sales. Notwithstanding any other provisions herein, Buyer and Sellers hereby waive compliance with all "bulk sales," "bulk transfer" and similar Laws that may be applicable with respect to the sale and transfer of any or all of the Transferred Assets to Buyer (or any Designated Buyer).

### ARTICLE VII
### CONDITIONS TO THE CLOSING

Section 7.1    Mutual Conditions. The respective obligations of each Party to consummate the Closing shall be subject to the satisfaction (or waiver by Buyer and Sellers, if permissible under applicable Laws) of the following conditions:

(a)    no Governmental Authority shall have issued a preliminary, temporary or permanent Order that is in effect and prevents, makes illegal or prohibits the consummation of any of the transaction contemplated hereby (any such Law or Order, a "<u>Legal Restraint</u>");

(b)    [(1) all Specified Filings shall have been made in accordance with applicable Law and (2) all Specified Consents, shall have been obtained in form and substance reasonably acceptable to Buyer;]

(c)    the Bankruptcy Court shall have entered the Bid Procedures Order and the Sale Order, and each of the Bid Procedures Order and the Sale Order shall be a Final Order.

Section 7.2    <u>Conditions to Obligations of Sellers</u>. The obligation of Sellers to consummate the Closing are further subject to the satisfaction (or waiver by Sellers, if permissible under applicable Law) of the following conditions:

(a)    Each representation and warranty in <u>Article IV</u> (read, for purposes of this <u>Section 7.2(a)</u> only, without giving effect to any qualifier as to materiality, "material" or "Buyer Material Adverse Effect") shall be true and correct in all respects as of the Closing as if made as of the Closing (except to the extent any such representation or warranty expressly speaks as of the date hereof or any other specific date, in which case such representation or warranty shall have been true and correct in all respects as of such date), except where the failure of such representation and warranty to be true and correct at such time has not, individually or in the aggregate, resulted in a Buyer Material Adverse Effect;

(b)    Buyer shall have performed or complied in all material respects (in all respects with respect to any covenant or agreement that is qualified by materiality) with each covenant or agreement required to be performed or complied with by it hereunder at or prior to the Closing; and

(c)    Sellers shall have received the documents listed in <u>Section 2.7(c)(ii) – Section 2.7(c)(iv)</u>.

Section 7.3    <u>Conditions to Obligations of Buyer</u>. The obligations of Buyer to consummate the transactions contemplated hereby shall be subject to the satisfaction, at or prior to the Closing, of each of the following conditions, any of which may be waived in writing by Buyer in its sole discretion:

(a)    each representation and warranty in <u>Article III</u> (read, for purposes of this <u>Section 7.3(a)</u> only, without giving effect to any qualifier as to materiality, "material" or "Material Adverse Effect") shall be true and correct in all respects as of the Closing as if made as of the Closing (except to the extent any such representation or warranty expressly speaks as of the date hereof or any other specific date, in which case such representation or warranty shall have been true and correct in all material respects as of such date), except where the failure of such representation and warranty to be true and correct at such time has not, individually or in the aggregate, resulted in a Material Adverse Effect;

(b)    each Seller shall have performed or complied in all material respects (in all respects with respect to any covenant or agreement that is qualified by materiality) with each

covenant or agreement required to be performed or complied with by it hereunder at or prior to the Closing;

     (c)    all Required Approvals shall have been obtained in form and substance reasonably acceptable to Buyer;

     (d)    there shall not have occurred a Material Adverse Effect in connection with the Transferred Assets;

     (e)    Buyer shall have received the documents listed in <u>Section 2.7(b)</u>; and

     (f)    Sellers shall have received the Consents of the Third Parties set forth in <u>Section 7.3(f)</u> of the Disclosure Schedules and delivered to Buyer evidence thereof, in form and substance reasonably acceptable to Buyer.

## ARTICLE VIII
## TERMINATION

     Section 8.1    <u>Termination Rights</u>.

     (a)    <u>Termination by Mutual Consent</u>. Buyer and Sellers shall have the right to terminate this Agreement at any time prior to the Closing by mutual written consent.

     (b)    <u>Termination by Either Buyer or Sellers</u>. Buyer, on the one hand, or Sellers, on the other hand, shall have the right to terminate this Agreement at any time prior to the Closing if:

     (i)    a Legal Restraint is in effect that has become final and nonappealable;

     (ii)    the Bankruptcy Cases are dismissed or converted to cases under Chapter 7 of the Bankruptcy Code; or

     (iii)    Buyer is not the [Winning Bidder].

     (c)    <u>Termination by Buyer</u>. Buyer shall have the right to terminate this Agreement at any time prior to the Closing if:

     (i)    the Closing shall not have been consummated prior to 5:00 p.m. on December 10, 2024 (the "<u>End Date</u>"), subject to extension by written consent of Hawk and the Trustee; <u>provided</u>, <u>however</u>, that the right to terminate this Agreement under this Section 8.1(c)(i) shall not be available to Buyer if the failure of the Closing to have occurred prior to 5:00 p.m. on the End Date was primarily caused by, or primarily resulted from, Buyer's breach of any of its covenants or agreements hereunder;

     (ii)    any Seller breaches any of its covenants or agreements hereunder or violates the terms of the Settlement Agreement or Sale Order, or if any of the representations or warranties in <u>Article III</u> fails to be true and correct, which breach or failure (1) would give rise

to the failure of a condition in <u>Section 7.1</u> or <u>Section 7.3</u> and (2) is not reasonably capable of being cured by such Seller within ten (10) days after receipt by such Seller of written notice from Buyer of such breach or failure or, if reasonably capable of being cured during such ten (10) day period, is not cured by such Seller within such ten (10) day period;

        (iii)    any Seller or any of its Affiliates or Representatives takes any Alternative Sale Action;

        (iv)    any Milestone is not satisfied;

        (v)    a Material Adverse Effect has occurred;

        (vi)    any Required Approvals are denied;

        (vii)    any Seller withdraws or seeks authority to withdraw the Sale Motion; or

        (viii)    for any reason (including an Order of the Bankruptcy Court) Buyer is unable or legally prohibited, pursuant to Section 363(k) of the Bankruptcy Code or otherwise, to credit bid the amount agreed in the Settlement Agreement.

        (d)    <u>Termination by Sellers</u>. Sellers shall have the right to terminate this Agreement at any time prior to the Closing if Buyer violates the terms of the Settlement Agreement or breaches any of its covenants or agreements hereunder, or if any of the representations or warranties in <u>Article IV</u> fails to be true and correct, which breach or failure (i) would give rise to the failure of a condition in <u>Section 7.1</u> or <u>Section 7.2</u> and (ii) is not reasonably capable of being cured by Buyer within ten (10) days after receipt by Buyer of written notice from Sellers of such breach or failure or, if reasonably capable of being cured during such ten (10) day period, is not cured by Buyer within such ten (10) day period.

        Section 8.2    <u>Effect and Manner of Termination</u>.

        (a)    If this Agreement is terminated under <u>Section 8.1</u>, this Agreement shall be void and of no force or effect, without any Liability on the part of any Party, whether arising prior to or after such termination, based on or related to this Agreement or the negotiation, execution, performance or subject matter hereof (whether in contract or in tort or otherwise, or whether at law (including at common law or by statute) or in equity); <u>provided</u>, <u>however</u>, that this <u>Section 8.2</u> and <u>Article IX</u> shall survive any such termination and remain in full force and effect and no such termination shall relieve any Party of any willful, knowing and material breach hereof occurring prior to such termination.

        (b)    This Agreement may be terminated only pursuant to <u>Section 8.1</u>. In order to terminate this Agreement under <u>Section 8.1</u> (except for <u>Section 8.1(a)</u>), the Party desiring to terminate this Agreement shall give written notice of such termination to the other Parties, specifying the provision hereof pursuant to which such termination is effected.

# ARTICLE IX
# GENERAL PROVISIONS

Section 9.1    <u>Nonsurvival of Representations, Warranties and Covenants</u>. The respective representations, warranties and covenants of Sellers and Buyer contained herein and any certificate delivered pursuant hereto shall terminate at, and not survive, the Closing; <u>provided</u> that this <u>Section 9.1</u> shall not limit any covenant or agreement of the Parties that by its terms requires performance after the Closing.

Section 9.2    <u>Indemnification</u>. Buyer (or any Designated Buyer) shall indemnify and hold harmless the Sellers, the Sellers' bankruptcy estates, the Trustee and his Court approved professionals, their members, officers, directors and/or employees for any claim or cause of action alleging that any Intellectual Property of any third party, including but not limited to the Rembrandt Intellectual Property, has been improperly transferred or sold to the Buyer (or any Designated Buyer) as part of the Transferred Assets at Closing through the sale pursuant to this Agreement including the defense thereof. The indemnity provided for herein shall be broadly construed to include but shall not be limited to the reimbursement of all costs, professional fees and expenses including legal fees, when incurred by the Trustee, and all expert fees, court costs, and expenses. In addition, in the event that the Sellers' bankruptcy estates, the Trustee or his Court approved professionals, their members, officers, directors and/or employees are sued by any third party as a consequence of (i) the Closing, (ii) the transfer of the Transferred Assets, or (iii) the utilization of the Transferred Assets, including but not limited to, the Rembrandt Intellectual Property, Buyer (or any Designated Buyer) will immediately enter a defense on behalf of the Sellers, the Sellers' bankruptcy estates, the Trustee or his Court approved professionals, their members, officers, directors and/or employees.  Buyers (or any Designated Buyer) may join any lawsuit with any other proceeding involving the same or affiliated plaintiffs.  Notwithstanding any other provision contained herein, this Section 9.2 shall survive Closing. Buyer (or any Designated Buyer) shall have the right to assume control of or direct the defense against any claim, cause of action, or lawsuit covered by this Section 9.2 and to select counsel to represent Sellers, the Sellers' bankruptcy estates, the Trustee and his Court approved professionals, their members, officers, directors, and/or employees (the "<u>Indemnified Parties</u>") with respect to any claim, cause of action, or lawsuit covered by this Section 9.2 and shall use its reasonable efforts in any such defense.  The Indemnified Parties shall have the right to approve or reject any counsel proposed by Buyer (or any Designated Buyer) selects, which approval shall not be unreasonably withheld. Sellers, the Sellers' bankruptcy estates, the Trustee and his Court approved professionals, their members, officers, directors, and/or employees shall use reasonable efforts to cooperate with Buyer (or any Designated Buyer) and its chosen counsel in the defense of any such claim, cause of action, or lawsuit.

Section 9.3    <u>Fees and Expenses</u>. Except as otherwise provided herein (including <u>Section 5.4(a)</u> and <u>Section 6.1</u>), all fees and expenses incurred in connection with or related to this Agreement and the Ancillary Agreements and the transactions contemplated hereby and thereby shall be borne and paid by the Party incurring such fees or expenses, whether or not such transactions are consummated.

Section 9.4    <u>Transition of Permits</u>. To the extent that Buyer (or any Designated Buyer) has not obtained all of the Permits that are necessary for Buyer (or any Designated

Buyer) to take title to all of the Transferred Assets at the Closing and thereafter operate all aspects of the Business at the Closing, Sellers shall, to the extent permitted by applicable Laws, use commercially reasonable efforts to maintain after the Closing such Permits that Buyer reasonably requests, at Buyer's sole expense, until Buyer (or any Designated Buyer) has obtained such Permits.

Section 9.5    <u>Amendment and Modification</u>. This Agreement may not be amended, modified or supplemented in any manner, whether by course of conduct or otherwise, except by an instrument in writing specifically designated as an amendment hereto, signed on behalf of each Party.

Section 9.6    <u>Waiver</u>. No failure or delay of any Party in exercising any right or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such right or power, or any course of conduct, preclude any other or further exercise thereof or the exercise of any other right or power. Any agreement on the part of either Party to any such waiver shall be valid only if set forth in a written instrument executed and delivered by a duly authorized officer on behalf of such Party.

Section 9.7    <u>Notices</u>. All notices and other communications hereunder shall be in writing and shall be deemed duly given (a) on the date of delivery if delivered personally, (b) on the first Business Day after the date of dispatch if delivered utilizing a next-day service by a recognized next-day courier, (c) on the day of transmission if sent by email during regular business hours on a Business Day and, if not, then on the following Business Day or (d) on the earlier of confirmed receipt or the fifth (5th) Business Day after the date of mailing if delivered by registered or certified mail, return receipt requested, postage prepaid, in each case, at the following addresses and email addresses (or to such other address or email address as a Party may have specified by notice given to the other Parties under this <u>Section 9.6</u>):

(i)    if to Sellers, to:

William A. Homony, Chapter 11 Trustee
8 Penn Center, Suite 950
1628 John F. Kennedy Blvd.
Philadelphia, PA 19103
Email:          bhomony@mctllp.com

with a copy (which shall not constitute notice) to:

Obermayer Rebmann Maxwell & Hippel LLP
Centre Square West
1500 Market Street, Suite 3400

Philadelphia, PA  19102
Attention:    Michael D. Vagnoni
Email:          michael.vagnoni@obermayer.com

(ii) if to Buyer and/or Hawk, to:

SeeCubic, Inc.
1732A Marsh Road, Suite 124
Wilmington, Delaware 19810
Attention:      Shad L. Stastney
Email:          shadron.stastney@seecubic.com

with a copy (which shall not constitute notice) to:

Skadden, Arps, Slate, Meagher & Flom LLP
320 South Canal Street
Chicago, Illinois 60606
Attention:      James J. Mazza, Jr.
Email:          james.mazza@skadden.com

and

K&L Gates LLP
301 Hillsborough St, Ste. 1200
Raleigh, North Carolina 27603
Attention:      Margaret R. Westbrook
Email           margaret.westbrook@klgates.com

Section 9.8      Interpretation.

(a)      No Strict Construction. The Parties have been represented by counsel during the negotiation and execution hereof and, therefore, waive the application of any Law, holding or rule of construction providing that ambiguities in a Contract or other document shall be construed against the Party drafting such Contract or document. Each Party has participated in the drafting and negotiation hereof. If an ambiguity or question of intent or interpretation arises, this Agreement must be construed as if it is drafted by all the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of authorship of any of the provisions hereof.

(b)      Time Periods. When calculating the period of time prior to which, within which or after which any act is to be done or step taken pursuant hereto, (i) the date that is the reference date in calculating such period shall be excluded and (ii) if the last day of such period is not a Business Day, the period in question shall end on the next succeeding Business Day. Unless expressly provided otherwise, the measure of a period of a month(s) or a year(s) for purposes hereof shall be that date of the following month or year corresponding to the starting date; provided that if no corresponding date exists, the measure shall be that date of the following month or year corresponding to the next day following the starting date.

(c)      Dollars. Unless otherwise specifically indicated, any reference herein to "$" means U.S. dollars.

        (d)    <u>Gender and Number</u>. Any reference herein to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

        (e)    <u>Articles, Sections and Headings</u>. When a reference is made herein to an Article or a Section, such reference shall be to an Article or a Section hereof unless otherwise indicated. The table of contents and headings herein are for reference purposes only and shall not affect in any way the meaning or interpretation hereof.

        (f)    <u>Include</u>. Whenever the words "include," "includes" or "including" are used herein, they shall be deemed to be followed by the words "without limitation."

        (g)    <u>Hereof</u>. The words "hereof," "hereto," "hereby," "herein" and "hereunder" and words of similar import when used herein shall refer to this Agreement as a whole and not to any particular provision hereof.

        (h)    <u>Extent; Or</u>. The word "extent" in the phrase "to the extent" means the degree to which a subject or other thing extends, and such phrase shall not mean simply "if." The word "or" shall not be exclusive.

        (i)    <u>Laws</u>. Any Law defined or referred to herein means such Law as from time to time amended, modified or supplemented prior to the date hereof, and includes all rules and regulations promulgated under such Law.

        (j)    <u>Persons</u>. References to a person are also to its successors and permitted assigns.

        (k)    <u>Exhibits and Disclosure Schedule</u>. The Exhibits hereto and the Disclosure Schedules are incorporated and made a part hereof and are an integral part hereof. Each capitalized term used in any Exhibit or in the Disclosure Schedules but not otherwise defined therein has the meaning given to such term herein. The Disclosure Schedules shall be organized, for purposes of convenience only, into sections that correspond to the Sections hereof. Any item in any section of the Disclosure Schedule that corresponds to a Section in <u>Article III</u> shall apply to and qualify such Section and any other Section in <u>Article III</u> if such item's relevance to such other Section is reasonably apparent.

        (l)    <u>Time</u>. Unless specified otherwise herein, any reference herein to a specific time shall be to such time in the North American Eastern Time Zone.

        Section 9.9    <u>Entire Agreement</u>. This Agreement, the Settlement Agreement and the Ancillary Agreements constitute the entire agreement, and supersede all prior written agreements, arrangements, communications and understandings and all prior and contemporaneous oral agreements, arrangements, communications and understandings between the Parties with respect to the subject matter hereof and thereof. Neither this Agreement nor the Settlement Agreement or any Ancillary Agreement shall be deemed to contain or imply any restriction, covenant, representation, warranty, agreement or undertaking of any Party with respect to the transactions contemplated hereby or thereby other than those expressly set forth herein or therein or in any document required to be delivered hereunder or thereunder, and none shall be deemed to exist or be inferred with respect to the subject matter hereof.

Section 9.10    Parties in Interest. This Agreement shall be binding upon and inure solely to the benefit of each Party hereto, and nothing herein, express or implied, is intended to or shall confer upon any Person (including employees of Sellers) other than the Parties and their respective successors and permitted assigns any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason hereof.

Section 9.11    Governing Law. Except to the extent of the mandatory provisions of the Bankruptcy Code, this Agreement, and all Actions, claims and causes of action (whether in contract or in tort or otherwise, or whether at law (including at common law or by statute) or in equity) that may be based on, arise out of or relate hereto or the negotiation, execution, performance or subject matter hereof (collectively, "Governed Claims") shall be governed by the Laws of the State of [Delaware] applicable to agreements made and to be performed solely therein, without giving effect to principles of conflicts of law.

Section 9.12    Submission to Jurisdiction; Waiver of Jury Trial. Without limiting any Party's right to appeal any Order of the Bankruptcy Court, (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms hereof and to decide any Governed Claims and (b) any and all Governed Claims shall be filed and maintained only in the Bankruptcy Court. The Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court for, and irrevocably waive the defense of an inconvenient forum to the maintenance of, any Governed Claim; provided, however, that, if the Bankruptcy Case is closed, (i) each Party irrevocably agrees that any Governed Claim shall be heard and determined in the Court of Chancery of the State of Delaware or, to the extent such court does not have subject matter jurisdiction, the U.S. District Court for the District of Delaware or, to the extent such court does not have subject matter jurisdiction, the Superior Court of the State of Delaware and (ii) each Party hereby irrevocably submits to the exclusive jurisdiction and venue of the courts set forth in the foregoing clause (i) for, and irrevocably waives the defense of an inconvenient forum to the maintenance of, any Governed Claim. Each Party further agrees that notice provided under Section 9.6 shall constitute sufficient service of process and waives any argument that such service is insufficient. Each Party hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any Governed Claim, (1) any claim that it is not personally subject to the jurisdiction of the courts in Delaware as described herein for any reason, (2) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (3) that (A) the suit, action or proceeding in any such court is brought in an inconvenient forum, (B) the venue of such suit, action or proceeding is improper or (C) this Agreement, or the subject matter hereof, may not be enforced in or by such courts. **EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY GOVERNED CLAIM.**

Section 9.13    No Recourse. Notwithstanding any provision hereof or of any Ancillary Agreement, by its acceptance of the benefits hereof, each Party agrees and acknowledges on its own behalf and on behalf of its respective Affiliates that (a) no Person, other than the Parties, have Liabilities hereunder, (b) this Agreement and the Ancillary Agreements may be enforced only against the Parties, (c) no Governed Claim may be brought against any Person that is not a Party and (d) no Party shall have any right of recovery related to

a Governed Claim against any former, current, or future direct or indirect equity holders, controlling persons, directors, officers, employees, agents, Affiliates, members, managers, general or limited partners, Representatives or assignees of any Party.

Section 9.14    Assignment; Successors. Neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned or delegated, in whole or in part, by operation of law or otherwise, by any Seller without the prior written consent of Buyer, or by Buyer without the prior written consent of Sellers, and any such assignment without such prior written consent shall be null and void; provided, however, that no assignment shall limit Buyer's obligations hereunder. Notwithstanding the foregoing, Buyer may assign any of its rights or delegate any of its obligations hereunder to any of its Affiliates without obtaining the prior written consent of any Person. This Agreement shall be binding on, inure to the benefit of and be enforceable by, the Parties and their respective successors and permitted assigns.

Section 9.15    Enforcement. The Parties agree that irreparable damage would occur in the event that any of the provisions hereof were not performed in accordance with their specific terms or were otherwise breached. Accordingly, each Party shall be entitled to specific performance of the terms hereof, including an injunction or injunctions to prevent breaches hereof and to enforce specifically the terms and provisions hereof. Each Party hereby further waives (a) any defense in any action for specific performance that a remedy at law would be adequate and (b) any requirement under any law to post security as a prerequisite to obtaining equitable relief.

Section 9.16    Severability. Whenever possible, each provision or portion of any provision hereof shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision or portion of any provision hereof is held to be invalid, illegal or unenforceable in any respect under any applicable Law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or portion of any provision in such jurisdiction, and this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision or portion of any provision had never been contained herein.

Section 9.17    Counterparts. This Agreement may be executed in several counterparts, each of which shall be deemed an original and all of which shall be one (1) and the same instrument. Delivery of an executed counterpart hereof by facsimile or other electronic transmission (including email or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com) shall be effective as delivery of an original counterpart hereof.

Section 9.18    Publicity. Except with respect to any dispute between or among the Parties regarding this Agreement or the transactions contemplated hereby, from and after the date hereof, the Parties shall consult with each other before making any press release or otherwise making any public statements with respect to this Agreement or the transactions contemplated hereby, and neither Buyer nor Sellers shall make any press release or any public statement prior to obtaining Sellers' (in the case of Buyer) or Buyer's (in the case of Sellers) written approval, which approval shall not be unreasonably withheld, except that no such approval shall be necessary to the extent disclosure may be required by applicable Law.

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, each of the undersigned has caused this Agreement to be executed as of the date first written above by a duly authorized person thereof.

**TRUSTEE**

By: _____
     Name:


**STREAM TV NETWORKS, INC.**

By: _____
     Name:
     Title:


**TECHNOVATIVE MEDIA, INC.**

By: _____
     Name:
     Title:

IN WITNESS WHEREOF, each of the undersigned has caused this Agreement to be executed as of the date first written above by a duly authorized officer thereof.

**SEECUBIC, INC.**

By: _____
    Name:
    Title: