# Exhibit 12

# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| In re: | Chapter 11 |
| Stream TV Networks, Inc.,  (Stream) | Bky. No. 23-10763 (MDC) |
| Debtor. |  |

|  |  |
|---|---|
| In re: | Chapter 11 |
| Technovative Media, Inc.,  (Technovative) | Bky. No. 23-10764 (MDC) |
| Debtor. | (Jointly Administered) |

## REMBRANDT 3D HOLDING LTD.'S OBJECTION TO THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS

Rembrandt 3D Holding Ltd. ("Rembrandt") objects to the sale of substantially all of the Debtor's assets (the "363 Sale"). In further support of this Objection, Rembrandt respectfully state as follows:

### Relief Requested

1.     By this Objection, Rembrandt requests that the 363 Sale is not approved and Rembrandt further seeks an order to prevent the 363 Sale and that the chapter 11 trustee (the "Trustee") not make any new proposal to sell assets of the Debtors until the Trustee has properly determined what are the assets of the Debtors and more specifically, has removed the technology that belongs to other third party entities from the technology the debtors are proposing to sell.

2.     The 363 Sale should not be approved for at least the following reasons: 1) the bankruptcy estates do not own either of the Philips or Rembrandt technology that has been incorporated into the technology and products that arere being sold by the Debtors; 2) the proposed transaction will violate both the Philips and Rembrandt licenses such that any purchaser would be immediately subjected to both contract and intellectual property enforcement

1

claims if they took possession of the assets being offered for sale; 3) all intellectual property

owned by the bankruptcy estate and the Philips license are held by subsidiaries (or subsidiaries

of subsidiaries) of Technovative and Rembrandt is the only creditor of Technovative such that

the proceeds from the sale of purported assets of Technovative are being used to pay creditors of

Stream before fully paying off the creditors of Technovative ; 4) the actions of Technovative that

led to the violations of Rembrandt's rights were conducted entirely at the direction of the secured

creditors of Stream that were intimately familiar with Rembrandt's rights and the settlement

agreement, yet choose to exert control over Technovative and its subsidiaries to flagrantly violate

Rembrandt's rights and incur liability to Rembrandt; 5) the assets of the bankruptcy estate have

been obfuscated and hidden by the secured creditors such that there is nothing of value to sell;

and 6) there is a reasonable alternative to the proposed sale process that would maintain the value

of the estate property without violating the existing licensing agreements.

       3.      The Trustee seeks to conduct a 363 Sale of the Debtors' assets, which includes

technology that incorporates certain intellectual property of Rembrandt. Rembrandt issued

Stream TV Networks, Inc. ("Stream"), one of the Debtors in this bankruptcy case, a non-

transferable license through a 2021 settlement agreement but has not agreed to the transfer of its

IP to any other party. Accordingly, the Motion must be denied because the Debtors cannot sell

what they don't own.  While the Trustee makes clear that the settlement agreement is not being

assigned, no effort has been made to remove Rembrandt's intellectual property from the assets

being sold.  Rembrandt seeks an order to prevent the 363 Sale and to require the Trustee to

properly determine what are the assets of the Debtors before proposing any other sales of the

assets of the Debtors.

4.      The Trustee has an affirmative duty to determine what is and what is not property of Debtors' estates, and he admitted under oath that he has not done so. Selling assets "as-is, where-is" does not excuse or justify his abdication of this responsibility and selling off assets of other non-Debtors parties.  He cannot expand the property of the bankruptcy estate by willfully failing to take notice that other parties own the technology that has been incorporated into UltraD.  It is clearly an effort to circumvent the law.

5.      The assets offered for sale and being sold and used includes patented inventions covered by patents owned by Rembrandt and Philips.  While the agreements themselves are not assignable, the issue is not the transfer of a contract, but rather the transfer of technology that includes Rembrandt's and Philips's trade secrets and know-how.  That intellectual property is not part of the assets of the estates.

6.      Stream is licensed by Rembrandt and owes the license fee as an administrative claim for its use during the pendency of the bankruptcy, but when Rembrandt's counsel asked the Trustee's counsel whether the actions of the Trustee, SSG Capital Advisors, the individuals at SSG, Technovative and/or their subsidiaries actually making the offers to sell assets of the Technovative estate are covered by the Rembrandt to Stream license, there was no substantive response.  Technovative and its subsidiaries are not parties to the license agreement with Rembrandt.  They only had the right to make products for Stream to sell under the "have made" rights in the Rembrandt license.

7.      The attempt to sell technology belonging to Rembrandt and Philips violates the license agreements with both entities, but would also subject the purchaser, Trustee, SSG Capital Advisors, the individuals at SSG, Stream, Technovative and/or their subsidiaries actually making the offers for sale, to claims patent infringement under 35 U.S.C. § 271 of both the Rembrandt

3

and Philips patents and to claims of misappropriation of the trade secrets and know-how licensed

by Rembrandt and Philips. To be clear, the activities of each of those individuals and entities are

independently actionable and they are liable for their activities independent of any liabilities of

Stream.  If any of those parties would look to the Debtors for indemnification to defend the

patent infringement and trade secret misappropriation litigation, it would render the estate

administratively insolvent.

8.     As a wholly owned subsidiary of Stream, Technovative would have a right to

supply/distribute products under the Rembrandt license solely for the benefit of Stream or

Rembrandt under the terms of the license granted to Stream.  However, while in control of

Technovative, SeeCubic, Inc. took actions to attempt to sell others access to Rembrandt's trade

secrets and products covered by Rembrandt's patents.  SeeCubic thus knowingly caused

Technovative to infringe Rembrandt's patents and misappropriate Rembrandt trade secrets.

9.     Rembrandt is the only creditor of Technovative and the secured creditors do not

hold a security interest in the assets that include the technology covered by the Philips license or

the Rembrandt license. Any pledge agreement asserted by the secured creditors would be fully

satisfied by the purported settlement agreement with Stream. If assets of Technovative are to be

sold to pay creditors of Technovative, Rembrandt would receive the value of that sale until its

claim against Technovative is satisfied, then can its shareholder (Stream) receive the value of

proceeds of the sale.

10.    The manufacturing equipment is currently under the control of SeeCubic and has

not been returned to Stream.  Rembrandt has not been able to obtain information about its

condition.  The condition of the technology related to UltraD is not disclosed, nor where

information can be obtained.  Even assuming an "as is, where is" sale, one needs to provide

reasonable information about where the technology is and what it is.  All major assets of Stream

and its subsidiaries are exclusively under the control of SeeCubic or entities where the CEO of

SeeCubic, Shadron Stastney is the director.  Given that SeeCubic has been trying to take control

of these assets for over four years, any sale process should make sure the "as is, where is" assets

are outside the control of the primary staking horse bidder so that other bidders have a reasonable

chance to evaluate those assets.

11.     The 363 Sale should also be denied because the proposed Stalking Horse Bidder

has a long history of disqualifying behavior, using and offering for sale the Rembrandt

intellectual property without the legal right to do so. SeeCubic first seized the Debtors' assets in

2020 pursuant to a purported settlement agreement that was invalidated by the Delaware

Supreme Court in 2022. Rather than return the assets to the Debtors as mandated, SeeCubic and

Hawk engaged an investment banker to sell them.

12.     After the Debtors filed for chapter 11 protection and attempted to obtain turnover

of their assets, SeeCubic CEO Shad Stastney moved against the Debtors' management in

Amsterdam Court and seized control of the Debtors' research and development operations. Mr.

Stastney continues to serve as sole director of three of the Debtors' Netherlands subsidiaries,

controlling the Debtors' intellectual property portfolio, their research and development

operations, and their small-run manufacturing facilities used to create technology demonstrator

samples.

13.     Finally, the schedule for conducting and consummating the 363 Sale as proposed

in the Trustee's Motion does not allow any serious bidder the time to conduct meaningful due

diligence. The Trustee intends to offer the Debtors' assets "as-is, where-is" so that there is no

liability to the Debtors' estate and to remove the obligation to provide information that would be

reasonably required by any bidder expected to pay at least $150 million to exceed the Stalking Horse's credit bid.

14.     The accelerated schedule, the "as-is, where-is" nature of the sale, and the agreement to allow a $150 million opening credit bid by the stalking horse all lead to a disheartening conclusion: the proposed 363 Sale is a merely a façade to cover a back-door plan to hand the assets to SeeCubic – a plan similar to the Omnibus Agreement, which transferred the Debtors' assets to SeeCubic and left the unsecured creditors with nothing until the Delaware Supreme Court intervened.

## JURISDICTION

15.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b) the Standing Order of Reference to the Bankruptcy Court Under Title 11 of the United States District Court for the Eastern District of Pennsylvania, dated July 25, 1984, and as amended (Luongo, C.J.). This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## FACTUAL AND PROCEDURAL BACKGROUND

**Rembrandt Develops Glasses-Free 3D Innovations Consisting of Technology Patents and Trade Secrets.**

16.     A more detailed description of the Rembrandt Technology is included in the Declaration of Stephen Blumental attached to this filing as Exhibit A.

17.     Rembrandt is the successor-in-interest to 3D Fusion Corp. ("3DFusion"), creator of certain patents and trade secrets that improved the glasses-free 3D intellectual propriety of Koninklijke Philips N.V. ("Philips"). Relevant United States patents held by Rembrandt include

US8558830, US9681114, and US9521390. (See Exhibit 1 of the Declaration of Stephen Blumental attached to this filing as Exhibit A)

18.     Over the course of many years, Philips invested approximately $500 million to develop its glasses-free 3D technology, known as WOWvx. The PC-driven technology used mathematical algorithms to add depth and autostereoscopic information to 2D content (2D+Depth), creating a glasses-free 3D viewing experience.

19.     In 2007, Philips provided one of its WOWvx displays to 3DFusion CEO Stephen Blumenthal so that Blumenthal could evaluate the proprietary and exclusive Philips technology which Philips was attempting to license to third parties worldwide without success. Blumenthal discovered that the Philips technology suffered from significant image quality issues – numerous artifacts such as ghosting – that required weeks of manual post-processing to correct. Through more than 3,000 hours of experimentation and research, Blumenthal developed a novel and non-obvious methodology to correct those image quality issues. With his "adjustability" solution, Blumenthal realized he had cured the flawed half-billion-dollar Philips technology to make it marketable.

20.     Unable to improve its own technology, Philips shut down its glasses-free 3D division in March 2009. 3DFusion filed patent applications on the Blumenthal inventions in December 2009 and showed Philips executives the improved technology. The Philips licensing division was sufficiently impressed and began discussions to provide 3DFusion with a license to the Philips glasses-free IP portfolio, which consisted of 800 patents, software development kits, and other tools. (See Exhibit 1 of the Declaration of Stephen Blumental attached to this filing as Exhibit A))

7

21.     3DFusion retained former Philips glasses-free 3D engineers in Eindhoven (the

"Eindhoven Team") in January 2010 to implement Blumenthal's solution into the core Philips

technology. These engineers worked with 3DFusion for 15 months on 30 customer R&D

projects, developing and advancing Blumenthal's patented IP. In April 2010, Philips granted its

first technology license for its WOWvx technology to Rembrandt.

22.     In June of 2010, Stephen Blumenthal met with Mathu Rajan and Raja Rajan when

they came to the 3DFusion Wall Street showroom offices for a demonstration of the 3D glasses

free platform.

23.     The Rajans immediately signed NDAs to be able to review details of 3DFusion's

technology and business plans.

24.     At the time of this original June 9, 2010 NDA between Stream and 3D Fusion,

(now owned by Rembrandt), Stream had no technology of its own.

25.     In June of 2010, all rights were held by 3D Fusion and therefore all improvements

to that technology made after the June 9, 2010 NDA were owned by 3D Fusion. The NDA reads:

> *"2.3.3 all inventions, improvements, copyrightable works and designs,*
> *relating to business plans, marketing plans, technology, machines,*
> *methods, compositions, or products of Disclosing Party directly resulting*
> *from or relating to the Confidential Information and the right to market,*
> *use, license and franchise the Confidential Information or the ideas,*
> *concepts, methods or practices embodied therein shall be the exclusive*
> *property of the Disclosing Party, and the Recipient has no right or title*
> *thereto."*

26.     The original technology developed by 3DFusion was disclosed to Stream and is

the basis for the improvements over the old Philips technology. Rembrandt owns all the rights to

the underlying technology and business plans along with all improvements.  These advancements

are fully integrated into all the Stream technology and products.  Specifically, Rembrandt has

identified with particularity how all the products sold by Stream have included Rembrandt

technology and infringe Rembrandt patents (See Exhibit 1 of the Declaration of Stephen Blumental attached to this filing as Exhibit A)

27.    In 2011, Stream formed SeeCubic B.V. ("SCBV") to develop its own glasses-free 3D solution based on the WOWvx technology, which it also licensed from Philips.

28.    The Eindhoven Team, having worked under Blumenthal's supervision and control for 15 months, had extensive knowledge of Blumenthal's innovations—both patented and protected as trade secrets of 3DFusion. Eindhoven Team employees, in violation of their NDAs and fiduciary duties, disclosed aspects of 3DFusion's intellectual property and trade secrets to SCBV and its parent company, Stream.

29.    The trade secrets reflect a wide range of improvements developed by Blumenthal and the 3DFusion team from 2007 to 2011. During this time, the team generated approximately 2,000 pages of emails, 1,000 pages of documents, and spent thousands of hours working on content and sharing ideas and advancements. The Rembrandt trade secrets range from the repurposing of Philips' software tools, resulting in massive 3D image correction and optimization opportunities, to utilization of a Philips optical lens array in a manner not envisioned by Philips that consequently, when coupled with other trade secret improvements to the Philips WOWvx platform, achieved new heights in operational and performance standards.

30.    No attempt is made herein to explain all facets of each development, but rather to provide reasonable particularity of unique technology that was proprietary to 3DFusion and now to Rembrandt.  However, as part of the discovery processing in the pending litigation that Rembrandt filed seeking Injunctive Relief for Misappropriation Of Trade Secrets (the "Delaware Complaint") in the United States District Court For The District Of Delaware against Technovative Media, Inc ("Technovative"), Hawk Investment Holdings Ltd. ("Hawk"), and

9

SeeCubic, Inc.("SeeCubic"), Rembrandt has prepared a detailed list of trade secrets that was provided to SeeCubic's counsel under a protective order as attorney eyes only.  In the attached Declaration of Stephen Blumenthal (Exhibit A), Mr. Blumenthal attached a list with the corresponding trade secret number that redacts the detailed description of each secret, but does list the documentary evidence supporting both the proof of development of the trade secret and the information provided to at least Barenbrug while Barenbrug was working with Mr. Blumenthal and 3DFusion (See Exhibit 10 of the Declaration of Stephen Blumental attached to this filing as Exhibit A).

**Rembrandt Pursues Stream for Contract Breaches Related to Use of Rembrandt Intellectual Property**

31.    These events and agreements were the basis for the Rembrandt lawsuit filed against Stream, Mathu Rajan, and Raja Rajan. Rembrandt, Stream, Rembrandt-Holding filed a complaint in the New York State Supreme Court in January 2017 against Stream TV Network, Inc. ("Stream"), Raja Rajan, and Mathu Rajan among others (Stream, Raja Rajan, and Mathu Rajan, collectively referred to as the "Defendants"). Defendants removed the state action to the United States District Court for the Southern District Of New York. Defendants were served with the FAC on June 23, 2017 (Rembrandt 3D Holding, Ltd. v. Stream TV Network, Inc. et al, No. 17-CV-882-RA, D.I. 1-1)). (See Exhibit 1 of the Declaration of Stephen Blumental attached to this filing as Exhibit A)

32.    After Barenbrug and others filed declarations alleging that they had not signed non-disclosure agreements and Rembrandt responded with copies of the non-disclosure agreements, the case was referred for mediation.

33.     The First Mediation Conference was held on July 18, 2018 under the supervision
of Magistrate Judge Parker in the Southern District of New York. After the First Mediation
Conference, and for the following six months, the parties corresponded settlement terms via
email and conducted several in-person settlement conferences at Stream offices in Philadelphia,
exchanging various redlined proposals between them.

34.     Magistrate Judge Parker ordered Rembrandt and Stream to attend a Second
Mediation Conference on April 9, 2019, this time bringing with them individuals with the
authority to bind their respective companies. With the assistance of Magistrate Parker, the parties
negotiated updated settlement terms from the previously circulated redlined term sheet.

**Stream Settles Litigation and Obtains a License from Rembrandt**

35.     Shadron L. Stastney ("Stastney") represented Stream in the Second Mediation
Conference.

36.     Stastney was both CFO and Vice Chairman of the Board of Stream at the time.
Stastney had personal knowledge of the material facts, had knowledge of the Philips license,
played a key role in the negotiations, and signed the Term Sheet for Development, Supply, and
License Agreement between Stream and Rembrandt on April 9, 2019 (See Exhibit 2 of the
Declaration of Stephen Blumental attached to this filing as Exhibit A)

37.     While it was clear in the mediation session, that Stastney understood that the
Stream technology had been built on top of the technology of Philips, he confirmed this directly
in this deposition on June 27, 2023, when he testified:

> T*he underlying technology was originally developed by Philips in the
> Netherlands starting in the early 2000s. [. . .]  The team in the
> Netherlands wanted to continue to develop the technology and so they
> went looking for funding effectively to do so. Stream TV Networks had
> started doing other things, as you can tell by the name Stream TV*

11

> *Networks, none of which is really applicable to what they do now. And
> they were looking also for a new business line and determined that they
> would be able to raise money to provide a facility and working capital for
> the team in the Netherlands. [. . .] SLS is the one that provided the funding
> so that facility in the Netherlands could be set up and so that the initial
> license with Philips of the patent portfolio on which the technology is
> based could be obtained.  (D.I. 303 at 57:24-25; 58:3-11; 58:14-17.)*

38.    Rembrandt agrees that Stream had no technology of its own until Rembrandt's

predecessor, 3D Fusion Corp., introduced Stream to the Eindhoven team and Stream licensed

technology from Philips (Koninklijke Philips Electronics N.V., a Netherlands corporation).  The

very reason for the original SLS investment was to obtain the license from Philips.

39.    Rembrandt has closely evaluated the quality of the Stream products and even in

the midst of its controversies with Stream purchased early versions of Stream's TVs and Stream

provided additional units during the Rembrandt – Stream SDNY litigation.  The quality of the

product has improved over time.  Rembrandt was impressed with Ultra-D and decided to

structure a settlement in such a way that the primary value of the settlement was a supply of

Ultra-D units.

40.    Prior to the Rembrandt – Stream SDNY litigation, Stream reported a recent

valuation at over $400,000,000 ($4/share with over a 1,000,000 shares and warrants outstanding

prior to Rembrandt litigation).  By the time of the mediation with Mr. Stastney he reported that

the share price has fallen to $1.50/share.

41.    By settling the IP dispute with Rembrandt and by adding significant volume to

Stream's production to satisfy Rembrandt's orders, it was reasonable to believe that Stream's

stock price would increase.  Therefore, Rembrandt negotiated for warrants in Stream with the

hope and expectation that by working collectively and honoring Rembrandt's IP, the value of

both companies would increase and Rembrandt would be rewarded with helping to create value for Stream's shareholders.

42.    Importantly, Stastney provided the material financial information regarding the value of the shares in Stream, the relative changes to the share value before and after the Rembrandt litigation, the value of the at cost displays being offered to Rembrandt.  Stastney provided information about the expected profit margins that Rembrandt would be saving by purchasing displays at cost from Stream.  While the cash component of settlement was not trivial, it is clear that the $400/display x over 3,000,000 displays was the lion's share of the value offered by Stream for the license. (See Declaration of Christopher A. Michaels In Support of Rembrandt 3d Holding Ltd.'s Objection To Motion of William A. Homony In His Capacity As Chapter 11 Trustee For Entry Of An Order Approving A Settlement Agreement And Mutual Release With Hawk Investment Holdings, Ltd., As Collateral Agent For The Secured Noteholders Of Seecubic, Inc., Pursuant To Fed. R. Bankr. P. 9019(A) And 11 U.S.C. § 105(A) AT D.I. 628 Attached as Exhibit B)

43.    The Settlement Term Sheet, which was also signed by Rembrandt and Magistrate Parker, is unequivocal proof of Stastney's comprehensive knowledge of Rembrandt's ownership rights in the Rembrandt IP.

44.    Through the mediation process, Stastney ascertained the value of Rembrandt's technology and agreed to tender a settlement and license payment. As compensation, Stream agreed to (i) pay Rembrandt $5,840,000 in cash; (ii) issue 2,000,000 warrants to purchase Stream stock; (iii) provide Rembrandt with 100 units of 4K-resolution glasses-free 3D televisions at no cost; (iv) provide Rembrandt with 8 units of 8K-resolution glasses-free 3D prototypes at no cost;

and (v) grant Rembrandt the right to purchase 3,015,000 units of 8K-resolution mass-produced televisions at Stream's cost, for a total value of between $368,207,000 and $1,212,407,000.

45.     On May 23, 2021, Stream and Rembrandt memorialized the Settlement Term Sheet in a more formal Settlement Agreement and Mutual Release (the "Settlement Agreement"), with terms nearly identical to those negotiated in mediation. The Settlement Agreement granted a non-transferable license for Stream to use the Rembrandt IP in exchange for cash and products valued at approximately $1.2 billion. (See Exhibit 6 of the Declaration of Stephen Blumental attached to this filing as Exhibit A).

**Stream Loses and Regains its Technology**

46.     In April of 2021, Rembrandt contacted Stastney, in his new role as CEO of SeeCubic, along with other secured lenders, creditors, and lenders of Stream.  However, Stastney refused to have SeeCubic obtain a license to Rembrandt's technology despite his personal knowledge that the use of UltraD technology required a license to Rembrandt's IP and the Stream and Rembrandt Settlement Agreement did not transfer any rights to SeeCubic to absolve it of its trade secret misappropriation and patent infringement.

47.     Despite that knowledge, SeeCubic, pursued actions to take control of Stream's assets through an agreement between Stream and its secured creditors (the "Omnibus Agreement") which transferred all of Stream's assets to SeeCubic, a "newco" formed by the creditor.

48.     Just months after Rembrandt and Stream executed the Settlement Agreement, the Delaware Chancery Court issued a Partial Final Judgment that validated an agreement between Stream and its secured creditors (the "Omnibus Agreement") which transferred all of Stream's assets to SeeCubic, a "newco" formed by the creditors.

14

49.     Stream appealed the Chancery Court ruling to the Delaware Supreme Court and

on December 21, 2021, and on June 15, 2022, the Delaware Supreme Court issued a unanimous

decision reversing and vacating the decision, rendering the Omnibus Agreement void ab initio,

and remanding the case to the Chancery Court to unwind the transfer of Stream's assets. See

Stream TV Networks, Inc. v. Seecubic, Inc., No. 360, 2021, p. 3 (Del. June 15, 2022) (Holding

that "a majority vote of Class B stockholders is required under Stream's charter" to "transfer

pledged assets to secured creditors in connection with what was, in essence, a privately

structured foreclosure transaction"). In holding that its corporate charter had been violated, the

Delaware Supreme Court noted that Stream's charter was "unambiguous" and, ergo, "enforcing

the unambiguous [c]harter provision [requiring Class B stockholders be allowed to vote on the

asset transfer] is consistent with our policy of seeking to promote stability and predictability in

our corporate laws. . . ."  Id. at pp. 53-54.

### Rembrandt Files Suit Against SeeCubic, Hawk, and Technovative in the U.S. District Court for the District of Delaware

50.     After using this invalidated agreement to take control of Stream assets, SeeCubic

proceeded to destroy value of those assets by breaching both the Philips and Rembrandt license

agreements, damaging production equipment, and promulgating a business plan based on

infringing intellectual property and attempting to license out technology belonging to Philips and

Rembrandt when both licenses specifically prohibited such sublicensing efforts thereby creating

massive liabilities for infringement at Stream's subsidiary companies and specifically at

Technovative.

51.     Upon learning of SeeCubic's malfeasance and reviewing its website and attempts

to license out Rembrandt's technology through its control of Technovative and subsidiaries of

Technovative, Rembrandt filed a Complaint For Injunctive Relief And Misappropriation Of Trade Secrets (the "Delaware Complaint") in the United States District Court For The District Of Delaware against Technovative Media, Inc ("Technovative"), Hawk Investment Holdings Ltd. ("Hawk"), and SeeCubic, Inc.("SeeCubic"), and a true copy along with the exhibits was attached as Exhibit A to the Declaration re: of Christopher A. Michaels in Opposition of Hawk Emergency Motion for Relief from the Automatic Stay [ECF No. 69], which is incorporated herein by reference.

**The Debtors File for Chapter 11 Protection and Seek Turnover of Estate Assets**

52.      On March 15, 2023, Stream and Technovative filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. Despite Stream's Motion for Turnover on April 5, 2023 [ECF No. 76], assets possessed and/or controlled by SeeCubic were not returned to the Debtors' estates.

53.      Not only did SeeCubic refuse to return assets to the Debtors, it took action with Hawk in the Amsterdam Court of the Netherlands to unseat Stream's management as director of Stream's Dutch subsidiaries.

54.      The appointment gave Stastney control over Stream's patent portfolio as well as the R&D facility, engineers, and small-run manufacturing equipment.

55.      SeeCubic and its CEO now have complete control over Stream's production equipment and all of the technology house in SCBV and the subsidiaries holding title to all of Stream's intellectual property and agreement with Philips.

56.      Stream does not have control over its assets and the Trustee has taken no action to provide Rembrandt or Rembrandt 3D Corp (Rembrandt-Delaware) with any information to assess the status of the technology held by Stream and its subsidiaries.

16

57.   Specifically, Rembrandt-Delaware signed an NDA with the Trustee and asked for

information regarding the assets as part of an offer to make an investment in Stream that would

pay all secured creditors and at least 50% of the unsecured claims and requested that information

be provided about the following Stream assets:

"*The major assets of Stream are the intellectual property licensed from Philips and Rembrandt-Holding and the technology that Stream has developed itself including both intellectual property and manufacturing equipment.  Specifically, the assets include:*

*Philips Technology License[1]:*
1) *Schedule B – Roughly 1,500 patents listed in Schedule B*
2) *Schedule C - Licensed Know-How and Licensed Software*
   a) *The Licensed Know-How is based on the 3D Technology, developed (i) by the former Philips incubator 3DSolutions and (ii) by the Philips Research organization in direct support of the former Philips incubator 3D Solutions and Philips' Intellectual Property & Standards organization, and implemented in several prototypes .*
   b) *The Licensed Know-How includes:*
      i) *available technical documentation on product design, manufacturing process description and equipment specifications;*
      ii) *available rendering firmware; and*
      iii) *available 3D content creation software.*
   c) *Licensed Software and technical documentation on product designs, manufacturing process description and equipment specifications include:*
      i) *all documentation which is available in archives including TPD archive , Software archive complete with compilable and linkable source code,*
      ii) *Departmental archive; and*
      iii) *lens design software.*
   d) *Details on rendering firmware:*
      i) *Firmware archive (including schematics of Hydra, Spartak, SpartakPlus,*
      ii) *SpartakNext, SpartakN ext-H DMI); and*
      iii) *Firmware download tool.*
   e) *Details on the 3D content creation software:*
      i) *Display Control Tool;*
      ii) *Player API*
      iii) *MediaPlayer9*
      iv) *Settings API*
      v) *Media Sequencer*
      vi) *WOWzone application*
      vii) *WOWvx Player;*
      viii) *WOWvx BlueBox Spacer;*
      ix) *WOWvx BlueBox server*

---

[1] See "Stream (Ultra-D Venures)-Philips License in Rembrandt Data Room

   x) *WOWvx BlueBox configurator*
   xi) *WOWvx BlueBox Compositor,*
   xii) *BlueBox server configuration scripts*
   xiii)  *DirectX visualize*
   xiv) *OpenGL control & visualiser*
   xv) *B3D source tilter*
   xvi) *3DS MAX rendering plugin;*
   xvii)  *Maya rendering plugin;*
   xviii)  *Red Box; and*
   xix) *Documentation*

  f) *Super Drive Train License - a conversion and rendering implementation ("Super Drive Train"), consisting of ULTRA-D algorithms, that shall be compatible with the Dolby3D format.*

### *Rembrandt-Holding License*

  1) *License and Settlement Agreement May 23, 2021that provides for a license to patents and trade secrets held Rembrandt-Holding and the agreement was amended on August 12, 20232; and*

  2) *A Licensing Covenant between Rembrandt-Holding, Stream, and VSI restricting licensing of other parties by Rembrandt-Holding dated August 14, 2023.3*

*The only licenses that Rembrandt-Holding has issued are to Rembrandt 3D Corp and to Stream. If Rembrandt 3D Corp acquires Stream, it will hold the only licenses to Rembrandt-Holding's technology.*

### *Stream Intellectual Property:*

  1) *Patents4;*
  2) *Trademarks;*
  3) *Copyright and source code software for content conversion tools, content creation, real time conversion, and*
  4) *A computer chip design with 3D rendering designed for use with a 3D optical stack (lens bonded to a LCD display)*
  5) *A Licensing Covenant between Rembrandt-Holding, Stream, and VSI restricting licensing of other parties by Rembrandt-Holding dated August 14, 2023.*

### *Stream Production Equipment:*

  1) *Stream commissioned the manufacture of specialized optical bonding equipment for a Small Production Line ("SPL") and a Mass Production Line (the "MPL", and together with the SPL, the "Bonding Equipment"). Both machines were installed at the facility of contract manufacturer Pegatron in Suzhou, China for bonding of 55" and 65" 3D*

---

[2] See "IP Licenses" in Rembrandt Data Room

[3] See "IP Licenses" in Rembrandt Data Room

[4] See pages 32-54 of Docket Entry 48.

*panels. The MPL, with its greater automation, achieved milestone efficiency with a 96%*
*yield rate during production of 4,000 units of 65" glasses-free 3D advertising displays.5*

2) *The Bonding Equipment is an asset of Stream and currently held in a storage unit and the*
*original manufacturer of the equipment has agreed to recalibrate the equipment and*
*allow initial production runs to occur within its facility.*

### Stream Development and Joint Marketing Contracts:

1) *Joint Marketing Agreement with BOE6; and*
2) *Automotive Display Co-Development Agreement Bosch7.*

58.     To date both Rembrandt and Rembrandt-Delaware have received no information

from the Trustee regarding these assets.

59.     From his testimony at the June hearing, it appears that Trustee does not have

understanding or information about a collection of assets that once supported a $400,000,000

valuation of Stream.

60.     If so, has completely abdicated his fiduciary duties to SeeCubic and SeeCubic is

the stalking horse bidder.

**The Trustee Seeks Expert Intellectual Property Advice Very Late in the Process.**

61.     While it is encouraging that the Trustee now seeks to hire a registered patent

attorney to advise him (D.I. 812), it is very late in this process.

62.     It is disturbing that the engagement was signed back in August of 2024, yet no

effort has been made to resolve any of the intellectual property issues raised in this case.

---

[5] See pages 55-59 of Docket Entry 48 for pictures of bonding equipment.

[6] See pages 60-71 of Docket Entry 48 for copy of agreement.

[7] See pages 72-77 of Docket Entry 48 for copy of agreement.

63.     Has the Trustee sought an opinion of counsel and is the Trustee relying on such
an opinion to avoid enhanced damages under 35 USC Section 284? If so, the Trustee has waived
privilege and the opinion and work product are discoverable.[8]

64.     If a patent attorney was hired in August, why was the patent attorney not
consulted prior to designing a sale process that attempts to transfer intellectual property of both
Philips and Rembrandt?

65.     Rembrandt believes that earlier hiring of a registered patent attorney might have
helped the Trustee avoid many of the problems with the current proposed sale, it is not clear how
the Trustee will use the advice of the patent attorney to avoid the intellectual property concerns
they have created with the 363 Sale.

66.     Therefore, the 363 Sale should not be approved and the Trustee should be ordered
to meaningfully engage the newly hired registered patent attorney to resolve the intellectual
property concerns prior to any 363 Sale or approval of a plan of reorganization.

**A Temporary Restraining Order was Issued by the Bankruptcy Court to protect both the
Debtors and their Third-Party Licensors, Including Rembrandt, from Infringement.**

67.     On September 30, 2023, ten days after Stastney staged his coup to seize
operational control of the Debtors' Netherlands subsidiaries, Stream filed a motion seeking
injunctive relief[9] to prevent SeeCubic, Hawk, and SCBV (at the direction of Stastney) from using
the Debtors' technology to compete with the Debtors.

68.     On October 2, 2023, Rembrandt filed a memorandum in support of the Debtors'
request for a TRO[10], citing Stastney's newly regained control of SCBV as a prelude to

---

[8] *In re:EchoStar Communications Corp*, 448 F.3d 1294, 1296 (Fed. Cir. 2006)

[9] Adversary Case No. 23-00057, Docket No. 29

[10] Adversary Case No. 23-00057, Docket No. 32

anticipated violations of the Rembrandt IP by SeeCubic and Hawk in continuance of the actions
they had taken while the 225 Action was being litigated.

69.     On information and belief, with operational control of Stream's technology under
his control overseas, Stastney used, and continues to use, SCBV as SeeCubic's own technology
development entity. SeeCubic commissioned the creation of technology demonstrator samples
for use in developing customer relationships beneficial to SeeCubic, not to the Debtors' estates.
Stastney, SeeCubic, SCBV, and those working in concert with them were once again using
Rembrandt technology without a license, far from the Bankruptcy Court and under the protection
of the Amsterdam Court which waited for a definitive ruling from an American court.

70.     Even worse, SeeCubic promoted, and continues to promote, a sublicensing
business model to potential customers, putting both of the Debtors' critical third-party
technology licenses (from Rembrandt and Philips) in jeopardy because neither license is
transferable and neither permits sublicensing.

71.     From October 6, 2023 through November 27, 2023, the Bankruptcy Court held
hearings on Stream's motion for injunctive relief, and on January 4, 2023, it issued a Temporary
Restraining Order against Stastney, SeeCubic, Hawk, SCBV, and others (the "TRO")[11].

**The Trustee has Allowed the Proposed Stalking Horse Bidder to Violate the TRO.**

72.     Despite this Court's issuance of the TRO, Stastney, SeeCubic, Hawk, SCBV, and
others working in concert with them have continued to use the Debtors' technology (and
therefore, the Rembrandt IP) for their own benefit, and to the detriment of the Debtors and other
parties in interest. Upon information and belief, SeeCubic has used and continues to use the
Debtors' assets to raise capital necessary to fulfill its obligation to provide an additional $6.5

---

[11] Adversary Case No. 23-00057, Docket No. 119

million to fund the 363 Sale Carve-Out as required by the Motion if SeeCubic prevails as the

Stalking Horse Bidder.

73.      On May 6, 2024, Rembrandt notified counsel for SeeCubic and Hawk that it had

become aware of a planned May 7, 2024 meeting to be held by their clients in violation of the

TRO. Counsel for SeeCubic failed to acknowledge Rembrandt's email at all. Hawk's counsel

eventually responded, but only two days after the alleged meeting had occurred. Hawk's counsel

stated:

> It is up to the Debtors to determine whether they believe a violation occurred or
> needs to be addressed. The Debtors have not taken any action or voiced any
> concerns. The e-mails also suggest Rembrandt believes its technology may have
> been improperly used. But there is no pending motion or order defining or dealing
> with the use of Rembrandt's technology.

74.      The position of Hawk's counsel is untenable because the TRO specifically

references the Rembrandt technology and prohibits the Enjoined Parties from:

> Tak[ing] any action to sublicense, transfer, assign, or otherwise dispose of **or
> affect** any license or technology held or purported to be held by the Debtors'
> estates, including but not limited to the Ultra- D technology, and the Philips or
> Rembrandt licenses. (TRO ¶ 9(a), emphasis added)

Rembrandt does not need to file a separate motion in this court to protect its intellectual property,

as it is clearly covered by the Court's TRO. Unauthorized use and/or distribution of its

technology does indeed affect the value of its license. Misappropriation of trade secrets

constitutes irreparable harm.

75.      SeeCubic is in contempt of court. Stastney circulated a memorandum in late

September on behalf of SeeCubic to investors and other stakeholders. The email touted "28

projects across 25 customers" who were all engaged in proof-of-concept stages of negotiations

with SeeCubic and SCBV, which is under Stastney's control as sole director. As stated above,

only Stream possesses a license from Rembrandt. None of Stream's subsidiaries, including

Technovative, is entitled to use the Rembrandt IP *unless it is for the benefit of Stream*. Stastney's

email clearly indicated that these many projects were for the benefit of SeeCubic, which was

seeking investment to support its growing business.

76.    As indicated in the September 2024 Monthly Operating Report filed by the

Trustee, a royalty payment was made to Philips pursuant to the Philips license agreement. This

confirms that the Debtors' subsidiaries, under the direction of Stastney, have sold products

containing the Debtors' technology, the Philips technology, and thus, the Rembrandt technology.

77.    If the Trustee is aware of violative actions – as he should be, as custodian of

estate assets like the Debtors' intellectual property – he must take action to enforce the TRO.

Due to a failure to monitor the actions of parties as to whether SeeCubic and Hawk are violating

the TRO, the Trustee is failing to secure the Debtor's assets, giving an unfair advantage to the

Enjoined Parties, and negatively impacting all other parties in interest.

**Discovery Sought to Verify the Trustee's Knowledge, Actions, and Inactions**

78.    Rembrandt sent notices for depositions pursuant to Fed. R. Civ. P. 30 (B)(6) to

both Hawk and SeeCubic and they failed to appear.

79.    On multiple occasions[12], commencing from July 26, 2024, Visual Semiconductor,

Inc. ("VSI") sought discovery from the Trustee on the issue of likely TRO violations. Unwilling

to cooperate, the Trustee and filed a Motion to Quash the discovery[13], which begs the question:

What does the Trustee have to hide? The nature of his position requires transparency, but his

fight to avoid answering questions and producing documents is dubious and calls into question

whether the Trustee may have been complicit in the TRO violations. At the very least, the

---

[12] Docket Nos. 712, 718, and 761

[13] Docket No. 724

Trustee failed to exercise reasonable skill and care. VSI filed a Motion to Compel discovery on

September 4, 2024 seeking assistance from the Court to obtain reasonable discovery. On October

30, 2024, this Court granted the Trustee's Motion to Quash discovery on the issue of TRO

violations[14].

80.    Rembrandt has filed this Opposition Motion, in part, because discovery to

confirm the extent of the TRO violations has been quashed. Actions of the enjoined parties in

contravention of the TRO affect the Rembrandt IP and must be verified or refuted, not

concealed.

81.    Rembrandt notes that VSI has also served discovery requests on Hawk and certain

key representatives of Hawk[15]. Rembrandt hopes discovery will be granted to confirm or

definitively refute any TRO violations committed Hawk, as collateral agent for SeeCubic, which

holds most if not all of the Debtors' secured debt and serves as the proposed Stalking Horse

Bidder. The truth will only be known with transparency on the part of all parties in interest.

82.    While Rembrandt believes that SeeCubic and Hawk have violated the TRO,

Rembrandt is deeply troubled by the statements by the Trustee's counsel that:

> *"31. Since its retention, SSG has begun marketing the Debtors' Assets*
> *for sale to potential purchasers in order to solicit the highest and best bid to*
> *maximize the value to the Debtors' estates.*
>
> *32. SSG will continue to actively market the Assets, to a wide spectrum*
> *of interested parties, including potential financial and strategic buyers." (DI*
> *750 at page 10)*

83.    Rembrandt has provided overwhelming proof that the Stream assets include

Rembrandt's intellectual property.  SSG has not licensed any patents from Rembrandt.

---

[14] Docket No. 777

[15] Docket Nos. 762, 763, 764, and 765

84.     While the Trustee and now apparently SSG have been offering Rembrandt's patented invention to others for sale, the Trustee has not affirmatively assumed the Rembrandt license and failed to positively state that the Trustee is relying on the Rembrandt license to cover the activities of SSG.

85.     Assuming the license would require full payment of the arrears and on-going license fees which add up to over $3,000,000 (11 U.S. Code § 365(b)(1)(A).

86.     If the Trustee intends to reject the Rembrandt license, that means any offer for sale of Rembrandt's patented inventions by the Trustee or SSG would constitute patent infringement.[16]

87.     "Trustees, receivers or managers of any property, including debtors in possession, may be sued, without leave of the court appointing them, with respect to any of their acts or transactions in carrying on business connected with such property. Such actions shall be subject to the general equity power of such court so far as the same may be necessary to the ends of justice..." Voice Sys. and Servs., Inc. v. VMX, Inc., citing 28 U.S.C. § 959(a) The court granted a preliminary injunction that prevented the debtor from continuing the alleged infringement.[17]

---

[16] 35 U.S.C. § 271(a) provides that "whoever without authority makes, uses, **offers to sell,** or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent…" (emphasis added).

[17] "None of this implies that debtors in bankruptcy may violate federal law with impunity, selling patented products or, say, going into the cocaine distribution business. Cf. Douglas G. Baird, The Elements of Bankruptcy 194-98 (1992). Damages for wrongs done during the bankruptcy proceeding are administrative claims, and thus paid in full most of the time. The bankruptcy judge may enjoin ongoing wrongs, or release the automatic stay to allow another court to consider claims that debtors are violating the law." In re Mahurkar Double Lumen Hemodialysis Catheter Patent Litig., 140 B.R. 969, 977 (N.D. Ill. 1992) (Judge Easterbrook sitting by designation); see also Lancaster Composite, Inc. v. Hardcore Composites Operations, LLC, No. Civ. 04-1414-SLR, 2005 WL 121794, at *977 (D. Del. Jan. 14, 2005)

88.     If the Trustee or SSG look to the bankruptcy estate for indemnification against Rembrandt's claims of infringement against those entities, such indemnification would likely render the estate administratively insolvent.

**The Trustee is Attempting to Sell Assets that the Debtors Do Not Own**

89.     SCBV, as a wholly owned subsidiary of Stream and Technovative, currently employs Bart Barenbrug.  Dr. Barenbrug had access to Rembrandt intellectual property that was eventually licensed to Stream (See List of Trade Secrets attached to Declaration of Stephen Blumenthal attached as Exhibit A).

90.     Rembrandt has cited precise documents where the trade secrets were shared with Dr. Barenbrug.  Stephen Blumenthal's declaration and Rembrandt various pleadings have provided overwhelming and incontrovertible evidence that the UltraD technology and all of Stream's products to date include Rembrandt's technology.

91.     The Rembrandt license granted to Stream states: "Either Party may sub-license their rights to other parties for the purpose of having products distributed by the Party." No other sub-licensing is permitted. (See Exhibit 6 to Declaration of Stephen Blumenthal attached as Exhibit A at ¶ 14.)  Nothing in the license allows SCBV to make products for any entity other than Stream.

92.     The Trustee intends to transfer the Stream technology – which includes Rembrandt' intellectual property and trade secrets as repeatedly acknowledged by the Debtors and documented in both the Settlement Term Sheet and the Settlement Agreement – through the proposed 363 Sale without an assignment of the Stream license from Rembrandt or issuance of a new, direct license from Rembrandt. The Trustee cannot sell what the Debtor does not own.

93.     If the Trustee is allowed to conduct the 363 Sale, the harm to Rembrandt will be (1) the destruction of its trade secrets, and (2) the unauthorized use of said trade secrets and the patented technology without a license by SeeCubic as the Stalking Horse or another bidder should one prevail. If the Trustee is allowed to transfer Rembrandt's intellectual property without a license from Rembrandt, the damage to Rembrandt will be irreparable and immediate and will cut off Rembrandt's ability to negotiate its own licenses and to control the specifications of glasses 3D products entering the marketplace. These damages cannot be fully addressed by monetary relief.

**The Trustee Attempted to Eliminate the Rembrandt Claim Against Technovative which had been Acknowledged by Technovative Shortly After the Petition Date**

94.     On October 10, 2024, the Trustee filed an amended Schedule E/F for Technovative , eliminating the Rembrandt claim without explanation or notice. He merely classified the reason for the debt as "unknown" and reduced the debt to zero. The Trustee made no effort to communicate with Rembrandt prior to his filing in order to understand the basis for the claim, nor did he communicate with Technovative's prior management. Despite his knowledge of a settlement agreement valued at $1.2 billion with Stream and ongoing litigation against Technovative seeking damages in the U.S. District Court of Delaware, the Trustee appears to have amended the Schedule without any diligent exploration of the factors substantiating the claim. Rembrandt has since filed its own claim against Technovative in response

95.     The Trustee's actions are a breach of his fiduciary duty.

**The Trustee Granted Hawk's $180 Million Secured Claim without a Complete**

**Investigation of, and Allowance for, Debt-to-Equity Conversion that would have**

**Eliminated or Significantly Reduced the Claim**.

96.     In 2018, the Debtor entered into an agreement with Hawk which provided that the

Hawk Notes would convert into equity if and when the Debtor raised additional equity capital

(the Hawk Conversion Agreement") (D.I., 48 at Exhibit F).  D.I. 48 at ¶ 28.  The Debtor and SLS

contemporaneously entered into a parallel agreement governing the SLS Insider Notes (the "SLS

Conversion Agreement" (D.I. 48 at Exhibit G).  Id.  Per the Conversion Agreements, conversion

of debt to equity is at the discretion of the Debtor.  Id.

97.     During the June 26 trial, Judge Coleman asked if the Hawk debt was still

convertible and Hawk's counsel agreed that debt if fully convertible:

> *From June 26 trial transcript -*
>
> *THE COURT: ... the only issue I was trying to figure out is did they ultimately have the*
> *right to convert?*
>
> *MR. ALEXANDER: Your Honor, I believe that the collateral estoppel order that they've*
> *referenced, has a provision in there that indicates that the Hawk debt is convertible.*
>
> *MR. CAPONI: The Hawk debt is convertible, Your Honor.*

98.      Hawk's debt is convertible and either has already been converted due to prior

investment in Stream or is presently convertible by new investment into Stream.

99.     At any time, the Hawk debt can be converted to equity for $39 million according

to the terms of the conversion agreement such that any cash investment into Stream during a

reorganization in the form of a preferred share, would fully convert all Hawk debt into equity

leaving $39 million to pay all remaining secured debt of $18 million, administrative claims, and roughly 50% of unsecured claims, plus some operating capital for the resulting entity.

100.    Further, the reorganized entity would have fully intact licenses from Philips and Rembrandt and be free of all debt and liabilities.

101.    It seems that any investment banker would find it easier to raise over $39,000,000 in investment than the proposed $120,000,000 put forth as a minimum bid for a 363 sale proposed by the trustee.

102.    Mr. Michaels sent this exact proposal to the trustee along with a letter from counsel to investors on February 19, 2024, all to no avail.  (See correspondence between Christopher Michaels filed as Exhibit 2 to DI 628 and attached as Exhibit C)

103.    As opposed to executing an NDA so Rembrandt could disclose the investors or provide even basic information about the status of the assets, the trustee pursued a settlement placing hundreds of millions of dollars of value on secured creditors rights that by Hawk's own admission can be converted to equity for $39,000,000.

104.    Rembrandt 3D Corp has made an independent proposal to the Trustee (attached as Exhibit C) to fund a reorganization plan through new investment in Stream that would include $39 million invested in a preferred share that would clearly convert the Hawk Debt assuming their debt is not disallowed entirely or equitably subordinated due to their malfeasance in causing harm to the Debtor.

105.    Upon information and belief, the Trustee was provided with documentation detailing "new money" raised by Stream since the 2018 effective date of the Hawk Conversion Agreement, giving evidence that the Hawk debt had been significantly, if not entirely, extinguished. The amount of remaining debt, if any, was a critical factor in determining the

creditor's rights possessed by Hawk (as collateral agent for SeeCubic) and which affects all parties in interest.

106.    Rather than investigate the status of the Debtor's assets or the Hawk debt conversion, on May 6, 2024, the Trustee entered into a Sharing and Carve-Out Agreement that settled the Hawk and SeeCubic claims as well as various open legal issues (the "9019 Settlement"). In his Motion to Approve the 9019 Settlement, the Trustee acknowledged that the Debtors had made longstanding assertions that the Hawk debt had been converted, but the Trustee didn't want to burden the Debtors' estates with the expense of investigating the truth of the matter. Instead, he consented to allow Hawk a claim of $180 million to the detriment of other parties in interest, including Rembrandt.

107.    While the Trustee seemed very concerned about the cost of investigating some easily verified transaction information, the Trustee seems to have no similar concerns to entering a patent infringement and trade secret dispute regarding a technology he does not understand.

108.    The complexities and costs of an intellectual property dispute will easily render the estate administratively insolvent.

**The 363 Sale Is Designed to Transfer the Debtors' Assets to SeeCubic Rather than Bring Value to the Creditors**.

109.    The proposed 363 Sale appears to be a back-door plan to hand the assets to SeeCubic using Hawk's debt and credit bid to establish a barrier to prevent bona fide bidders from participating in the sale.

### ARGUMENT

It is widely accepted, in addition to being firmly intuitive, that the Bankruptcy Code does not expand a debtor's interests in property beyond what such interests were at the petition date.

30

*Jones v. GE Capital Mortgage Co.* (*In re Jones*), 179 B.R. 450, 455 (Bankr. E.D. Pa. 1995)

("[T]he owner of an insurance policy cannot obtain greater rights to the proceeds of that policy

than he would have under state law by merely filing a bankruptcy petition") (citing *First Fid.

Bank v. McAteer*, 985 F.2d 114, 117 (3d Cir. 1993)); See also *Moody v. Amoco Oil Co.*, 734 F.2d

1200, 1213 (7th Cir. 1984) ("[W]hatever rights a debtor has in property at the commencement of

the case continue in bankruptcy -- no more, no less."), cert denied, 469 U.S. 982 (1984); *Mission

Prod. Holdings, Inc. v. Tempnology*, LLC, 139 S. Ct. 1652, 1663, 203 L. Ed. 2d 876 (2019)

(recognizing the "general bankruptcy rule [that] the estate cannot possess anything more than the

debtor itself did outside bankruptcy" and that "[a] debtor's property does not shrink by

happenstance of bankruptcy, but it does not expand, either.").

A debtor (or in this case, the Trustee), may not sell property unless that property

constitutes property of the debtor's bankruptcy estate and, before approving a sale, the

bankruptcy court must determine whether the property the debtor proposes to sell constitutes

property of the estate. *In re Whitehall Jewelers Holdings, Inc.*, Case No. 08-11261 (KG), 2008

WL 2951974, at *9 (Bankr. D. Del. July 28, 2008) (citing *Moldo v. Clark* (*In re Clark*), 266 B.R.

163, 172 (9th Cir. B.A.P. 2001). Bankruptcy courts have consistently made this finding. See also

*Anderson v. Conine* (*In re Robertson*), 203 F.3d 855 (5th Cir. 2000) (holding that Section 363(f)

does not allow a trustee to sell property that is not property of the estate); *In re Worcester

Country Club Acres, LLC*, 655 B.R. 41, 47 (Bankr. D. Mass. 2023) (holding that because the

ownership of the land was disputed, it "must be adjudicated in order to determine if they are

property of the Debtor's bankruptcy estate, they cannot be sold under § 363(b) or (c) and

pursuant to § 363(f)(4) prior to a resolution of those issues."); *In re Coburn*, 250 B.R. 401, 403

(Bankr. M.D. Fla. 1999) (it was necessary to determine whether an asset was property of the

estate in order to then decide whether the trustee was entitled to sell the asset pursuant to Section

363(f))); *Darby v. Zimmerman* (*In re Popp*), 323 B.R. 260, 266 (B.A.P. 9th Cir.2005); *Fresh*

*Prepared Foods, Inc. v. Farm Ridge Foods LLC*, 2013 WL 4804816, at *3 (D.N.J. Sept. 9, 2013)

("it is well-settled that a 'bankruptcy court may not allow the sale of property as 'property of the

estate' without first determining whether the debtor in fact owned the property").

A sale under Section 363 "cannot be had when there is an unresolved issue of whether the

subject property is 'property of the estate' . . . ." *In re Interiors of Yesterday, LLC,* Case No. 02-

30356 (LMW) , 2007 WL 419646 (Bankr. D. Conn. Feb. 2, 2007). See also *Warnick v. Yassian*

(*In re Rodeo Canon Dev. Corp*.), 362 F.3d 603, 605–06 (9th Cir. 2004), withdrawn and modified

by 126 Fed. App'x 353 (9th Cir. 2005) (this Court "may not allow the sale of property as

'property of the estate' without first determining whether the debtor in fact owned the

property."); *Ross v. A V Car & Home, LLC* (*In re Brown*), Case No. 16-00466, A.P. No. 18-

10026, 2019 Bankr. LEXIS 286, 2019 WL 413625, at *3 (Bankr. D.C. Jan. 30, 2019) (court may

not authorize sale of property where ownership of a portion of the property is in dispute).

Rembrandt has provided overwhelming evidence that it owns its intellectual property and

has included detailed proof that the UltraD products sold by Stream include Rembrandt's

intellectual property.  The evidence includes numerous emails, white papers, and patents that are

then compared to pictures of the UltraD products.

This overwhelming evidence has been met by precisely zero contradicting evidence.  Dr.

Barenbrug already falsely declared that he did not sign an NDA with 3DFusion and Rembrandt

responded with a copy of the NDA.  Mathu Rajan has stated that Stream's technology is

dependent on licenses from Rembrandt and Philips.  Shadron Stastney negotiated the Rembrandt

settlement agreement before Magistrate Parker when he was CFO of Stream.  The CEO and CFO

32

of Stream acknowledged Rembrandt's rights and now Shadron Stastney servies as the CEO of

SeeCubic, the stalking horse bidder.  How much greater evidence has ever existed for an

intellectual property case than is present here?

The former officer of Stream, Mathu Rajan, filed a plan with VSI that included an

assumption of the Rembrandt license.  The Trustee has not rejected Rembrandt's license and has

been using and offering assets for sale that require the license from Rembrandt.  In practice, the

Trustee has assumed the Rembrandt license and therefore has added an over $3,000,000

immediate administrative claim to Stream's estate.

If the Trustee is arguing that he and SSG are not covered by the license from Rembrandt,

then they have been willfully committing patent infringement.

It is the trustee who bears the burden of establishing that the property to be sold is

property of the estate under Section 363(b). See, e.g., *In re Whitehall Jewelers Holdings, Inc*.,

2008 WL 2951974, at *17 (Bankr. D. Del. July 28, 2008) (holding that the debtors failed to meet

their burden of establishing that the assets were property of the estate, and therefore were not

permitted to sell the goods under Section 363(f)(4)).  Here, the Trustee clearly has not met that

burden. In fact, it is evident that, as described herein, the Trustee is attempting to sell

Rembrandt's IP rights, without **the required ( and non-waivable) determination or**

understanding (i) ownership and/or licensing of applicable IP interests in the purported Stream

IP, (ii) which of Rembrandt's trade secrets SeeCubic/Hawk have misappropriated, (iii) if

SeeCubic/Hawk will stop using Rembrandt's IP once a sale to a third-party has been completed,

i.e., is a buyer buying a lawsuit, and (iv) if SeeCubic/Hawk has violated and continues to violate

the TRO that was put in place to protect creditors like Rembrandt. Rembrandt requests further

discovery and a hearing before the Debtors are allowed to conduct the proposed 363 Sale.

33

A purchaser must act in good faith. The trustee certainly has that obligation and

knowingly selling (or trying to sell) property not owned by the Debtor would be fraud. Likewise,

if the sale to a purchaser involved fraud, that would meet the criteria. We would have that if

SeeCubic/Hawk bought the asset with Rembrandt IP still embedded without a license. *In re*

*Abbotts Dairies* 788 F.2d 143. "Courts have generally....set aside sales that were tinged with

fraud, error or similar defects which would in equity affect the validity of any private

transaction." *Taylor v Lake* 664 F.2d 1158 and *In re Rock Indus. Mach. Corp* 572 F.2d 1198.


### RESERVATION OF RIGHTS

Rembrandt reserves the right to supplement this Objection to the 363 Sale or to raise

additional or further objections to the 363 Sale at the Sale Hearing, or any other relevant hearing.


### CONCLUSION

For the reasons stated above, Rembrandt respectfully requests that the Court deny the 363

Sale and grant such other and further relief as this Court deems just and proper


Dated: November 22, 2024

*/s/ Andrew DeMarco*
Andrew DeMarco, Esq. (PA Bar No. 326294)
ademarco@devlinlawfirm.com
DEVLIN LAW FIRM LLC
1526 Gilpin Avenue
Wilmington, DE 19806
Telephone: (302) 449-9010
Facsimile: (302) 353-4251

*Attorneys for Rembrandt 3D Holding Ltd.*