IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| REMBRANDT 3D HOLDING LTD., <br><br> *Plaintiff,* <br><br> v. <br><br> WILLIAM A. HOMONY, an individual residing in Pennsylvania and Chapter 11 Trustee for The Estates of Stream TV Networks, Inc. and Technovative Media, Inc.; SSG ADVISORS, LLC, a Pennsylvania Corporation; J. SCOTT VICTOR, an individual working for SSG ADVISORS, LLC, TERESA C. KOHL, an individual working for SSG ADVISORS, LLC, CRAIG D. WARZNAK, an individual working for SSG ADVISORS, LLC, ALEXANDER D. LAMM, an individual working for SSG ADVISORS, LLC, SAMUEL P. CHARLTON, an individual working for SSG ADVISORS, LLC, and DOES 1-10, inclusive, <br><br> *Defendants.* | Case No. 2:24-cv-6706-JMY <br><br> **DEMAND FOR JURY TRIAL** |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS COMPLAINT**

# TABLE OF CONTENTS

I. INTRODUCTION ............................................................................................................. 1

II. RELEVANT FACTUAL BACKGROUND ..................................................................... 3

III. SUBJECT MATTER JURISDICTION EXISTS UNDER 28 U.S.C. § 959(a) ................. 4

    A. The § 959(a) "Carrying on Business" Exception Applies ...................................... 4

    B. Ultra Vires Conduct Nullifies Barton Protections................................................... 7

        1. Sale of Excluded Assets ............................................................................. 7

        2. Post-Petition Manufacturing ...................................................................... 7

        3. Post-Petition Marketing ............................................................................. 7

        4. Violation of TRO ....................................................................................... 8

        5. Collusion with SeeCubic............................................................................ 8

        6. SeeCubic's Control of Rembrandt IP......................................................... 8

        7. Skewed Sale in Favor of Hawk.................................................................. 8

    C. Factual Disputes Preclude Dismissal Under Rule 12(b)(1) ..................................... 9

IV. RES JUDICATA DOES NOT BAR REMBRANDT'S CLAIMS ................................... 10

    A. No Final Judgment on IP Ownership..................................................................... 10

    B. Fraudulent Conduct Exception ................................................................................11

V. JUDICIAL IMMUNITY DOES NOT SHIELD INTENTIONAL TORTS ...................... 12

    A. Unauthorized Sale of Excluded Assets .................................................................. 12

    B. Intentional Torts .................................................................................................... 12

VI. THE COMPLAINT STATES PLAUSIBLE CLAIMS .................................................... 13

    A. Patent Infringement................................................................................................ 13

    B. Trade Secret Misappropriation............................................................................... 13

    C. Breach of Contract ................................................................................................. 14

VII. CONCLUSION................................................................................................................. 15

## TABLE OF AUTHORITIES

**Cases**      **Page(s)**

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................................................. 13

*Barton v. Barbour*,
  104 U.S. 126 (1881) ............................................................................................................... 4

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................................................. 13

*Child v. Delaware Cnty.*,
  2024 WL 464396 (E.D. Pa. 2024) .......................................................................................... 9

*In re Crown Vantage, Inc.*,
  421 F.3d 963 (9th Cir. 2005) .................................................................................................. 5

*In re MBMK Prop. Holdings*,
  2024 WL 3167232 (Bankr. E.D. Pa. 2024) ..................................................................... 7, 12

*In re Truong*,
  763 F. App'x 150 (3d Cir. 2019) ....................................................................................... 9, 12

*In re VistaCare Grp.*, LLC,
  678 F.3d 218 (3d Cir. 2012) ............................................................................................. 4, 6

*Lazarus v. Chevron USA, Inc.*,
  958 F.3d 236 (3d Cir. 2020*)* ................................................................................................ 11

*Murtha v. QDRO Benefits, LLC*,
  2016 WL 1071107 (E.D. Pa. 2016) ...................................................................................... 14

*Phoenician Med. Villa, LLC v. Swope*,
  872 F.3d 138 (3d Cir. 2017) ................................................................................................. 12

**Statutes**

18 U.S.C. § 1836 ........................................................................................................................ 13
35 U.S.C. § 271 ........................................................................................................................... 10

Plaintiff Rembrandt 3D Holding Ltd. ("Plaintiff" or "Rembrandt"), by and through its undersigned counsel, submits this Memorandum of Law in opposition to Defendants William A. Homony, in his capacity as Chapter 11 Trustee (the "Trustee") of the bankruptcy estates of Stream TV Networks, Inc. ("Stream") and Technovative Media Inc. ("Technovative," and collectively with Stream, the "Debtors") and SSG Advisors, LLC, J. Scott Victor, Teresa C. Kohl, Craig D. Warznak, Alexander D. Lamm, and Samuel P. Charlton (collectively, "SSG") joint motion to dismiss Rembrandt's Complaint [D.I. 1, "Compl."].

I.  **INTRODUCTION**

Defendants' motion to dismiss seeks to evade liability for their knowing and intentional misconduct in taking possession of and selling Rembrandt's trade secrets and patented technology, i.e., intellectual property ("IP")—property that was expressly excluded from the bankruptcy estate by both court order and contract. Defendants argue that this action is barred by the *Barton* doctrine, judicial immunity, and res judicata, and further contend that Rembrandt's Complaint fails to state a claim. Each of these defenses fails as a matter of law and fact.

First, Defendants' reliance on the *Barton* doctrine is misplaced because the Trustee's conduct falls squarely within the statutory exception of 28 U.S.C. § 959(a). The Trustee and SSG did not merely liquidate assets; instead, they actively carried on business during the bankruptcy proceeding by manufacturing prototypes, marketing Ultra-D technology as a licensable, revenue-generating platform, and structuring a complex sale process designed to maximize ongoing commercial value. These business operations, as detailed in the Complaint, trigger the section 959(a) exception and defeat *Barton*'s jurisdictional bar.

Second, the Trustee's actions constitute ultra vires conduct. The Trustee marketed and sold assets that included Rembrandt's IP, despite explicit exclusion of such property in the Sale Approval Order and the Asset Purchase Agreement. The Trustee's failure to distinguish estate

property from excluded assets, his disregard of Rembrandt's repeated objections, and his violation of both statutory and court-ordered duties strip him and his agents of *Barton* and judicial immunity. Courts, including those in this Circuit, have consistently held that trustees are not protected when they act outside their authority or in direct contravention of court orders.

Third, Defendants' assertion that res judicata bars Rembrandt's claims is unfounded. The Bankruptcy Court never decided the ownership of Rembrandt's IP, and in fact expressly preserved Rembrandt's right to pursue claims against third parties for the misuse of its IP. Rembrandt's claims arise from Defendants' conduct during the bankruptcy proceeding—specifically, the manufacture, marketing, use, and sale of prototypes and technology that incorporated Rembrandt's IP, all in violation of court orders and contractual restrictions. These are independent wrongs that were neither litigated nor resolved in the bankruptcy process, and thus fall outside the scope of res judicata.

Fourth, judicial immunity does not shield the Trustee or SSG from liability for intentional torts or ultra vires acts. The Complaint alleges that Defendants knowingly included Rembrandt's IP in the sale, facilitated its use by SeeCubic Inc. ("SeeCubic") to raise capital, and engaged in conduct that constitutes willful patent infringement, trade secret misappropriation, and breach of contract. Such intentional misconduct is not protected by immunity.

Finally, Rembrandt's Complaint states plausible claims for relief. The Complaint identifies the specific patents and trade secrets at issue, describes with particularity the acts of infringement and misappropriation, and details the contractual provisions breached by the Trustee's unauthorized transfer of Rembrandt's IP. These well-pleaded allegations satisfy the standards of Rule 8 and prevailing Supreme Court precedent.

For these reasons, and as set forth more fully below, Defendants' motion to dismiss should

be denied in its entirety.

## II.     RELEVANT FACTUAL BACKGROUND

Rembrandt is the owner of key patents and trade secrets that are foundational to Stream TV Networks' Ultra-D technology, all of which were licensed to Stream under a May 23, 2021, Settlement Agreement that strictly prohibits assignment without Rembrandt's consent (Compl. ¶¶1, 11, 216; Ex. 1 ¶4.1). Rembrandt's IP includes the '830, '390, and '114 patents as well as proprietary methodologies for 3D content conversion and display, such as the Borders and Liveliness algorithms, which are embedded in the Ultra-D platform (Compl. ¶¶2, 133–152). Despite repeated and explicit notice from Rembrandt, the Trustee and SSG marketed the Debtors' assets using a "363 Sale Teaser" (Ex. 5) that touted Ultra-D technology reliant on Rembrandt's IP, without disclosing the non-assignability of the Rembrandt license or the restrictions of the Settlement Agreement (Compl. ¶¶8–9, 127–132). The Bankruptcy Court's Sale Approval Order (Ex. 13) and the Asset Purchase Agreement (Ex. 9, § 2.2) expressly excluded "Rembrandt Intellectual Property" from the sale, recognizing that only property of the Debtors' estates could be transferred (Compl. ¶12, 86, 129). Nevertheless, the Trustee permitted SeeCubic B.V. ("SCBV") to transfer prototypes using Rembrandt's IP post-petition to SeeCubic, a non-licensed entity, as evidenced by royalty reports submitted to Philips (Compl. ¶104; Ex. 12, Tr. 45).

Throughout the bankruptcy proceedings, Rembrandt consistently objected to the inclusion of its IP in any sale, notifying the Trustee on numerous occasions and requesting that he investigate and segregate non-estate assets (Compl. ¶¶11, 109–119, 127–131). The Trustee admitted under oath that he did not retain any experts to determine whether the assets being sold included Rembrandt's IP and failed to take reasonable steps to distinguish estate property from excluded assets (Compl. ¶¶117–119). The Bankruptcy Court ultimately approved the sale of Debtor-owned assets to SeeCubic but preserved Rembrandt's right to pursue IP claims against third parties,

3

confirming that the issue of IP ownership was never adjudicated, and that Rembrandt's rights were not extinguished by the sale (Compl. ¶86, 94; Ex. 15, p. 18).

The Trustee's actions—including post-petition manufacturing, marketing, use, and the sale of assets incorporating Rembrandt's IP—constitute business operations under 28 U.S.C. § 959(a) and go far beyond mere liquidation (Compl. ¶104, 126–132). These acts, taken in knowing disregard of court orders and contractual restrictions, form the basis of Rembrandt's claims for patent infringement, trade secret misappropriation, and breach of contract (Compl. ¶¶154–216).

### III.     SUBJECT MATTER JURISDICTION EXISTS UNDER 28 U.S.C. § 959(a)

Defendants' jurisdictional arguments ignore the Trustee's active business operations during bankruptcy, which strip him of *Barton* protections.

#### A.     The § 959(a) "Carrying on Business" Exception Applies

The *Barton* doctrine does not bar this action because the Trustee engaged in post-petition business operations that fall squarely within the statutory exception under 28 U.S.C. § 959(a). *See, e.g.*, *In re VistaCare Grp.*, LLC, 678 F.3d 218 (3d Cir. 2012) (addressing *Barton* doctrine stemming from *Barton v. Barbour*, 104 U.S. 126 (1881)). Section 959(a) applies when a trustee is "carrying on business" connected with the estate rather than merely liquidating assets. *Id.* at 226-227. Here, the Trustee permitted SCBV, a subsidiary of Debtors located in the Netherlands, to **manufacture** prototypes using Rembrandt's IP post-petition and transfer, through importation into the United States, those prototypes to SeeCubic (Compl. ¶ 104; Ex. 12, Tr. 45). Crucially, the Trustee permitted SeeCubic to receive and use these SCBV prototypes so that it could **demonstrate** Stream's Ultra-D technology to potential investors as part of a capital raise, including to foreign investors (Compl. ¶7). SeeCubic's access to and use of these prototypes was integral to its marketing and fundraising efforts and that the prototypes themselves incorporated Rembrandt's patented technology and trade secrets (Compl. ¶¶7, 106, 107, 169). These actions occurred during

4

the bankruptcy proceedings and constituted active business operations. *See, e.g.*, *In re Crown Vantage, Inc.*, 421 F.3d 963, 971–72 (9th Cir. 2005) ("Rather, the exception applies only to the 'carrying on' of the debtor's business, such as manufacturing, selling, or leasing inventory, or other aspects of operating a going concern.").

SeeCubic's involvement is further underscored by the fact that its personnel, including its CEO, had previously been involved with Stream and were aware of the need for a license to Rembrandt's IP, yet the Trustee nonetheless allowed SeeCubic to use the prototypes without such a license (Compl. ¶¶59, 64, 83). SeeCubic's receipt and use of the SCBV prototypes, during the bankruptcy, constituted patent infringement and trade secret misappropriation, and that the Trustee's failure to prevent this use violated both the Bankruptcy Court's Temporary Restraining Order and the Settlement Agreement (Compl. ¶¶7, 83, 86, 106–108, 167–169).

The Trustee and SSG marketed the Debtors' assets through a "363 Sale Teaser" (Ex. 5), which advertised Ultra-D technology as a turnkey business opportunity. The teaser highlighted an "Extensive intellectual property portfolio" covering 3D rendering and optical design, the ability to "license and embed" technology into partner hardware, and revenue potential from licensing and hardware sales. This marketing strategy targeted over five hundred and fifty (550+) potential buyers and framed the sale as a commercial enterprise, not a liquidation of discrete assets (Compl. ¶ 126–132). Moreover, the language mirrors active business operations, akin to promoting a going concern. The Teaser's focus on licensing opportunities (e.g., embedding technology into partner hardware) demonstrates efforts to generate recurring revenue streams, a hallmark of business operations. This exceeds liquidation, which involves selling discrete assets "as is." See generally *In v*. SSG's creation of the "363 Sale Teaser" was part of the Trustee's business operations, invoking section 959(a) for all Defendants.

The Trustee's administration of the Debtors' estates involved negotiating complex commercial terms consistent with operating a business, not liquidating assets. To maximize istaSeeCubic, and carve-outs for creditors (Defs.' Mem. at 6–9). The Asset Purchase Agreement (Ex. 9) facilitated the transfer of technology licenses, customer relationships, and ongoing operations—terms reflective of a commercially viable enterprise rather than a passive asset dump. The Bankruptcy Court's Sale Approval Opinion (Ex. 15) confirmed these actions as business operations, noting the Trustee marketed assets to "maximize value" through a process "akin to operating a business" (*id*. at 18–19). Critically, the sale included Technovative's equity stake in subsidiaries that remained operational entities post-sale (*id*. at 21). Such efforts to preserve and monetize going-concern value align with section 959(a)'s exception, as recognized in *In re VistaCare Grp.*, 678 F.3d at 227 (focusing on continuity of operations).

The Trustee's actions went beyond mere liquidation, constituting active business operations under section 959(a). Unlike passive asset disposition, the Trustee engaged in post-petition activities characteristic of operating a commercial enterprise. However, liquidation involves selling estate assets "as is" without operational continuity. Here, the Trustee continued SCBV's R&D operations post-petition, including manufacturing prototypes (Compl. ¶ 104; Ex. 12, Tr. 45), which constitutes active business development. The Defendants marketed Ultra-D as a licensable platform through SSG's "363 Sale Teaser" (Ex. 5), framing the sale as a revenue-generating opportunity for future licensing and partnerships. The Defendants structured the sale to preserve customer contracts and licensing opportunities (Defs.' Mem. at 7), ensuring continuity of commercial relationships akin to operating a going concern.

These actions demonstrate a "going concern" and triggered section 959(a)'s exception. The Trustee's conduct—manufacturing, marketing, and preserving revenue streams—falls squarely

6

within statutory "business operations," defeating the *Barton* doctrine and rendering dismissal under Rule 12(b)(1) improper.

### B.  Ultra Vires Conduct Nullifies Barton Protections

The Trustee's sale of Rembrandt's IP—expressly excluded from the bankruptcy estate by the Sale Approval Order (Ex. 13, ¶ AA)—constitutes ultra vires conduct outside the scope of his authority. Courts recognize that trustees lose *Barton* protections when they act beyond court-authorized duties. *In re MBMK Prop. Holdings*, 2024 WL 3167232, at *21 (Bankr. E.D. Pa. 2024) (immunity void for acts exceeding statutory authority). Here, the Trustee's actions violated both the Bankruptcy Code and the Bankruptcy Court's explicit orders on numerous occasions.

#### 1.  Sale of Excluded Assets

The Sale Approval Order explicitly excluded "Rembrandt Intellectual Property" from the sale (Ex. 13, ¶ AA). Despite this, the Trustee marketed and sold assets incorporating Rembrandt's patented technology and trade secrets. Selling non-estate assets violates 11 U.S.C. § 363(b)(1), which requires trustees to confirm asset ownership before sale. The Trustee admitted he never retained experts to verify whether the Debtors' assets included Rembrandt's IP (Compl. ¶¶ 117–119), abdicating his duty to "marshal and protect" estate property.

#### 2.  Post-Petition Manufacturing

The Trustee permitted SCBV (Stream's subsidiary) to manufacture prototypes using Rembrandt's IP post-petition (Compl. ¶ 104; Ex. 12, Tr. 45). These prototypes were used to demonstrate Ultra-D technology to SeeCubic's investors, a commercial activity unrelated to liquidation. Manufacturing new products exceeds the Trustee's statutory role as a liquidator and constitutes unauthorized business operations.

#### 3.  Post-Petition Marketing

The Trustee and SSG marketed Ultra-D technology through a "363 Sale Teaser" (Ex. 5),

which advertised assets reliant on Rembrandt's IP to 550+ potential buyers. The teaser highlighted licensing opportunities for technology Stream did not own. By framing the sale as a "turnkey business opportunity" that included Rembrandt's IP, the Defendants misled buyers and acted outside their authority to liquidate only estate property.

    4.  <u>Violation of TRO</u>

The Bankruptcy Court's Temporary Restraining Order (TRO) (Ex. 8) barred third parties from using Rembrandt's IP. Despite this, the Trustee allowed SeeCubic to use SCBV prototypes (manufactured with Rembrandt's IP) for investor demonstrations (Compl. ¶ 104; Ex. 12, Tr. 45). The Trustee's failure to prevent post-petition infringement or recover unauthorized assets violated his duty to enforce court orders and protect estate interests.

    5.  <u>Collusion with SeeCubic</u>

The Trustee structured the sale to favor SeeCubic (the stalking horse bidder) despite its status as an enjoined party under the TRO. SeeCubic's CEO, Shadron Stastney, controlled SCBV and used Rembrandt's IP to market assets (Compl. ¶ 83). The Trustee's collaboration with SeeCubic to sell assets containing Rembrandt's IP—while ignoring Rembrandt's objections—constitutes bad faith and thus, exceeds statutory authority.

    6.  <u>SeeCubic's Control of Rembrandt IP</u>

The Trustee failed to secure access to Stream's software development system, which housed source code critical to Ultra-D technology (Compl. ¶¶ 109–114). By allowing Stastney and SCBV to retain control, the Trustee enabled unauthorized use of Rembrandt's IP. 11 U.S.C. § 704(a)(1) requires trustees to "collect and reduce to money the property of the estate." The Trustee's inaction breached this duty.

    7.  <u>Skewed Sale in Favor of Hawk</u>

The Trustee prioritized Hawk (a secured creditor) over unsecured creditors like Rembrandt

by approving a sale process that allowed SeeCubic to credit bid $150 million of Hawk's claim (Compl. ¶ 96). This skewed the sale in favor of Hawk, disregarding Rembrandt's senior IP rights. Trustees must act in the "best interest of all stakeholders," not just select creditors. *In re Truong*, 763 F. App'x 150, 154 (3d Cir. 2019).

To recap, the Trustee's ultra vires conduct includes (1) selling excluded assets, (2) operating a business post-petition, (3) misleading marketing, (4) ignoring court orders, (5) colluding with enjoined parties, (6) failing to secure estate property, and (7) breaching fiduciary duties. These acts strip the Trustee of *Barton* immunity and warrant denial of the motion to dismiss.

### C. Factual Disputes Preclude Dismissal Under Rule 12(b)(1)

The Trustee's jurisdictional arguments under Rule 12(b)(1) also fail because material factual disputes exist over whether his actions constituted "business operations" under 28 U.S.C. § 959(a) or ultra vires conduct outside his statutory authority. Resolving these disputes—including whether the Trustee engaged in post-petition manufacturing, marketed assets as a licensable platform, or sold non-estate property—requires factual development beyond the pleadings. Courts consistently deny jurisdictional dismissal where, as here, contested facts determine whether a statutory exception applies. *Child v. Delaware Cnty.*, 2024 WL 464396, at 2 (E.D. Pa. 2024) ("Dismissal under Rule 12(b)(1) is improper where jurisdictional facts are intertwined with the merits and subject to dispute"). Because the Trustee's characterization of his conduct as mere liquidation is directly contradicted by Rembrandt's allegations of active business operations and unauthorized asset sales, this Court must deny the motion and permit discovery to resolve these threshold issues.

Defendants' argument that Rembrandt's IP was not included in the sale—regardless of whether it is factually accurate—is irrelevant to Rembrandt's claims and the relief sought. The core of Rembrandt's Complaint is not simply whether the sale order or asset purchase agreement

9

formally transferred Rembrandt's IP, but rather that the Trustee and SSG, during the bankruptcy proceedings, knowingly took possession of, used, and marketed assets incorporating Rembrandt's IP in violation of explicit contractual and court-ordered exclusions. The Complaint alleges that the Trustee failed to distinguish estate property from excluded assets, marketed Ultra-D technology as a licensable platform reliant on Rembrandt's IP, permitted the manufacture and demonstration of prototypes using Rembrandt's IP, and enabled SeeCubic to exploit that technology for commercial gain—all without Rembrandt's consent and in direct contravention of the Settlement Agreement and the Sale Approval Order (*see*, *e.g.*, Compl. ¶¶ 7, 8–9, 11–12, 86, 104, 117–119, 126–132, 216).

Thus, even if Defendants are correct that Rembrandt's IP was technically excluded from the sale, that fact does not insulate them from liability for their conduct during the bankruptcy process. The actionable misconduct is the unauthorized use, marketing, and transfer of Rembrandt's IP in connection with the estate's business operations, not the formal terms of the sale itself. 35 U.S.C. § 271. The Complaint's claims for patent infringement, trade secret misappropriation, and breach of contract arise from Defendants' actions in handling Rembrandt's IP as if it were estate property, in knowing disregard of Rembrandt's rights and the Bankruptcy Court's orders—not from any technical defect in the sale documentation. Accordingly, Defendants' argument about whether the IP was included in the sale is immaterial to the legal sufficiency of Rembrandt's claims and does not warrant dismissal.

## IV.  RES JUDICATA DOES NOT BAR REMBRANDT'S CLAIMS

The Bankruptcy Court's "exclusion" of Rembrandt's IP precludes Defendants from invoking res judicata for claims it never adjudicated.

### A.  No Final Judgment on IP Ownership

The Bankruptcy Court's Sale Approval Order explicitly excluded "Rembrandt Intellectual Property" from the assets transferred in the sale (Ex. 13, ¶ AA), on paper, preserving Rembrandt's

10

ownership rights and its ability to pursue claims against third parties for post-sale misuse of its IP, as expressly affirmed in the Sale Approval Opinion (Ex. 15, p. 18). Res judicata does not bar Rembrandt's claims because the doctrine applies only to issues actually litigated or integral to the prior proceeding. Critically, the Bankruptcy Court never decided the ownership of Rembrandt's IP, and the Sale Approval Order explicitly carved out such claims from its scope (*id.*).

Rembrandt's claims are premised on the manufacture and demonstration of prototypes using Rembrandt's IP (Compl. ¶ 104) and the marketing of Ultra-D technology to investors as a licensable platform (Ex. 5). These actions were neither litigated nor resolved in the bankruptcy proceedings. The Trustee's attempt to conflate Rembrandt's objections to the sale with its IP and contract claims ignores both the Bankruptcy Court's explicit preservation of Rembrandt's rights and the foundational principle that res judicata cannot bar. The doctrine is designed to prevent re-litigation of the same controversy, not to immunize defendants from liability for wrongs not litigated. Here, Rembrandt's claims are rooted in Defendants' exploitation of excluded IP, which the Bankruptcy Court never authorized or addressed. Dismissal on res judicata grounds is therefore unwarranted.

### B. Fraudulent Conduct Exception

The Complaint alleges that Defendants knowingly transferred and sold Rembrandt's intellectual property (IP) in violation of the Settlement Agreement and explicit exclusion clauses in the Asset Purchase Agreement (APA) (Ex. 9, §2.2), which barred the transfer of "Rembrandt Intellectual Property" without authorization. This deliberate misconduct constitutes fraud that vitiates the application of res judicata. Courts consistently hold that fraudulent conduct—such as selling assets a party knows it does not own—renders prior judgments inapplicable to subsequent claims arising from that fraud. *Lazarus v. Chevron USA, Inc.*, 958 F.3d 236 (3d Cir. 2020*)* (fraud vitiates res judicata in this Circuit). Here, Defendants' intentional inclusion of Rembrandt's IP in

11

prototypes and the sale, despite clear contractual and court-ordered prohibitions, undermines the integrity of the bankruptcy process and precludes res judicata's preclusive effect. The fraud exception exists precisely to prevent defendants from shielding themselves from liability by exploiting prior proceedings tainted by their own bad faith. Because Rembrandt's claims are rooted in Defendants' fraudulent use of excluded IP, dismissal on res judicata grounds is improper.

## V.   JUDICIAL IMMUNITY DOES NOT SHIELD INTENTIONAL TORTS

### A.   Unauthorized Sale of Excluded Assets

Judicial immunity shields trustees only for acts taken "pursuant to court orders," as reaffirmed by the Third Circuit in *Phoenician Med. Villa, LLC v. Swope*, 872 F.3d 138, 142 n.3 (3d Cir. 2017). Here, the Trustee's inclusion of Rembrandt's intellectual property (IP) in the sale directly violated the Asset Purchase Agreement's (APA) explicit exclusion of "Rembrandt Intellectual Property" (Ex. 9, §2.2) and the Bankruptcy Court's Sale Approval Order (Ex. 13, ¶AA). By marketing and transferring assets he knew or should have known were excluded, the Trustee acted outside the scope of his court-authorized duties, rendering his conduct ultra vires and stripping him of immunity. Courts consistently deny immunity for actions that contravene explicit court orders or statutory mandates. *In re MBMK Prop. Holdings*, 2024 WL 3167232, at 21 (Bankr. E.D. Pa. 2024) (trustee's unauthorized sale of non-estate property nullifies immunity). Immunity cannot apply to the Defendants' sale of excluded assets (ultra vires) because the Bankruptcy Court never authorized such.

### B.   Intentional Torts

Judicial immunity does not extend to intentional torts such as willful patent infringement or trade secret misappropriation. The Third Circuit in *In re Truong*, 763 F. App'x at 154, held that trustees may be held liable for "willful and malicious" conduct that exceeds their statutory authority. Here, the Trustee's deliberate use of Rembrandt's IP in post-petition manufacturing

12

(Compl. ¶104) and marketing (Ex. 5) constitutes intentional misconduct, including direct infringement of Rembrandt's patents and misappropriation of trade secrets. These acts, which were neither authorized by the Bankruptcy Court nor incidental to the Trustee's liquidation duties, fall outside the scope of immunity. Trustees cannot claim protection for actions that amount to bad-faith exploitation of third-party property. *Id*. at 154 (immunity inapplicable to "collateral" or "unauthorized" acts).

The Trustee's ultra vires sale of excluded assets and intentional torts are not shielded by judicial immunity, warranting denial of dismissal.

## VI. THE COMPLAINT STATES PLAUSIBLE CLAIMS

### A. Patent Infringement

The Complaint plausibly alleges direct patent infringement under 35 U.S.C. § 271(a), identifying the '830, '390, and '114 patents with specificity, including exemplary claims such as Claim 1 of the '830 Patent (Compl. ¶¶154–170, 172–187, 188–200). It further details the accused products—Ultra-D monitors and prototypes—that allegedly infringe these patents through their use of Rembrandt's proprietary 3D rendering technology. Critically, the Complaint alleges direct infringement by Defendants' post-petition manufacturing and marketing of these products, including prototypes produced after the bankruptcy sale (Compl. ¶¶167–199). These allegations, which identify the patents, claims, accused devices, and infringing acts, satisfy the pleading standards of *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), by providing "enough facts to state a claim to relief that is plausible on its face."

### B. Trade Secret Misappropriation

Rembrandt's trade secret claims under the Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836, are pled with the requisite specificity. The Complaint describes Rembrandt's protected secrets, including the Borders algorithm (which corrects 3D "window violation" artifacts) and

Liveliness adjustment technology (which enhances image depth), with technical precision (Compl. ¶¶139–152). These secrets derive independent economic value from being confidential and were subject to reasonable safeguards, including encryption and access controls (Compl. ¶¶133–138). Defendants' use of these secrets in marketing materials, such as the "363 Sale Teaser" (Ex. 5), which advertised Ultra-D's reliance on Rembrandt's proprietary technology, constitutes misappropriation under 18 U.S.C. § 1839(5). The Trustee's transfer of IP to SeeCubic during the proceedings and sale (not post-sale) violated the Settlement Agreement (Ex. 1, ¶4.1; Compl. ¶216). The Complaint thus plausibly alleges that Defendants acquired and used trade secrets through improper means, satisfying DTSA's pleading requirements.

### C. Breach of Contract

The Trustee's transfer of Rembrandt's licensed IP to SeeCubic violated the non-assignability clause of the parties' Settlement Agreement (Ex. 1, ¶4.1), which expressly prohibited Stream or its affiliates from assigning Rembrandt's IP without consent. By structuring the sale to include Rembrandt's technology and permitting SeeCubic to exploit it post-sale, the Trustee breached this contractual obligation (Compl. ¶216). The Agreement's clear terms, combined with the Trustee's unauthorized actions, establish a prima facie breach of contract claim. *See Murtha v. QDRO Benefits, LLC*, 2016 WL 1071107, at 4 (E.D. Pa. 2016) (breach requires existence of contract, breach, and damages). Rembrandt's allegations, including the Agreement's terms and the Trustee's disregard for them, suffice to survive dismissal.

The Complaint's detailed allegations for patent infringement, trade secret misappropriation, and breach of contract meet federal and state pleading standards, warranting denial of Defendants' motion.

14

## VII. CONCLUSION

Defendants' motion fails because (1) the Trustee's business operations during bankruptcy invoke section 959(a); (2) res judicata does not bar claims over excluded IP; (3) immunity cannot shield intentional torts; and (4) the Complaint meets all pleading standards. Discovery is essential to resolve factual disputes.

Dated: April 18, 2025

Respectfully submitted by:

*/s/ Andrew DeMarco*
Andrew DeMarco (PA Bar No. 326294)
ademarco@devlinlawfirm.com
Neil Benchell (*pro hac vice*)
nbenchell@devlinlawfirm.com
DEVLIN LAW FIRM LLC
1526 Gilpin Avenue
Wilmington, DE 19806
Tel: (302) 449-9010

*Attorneys for Plaintiff
Rembrandt 3D Holding Ltd.*

## CERTIFICATE OF SERVICE

I hereby certify that on April 18, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Andrew DeMarco*
Andrew DeMarco (PA Bar No. 326294)